Exhibit 1

Basil P. Fthenakis, Esq. (88399)
CRITERION LAW
2225 E. Bayshore Road, Suite 200
Palo Alto, California  94303
Tel. (650) 352-8400
Fax. (650) 352-8408

Of counsel:

David S. Godkin (admitted *pro hac vice*)
Andrew A. Caffrey, III (admitted *pro hac vice*)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA 02210
(617) 307-6100
godkin@birnbaumgodkin.com
caffrey@birnbaumgodkin.com

Attorneys for Plaintiff,
SIX4THREE, LLC, a Delaware
limited liability company

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| SIX4THREE, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> FACEBOOK, INC., a Delaware corporation and DOES 1 through 50, inclusive <br><br> Defendants. | Case No. CIV 533328 <br><br> SECOND AMENDED COMPLAINT OF PLAINTIFF, SIX4THREE, LLC, FOR INJUNCTION AND DAMAGES FOR: <br> 1. VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200 ET SEQ.; <br> 2. PROMISSORY ESTOPPEL; <br> 3. NEGLIGENT MISREPRESENTATION; <br> 4. INTENTIONAL INTERFERENCE WITH CONTRACT; AND <br> 5. INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS. |

Plaintiff, Six4Three, LLC, alleges as follows:

1.    This matter concerns Defendant Facebook, Inc.'s campaign of promises,

enticements, and representations to third-party software developers ("Developers") such as

1

1  Plaintiff Six4Three, LLC ("643"), to develop applications for Facebook, based on Facebook's

2  representations that Developers would have a level playing field, fair competition, and an

3  opportunity to grow their business. Facebook's campaign was part of a calculated strategy to

4  drive Facebook's own growth by leveraging the hard work of Developers. But once Facebook

5  decided it would prefer to no longer compete with Developers, it abruptly reversed course, and

6  broke its promise of fair competition in Facebook's platform. Facebook's conduct here is a classic

7  "bait and switch" tactic that is barred by California law, as detailed below.

8  **PARTIES**

9      2.    Plaintiff 643 is a Delaware Limited Liability Corporation with a principal place of

10  business at 535 Mission Street, 14th Floor, San Francisco, California.

11      3.    On information and belief, Defendant Facebook, Inc., is a Delaware Corporation

12  with a principal place of business of One Hacker Way, Menlo Park, California.

13      4.    Plaintiff is ignorant of the true names and capacities of the Defendants sued herein

14  as Does 1 through 50, inclusive, and each of them, and therefore sues said Defendants by such

15  fictitious names. Plaintiff will amend this complaint when the true names and capacities of said

16  Defendants have been ascertained. Plaintiff is informed and believes and thereon alleges, that

17  Defendants Does 1 through 50, inclusive, and each of them, are legally responsible in some

18  manner for the events and happenings referred to herein and proximately caused or contributed to

19  the injuries to Plaintiff as hereinafter alleged. Wherever in this complaint any Defendant is the

20  subject of any charging allegation by Plaintiff, it shall be deemed that said Defendants Does 1

21  through 50, inclusive, and each of them, are likewise the subjects of said charging allegation.

22      5.    Plaintiff is informed and believes, and thereon alleges, that at all times herein

23  mentioned, each of the Defendants was the agent and employee of each of the remaining

24  Defendants and, in doing the things herein alleged, was acting within the course and scope of said

25  agency and employment.

26  **FACTS**

27      6.    643 is an image pattern recognition startup company.

28

2

Case No. CIV 533328    Plaintiff's Second Amended Complaint for Injunction and Damages

7.      Facebook operates a social networking service that enables users to connect and share information with their friends and family.

8.      Facebook refers to the network of relationships between its users as the "Graph" or the "Social Graph."

9.      The Facebook Developer Platform (also called "Facebook Platform") enables Developers to make their applications and other services available to Facebook users.

## I.   LAUNCH OF FACEBOOK PLATFORM IN 2007

10.     At 3PM PDT on May 24, 2007, Mark Zuckerberg, Facebook Founder and CEO, made a self-described revolutionary announcement to a crowded room of software developers in San Francisco. Zuckerberg announced the launch of Facebook Platform, which he had described weeks earlier in an interview with Fortune magazine as "the most powerful distribution mechanism that's been created in a generation."[1] He went on in the Fortune interview to describe the motivation for creating Facebook Platform in this way: "We want to make Facebook into something of an operating system so you can run full applications," specifying that this development was the internet-equivalent to what Microsoft did with Windows, which allowed other developers to build applications for PCs. (See http://archive.fortune.com/2007/05/24/technology/facebook.fortune/index.htm.)

11.     In fact, Zuckerberg's first demonstration of Facebook Platform was purportedly to Bill Gates in early May 2007. Microsoft and Facebook had reached an agreement for Microsoft to purchase banner ads on Facebook in which Microsoft had guaranteed Facebook a minimum of $100 million per year through 2011. Facebook Platform was positioned by Facebook to Microsoft as the driving force behind meeting Facebook's ambitious growth metrics. At the time of this announcement, Facebook had just exceeded 20 million active users and had raised only $37.7 million in venture capital investment. Even at this modest point in Facebook's growth, its photo sharing application was the largest photo application on the Internet, and according to Facebook's

---

[1] In the quoted text here and elsewhere in the Second Amended Complaint, representations by Facebook or its employees have been underlined for emphasis.

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

1  own internal statistics, drew more than twice the traffic of the next three photo sites combined at

2  the time of the May 24, 2007 announcement of Facebook Platform.

3     12.     Zuckerberg announced that the three key elements of Facebook Platform were

4  "deep integration, mass distribution, and new opportunity. " These were three key themes he

5  would repeat throughout the day and for years to come in numerous public conversations and

6  presentations. (See https://gigaom.com/2007/05/24/live-at-the-facebook-launch/.)

7     13.     Thus, Zuckerberg made three distinct promises: (1) promise of deep integration

8  with Facebook's social graph; (2) promise of Facebook's support in achieving mass distribution

9  of developer applications; and (3) promise of an opportunity to build a business on Facebook.

10    14.     By 8PM that evening, these key elements were memorialized on Facebook's

11  website with the official announcement "Facebook Platform Launches", stating "You can now

12  build applications that have the same access to integration into the social graph as Facebook

13  applications, such as photos, notes, and events…. The power of mass distribution is now in your

14  hands. You can gain distribution for your applications through the social graph like never before.

15  Applications can be virally engineered to reach millions of Facebook users quickly and efficiently

16  through the profile, news feed, and mini-feed…. With access to deep integration into the site, and

17  mass distribution through the social graph comes a new opportunity for you to build a business

18  with your application. You are free to monetize your canvas pages through advertising or other

19  transactions that you control." (See Facebook Platform Launches,

20  http://web.archive.org/web/20070706002021/http://developers.facebook.com/news.php?blog=1&

21  story=21).

22    15.     Facebook's announcement thus promised that (1) developers have "same access to

23  integration" for applications such as photos and notes as Facebook employees; (2) developers are

24  able to distribute applications through Facebook Platform; and (3) developers are able to

25  monetize applications through Facebook Platform.

26    16.     Zuckerberg went on to say: "The social graph is our base, and we've built a

27  framework that is completely optimized for developing social applications within our

28  environment…. We believe that there is more value for everyone in letting other people develop

4

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

1  applications on top of the base we've built than we could ever possibly provide on our own....

2  This is good for us because if developers build great applications then they're providing a service

3  to our users and strengthening the social graph.... This is a big opportunity. We provide the

4  integration and distribution and developers provide the applications. We help users share more

5  information and together we benefit."

6         17.    Zuckerberg thus promised that Facebook is committed long term to serving as a

7  platform that lets developers build applications on a level playing field because it is a big

8  opportunity for everyone.

9         18.    Zuckerberg then announced that Facebook had been working with over 70

10  developers in anticipation of the launch of Facebook Platform, including Amazon, Forbes, iLike,

11  Lending Club, Microsoft, Obama for America, Photobucket, Red Bull, Twitter, Uber, Virgin

12  Mobile USA, Warner Bros, Washington Post, and many others. (See live blog of F8 event from

13  leading Internet blogger, Mashable, at http://mashable.com/2007/05/24/facebook-f8-

14  live/#CIfbgFfPV5q0.)

15         19.    Around 4PM during Zuckerberg's presentation, he announced 5 case studies from

16  these early developer partners aimed at showing how easy it was for all developers to integrate

17  with Facebook Platform. Zuckerberg distributed case studies from Red Bull, Box.net, Lending

18  Club, Microsoft and Slide.com. Zuckerberg continued to emphasize during this public, annual

19  keynote to Developers that Facebook Platform is the single biggest and most revolutionary

20  change to Facebook since its inception, stating: "Every once in a while a platform comes along

21  that allows people to build a completely new application—sometimes even starts new industries."

22  (See https://gigaom.com/2007/05/24/live-at-the-facebook-launch/.)

23         20.    GigaOm, a leading Internet blogger, live blogged the event and further quoted

24  Zuckerberg as saying: "With photo-sharing, he explained, 'it's not just the photos that spread, it's

25  the whole photos application'. Third-party applications won't be treated like second-class citizens

26  on Facebook, he says; users can add them to their profiles and drag them and drop them to their

27  content. Applications can use Flash, JavaScript, and Silverlight if a user approves them. Outside

28  applications can issue unlimited notifications to users, and fit into the Facebook environment by

5

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

1   accessing a 'friend selector' that spits out each users' connections. Now Zuckerberg says you can

2   serve ads on your app pages and keep all the revenue, sell them yourselves or use a network, and

3   process transactions within the site, keeping all the revenue without diverting users off

4   Facebook." (See https://gigaom.com/2007/05/24/live-at-the-facebook-launch/.)

5        21.    Zuckerberg thus promised that (1) developer applications won't be "second class

6   citizens"; (2) developer applications can access a user's connections and related user data made

7   available in the social graph; and (3) developer applications can sell ads through the Facebook

8   Platform.

9        22.    This grandiose language from Zuckerberg obviously sparked substantial questions

10  from the developer community so by 4:20PM pacific (1 hour and 20 minutes after the keynote

11  had started), Facebook had released the official "Facebook Platform FAQ", which was being

12  circulated among bloggers to educate developers further on this announcement. (See Exhibit 1,

13  Facebook F8 and Platform FAQ.) The Facebook Platform FAQ states, among other things:

14      **What is Facebook Platform?** Facebook Platform is a development system that enables

15      companies and developers to build applications for the Facebook website, where all of

16      Facebook's 24 million active users can interact with them. <u>Facebook Platform offers deep</u>

17      <u>integration in the Facebook website, distribution through the social graph and an</u>

18      <u>opportunity to build a business.</u>

19      * * *

20      **What's new in Facebook Platform?** We've been adding functionality since Facebook

21      Platform first shipped in beta in August 2006. <u>With the latest evolution of Facebook</u>

22      <u>Platform however, third-party developers can now create applications on the Facebook</u>

23      <u>site with the same level of integration as applications built by internal Facebook</u>

24      <u>developers. Now developers everywhere have the ability to create Facebook applications</u>

25      <u>that deeply integrate into the Facebook site, as well as the potential for mass distribution</u>

26      <u>through the social graph and new business opportunities.</u>

27      **Why did Facebook launch Facebook Platform?** Our engineers have created great

28      applications for Facebook, but we recognized that third-party developers can help us make

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

Facebook an even more powerful social utility. Facebook Platform gives developers everywhere the tools to create applications that we just wouldn't have the resources to build in-house, and those applications make Facebook an even better way for our users to exchange information. Developers also benefit from the Facebook Platform as it gives them the potential to broadly distribute their applications and even build new business opportunities.

**What kinds of applications can be built on Facebook Platform?** The kinds of applications developers can build on Facebook Platform are limited only by their imaginations. Because applications are based on the Facebook social graph they can be more relevant to users, keeping people in touch with what and whom they care about. We've already seen a variety of applications built by our developer partners, including those for sharing media files, book reviews, slideshows and more. Some of the possibilities of Facebook applications are illustrated in the Facebook Platform Application Directory, available at http://facebook.com/apps.

**Are there any restrictions on what developers can build?** Developers are encouraged to exercise their creativity when building applications. Of course, all applications are subject to the Terms of Service that every developer agrees to, which include basic requirements such as not storing any sensitive user information, not creating any offensive or illegal applications, and not building anything that phishes or spams users. And users will always have the power to report any applications that compromise Facebook's trusted environment, keeping our users' information safe.

\* \* \*

**How will Facebook deal with applications that compete with one another or even compete with Facebook-built applications?** We welcome developers with competing applications, including developers whose applications might compete with Facebook-built applications. Many applications are likely to offer similar features. We've designed Facebook Platform so that applications from third-party developers are on a level playing field with applications built by Facebook. Ultimately, our users will decide which

7

applications they find most useful, and it is these applications that will become the most popular.

* * *

**Can Facebook applications include ads?** We want to enable developers to build a business on their Facebook applications, so we're giving developers the freedom to monetize their applications as they like. Developers can include advertising on their applications' canvas pages , though no advertising will be allowed within the application boxes that appear within user profiles.

**Are you going to share revenue with developers?** While revenue sharing is not available at launch, we are looking into ways to share advertising revenue with developers. The version of Facebook Platform already lets developers monetize their applications as they like, whether they choose to offer it for free or to build a business on their application.

23.    In sum, these representations by Facebook reflected the following promises to Developers:

    a.    Developers would have "deep integration";

    b.    Developers would have access to the "social graph";

    c.    Developers would have "an opportunity to build a business."

    d.    Developers would have the same level of integration and ability to develop apps in the same manner as internal Facebook employees;

    e.    Facebook will provide adequate tools necessary for Developers to build their applications;

    f.    Facebook will help Developers achieve broad distribution of their applications;

    g.    so long as applications abide by Terms of Service (e.g. are not offensive or unlawful), Facebook will be neutral as to the applications built on its operating system;

Case No. CIV 533328        Plaintiff's Second Amended Complaint for Injunction and Damages

    h.  any application that does not violate Terms of Service, phish or spam users, contain offensive material, or break the law shall be accepted in Facebook Platform;

    i.  competing applications are welcome on Facebook's operating system;

    j.  Facebook will remain neutral among competing applications;

    k.  Facebook will remain neutral among its own applications and those of developers regardless of whether they compete or not;

    l.  applications similar in purpose and content will be allowed to compete on a "level playing field"

    m.  "level playing field" constitutes a definition of fairness in market competition, and that definition of fairness means that ultimately users will decide which applications win the market, not Facebook or other third parties;

    n.  implicit in this definition of fairness based on user decision is the necessary consequence that Facebook shall take no actions to promote its own applications or preferred applications from companies that have a special relationship with Facebook in order to slant this playing field in a manner that makes it less likely for users ultimately to decide the winner;

    o.  Facebook will enable Developers to build businesses on their operating system by directly monetizing their applications on Facebook;

    p.  Developers will be able to sell ads on their application pages; and

    q.  Developers will have a choice as to whether they monetize their application on Facebook's operating system.

## II. DEVELOPERS RESPONDED ENTHUSIASTICALLY TO THE LAUNCH OF FACEBOOK PLATFORM, JUST AS FACEBOOK INTENDED

    24.    The blogging community went into an immediate and prolonged frenzy over this announcement. Paul B. Allen, founder of Ancestry.com and well known Internet blogger, summed up the general sentiment expressed by countless bloggers when he wrote that same day, "I saw history in the making today...I was lucky enough to be in San Francisco for the Facebook

9

f8 Platform launch event. This announcement was at least an 8.0 on the Richter scale. It was a whopper.... A huge new opportunity was presented to the few hundred people in the room, including 65 companies that have spent the last few weeks developing applications for the launch of Facebook Platform. Facebook is inviting anyone to develop applications for their users on top of what Mark calls their "social graph" – the core of their service which basically keeps track of real people and their real connections to each other....[Facebook's] growth will be dramatically accelerated by the Platform announcement. If Facebook is adding 100,000 new users per day with its own few simple applications (like its photo sharing, a very simple service that has given Facebook twice as many photos as all other photo sharing sites combined), what will happen when thousands or tens of thousands of developers start building apps in Facebook and marketing them to more users? Facebook will reach 50 million, then 100 million, then 200 million users, and beyond. Rather than continue to try to develop features within its own proprietary, closed network, basically keeping all of its users to itself...Facebook intuitively gets the concepts that are so brilliantly discussed in Wikinomics (which are so non-intuitive to old schools business types), and has chosen to open up its network for all to participate in...Application developers can now have access to core Facebook features, such as user profiles and user connections, and even publishing to the News Feed, all with the control and permission of Facebook users...When Facebook has 100 million users, in the not too distant future, having the ability to develop an App in their system will almost be like being able to get a link on Google's own home page." (See http://www.paulallen.net/prediction-facebook-will-be-the-largest-social-network-in-the-world/.)

25.    To Developers, Facebook Platform represented not just an entire new operating system, but an ecosystem that could potentially reorganize the entire Internet (potentially replacing Google). The sentiment amongst Developers, as widely held throughout the industry and reported by popular sites like TechCrunch (http://techcrunch.com/2007/05/24/facebook-launches-facebook-platform-they-are-the-anti-myspace/) and the Wall Street Journal (http://www.wsj.com/public/article/SB117971397890009177-wjdKPmjAqS_9ZZbwiRp_CoSqvwQ_20070620.html), was that if you aren't building for Facebook, you will be left behind.

10

26.     Facebook and the Developers who were selected to participate in the private beta of Facebook Platform quickly set out to make Developers comfortable with this grandiose vision and create a level of comfort to induce them to participate in this entirely new industry. For instance, on May 29, 2007, just five days after Zuckerberg's announcement of Facebook Platform, Venture Beat, the popular tech blog, did a Q&A with iLike founder, Ali Partovi, who was also an early advisor and shareholder of Facebook. iLike was the first successful application on Facebook Platform and for quite some time was the largest music application on the Facebook Platform. iLike was purchased by MySpace in 2009.

Tell me about your experiences with Platform so far. You've been working on putting iLike on Facebook for several months now. Yet on the integration since Friday morning, there have been bugs and other issues on iLike's end. What's the status?

Partovi: So, first to give you the back-story on how we got involved. Over the past several months, we've pushed and pushed with Facebook asking for some sort of exclusive relationship. They repeatedly said they won't do an exclusive relationship but would rather create a level playing field where we could compete with other third parties. We then gave up a bit, and we were actually a bit late to the game learning about the platform in detail. But when we finally did get access, our President, Hadi Partovi (my twin brother) took very little time to decide this was a huge strategic priority. That was a month ago. We re-prioritized everything else, and started moving our people off other projects onto this. First two or three people, then a few more, and by the end it was a huge group of engineers pulling back-to-back all-nighters for a week-long sprint to the launch.

What made iLike think that Facebook Platform would be a big deal? What stood out about it?

Hadi has a strong background in the concept of platforms...at 24 he became the head of product management in the IE group at Microsoft, and was a key player in the browser wars. A month ago, even though the Facebook Platform wasn't fully fleshed out, he saw just from the early beginnings of it that this could redefine web development. What he said was, 'in the history of computing, there was the personal computer, there was

11

Case No. CIV 533328        Plaintiff's Second Amended Complaint for Injunction and Damages

Windows, there was the web, and now the Facebook Platform'. You can imagine that I and most our company was pretty skeptical. But he makes these calls so we followed him. As to what stood out, it's a combination of three things: (1) the technology itself – Facebook Platform, like any platform, offers the developer building blocks to build apps faster than they could if they were starting from scratch, and to tap into a rich source of data & capabilities that would never otherwise be available; (2) the potential for viral spread – due to the way the Facebook news feed works, an app can spread across the community entirely by viral spread, as friends get notified when one person adopts it…this essentially bypasses the idea of trying to make your app 'viral' as a standalone, because Facebook is itself naturally viral; (3) the rhetoric from the Facebook management team, starting from the CEO himself, made it clear that they have a long-term commitment to a level playing field. For example, they absolutely refused to give us any special advantage, insisting that the market needs to see a level playing field…we offered them ownership in our company, money, etc – but they had no interest. Furthermore, they built and launched their own 'video' app, but left it to 'compete' on its own merits alongside other third-party apps rather than making it 'pre-installed' for all Facebook users. So #1 and #2 made this something we had to jump on, and #3 made us comfortable with the long-term strategic implications . (See http://venturebeat.com/2007/05/29/qa-with-ilikes-ali-partovi-on-facebook/.)

27.     Partovi's comments immediately following Zuckerberg's announcement serve both to reflect the general sentiment held by Developers -- that Facebook had made clear its long term commitment to a level playing field for Developers – and to show how Facebook's allies (Partovi was an early advisor and shareholder after all), were committed to helping Facebook grow its new operating system quickly and induce developers to participate with large investments of capital. After all, iLike saw massive growth in the two years following its decision to build on the Facebook Platform and was ultimately acquired by MySpace in 2009 in large part due to that growth.

### III. **FACEBOOK CONTINUED TO ACTIVELY PROMOTE FACEBOOK PLATFORM TO DEVELOPERS**

28.     Three days after Partovi's Q&A with Venture Beat, on June 1, 2007 Facebook released its own statement further clarifying its intentions with Facebook Platform, entitled "Platform is Here".

> "Last Friday, we promised more information, so here it is…. With this evolution of Facebook Platform, we've made it so that any developer can build the same applications that we can. And by that, we mean that they can integrate their application into Facebook—into the social graph—the same way that our applications like Photos and Notes are integrated. " (See https://www.facebook.com/notes/facebook/platform-is-here/2437282130/)

29.     Thus Facebook promised that developers will be able to build applications in the same way that Facebook can by accessing the social graph.

30.     As recently as February 23, 2016, this representation remained available on Facebook's web page.

31.     Throughout the summer of 2007 Facebook remained on the offensive about its long-term commitment to developers on Facebook Platform. Facebook held numerous Hackathons and Developer Meetups in various cities to introduce new developers to Facebook Platform, it launched a Developer Feed and Wiki on its website to educate the Developer community on the benefits of Facebook Platform and help them more seamlessly invest their capital and resources towards building applications on the Facebook Platform. Facebook also held contests with prizes for developers. Zuckerberg continued to emphasize the revolutionary impact Facebook Platform would have on the Internet as a whole during this time. For instance, on July 17, 2007, Zuckerberg was interviewed by Time Magazine:

> **Time**: the frenzy surrounding Facebook seems to have intensified quite dramatically over the past several months. What do you think is behind the company's newfound cachet?
>
> **Zuckerberg**: I think the most recent surge, at least in the press, is around the launch of Facebook Platform. For the first time we're allowing developers who don't work at

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

1   Facebook to develop applications just as if they were. That's a big deal because it means

2   that all developers have a new way of doing business if they choose to take advantage of

3   it. There are whole companies that are forming whose only product is a Facebook

4   Platform application. That provides an opportunity for them, it provides an opportunity for

5   people who want to make money by investing in those companies, and I think that's

6   something that's pretty exciting to the business community. " (See

7   http://content.time.com/time/business/article/0,8599,1644040,00.html)

8       32.     In these public statements to Time Magazine, Zuckerberg made at least four

9   distinct promises: (1) Facebook would allow developers to build applications as if they were

10  developers employed by Facebook; (2) Facebook would offer developers on Facebook Platform a

11  new way of doing business; (3) Facebook would support an ecosystem where entire companies

12  could be formed whose sole business activity was within the Facebook Platform ecosystem; (4)

13  Facebook would support an ecosystem where investors could reasonably rely on Facebook to

14  make money by investing in companies solely devoted to the Facebook Platform ecosystem.

15      33.     Then on September 17, 2007, Facebook went even further by setting up a $10

16  million fund exclusively devoted to providing grants to developers to build on Facebook

17  Platform. Facebook and its partners in the fund would not even take equity in the developer; they

18  were offering free money to build applications on Facebook Platform with the only commitments

19  being that the grantee use the money to build on Facebook Platform and that Facebook's partners

20  would have the opportunity to invest first if they were interested in doing so. When asked why

21  Facebook was forming this fund, it replied: "We are forming this fund to help grow the Facebook

22  application ecosystem. By decreasing the barrier to start a company, we hope to entice an even

23  larger group of people to become entrepreneurs and build a compelling business on Facebook

24  Platform. We hope this is also a funding model that other venture capitalists will follow. " (See

25  http://500hats.typepad.com/500blogs/2007/09/facebook-announ.html.)

26      34.     Facebook's conduct in providing free money to developers to build applications on

27  Facebook Platform implies a specific promise that it will support developers' opportunity to

28  "build a compelling business on Facebook Platform" and that it is committed long term to the

14

1  stability of Facebook platform as an ecosystem that can support substantial investment and where

2  investors who participate in that ecosystem can expect a level playing field upon which to

3  generate a return on that investment.

4          35.     Indeed, others were quick to follow Facebook's lead in making investors

5  comfortable with supporting this new industry with large sums of capital. Numerous venture

6  capital firms or funds were soon after established that invested solely in Facebook applications. In

7  September 2007, Wired Magazine reported the following: "And by turning itself into a platform

8  for new applications, Facebook has launched a whole new branch of the software development

9  industry, just like Bill Gates did with MS-DOS in the 1980s. By allowing developers to charge

10  for their wares or collect the advertising revenue they generate, Zuckerberg set up a system for

11  every programmer to get paid for their efforts. Now venture capitalists like Bay Partners are

12  scrambling to fund almost anyone who has an idea for a Facebook application." (See

13  https://archive.wired.com/techbiz/startups/news/2007/09/ff_facebook?currentPage=all.)

14          36.     As a result of Facebook and its partners tremendous efforts in inducing Developers

15  to build applications on Facebook Platform and promising them the opportunity to build entire

16  industries, new sectors of investment and new types of applications, Facebook Platform quickly

17  became, in the words of AdWeek, "the most viral software distribution system ever". The overall

18  traffic to Facebook increased by one third within a mere three weeks of the announcement. By

19  December, the Facebook user base had gone from 24 million at the time of the announcement to

20  58 million, a 141% increase. Where Facebook had been adding about 100,000 new users per day

21  prior to Facebook Platform, it was now adding more than 250,000 users per day. (See

22  http://www.adweek.com/socialtimes/top-10-facebook-stories-of-2007/211540.)

23          37.     While it touted Facebook Platform to Developers around the world, Facebook did

24  not state or imply that access to Facebook Platform might later be rescinded or provided on an

25  unequal basis.

26          38.     By the end of 2009, in large part due to the Facebook Platform's success in

27  inducing developers to make investments in this new ecosystem, Facebook's user growth had

28

15

1  skyrocketed from 24 million active users at the time of the announcement of Facebook Platform

2  in May 2007 to over 350 million users in December 2009.

3        39.    In late 2009, Facebook released a document "A Look Back on the App Economy

4  of Facebook in 2009," in which it cited numerous success stories. For instance, Facebook app

5  Playfish was acquired by Electronic Arts that year for no less than $275 million. Watercooler, a

6  leading fantasy sports application on the Facebook Platform, successfully raised $5.5 million to

7  fuel its growth. Weardrobe was acquired by Like.com for an undisclosed sum. The document,

8  published by the Director of the Facebook Developer Network, ended: "We'd like to say thank

9  you to the developers and entrepreneurs who make up the Facebook Platform ecosystem and

10  congratulations on your accomplishments in 2009." (See

11  http://web.archive.org/web/20091223055629/http://developers.facebook.com/news.php?blog=1&

12  story=351.)

13  **IV. <u>FACEBOOK LAUNCHED GRAPH API IN 2010</u>**

14        40.    On or about April 21, 2010, Facebook announced the launch of Graph Application

15  Programming Interface ("Graph API") as a key new component of Facebook Platform at its

16  developer conference. Graph API allows Developers, with the consent of a Facebook user, to read

17  data from and write data to Facebook.

18        41.    Developers can only access Facebook content (referred to as "endpoints") with

19  explicit permission from the user. Examples of endpoints include a user's birthdate, favorite

20  athletes, or photos.

21        42.    Graph API also permits access to endpoints regarding a user's friends. One such

22  endpoint is the set of photos that a user's friends had chosen to share with that user (the "Friends'

23  Photos Endpoint"). A user's friends can control access to their photos and other endpoints by

24  Developers even if they are not users of the Developer's application.

25        43.    By granting Developers access to the Friends' Photos Endpoint, Facebook allowed

26  Developers to build applications that enabled a Facebook user to search the user's friends' photos

27  via a Facebook Platform application, assuming the user's friend explicitly provided such

28  permission. A user's friend had complete control over the permission settings. For instance, the

16

1    user's friend could provide access to all or no developers or to specific developers but not others,

2    as the user's friend saw fit.

3        44.    During the announcement of Graph API, Facebook touted several features of

4    Graph API in order to increase its appeal to Developers such as 643.

5        45.    Specifically, at the F8 Conference 2010, Zuckerberg announced: "The open graph

6    puts people at the center of the web -- it means that the web can become a set of personally and

7    meaningfully semantic connections between people…Three years ago at our first F8 we launched

8    Facebook Platform, and together we all started an industry…We think what we have to show you

9    today will be the most transformative thing we've ever done for the web…Use the open graph to

10   make it so that people can have instantly social and personalized experiences everywhere they go.

11   We're gonna be announcing a few pieces of new technology that make this possible -- the first is

12   the Graph API – makes it completely simple to read connections to Facebook's map of the

13   graph…implemented on top of an open standard. " (See

14   https://www.youtube.com/watch?v=4SOcRKINiSM.)

15       46.    After Zuckerberg completed his keynote at F8 2010, Bret Taylor, a Facebook

16   employee, further explained what Graph API meant for developers: "With Graph API every

17   object in Facebook has a unique ID, whether that object is a user profile, event, etc…you just

18   need to download an object with a new ID or download a connection with a new name. So to

19   download my friends you just need to download /btaylor /friends… And this applies for every

20   single object in Facebook. So let's say Facebook launches a new feature next year. We're not

21   gonna make you download a new SDK. You just need to download an object with a new ID or

22   download a connection with a new name. All of the code you already wrote will continue to work

23   perfectly. This is a really significant change for our new platform that I'm sure you can

24   appreciate. For the first time via the search capability of the Graph API, we're giving developers

25   the capability to search over all the public updates on Facebook. I think this is gonna lead to a

26   bunch of cool new applications and I'm really excited to see where people go with this…. We've

27   built our core of the Facebook Platform from the ground up with simplicity, stability, and the

28

1  graph in mind. This graph that for the first time we're building together." (See

2  https://www.youtube.com/watch?v=4SOcRKINiSM.)

3       47.    Facebook's employee Bret Taylor thus promised that: (1) developers can access

4  Graph API objects in a simple manner ("you just need to download an object with a new ID"); (2)

5  the accessible objects are ubiquitous ("this applies for every single object in Facebook"); (3) this

6  access will be sustained and can be relied upon by developers ("All of the code you already wrote

7  will continue to work perfectly…We're not gonna make you download a new SDK") (a Software

8  Development Kit (or "SDK") is a set of software development tools that allows for the creation of

9  applications for a particular development platform); (4) developers can search over all objects for

10  all public updates on Facebook; and (5) Facebook Platform guarantees simplicity, stability and

11  your ability to access and help build the graph with us.

12       48.    The software industry uses a common and well-known convention of referring to

13  software by version number (e.g., version 1.0, 2.0, etc.) to signify the existence of separate

14  versions of software and to identify a particular version of the software. When Facebook

15  announced the launch of Graph API, it did not refer to Graph API as having different versions.

16  Facebook thereby signified that Graph API's open, equal, and neutral nature would not change.

17  This representation was of course a deliberate decision on Facebook's part to continue to entice

18  developers by conveying a sense of security around investing time, money and effort building

19  applications on its revolutionary platform.

20       49.    Facebook did not represent that it had reserved the right to terminate any endpoint

21  of Graph API. To the contrary, Facebook repeatedly expressed its long-term commitment to this

22  API.

23       50.    This extension of the Facebook Platform ecosystem to further expand its

24  reorganization potential for the entire Internet contributed even further to Facebook's meteoric

25  rise and induced even more investors and developers to expand the industry Facebook had

26  created. By way of example, on October 21, 2010, Facebook partnered with Kleiner Perkins

27  Caufield & Byers, Zynga and Amazon to launch a $250 million fund to invest in new apps on the

28  Facebook Platform. By September 19, 2011, Facebook Platform had created over 182,000 jobs

18

Case No. CIV 533328       Plaintiff's Second Amended Complaint for Injunction and Damages

1    and $12.19 billion in value to the U.S. economy. Facebook now boasted over 850 million users as

2    of late 2011.

3        51.    On September 24, 2011, Facebook further extended its long-term commitment to

4    Facebook Platform by expanding Open Graph to accelerate its reorganization of the disparate

5    content on the Internet. (See http://mashable.com/2012/05/24/facebook-developer-platform-

6    infographic/#fDCxuACag5qr.) In his keynote address at F8 2011 on September 24, 2011,

7    Zuckerberg stated to a packed auditorium of developers: "The next era is defined by the apps and

8    depth of engagement that is now possible now that this whole network has been established... In

9    2007 in our very first F8 I introduced the concept of the social graph, all of the relationships

10   between people in the world. Last year we introduced the concept of the open graph as not only

11   the map of all the relationships but all of the connections in the world.... This year, we're taking

12   the next step: we're going to make it so that you can connect to anything you want in any way

13   you want.... Sometimes I think about what we're doing with the open graph is helping to define a

14   brand new language for how people connect...every year we take the next step and make some

15   new social apps possible. Open graph enables apps that focus primarily on two types of things:

16   the first is filling out your timeline, and the second is helping you discover new things through

17   your friends."

18       52.    Facebook thus made at least four distinct promises in this September 24, 2011

19   announcement: (1) Facebook has a long-term commitment to the Facebook Platform and ensuring

20   a fair playing field for developers and has had such a commitment for over four years now; (2)

21   Facebook is committed to extending the Facebook Platform to provide developers with more

22   ways to innovate and build businesses; (3) in keeping with this long term commitment, Facebook

23   will continue to help make new kinds of social apps possible; and (4) Facebook is in particular

24   focused on helping you discover new things through your friends and Facebook Platform will

25   enable developers seeking to do so.

26       53.    643 relied upon these representations, and others, as to the fair, level playing field

27   and the open, equal, and neutral nature of Facebook's Platform and Graph API, and invested

28

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

considerable time, energy, and money developing an application to make use of Graph API on Facebook's Platform.

## V. THE FTC ORDERED FACEBOOK NOT TO MISREPRESENT THE MANNER IN WHICH FACEBOOK PROVIDES ACCESS TO USER DATA

54.     On or about July 27, 2012, the United States Federal Trade Commission ("FTC") entered a Decision and Order (the "FTC Order") against Facebook.

55.     The FTC Order entered following a consent agreement between FTC and Facebook.

56.     The FTC noted in the FTC Order that the FTC had reason to believe Facebook has violated the Federal Trade Commission Act.

57.     The FTC Order provided, among other things, that Facebook and its representatives "shall not misrepresent in any manner, expressly or by implication, the extent to which it maintains the privacy or security of covered information . . . ."

58.     The FTC Order defined "covered information" to include an individual consumer's photos, among other things.

59.     The FTC Order also provided that Facebook and its representatives "shall not misrepresent in any manner, expressly or by implication . . . the extent to which [Facebook] makes or has made covered information accessible to third parties."

## VI. IN DECEMBER 2012, PLAINTIFF 643 BECAME A FACEBOOK DEVELOPER AND BEGAN DEVELOPING AN APPLICATION

60.     In December 2012, 643 entered into the Facebook Developer Platform, which permitted 643 to develop applications using the Graph API.

61.     643 has developed a unique automated image classification capability, which it used to develop an application called Pikinis ("the App"). The App was available for download on any iOS-compatible device, including the iPhone and iPad. The App enabled Facebook users to reduce time spent searching by automatically classifying photos that their friends have shared with them through Facebook's network, assuming their friends have provided such permission to Developers.

20

62.     The App required use of Facebook's Graph API, and specifically the Friends' Photos Endpoint. The App used 643's pattern-recognition technology to search through shared photos and identify those of their friends at the beach or in the summer.

63.     The App could only be used to sort through photos that a user's friend had chosen to share with that user based on the friend's Facebook privacy settings. 643 conducted initial user research that indicated considerable consumer demand for the App, among both men and women. Facebook has never expressed any disapproval of the App as the only content it accesses is content already available on Facebook.

64.     643 made plans to market and promote the App to attract users.

65.     643 sold the App for $1.99 in Apple's App store. The basic version of the App allowed a user to run a certain number of searches per month. In addition, users could choose to pay for premium access, which allowed unlimited searching. 643 offered different pricing tiers for premium access, ranging from $1.99 for a monthly subscription, to $6.99 for 6 months, to $9.99 for 12 months.

66.     Facebook benefits from the work of Developers such as 643 who create applications for use with Facebook. These applications can enhance user experience and drive traffic to Facebook's website and mobile app, which in turn generates revenue for Facebook through advertising sales, its primary revenue stream. It is no secret that Facebook's meteoric rise from 24 million users in 2007 to almost 1.6 billion users in 2016 rested in significant part on the release and growth of Facebook Platform.

**VII.    FACEBOOK RE-ITERATED ITS PROMISES RELATED TO GRAPH API AND FACEBOOK PLATFORM AT ITS 2014 F8 CONFERENCE**

67.     The extension of the Graph API at F8 2011 was simply the next step in Facebook's long term commitment to serve as a platform for other developers, a commitment that every statement and action it took since May 2007 (a period of well over 4 years) reaffirmed without a shadow of a doubt. The extension of the Facebook Platform continued to accelerate the massive economy Facebook had built. By January 2012, Facebook Platform had created 232,000 jobs in the EU alone, amounting to $15.3 billion of value to the European economy. By February 2012,

21

Case No. CIV 533328          Plaintiff's Second Amended Complaint for Injunction and Damages

1   250 million people were playing games on Facebook Platform each day (that is 12 times more

2   people than the average viewership of American Idol, the highest-rated TV show in the history of

3   television). By April 2012, 7 of the 10 highest grossing apps in the Apple App Store were built on

4   Facebook Platform. (See http://mashable.com/2012/05/24/facebook-developer-platform-

5   infographic/#fDCxuACag5qr.) It should be noted, in large part due to its long-term commitment

6   to the Facebook Platform, Facebook exceeded 1 billion users in 2012.

7        68.     By April 30, 2014, at the 2014 F8, having accumulated over 1.3 billion users,

8   Facebook decided that certain parts of this massive application ecosystem it had built (along with

9   hundreds of thousands of developers and billions of dollars of outside investment capital) were

10  better kept to itself. Despite having made this decision, Facebook made numerous promises that it

11  explicitly never intended to keep. Zuckerberg announced during his keynote: "This is gonna be a

12  different kind of F8. In the past we've had F8 when we've had a big product announcement or

13  new direction we were going in. This always meant a lot of different changes for your apps. Now

14  we're focused on building a stable mobile platform. You're trying to build great mobile apps and

15  businesses. And we want to bring this community together once per year to talk about all the

16  different things were doing to support you. We've heard from you that you want to use Facebook

17  Platform to do 3 things. Help you build, grow and monetize your apps."

18       69.     Thus, Zuckerberg reiterated the promise that Facebook had expressed to

19  developers unequivocally for over seven years now: that Facebook is committed in the long term

20  to helping them build, grow and monetize their apps.

21       70.     Zuckerberg continued: "As I said we're really focused on building a stable mobile

22  platform. And one thing you may not know, is that all of our mobile apps are built on top of the

23  very same platform and APIs that you guys use when you're writing Facebook and all our

24  engineers use the same tools and read all the same documentation that you do.... It's really

25  important for you and for all of our teams internally that we build stable and efficient

26  infrastructure that you can rely on for the long term. So this has been a really big focus for us.... I

27  want to start today by going through a few things we're doing to make our platform even more

28  stable and reliable for you to build, grow and monetize your apps. You want to be able to build

22

1   something and know that it's gonna be able to work for a while. So today for the first time we're

2   introducing a 2-year stability guarantee for all of our core API platforms…so even if we change

3   these core APIs in the future, we're guaranteeing that we're going to keep supporting them as is

4   for at least two years and maybe longer from the time we make that change. We're still gonna

5   experiment with new features and different things but we're gonna mark them as beta so you

6   know what's gonna be part of this core stable platform. We're also introducing API versioning.

7   This is something we want to make sure that all the apps we wrote two years ago keep working.

8   This is something we wanted internally as we build on this platform, so now everything is gonna

9   be versioned so you get to decide which version of the API you get to build against."

10      71.    Accordingly, Zuckerberg made at least four promises that: (1) Facebook continues

11   to provide a level playing field to developers where developers use the same tools as Facebook

12   employees to develop apps; (2) Facebook continues to be committed in providing developer

13   access "that you can rely on for the long term"; (3) Facebook promises that for all of its core API

14   endpoints it will guarantee their stability for no less than two years going forward; (4) Facebook

15   promises that it will let developers choose which version of the API they would like to access as

16   it introduces API versioning ("This is something we want to make sure that all the apps we wrote

17   two years ago keep working. This is something we wanted internally as we build on this platform,

18   so now everything is gonna be versioned *so you get to decide* which version of the API you get to

19   build against.").

20      72.    Many developers initially applauded Zuckerberg's 2-year stability guarantee and

21   the ability to let developers choose which version of the API to build against. One blogger

22   applauded Facebook's commitment to developers in noting: "Facebook co-founder and CEO

23   Mark Zuckerberg announced a two-year stability guarantee for all of the company's core APIs

24   and platforms. In fact every API launched by Facebook will now be versioned, and developers

25   will be able to choose which version to build on." (See

26   http://thenextweb.com/facebook/2014/04/30/facebook-announces-two-year-stability-guarantee-

27   core-apis-sla-fix-major-bugs-within-48-hours/#gref.) TechCrunch and many other bloggers also

28   reported on the API Guarantee, stating that developers "will be able to build with confidence

23

knowing that a core API will be available for at least two years". (See

http://techcrunch.com/2014/04/30/facebook-api-guarantee/.)

**VIII.   FACEBOOK THEN IMPLEMENTED POLICIES THAT DEPARTED RADICALLY FROM ZUCKERBERG'S ANNOUNCEMENT AT F8 2014**

73.   Unfortunately for the Developer community, Zuckerberg's announcement directly contradicted the policy that Facebook immediately began implementing that very day. Zuckerberg's statement that Developers, like Facebook employees, would be able to choose which API to use was simply false, and he must have known this statement to be false at the time he made it as only hours later Facebook sent Developers a notice that the Graph API they had come to rely on and upon which Facebook had enticed them to invest billions of dollars around was to be permanently retired in one year. Zuckerberg explicitly omitted and contradicted the one-year lifespan of Graph API during his keynote address. But given that Zuckerberg's announcement and the notice to developers occurred on the very same day, Zuckerberg must have known of this change while making his statements and approved of such changes in advance.

74.   Moreover, the 2-year stability guarantee turned out not to apply to the original Graph API and only to future APIs. Thus Facebook pulled the rug out from under the Developer community and took full economic advantage of the ecosystem Developers had built, but Zuckerberg's keynote address still generated sound bites consistent with his previous representations that Facebook was maintaining a fair and level playing field for Developers. Zuckerberg was forced to make statements he knew at the time to be false precisely because it was obvious to everyone in the developer community, especially Zuckerberg, that Facebook had for seven years been making clear and unambiguous promises to developers that they could rely on Facebook Platform over the long term to provide a fair playing field and to enable developers to build businesses.

75.   Finally, Graph API explicitly removed endpoints that were of high value to Developers, like the ability to access Photos, which for years Facebook had touted as one of its most valuable and highly trafficked features in order to entice developers to build applications. Facebook's only justification for removing access to photos was that this endpoint was "rarely

used", which contravenes every public statement Facebook had previously stated for over seven years in which Photos were consistently touted as its #1 application and driver of user engagement, an application that captured more photos and traffic than the next three photo sites on the Internet combined.

76.     Facebook's behavior of intentionally inducing Developers to build Facebook's business and then pulling the rug out from under them is a repeated pattern in Facebook's growth story. It is not an isolated incident simply related to Graph API versioning and the thousands of developers, like 643, whose businesses were destroyed by this bait and switch tactic.

77.     As an example, Facebook recently executed another bait and switch tactic that caused thousands of Developers to go out of business and lose countless millions of dollars of enterprise value and capital investment. At the same time that Zuckerberg pulled the rug out from Developers using photos and other endpoints in the Graph API at F8 2014, he also announced Facebook's acquisition and reliance on Parse as its new preferred tool for developers to build on Facebook Platform. Parse was a popular development platform for creating applications for Facebook, which handled much of the back-end functionality of such applications, allowing Developers to focus on features that matter to users. Zuckerberg stated in the same keynote where he announced the Graph API 2.0: "One of the things we're really excited about offering is Parse...We make it easy to focus on your app, the thing that will get you users and make you money...and Parse takes care of all the rest." A Facebook employee who followed Zuckerberg on stage went on to note that they had expanded the free tier to make it easier to grow on Parse, giving developers "unlimited requests, unlimited recipients, free analytics". Zuckerberg then finished his thoughts on Parse by saying "We're excited, we're aligned with your app, and we hope that it does get huge."

78.     As a result of this and many other similar statements and actions by Facebook, hundreds of thousands of Developers began using Parse to build applications on Facebook Platform. Parse's platform on Facebook states: "From startups to the Fortune 500, hundreds of thousands of developers trust us."

Case No. CIV 533328        Plaintiff's Second Amended Complaint for Injunction and Damages

79.     Then, abruptly, on January 28, 2016, Facebook announced that Parse would be shutting down: "We have a difficult announcement to make. Beginning today we're winding down the Parse service, and Parse will be fully retired after a year-long period ending on January 28, 2017. We're proud that we've been able to help so many of you build great mobile apps, but we need to focus our resources elsewhere." The statement continues: "We understand that this won't be an easy transition…We know that many of you have come to rely on Parse, and we are striving to make this transition as straightforward as possible."

80.     Many developers immediately commented on the devastating effect this would have on their app, business and investment in the Facebook Platform. One developer wrote: "@ParseIt Wow… Have spent months optimizing my app with your service to launch soon, and now this… Seems sudden… #utterlydisappointed." Another: "@ParseIt it would be nice to hear a little bit more about the need to focus your resources elsewhere." "@ParseIt my app had 2.5M users on your platform…this is sickening."

81.     The incident with Parse demonstrates a continued clear pattern on the part of Facebook to make clear and unambiguous promises to developers, to engage in conduct that induces developers to make substantial investments of time and money (all of which helped make Facebook one of the most valuable companies in the world today), and then Facebook seems to think that it can violate these promises with impunity the moment it becomes convenient for them to do so.

## IX. PLAINTIFF 643 RECEIVED NOTICE FROM FACEBOOK THAT ITS APP WOULD NO LONGER FUNCTION

82.     On January 20, 2015, Facebook sent an email to 643 stating that 643 must "upgrade" the App to Graph API v. 2.0 by April 30, 2015. The email stated that Facebook would end third-party access to the Friends' Photos Endpoint on April 30, 2015. The App will not function at all without access to the Friends' Photos Endpoint, so Facebook's suggestion that 643 "upgrade" the App to Graph API v. 2.0 was not possible.

83.     By deciding to end access to the Friends' Photos Endpoint, Facebook has made it impossible for 643 to continue to operate the App, to abide by the license agreements and

26

1    purchase terms entered into by 643 with its users, and for 643 to recoup any of its investment of

2    capital, human labor, time, effort, and energy.

3        84.    643 has sold approximately 5,000 copies of the App since its beta launch. A

4    substantial portion of App users have paid for premium access. 643 was not able to execute its

5    full public launch as a result of Facebook's decision.

6        85.    Each one of the App users entered into a license agreement with 643.

7        86.    Facebook requires Developers to enter into license agreements with users of

8    applications for Facebook. These license agreements must, among other things, require that the

9    users of these applications adhere to Facebook's terms of service.

10       87.    Accordingly, Facebook knew, or had reason to know, about the existence of 643's

11   license agreements with its users.

12       88.    Had Facebook refrained from ending access to Friends' Photos Endpoint, 643

13   could have quickly begun to generate hundreds of thousands of dollars of revenue on a monthly

14   basis.

15       89.    In total, 643 expended approximately $1.15 million in capital and uncompensated

16   labor by its team members in developing and marketing the App.

17       90.    643 attended Facebook events for Developers and made known the harm caused

18   verbally and via email to the appropriate Facebook employees.

19       91.    Faced with the imminent loss of its investment, 643 wrote to Facebook on March

20   16, 2015, and informed Facebook that its decision to discontinue access to the Friends' Photos

21   Endpoint would harm 643 in several ways. 643 informed Facebook that it had reasonably relied

22   on Facebook's representations that the endpoints would remain open, and that Developers would

23   have an equal opportunity to integrate applications into the social graph.

24       92.    643 requested that Facebook continue to permit Developers to have access to the

25   Friends' Photos Endpoint.

26       93.    643 alerted Facebook to the considerable harm it would suffer should access be cut

27   off. 643 also noted that some of its users had entered into subscriptions that extend beyond the

28   April 30, 2015, cut-off date, and that these users could be entitled to refunds of their purchases.

27

94.     Thus Facebook had actual knowledge of the contracts 643 had entered into with its users. In addition, Facebook had actual knowledge of the prospective economic relationships 643 expected with its users, as well as Facebook users generally.

95.     On or about April 30, 2015, Facebook did end access to the Friends' Photos Endpoint.

96.     As a result of Facebook ending access to the Friends' Photos Endpoint, the App no longer functions.

97.     On information and belief, Facebook has been working on its own applications using image recognition.

98.     On June 15, 2015, less than two months after closing access to the Friends' Photos Endpoint for Developers, Facebook announced the launch of "Moments," which allows users to "sync" photos they have taken with their friends and, using Facebook's facial recognition software, allows users to search photos that their friends have shared with them. *See* http://newsroom.fb.com/news/2015/06/introducing-moments/ (last accessed October 27, 2015).

99.     Instagram is an on-line photo sharing service that Facebook acquired in 2012.

100.    In June 2015, just two months after Facebook closed access to the Friends' Photos Endpoint, Instagram announced enhancements to its Search and Explore features, which allow users to search through photos that have been shared with that user on Instagram.

101.    On information and belief, in addition to 643, other Developers have been adversely impacted by Facebook closing access to certain endpoints of Graph API, including Friends' Photos.

102.    On September 21, 2015, the Wall Street Journal reported that Facebook's decision to restrict access to Graph API has caused a drug addiction researcher to halt his research efforts, shut down a voter-registration tool used by the 2012 Obama campaign, and decommissioned an app designed to help first generation college students connect with one another. Deepa Seetharaman & Elizabeth Dwoskin, "Facebook's Restrictions on User Data Cast a Long Shadow; Curbs disrupt startups, academic research and even political strategy"," THE WALL STREET J.,

1   Sept. 22, 2015, at B1 (available at

2   http://www.wsj.com/articles/facebooksrestrictionsonuserdatacastalongshadow1442881332).

3       103.    The Wall Street Journal also reported in the same article that Facebook reached an

4   unspecified compromise with dating app Tinder that permitted some form of access to photos of

5   mutual friends.

6       104.    Facebook has not offered 643 a compromise that would permit the App to function

7   and even if Facebook were to make such an offer, the harm to 643 is irreparable as its team

8   members have moved on to new employment and its code has been fully retired.

9       105.    Instead, the only proposed technical "fix" by Facebook was to create an offline,

10   searchable cache of Facebook's users' photos. But this solution (1) on its face violates

11   Facebook's own terms, (2) would not permit the App to function as originally intended and in the

12   same manner it had been, and (3) could result in a grave and substantial abuse of user trust,

13   violate user privacy, and gut the core principle of an individual's ownership and control of their

14   own data.

15       106.    Facebook did not terminate access to the Friends' Photos Endpoint for the purpose

16   of enhancing user privacy, as users already possessed complete control over such data. Instead, it

17   took these actions for the purpose of improperly monopolizing for itself the ability to access the

18   data previously accessible through the Friends' Photos Endpoint and other terminated endpoints,

19   and to create applications based on those data. As a result of these actions, users now have less

20   control over this data. They are not permitted to share it with other applications they trust but only

21   with Facebook.

22       107.    In sum, Facebook acts as a platform when it wants to exploit Developer creativity

23   and resources, and a monopolist when it wants to secure areas of the ecosystem for itself once

24   developer creativity and resources have been invested.

25       108.    As set forth above, Facebook made repeated, clear, and unambiguous promises

26   upon which many developers, including 643, relied, over a period of more than seven years, and

27   which were broken by Facebook. These broken promises directly and substantially harmed 643,

28

Case No. CIV 533328    Plaintiff's Second Amended Complaint for Injunction and Damages

1    nullifying its investment of time and money and making it impossible to generate revenues and

2    profits.

3        109.    Facebook deliberately baited, induced, and enticed (through countless promises in

4    both words and conduct) developers to help turn Facebook from a website that had raised $37

5    million and secured 24 million users to a company that is now one of the most valuable

6    enterprises in the world.

7    **COUNT I: VIOLATION OF BUSINESS AND PROFESSIONS CODE §§ 17200 *et seq.***
       **[Against all Defendants]**

8

9        110.    643 re-alleges and repleads paragraphs 1 through 109 as though set forth fully

10    herein.

11        111.    Facebook's representations and conduct were designed to, and did, entice 643 and

12    other Developers to create applications for Facebook with promises of, among other things, a

13    level playing field, fair competition, and a chance to build a business. Facebook decided to open

14    certain endpoints, and not others, precisely to induce developers to build certain types of

15    applications, including advanced photo-searching applications. Facebook promised Developers

16    that their own advanced photo-searching applications would be treated on a level playing field

17    with any photo-searching applications Facebook decided to launch in the future. Facebook also

18    promised developers it was committed over the long term to enable Developers to build

19    businesses using advanced photo-searching applications.

20        112.    Facebook caused substantial harm to 643 and other Developers when it then

21    decided to terminate Developers' ability to build advanced photo-searching applications, while

22    retaining its own ability to create these kinds of applications, because 643, like other Developers,

23    had invested considerable time and resources in developing this kind of application for Facebook.

24        113.    The efforts by 643 and other Developers helped to drive user adoption of

25    Facebook by enhancing user experience, thus creating substantial additional revenue and user

26    base for Facebook's benefit.

27        114.    In addition, Facebook took advantage of the market research and development

28    efforts by 643 and other Developers, which proved that advanced photo-searching applications

represented a massive market, perhaps one of the most attractive markets to help Facebook grow its revenues going forward, as evinced by Facebook's recent announcement of "Moments", its own photo searching application (see "Facebook Moments is a Smarter Photo App – Much Smarter, in *Wired Magazine*, June 15, 2015, http://www.wired.com/2015/06/facebook-moments/).

115.    Facebook's decision to end access to the Friends' Photos Endpoint does not enhance user privacy because the App could only sort through photos that had already been shared with the App user and the App user and the user's friends had full control over which, if any, developers were permitted to access their photos.

116.    Instead, by ending Developer access to the Friends' Photos Endpoint, Facebook has monopolized for itself the ability to create applications capable of searching or sorting photos, which harms consumers, Developers, and competitors.

117.    No countervailing benefits to competition or consumers stemming from Facebook's representations and conduct exist.

118.    The harm to 643 and other Developers by Facebook's representations and conduct outweighs the reasons, justifications, or motives for the representations and conduct by Facebook.

119.    643 could not have reasonably avoided its injury because Facebook only announced its decision to terminate access to the Friends' Photos Endpoint after 643 had made considerable investment and Facebook had approved the App.

120.    643 also requested that Facebook not end access to Friends' Photos Endpoint, but Facebook did not change its decision.

121.    Facebook's actions thus constituted an unfair business practice under California's Unfair Business Practices Act.

122.    Facebook's decision to end access to the Friends' Photos Endpoint was also unlawful.

123.    In taking the actions alleged herein, Facebook acted with fraud, malice and oppression, and in reckless disregard of the rights of 643.

124.   643 suffered substantial injury as a result of Facebook's actions, including the loss of its investment in developing the App and lost revenue.

125.   Accordingly, Facebook is liable to 643 for violation of California's Unfair Business Practices Act.

126.   As a proximate result of the acts and conduct of Facebook herein alleged, 643 has found it necessary to engage attorneys, and incur attorney's fees, and will continue to incur attorney's fees, in an unascertained amount to be established according to proof following the conclusion of trial.

## COUNT II: PROMISSORY ESTOPPEL
### [Against all Defendants]

127.   643 re-alleges and repleads paragraphs 1 through 126 as though set forth fully herein.

128.   Facebook clearly and unambiguously promised that:

    a.   Developers would be able to integrate their applications into Facebook's social graph;

    b.   Developers would have the same access to integration of their applications as Facebook;

    c.   Developers could easily access Graph API objects;

    d.   Facebook would support Developers in achieving mass distribution of Developer applications;

    e.   Facebook would provide adequate tools for developers to build their applications;

    f.   Developers would be able to build a business on Facebook Platform;

    g.   Developers would be able to monetize their applications on Facebook by selling ads on their application pages;

    h.   Developers would be able to build applications on a fair, level playing field;

    i.   Developer applications would not be "second class citizens" compared to Facebook's own applications;

Case No. CIV 533328          Plaintiff's Second Amended Complaint for Injunction and Damages

      j.   Developer applications that compete with Facebook applications would be welcome; and

      k.  As long as Developer applications abided by Facebook Terms of Service, Facebook will be neutral as to these applications.

129.   643 invested considerable capital, labor, time, and effort into developing the App in reliance on these promises.

130.   643's reliance was reasonable because Facebook had consistently made these representations for seven years without ever stating that it could prevent Developers from building the specific kinds of applications Facebook was enticing them to build all along.

131.   643's reliance was foreseeable by Facebook.

132.   643 was injured as a result of its reliance on Facebook's promises, which Facebook did not keep, in an unascertained amount in excess of $25,000.00, to be established according to proof at trial.

133.   Accordingly, Facebook is liable to 643 for damages.

## COUNT III: NEGLIGENT MISREPRESENTATION
### [Against all Defendants]

134.   643 re-alleges and repleads paragraphs 1 through 133 as though set forth fully herein.

135.   Facebook represented that

      a.  Developers would be able to integrate their applications into Facebook's social graph;

      b.  Developers would have the same access to integration of their applications as Facebook;

      c.  Developers could easily access Graph API objects;

      d.  Facebook would support Developers in achieving mass distribution of Developer applications;

      e.  Facebook would provide adequate tools for developers to build their applications;

      f.  Developers would be able to build a business on Facebook Platform;

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

g.   Developers would be able to monetize their applications on Facebook by selling ads on their application pages;

h.   Developers would be able to build applications on a fair, level playing field;

i.   Developer applications would not be "second class citizens" compared to Facebook's own applications;

j.   Developer applications that compete with Facebook applications would be welcome; and

k.   As long as Developer applications abided by Facebook Terms of Service, Facebook will be neutral as to these applications.

136.   Such representations were untrue, because Facebook later claimed that it had retained for itself the right to terminate the Friends' Photos Endpoint, and did close the Friends' Photos Endpoint to Developers, while Facebook kept for itself the ability to develop applications that access photos.

137.   Regardless of its actual belief, Facebook must have made those representations without any reasonable ground for believing the representations to be true.

138.   Facebook conveyed the representations in a commercial setting for a business purpose, namely inducing Developers to develop applications for Facebook.

139.   Facebook made those representations with the intent to induce Developers, including 643, to develop applications, including the App, that used the Friends' Photos endpoint, thereby adding features to Facebook, enhancing Facebook's functionality and user experience, and generating more revenue for Facebook.

140.   643 was not aware that Facebook's representations were false, and 643 developed the App in reliance on the truth of Facebook's representations.

141.   643's reliance on the truth of Facebook's representations was justified because Facebook had consistently made these representations for seven years without ever stating that it could prevent Developers from building the specific kinds of applications Facebook was enticing them to build all along.

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

142.    643 was injured as a result of its reliance on Facebook's representations, in an unascertained amount in excess of $25,000.00, to be established according to proof at trial.

143.    In taking the actions alleged herein, Facebook acted with fraud, malice and oppression, and in reckless disregard of the rights of 643.

144.    Accordingly, Facebook is liable to 643 for damages.

## COUNT IV: INTENTIONAL INTERFERENCE WITH CONTRACT
### [Against all Defendants]

145.    643 re-alleges and repleads paragraphs 1 through 144 as though set forth fully herein.

146.    643 had entered into license agreements and subscriptions for premium access with its users.

147.    Facebook knew of these license agreements and subscriptions.

148.    Facebook intentionally interfered with and disrupted these contracts when it stated that it would end 643's access to the Friends' Photos Endpoint on April 30, 2015, despite knowing that interference with these contracts would be certain or substantially certain to occur as a result of Facebook's act in ending 643's access.

149.    Facebook further intentionally interfered with and disrupted 643's contracts with its users when it did terminate 643's access to the Friends' Photos Endpoint on April 30, 2015, despite knowing that interference with these contracts would be certain or substantially certain to occur as a result of Facebook's act in ending 643's access.

150.    643's contract with its users was thereby disrupted by Facebook.

151.    As a result, 643 has suffered and will suffer damage in an unascertained amount in excess of $25,000.00 to be established according to proof at trial.

152.    In taking the actions alleged herein, Facebook acted with fraud, malice and oppression, and in reckless disregard of the rights of 643.

153.    Accordingly, Facebook is liable to 643 for damages.

Case No. CIV 533328        Plaintiff's Second Amended Complaint for Injunction and Damages

**COUNT V: INTENTIONAL INTERFERENCE WITH**
<u>**PROSPECTIVE BUSINESS RELATIONS**</u>
**[Against all Defendants]**

154.    643 re-alleges and repleads paragraphs 1 through 153 as though set forth fully herein.

155.    643 had an expectation of economic benefit from third parties, including its users who downloaded the App and other Facebook users who may have downloaded the App if 643 had marketed the App as it planned.

156.    Facebook knew of 643's relationship with the users of the App, and knew of 643's plans to market the App.

157.    Facebook intentionally disrupted these relationships when it announced that it would end 643's access to the Friends' Photos Endpoint on April 30, 2015, despite knowing that interference with these relationships would be certain or substantially certain to occur as a result of Facebook's act in ending 643's access.

158.    Facebook further intentionally interfered with and disrupted 643's relationships with its users when it did terminate 643's access to the Friends' Photos Endpoint on April 30, 2015, despite knowing that interference with these relationships would be certain or substantially certain to occur as a result of Facebook's act in ending 643's access.

159.    643's relationship with its users was thereby disrupted, and will be further disrupted.

160.    As a result, 643 suffered damage in an unascertained amount in excess of $25,000.00 to be established according to proof at trial.

161.    In taking the actions alleged herein, Facebook acted with fraud, malice and oppression, and in reckless disregard of the rights of 643.

162.    Accordingly, Facebook is liable to 643 for damages.

<u>**JURY TRIAL DEMAND**</u>

163.    643 demands a trial by jury on all claims so triable.

Case No. CIV 533328        Plaintiff's Second Amended Complaint for Injunction and Damages

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff 643 asks this Court to enter judgment against Defendant Facebook, Inc., as follows:

A.    A judgment or order declaring Facebook's conduct, as alleged, unlawful under California's Unfair Business Practices Act;

B.    A judgment, order, or award of damages adequate to compensate 643;

C.    A permanent injunction prohibiting Facebook from removing Developer access to the Friends' User Photos Endpoint;

D.    A permanent injunction prohibiting Facebook from interfering with 643's contracts or prospective business relations;

E.    An award of its reasonable attorneys' fees and costs;

F.    Punitive damages and/or treble damages as provided by California's Unfair Business Practices Act; and

G.    Such other further relief as this Court or a jury may deem proper and just.


Dated: February 26, 2016                    CRITERION LAW

                                            BIRNBAUM & GODKIN, LLP


                                            By: _____

                                                Basil P. Fthenakis, Esq.
                                                David S. Godkin (admitted *pro hac vice*)
                                                Andrew A. Caffrey, III (admitted *pro hac vice*)
                                                Attorneys for Plaintiff
                                                Six4Three, LLC

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

Exhibit 2

1

2    # FILED
     SAN MATEO COUNTY

3         JUN 3 0 2016

4         Clerk of the Superior Court

5         By _____
                   DEPUTY CLERK

6

7

8    ## SUPERIOR COURT OF THE STATE OF CALIFORNIA

9    ## COUNTY OF SAN MATEO

10

11   SIX4THREE, LLC, a Delaware limited          Case No. CIV533328
     liability company,
12                                               [~~PROPOSED~~] ORDER ON DEMURRER
                              Plaintiff,          TO PLAINTIFF'S SECOND AMENDED
13                                               COMPLAINT
                v.
14                                               Date: June 15, 2016
     FACEBOOK, INC., a Delaware                  Time: 9:00 a.m.
15   corporation and DOES 1-50, inclusive        Dept.: Law and Motion

16                            Defendants.

17

18

19

20

21                                               CIV533328
                                                 ORD
22                                               Order
                                                 95562
23                                               

24

25

26

27

28

     [PROPOSED] ORDER ON DEMURRER TO PLAINTIFF'S SECOND AMENDED COMPLAINT
                        CASE NO. CIV533328

1
2        Defendant Facebook, Inc.'s ("Facebook") Demurrer to Plaintiff Six4Three, LLC's Second
3    Amended Complaint came on regularly for hearing before the Court on June 15, 2016, in the Law
4    and Motion Department.
5        The Court, having reviewed the moving papers and all opposing and reply papers filed
6    with the Court, and having heard the arguments of counsel, OVERRULES Facebook's Demurrer
7    with respect to Plaintiff's First, Third, Fourth and Fifth Causes of Action, and SUSTAINS
8    Facebook's Demurrer with respect to Plaintiff's Second Cause of Action.  The Court modifies its
9    June 14, 2016 tentative ruling, as follows:
10            Defendant Facebook, Inc.'s Request for Judicial Notice is GRANTED
11            pursuant to Evidence Code §452(h) and 453(a). However, the legal effect,
12            truthfulness and proper interpretation of the documents remain disputable. *See*
13            *Unruh-Haxton v. Regents of University of California* (2008) 162 Cal App 4th 343,
14            365. A hearing on a demurrer may not be turned into a contested evidentiary
15            hearing through the guise of having the court take judicial notice of documents
16            whose truthfulness or proper interpretation are disputable. *Fremont Indemnity Co.*
17            *v. Fremont General Corp.* (2007) 148 Cal App 4th 97, 112-118.
18        The demurrer to the 1st cause of action for Violation of B&P Code 17200
19    is OVERRULED. Plaintiff has sufficiently pled an unfair, unlawful or fraudulent
20    business practice. *Cel-Tech Communications, Inc. v. Los Angeles Cellular*
21    *Telephone Company* (1999) 20 Cal 4th 163, 180. Plaintiff has specifically alleged
22    that it was a victim to a Facebook practice/scheme to lure in developers, generate
23    additional advertising revenue by enhancing the user's experience and then
24    monopolize for itself the market for image search capabilities. SAC ¶¶ 54-59,
25    105-06.
26        The demurrer to the 2nd cause of action for promissory estoppel is
27    SUSTAINED WITHOUT LEAVE TO AMEND. The SAC fails to sufficiently
28                                    -1-

1.    allege a clear, unambiguous promise by Facebook or the Plaintiff's reasonable

2.    reliance on such a promise. The SAC is based on the allegations at ¶52 that

3.    Facebook had a long-term commitment to the Facebook platform and to a level

4.    playing field for developers. Plaintiff has not alleged a clear and unambiguous

5.    promise to keep open the Friends' Photos Endpoint. As to reliance, Plaintiff

6.    identifies only conclusory, generalized statements and alleged omissions

7.    regarding Facebook's platform and API at the time they were launched in 2007

8.    and 2010. SAC ¶ 10-23. This was well before Plaintiff became a registered

9.    developer with Facebook in December 2012. Nothing in the statements referred to

10.    the friends' photo endpoint and nothing indicated that Facebook would make

11.    available all endpoints to developers forever. This does not sufficiently allege

12.    reasonable reliance.

13.        The demurrer to the 3rd cause of action for negligent misrepresentation is

14.    OVERRULED. The SAC sufficiently alleges the elements of a claim for

15.    negligent misrepresentation. These include 1) A misrepresentation of a past or

16.    existing fact, 2) without reasonable grounds for believing it to be true, 3) with the

17.    intent to induce another's reliance, 4) justifiable reliance on the representation and

18.    5) resulting damage. *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*

19.    (2007) 158 Cal App 4th 226, 243. Plaintiff has sufficiently alleged a

20.    misrepresentation, intent, and justifiable reliance. Plaintiff has sufficiently

21.    alleged such a representation and plaintiff's reliance on a promise is reasonable.

22.        The demurrer to the 4th cause of action for Intentional Interference with

23.    Contract is OVERRULED. Plaintiff has sufficiently alleged tortious interference.

24.    Plaintiff has pled a valid contract; has plausibly alleged knowledge of the

25.    agreements on Facebook's part and has alleged intentional acts designed to induce

26.    a breach. *Quelimane Co., Inc. v. Stewart Title Guaranty Company* (1998) 19 Cal

27.    4th 26, 55. See SAC at ¶¶ 86, 87, 148-49.

28.

[PROPOSED] ORDER ON DEMURRER TO PLAINTIFF'S SECOND AMENDED COMPLAINT
CASE NO. CIV533328

1    The demurrer to the 5th cause of action for Intentional Interference with

2    Prospective Business Relations is OVERRULED. The cause of action sufficiently

3    pled the required elements for such a cause of action: 1) an economic relationship

4    between the plaintiff and some third-party with the probability of future economic

5    benefit; 2) the defendant's knowledge of the relationship; 3) intentional acts by

6    defendant designed to disrupt the relationship; 4) actual disruption of the

7    relationship and 5) economic harm to the plaintiff proximately caused by

8    defendant. *Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal 4th 1134,

9    1153.

10

11       IT IS SO ORDERED.

12   Dated:        JUN 2 8 2016

13                                        HONORABLE DONALD J. AYOOB

14   *Approved as to form by:*

15   PERKINS COIE LLP                     BIRNBAUM & GODKIN, LLP

16

17   Julie E. Schwartz                    David S. Godkin

18

19

20

21

22

23

24

25

26

27

28
                                    -3-

Exhibit 3

Basil P. Fthenakis, Esq. (88399)
CRITERION LAW
2225 E. Bayshore Road, Suite 200
Palo Alto, California 94303
Tel. (650) 352-8400
Fax. (650) 352-8408
bpf@criterionlaw.com

Of counsel:

David S. Godkin (admitted *pro hac vice*)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA 02210
(617) 307-6100
godkin@birnbaumgodkin.com

James Kruzer (admitted *pro hac vice*)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA 02210
(617) 307-6100
kruzer@birnbaumgodkin.com


Attorneys for Plaintiff,
SIX4THREE, LLC, a Delaware
limited liability company

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| SIX4THREE, LLC, a Delaware limited liability company,<br><br>                   Plaintiff,<br><br>    v.<br><br>FACEBOOK, INC., a Delaware corporation and DOES 1-50, inclusive,<br><br>                   Defendant. | Case No. CIV533328<br><br>**PLAINTIFF SIX4THREE LLC'S RESPONSE TO DEFENDANT FACEBOOK, INC.'S SPECIALLY PREPARED INTERROGATORIES (SET TWO)** |

| | | |
|---|---|---|
| 1 | **PROPOUNDING PARTY:** | **DEFENDANT FACEBOOK, INC.** |
| 2 | **RESPONDING PARTY:** | **PLAINTIFF SIX4THREE LLC** |
| 3 | **SET:** | **ONE** |

Plaintiff Six4Three, LLC ("643") hereby objects and responds as follows to the Specially Prepared Interrogatories (Set One) ("Special Interrogatories") propounded by Defendant Facebook, Inc. ("Defendant").

## PLAINTIFF'S GENERAL OBJECTIONS

Each and every Special Interrogatory is subject to the General Objections and limitations set forth herein ("General Objections"), in addition to the specific objections and limitations set forth in the respective responses. The General Objections and limitations form part of the Response to each Special Interrogatory and are set forth to avoid duplication for each response. 643 makes the following General Objections to each Special Interrogatory:

1. Responding Party objects to the Special Interrogatories to the extent they are unduly burdensome and oppressive in the context of this action.

2. Responding Party objects to these Special Interrogatories insofar as they seek communications protected by the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.*, ("SCA"), which prohibits service providers from disclosing electronic communication content stored on a remote computing service.

3. Responding Party objects to these Special Interrogatories to the extent they seek information subject to the SCA pertaining to Users.

4. Responding Party objects to these Special Interrogatories to the extent they seek information 643 is legally or contractually prohibited from disclosing, including information that would require Responding Party to breach a confidentiality contract, protective order, settlement, or other duty to a third party to maintain confidentiality.

5. Responding Party objects to these Special Interrogatories to the extent they are unduly burdensome and oppressive in the context of this action.

6. Responding Party objects to these Special Interrogatories to the extent they are covered by the attorney-client privilege, settlement privilege, work-product doctrine, or other

-1-

applicable privilege. Any such documents will not be provided in response to these requests for production and any inadvertent production shall not be deemed a waiver of any privilege with respect to such documents or of any work-product protections attaching to such documents.

7.      Responding Party objects to these Special Interrogatories to the extent they require disclosure of documents containing proprietary or confidential information, trade secrets, or information that may implicate third-party privacy rights.

8.      Responding Party objects to these Special Interrogatories to the extent they are vague, ambiguous, unintelligible, overly broad, or harassing.

9.      Responding Party objects to these Special Interrogatories to the extent they seek documents not relevant to the subject matter of this action or reasonably calculated to lead to the discovery of admissible evidence.

10.     Responding Party objects to these Special Interrogatories to the extent they seek information not within the possession, custody or control of Responding Party. An objection on this ground does not constitute a representation or admission that such documents exist.

11.     Responding Party objects to these Special Interrogatories insofar as they seek information already in Propounding Party's possession, custody or control, or that can be obtained by Propounding Party with equal burden or directly from Users.

12.     Responding Party objects to these Special Interrogatories to the extent they attempt to impose obligations beyond those required or allowed by the California Code of Civil Procedure.

13.     Responding Party objects to the definitions of "Documents" and "Communications" to the extent they impose any obligations with respect to the production of electronically stored information that are different from or in addition to those imposed by the California Code of Civil Procedure. Responding Party further objects to these definitions to the extent they include electronically stored information that is not reasonably accessible due to undue burden or expense, obtainable from another source that is less burdensome, and/or unreasonably cumulative or duplicative, or where the likely burden or expense outweighs the likely benefit.

14.     Responding Party objects to the definitions of "643," "Plaintiff," "You," and "Your" on the grounds that they are overbroad and call for information covered by the attorney-client and work product privileges.

15.     Responding Party's responses are based solely upon information presently available and specifically known to Responding Party. As such, Responding Party's responses are made without prejudice to its right subsequently to add, modify or otherwise change or amend these responses. Responding Party reserves the right to change any of its objections or responses as new information is discovered. Specifically, Responding Party reserves the right to introduce other information or documents, use information that it may later determine to have been responsive to these requests, and revise, correct, supplement or clarify any of its written responses at any time.

These General Objections are incorporated into each and every objection to Propounding Party's specific requests for production. All responses are subject to, preserve and do not constitute a waiver of these General Objections.

## OBJECTIONS AND RESPONSES TO SPECIAL INTERROGATORIES

### SPECIAL INTERROGATORY NO. 33:

State ALL antitrust laws that YOU contend Facebook's conduct threatens an incipient violation of, or violates the policy or spirit of.

### RESPONSE TO SPECIAL INTERROGATORY NO. 33:

Responding Party incorporates each of the General Objections and further objects to this demand to the extent that it: (1) is vague and ambiguous; (2) is overly broad and unduly burdensome in seeking "ALL laws"; (3) calls for information covered by the attorney-client privilege and work product privileges; (4) seeks information not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence; and (5) seeks information equally available to Defendant.

Subject to and without waiving the foregoing objections, Responding Party responds that its analysis, investigation and discovery are ongoing and it does not intend to limit evidence at

1   trial to matters stated herein. Facebook's conduct repeatedly violates Business and Professions

2   Code § 17200 et seq. by engaging in: (1) unlawful business acts or practices; (2) unfair business

3   acts or practices; (3) fraudulent business acts or practices; (4) unfair, deceptive, untrue or

4   misleading advertising; and (5) business acts or practices prohibited by §§ 17500-17577.5.

5   Further, Facebook's conduct repeatedly violates Business and Professions Code §§ 17500 et seq.,

6   which prohibits advertising goods or services that Facebook knew or should have known were

7   likely to deceive. Facebook's conduct also repeatedly violates California's Consumer Legal

8   Remedies Act (Cal. Civ. Code §§ 1750 et seq.) protecting consumers against unfair and deceptive

9   business practices (Cal. Civ. Code § 1760) and various violations of Cal. Civ. Code § 1770.

10  Finally, Facebook's conduct repeatedly violates Business and Professions Code §§ 16600 et seq.

11  prohibiting contracts that restrain engagement in a lawful profession, trade or business of any

12  kind.

13        Facebook's conduct also violates Section 5 of the Federal Trade Commission Act (15

14  U.S.C. § 45) prohibiting unfair methods of competition in or affecting commerce and unfair or

15  deceptive practices in or affecting commerce. Facebook's conduct further violates Section 1 of

16  the Sherman Act prohibiting contracts in restraint of trade or commerce. Facebook's conduct

17  further repeatedly violates Section 2 of the Sherman Act prohibiting the monopolization or

18  attempt to monopolize any part of the trade or commerce among states. Facebook's conduct

19  further repeatedly violates Section 2 of the Clayton Act, the Robinson-Patman Price

20  Discrimination Act, prohibiting discrimination of price between different purchasers where the

21  effect is to lessen competition or tend to create a monopoly. Facebook's conduct further

22  repeatedly violates Section 3 of the Clayton Act prohibiting agreements that require avoidance of

23  services or goods from competitors that tend to create a monopoly or lessen competition.

24  Facebook's conduct further repeatedly violates the Cartwright Act, Business and Professions

25  Code §§ 16720 et seq., prohibiting trusts or actions in concert in restraint of trade or commerce.

26  Facebook's violations further include numerous per se violations resulting from tying agreements

27  with a host of third parties.

28

-4-

1    Finally, Facebook's conduct violates numerous other state laws that are accessible via

2    Business and Professions Code §§ 17200 et seq., including but not limited to New York General

3    Business Law §§ 349 et seq. prohibiting deceptive acts or practices in conduct of any business,

4    trade or commerce or in the furnishing of any service. Facebook's conduct further violates

5    Business and Professions Code § 17200 et seq. by reason of its tortious conduct, including but not

6    limited to constructive fraud, negligent misrepresentation of material fact, intentional interference

7    with contract and intentional interference with prospective business relations.

8    **SPECIAL INTERROGATORY NO. 34:**

9    State ALL laws that YOU contend Facebook's conduct violates RELATED TO YOUR

10   claim for violation of Business and Professions Code § 17200 et seq.

11   **RESPONSE TO SPECIAL INTERROGATORY NO. 34:**

12   Responding Party incorporates each of the General Objections and further objects to this

13   demand to the extent that it: (1) is vague and ambiguous; (2) is overly broad and unduly

14   burdensome in seeking "ALL laws"; (3) calls for information covered by the attorney-client

15   privilege and work product privileges; (4) seeks information not relevant to the subject matter of

16   this litigation and not reasonably calculated to lead to the discovery of admissible evidence; and

17   (5) seeks information equally available to Defendant.

18   Subject to and without waiving the foregoing objections, Responding Party responds that

19   its analysis, investigation and discovery are ongoing and it does not intend to limit evidence at

20   trial to matters stated herein. Facebook's conduct repeatedly violates Business and Professions

21   Code § 17200 et seq. by engaging in: (1) unlawful business acts or practices; (2) unfair business

22   acts or practices; (3) fraudulent business acts or practices; (4) unfair, deceptive, untrue or

23   misleading advertising; and (5) business acts or practices prohibited by §§ 17500-17577.5.

24   Further, Facebook's conduct repeatedly violates Business and Professions Code §§ 17500 et seq.,

25   which prohibits advertising goods or services that Facebook knew or should have known were

26   likely to deceive. Facebook's conduct also repeatedly violates California's Consumer Legal

27   Remedies Act (Cal. Civ. Code §§ 1750 et seq.) protecting consumers against unfair and deceptive

28   business practices (Cal. Civ. Code § 1760) and various violations of Cal. Civ. Code § 1770.

-5-

1    Finally, Facebook's conduct repeatedly violates Business and Professions Code §§ 16600 et seq.

2    prohibiting contracts that restrain engagement in a lawful profession, trade or business of any

3    kind.

4           Facebook's conduct also violates Section 5 of the Federal Trade Commission Act (15

5    U.S.C. § 45) prohibiting unfair methods of competition in or affecting commerce and unfair or

6    deceptive practices in or affecting commerce. Facebook's conduct further violates Section 1 of

7    the Sherman Act prohibiting contracts in restraint of trade or commerce. Facebook's conduct

8    further repeatedly violates Section 2 of the Sherman Act prohibiting the monopolization or

9    attempt to monopolize any part of the trade or commerce among states. Facebook's conduct

10   further repeatedly violates Section 2 of the Clayton Act, the Robinson-Patman Price

11   Discrimination Act, prohibiting discrimination of price between different purchasers where the

12   effect is to lessen competition or tend to create a monopoly. Facebook's conduct further

13   repeatedly violates Section 3 of the Clayton Act prohibiting agreements that require avoidance of

14   services or goods from competitors that tend to create a monopoly or lessen competition.

15   Facebook's conduct further repeatedly violates the Cartwright Act, Business and Professions

16   Code §§ 16720 et seq., prohibiting trusts or actions in concert in restraint of trade or commerce.

17   Facebook's violations further include numerous per se violations resulting from tying agreements

18   with a host of third parties.

19          Finally, Facebook's conduct violates numerous other state laws that are accessible via

20   Business and Professions Code §§ 17200 et seq., including but not limited to New York General

21   Business Law §§ 349 et seq. prohibiting deceptive acts or practices in conduct of any business,

22   trade or commerce or in the furnishing of any service. Facebook's conduct further violates

23   Business and Professions Code § 17200 et seq. by reason of its tortious conduct, including but not

24   limited to constructive fraud, negligent misrepresentation of material fact, intentional interference

25   with contract and intentional interference with prospective business relations.

26

27

28

-6-

DATED:  January 11, 2017

CRITERION LAW

BIRNBAUM & GODKIN

By: _____

Basil P. Fthenakis
David S. Godkin (admitted *pro hac vice*)
James E. Kruzer (admitted *pro hac vice*)
Attorneys for Plaintiff
Six4Three, LLC

**PROOF OF SERVICE**

I, James E. Kruzer, declare:

I am a citizen of the United States and employed in Suffolk County, Massachusetts. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 280 Summer Street, Boston, MA 02210. On January 12, 2017, I served a copy of the within document(s):

PLAINTIFF SIX4THREE LLC'S RESPONSE TO DEFENDANT FACEBOOK, INC.'S SPECIALLY PREPARED INTERROGATORIES (SET TWO)

☒　　By electronically mailing a true and correct copy through Birnbaum & Godkin, LLP's electronic mail system to the email addresses set forth below.

SONAL N. MEHTA (SBN 222086)
LAURA E. MILLER (SBN 271713)
CATHERINE Y. KIM (SBN 308442)
Durie Tangri LLP
217 Leidesdorff Street
San Francisco, CA  94111
Telephone: 415-362-6666
Facsimile: 415-236-6300
smehta@durietangri.com
lmiller@durietangri.com
ckim@durietangri.com

Attorney for Defendant
FACEBOOK, INC.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed January 12, 2017, at Boston, Massachusetts.

_____
James E. Kruzer

Case No. 533328　　　643 RESPONSE TO FACEBOOK'S SPECIAL INTERROGATORIES (SET TWO)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, Ted Kramer, as a certified representative of Plaintiff Six4Three LLC ("643"), certify and declare under penalty of perjury under the laws of the state of California that I have read and reviewed 643's Answers to Facebook's Second Set of Specially Prepared Interrogatories; and believe them to be true and accurate based on the information available to 643 at the present time.

Executed January 11, 2017, at San Francisco, California.

_____

By: Ted Kramer

Exhibit 4

1  DURIE TANGRI LLP
   SONAL N. MEHTA (SBN 222086)
2  smehta@durietangri.com
   LAURA E. MILLER (SBN 271713)
3  lmiller@durietangri.com
   CATHERINE Y. KIM (SBN 308442)
4  ckim@durietangri.com
   217 Leidesdorff Street
5  San Francisco, CA  94111
   Telephone:     415-362-6666
6  Facsimile:     415-236-6300

7  Attorneys for Defendant
   Facebook, Inc.

8

9              SUPERIOR COURT OF THE STATE OF CALIFORNIA

10                      COUNTY OF SAN MATEO

11  SIX4THREE, LLC, a Delaware limited liability       Case No. CIV 533328
    company,
12                                                     **NOTICE TO ADVERSE PARTY OF**
                         Plaintiff,                    **REMOVALTO FEDERAL COURT**
13
         v.                                            Ctrm:   Law and Motion Dept.
14
    FACEBOOK, INC., a Delaware corporation and         FILING DATE:        April 10, 2015
15  DOES 1-50, inclusive,                              TRIAL DATE:         May 15, 2017

16                       Defendant.

17

18

19

20

21

22

23

24

25

26

27

28

_____
NOTICE TO ADVERSE PARTY OF REMOVALTO FEDERAL COURT / CASE NO. CIV 533328

TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT a Notice of Removal of this action was filed in the United States District Court for the Northern District of California, San Francisco Division, on January 24, 2017. A copy of the said Notice of Removal is attached to this Notice and is served and filed herewith.

Dated:  January 24, 2017

DURIE TANGRI LLP

By: _____
LAURA E. MILLER

Attorneys for Defendant
Facebook, Inc.

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

SIX4THREE, LLC

**DEFENDANTS**

FACEBOOK, INC.

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

David S. Godkin, godkin@birnbaumgodkin.com
James Kruzer, kruzer@birnbaumgodkin.com
BIRNBAUM & GODKIN, LLP
280 Summer Street, Boston, MA 02210, Telephone: 617-307-6100

Attorneys *(If Known)*

DURIE TANGRI LLP
SONAL N. MEHTA (SBN 222086), smehta@durietangri.com
LAURA E. MILLER (SBN 271713), lmiller@durietangri.com
CATHERINE Y. KIM (SBN 308442), ckim@durietangri.com
217 Leidesdorff Street, San Francisco, CA 94111, Telephone: 415-362-6666

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment Of Veteran's Benefits<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Personal Injury - Medical Malpractice<br><br>**PERSONAL INJURY**<br>☐ 365 Personal Injury – Product Liability<br>☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br><br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC § 881<br>☐ 690 Other<br><br>**LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Management Relations<br>☐ 740 Railway Labor Act<br>☐ 751 Family and Medical Leave Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Employee Retirement Income Security Act | ☐ 422 Appeal 28 USC § 158<br>☐ 423 Withdrawal 28 USC § 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS–Third Party 26 USC § 7609 | ☐ 375 False Claims Act<br>☐ 376 Qui Tam (31 USC § 3729(a))<br>☐ 400 State Reapportionment<br>☒ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts<br>☐ 893 Environmental Matters<br>☐ 895 Freedom of Information Act<br>☐ 896 Arbitration<br>☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision<br>☐ 950 Constitutionality of State Statutes |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 440 Other Civil Rights<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 445 Amer. w/Disabilities–Employment<br>☐ 446 Amer. w/Disabilities–Other<br>☐ 448 Education | **Habeas Corpus:**<br>☐ 463 Alien Detainee<br>☐ 510 Motions to Vacate Sentence<br>☐ 530 General<br>☐ 535 Death Penalty<br>**Other:**<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br>☐ 560 Civil Detainee– Conditions of Confinement | **IMMIGRATION**<br>☐ 462 Naturalization Application<br>☐ 465 Other Immigration Actions | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation–Transfer |  ☐ 8 Multidistrict Litigation–Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1331; 28 U.S.C. § 1441(a); 15 U.S.C. § 4; 15 U.S.C. § 15

Brief description of cause:

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, Fed. R. Civ. P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S), IF ANY *(See instructions):*

JUDGE       DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

(Place an "X" in One Box Only)      ☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE    ☐ EUREKA-MCKINLEYVILLE

**DATE:** 01/24/2017      SIGNATURE OF ATTORNEY OF RECORD:

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original from by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. a)  **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   b)  **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   c)  **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II.  **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

   (1)  <u>United States plaintiff</u>. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

   (2)  <u>United States defendant</u>. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

   (3)  <u>Federal question</u>. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

   (4)  <u>Diversity of citizenship</u>. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**.** (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III.  **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.  **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V.  **Origin.** Place an "X" in one of the six boxes.

   (1)  <u>Original Proceedings</u>. Cases originating in the United States district courts.

   (2)  <u>Removed from State Court</u>. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

   (3)  <u>Remanded from Appellate Court</u>. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

   (4)  <u>Reinstated or Reopened</u>. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

   (5)  <u>Transferred from Another District</u>. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

   (6)  <u>Multidistrict Litigation Transfer</u>. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

   (8)  <u>Multidistrict Litigation Direct File</u>. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

   <u>Please note that there is no Origin Code 7</u>. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI.  **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

VII.  **Requested in Complaint.** <u>Class Action</u>. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

   <u>Demand</u>. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

   <u>Jury Demand</u>. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.  **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

IX.  **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

DURIE TANGRI LLP
SONAL N. MEHTA (SBN 222086)
smehta@durietangri.com
LAURA E. MILLER (SBN 271713)
lmiller@durietangri.com
CATHERINE Y. KIM (SBN 308442)
ckim@durietangri.com
217 Leidesdorff Street
San Francisco, CA 94111
Telephone:    415-362-6666
Facsimile:    415-236-6300

Attorneys for Defendant
Facebook, Inc.

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIX4THREE, LLC,<br><br>                    Plaintiff,<br><br>         v.<br><br>FACEBOOK, INC.,<br><br>                    Defendant. | Case No. 3:17-cv-00359<br><br>**NOTICE OF REMOVAL OF ACTION:<br>UNDER 28 U.S.C. § 1441(A)<br>(FEDERAL QUESTION)** |

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

PLEASE TAKE NOTICE that Defendant Facebook, Inc. ("Facebook") hereby removes to this Court the state court action described below.

On April 10, 2015, an action was filed in the Superior Court of the State of California in and for the County of San Mateo entitled *Six4Three, LLC v. Facebook, Inc.*, case number CIV53328, attached hereto as Exhibit A. After demurrer practice, Plaintiff Six4Three LLC ("Six4Three") filed a Second Amended Complaint on February 26, 2016. A copy of the Second Amended Complaint is attached hereto as Exhibit B.

On January 12, 2017, Six4Three served verified interrogatory responses in which Six4Three disclosed that it intends to present the violation of numerous federal statues, including federal antitrust statutes providing for exclusive federal jurisdiction, as the predicate unlawful acts for its claim that Facebook has violated California Business & Professions Code Section 17200 *et seq.* ("Section 17200"). A copy of the interrogatory responses is attached hereto as Exhibit C.

The balance of the Superior Court case file is attached hereto as Exhibit D.

## I.      JURISDICTION

This action is a civil action of which this Court has original and exclusive jurisdiction under, among other things, Section 4 of the Sherman Act (15 U.S.C. § 4) and Section 4 of the Clayton Act (15 U.SC. § 15), and is one which may be removed to this Court by Defendant pursuant to the provisions of 28 U.S.C. Sections 1331 and 1441(a) in that it arises under federal antitrust law.

## II.      INTRADISTRICT ASSIGNMENT

As this action arose in the City and County of San Mateo, assignment to the San Francisco Division of the United States District Court for the Northern District of California is proper.

## III.      SIX4THREE'S VERIFIED INTERROGATORY RESPONSE REVEALS THAT ITS SECTION 17200 CLAIM IS BASED ON FEDERAL ANTITRUST LAW

Six4Three's Second Amended Complaint purports to state four causes of action: intentional interference with contractual relations, intentional interference with prospective economic advantage,

negligent misrepresentation, and violations of Section 17200.[1]  The parties have been proceeding in the Superior Court, with discovery ongoing.  As part of the discovery process, Facebook propounded an interrogatory asking Six4Three to "State ALL laws that YOU contend Facebook's conduct violates RELATED TO YOUR claim for violation of Business and Professions Code § 17200 et seq."  On January 12, 2017, Six4Three responded to the interrogatory and identified the alleged violation of a number of federal antitrust laws as the predicate for unlawful acts for Six4Three's Section 17200 claims:

> Subject to and without waiving the foregoing objections, Responding Party responds that its analysis, investigation and discovery are ongoing and it does not intend to limit evidence at trial to matters stated herein.  Facebook's conduct repeatedly violates Business and Professions Code § 17200 et seq. by engaging in: (l) unlawful business acts or practices; (2) unfair business acts or practices; (3) fraudulent business acts or practices; (4) unfair, deceptive, untrue or misleading advertising; and (5) business acts or practices prohibited by §§ 17500-l7577.5.  Further, Facebook's conduct also repeatedly violates Business and Professions Code §§ 17500 et seq., which prohibits advertising goods or services that Facebook knew or should have known were likely to deceive, Facebook's conduct also repeatedly violates California's Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750 et seq.) protecting consumers against unfair and deceptive business practices (Cal. Civ. Code § 1760) and various violations of Cal. Civ. Code 1770.  Finally, Facebook's conduct repeatedly violates Business and Professions Code §§ 16600 et seq. prohibiting contracts that restrain engagement in a lawful profession, trade or business of any kind.

> Facebook's conduct also violates **Section 5 of the Federal Trade Commission Act** (15 U.S.C. § 45) prohibiting unfair methods of competition in or affecting commerce and unfair or deceptive practices in or affecting commerce, Facebook's conduct further violates **Section 1 of the Sherman Act** prohibiting contracts in restraint of trade of commerce. Facebook's conduct further repeatedly violates **Section 2 of the Sherman Act** prohibiting the monopolization or attempt to monopolize any part of the trade or commerce among states. Facebook's conduct further repeatedly violates **Section 2 of the Clayton Act, the Robinson-Patman Price Discrimination Act**, prohibiting discrimination of price between different purchasers where the effect is to lessen competition or tend to create a monopoly, Facebook's conduct further repeatedly violates **Section 3 of the Clayton Act** prohibiting agreements that require avoidance of services or goods from competitors that tend to create a monopoly or lessen competition.  Facebook's conduct further repeatedly violates the Cartwright Act, Business and Professions Code §§ 16720 et seq., prohibiting trusts or actions in concert in restraint of trade or commerce.  Facebook's violations further include numerous per se violations resulting from tying agreements with a host of third parties.

> Finally, Facebook's conduct violates numerous other state laws that are accessible via Business and Professions Code §§ 17200 et seq., including but not limited to New York General Business Law §§ 349 et seq. prohibiting deceptive acts or practices in conduct of any business, trade or commerce or in the furnishing of any service.  Facebook's conduct further violates Business and Professions Code § 17200 et seq. by reason of its tortious conduct, including but not limited to constructive fraud, negligent misrepresentation of

---

[1]  The Second Amended Complaint also includes a claim for promissory estoppel.  On June 28, 2016, Facebook's demurrer was sustained as to this claim without leave to amend.

1  material fact, intentional interference with contract and intentional interference with
2  prospective business relations.

3  Exhibit C at 5–6 (emphasis added).

4  After receiving Six4Three's interrogatory response, counsel for Facebook approached Six4Three

5  to confirm that Six4Three in fact intended to pursue all of the federal and state claims identified in its

6  interrogatory response.  Exhibit E.  Facebook's counsel noted that it would understand Six4Three to be

7  pursuing all such claims if it did not hear otherwise from Six4Three by January 23.  Six4Three did not

8  respond, confirming that it is in fact relying upon the violation of federal laws, including federal antitrust

9  laws, as the predicate for its Section 17200 claims.

10  **IV.   SIX4THREE'S CONTENTIONS CONFIRM THAT THIS MATTER SHOULD BE
          REMOVED TO FEDERAL COURT.**

11

12  "[A]ny civil action brought in a State court of which the district courts of the United States have

13  original jurisdiction, may be removed by the defendant or the defendants, to the district court of the

14  United States for the district and division embracing the place where such action is pending."  28 U.S.C.

15  § 1441(a).  "The several district courts of the United States are invested with jurisdiction to prevent and

16  restrain violations of sections 1 to 7 of" the Sherman Act.  15 U.S.C. § 4.  "[A]ny person who shall be

17  injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor

18  in any district court of the United States in the district in which the defendant resides or is found or has

19  an agent . . . ."  15 U.S.C. § 15.

20  Pursuant 28 U.S.C. § 1446(b)(3) "if the case stated by the initial pleading is not removable, a

21  notice of removal may be filed within thirty days after receipt by the defendant, through service or

22  otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be

23  ascertained that the case is one which is or has become removable."  This notice of removal is being filed

24  within thirty days of Six4Three's interrogatory responses disclosing Six4Three's reliance on federal

25  antitrust laws as the predicate for its Section 17200 claim.

26  Because Six4Three's Section 17200 claim arises under federal antitrust law, it is necessarily

27  federal in character, and presents substantial, disputed questions of federal antitrust law.  *See, e.g.,*

28  *National Credit Reporting Ass'n, v. Experian Information Solutions, Inc.,* No. C04-01661 WHA, 2004

3

WL 1888769 (N.D. Cal. July 21, 2004).

**V.     CONCLUSION**

For the reasons stated above, this matter is properly removed to federal court, exclusive jurisdiction.


Dated:  January 24, 2017                              DURIE TANGRI LLP


                                            By: _____/s/ Laura E. Miller_____
                                                        LAURA E. MILLER

                                                Attorneys for Defendant
                                                Facebook, Inc.

# EXHIBIT A

1  Basil P. Fthenakis, Esq (88399)
2  CRITERION LAW
   2225 E. Bayshore Road, Suite 200
3  Palo Alto, California 94303
   Tel (650) 352-8400
4  Fax (650) 352-8408

5  Of counsel:

6  David S. Godkin
   Andrew A Caffrey, III
7  BIRNBAUM & GODKIN, LLP
   280 Summer Street
8  Boston, MA 02210
   (617) 307-6100
9  godkin@birnbaumgodkin com
   caffrey@birnbaumgodkin com
10

11 Attorneys for Plaintiff,
   SIX4THREE, LLC, a Delaware
12 limited liability company

13

14                SUPERIOR COURT OF CALIFORNIA

15                   COUNTY OF SAN MATEO

16

17 SIX4THREE, LLC, a Delaware limited      )  Case No
   liability company,                      )
18                                         )  COMPLAINT OF PLAINTIFF,
            Plaintiff,                      )  SIX4THREE, LLC, FOR INJUNCTION
19                                         )  AND DAMAGES FOR:
   v.                                      )  1  PROMISSORY ESTOPPEL,
20                                         )  2  INTENTIONAL INTERFERENCE
   FACEBOOK, INC., a Delaware corporation  )     WITH CONTRACT,
21 and DOES 1 through 50, inclusive        )  3  INTETIONAL INTERFERENCE WITH
                                           )     PROSPECTIVE BUSINESS
22          Defendants                      )     RELATIONS, AND,
                                           )  4  VIOLATION OF CALIFORNIA
23 _____)     BUSINESS AND PROFESSIONS
                                              CODE §§ 17200 ET SEQ
24

25 Plaintiff, Six4Three, LLC, alleges as follows:

26     1.    This matter concerns Defendant Facebook, Inc.'s unilateral decision to terminate

27 third-party developer access to part of the Facebook platform, which it had previously pledged to

28

   ────────────────────────────────────────────────
FINAL                              1
   Case No _____     Plaintiff's Complaint for Injunction and Damages

keep open  In reliance on Facebook's representations of open access to the Facebook platform, Plaintiff Six4Three, LLC ("643") invested considerable time, effort, and expense in developing an application, only to have that investment rendered worthless by Facebook's decision. 643 brings this action to make Facebook adhere to its open-access promise, or make 643 whole for the loss of its investment

## PARTIES

2      Plaintiff 643 is a Delaware Limited Liability Corporation with a principal place of business at 175 Varick Street, 4th Floor, New York, New York

3      On information and belief, Defendant Facebook, Inc , is a Delaware Corporation with a principal place of business of One Hacker Way, Menlo Park, California.

4.      Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as Does 1 through 50, inclusive, and each of them, and therefore sues said Defendants by such fictitious names  Plaintiff will amend this complaint when the true names and capacities of said Defendants have been ascertained  Plaintiff is informed and believes and thereon alleges, that Defendants Does 1 through 50, inclusive, and each of them, are legally responsible in some manner for the events and happenings referred to herein and proximately caused or contributed to the injuries to Plaintiff as hereinafter alleged  Wherever in this complaint any Defendant is the subject of any charging allegation by Plaintiff, it shall be deemed that said Defendants Does 1 through 50, inclusive, and each of them, are likewise the subjects of said charging allegation

5      Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each of the Defendants was the agent and employee of each of the remaining Defendants and, in doing the things herein alleged, was acting within the course and scope of said agency and employment

## FACTS

6      643 is an image pattern recognition startup company.

7.      Facebook operates a social networking service that enables users to connect and share information with their friends and family.

FINAL

Case No _____      Plaintiff's Complaint for Injunction and Damages

8      Facebook refers to the network of relationships between its users as the "Graph" or the "Social Graph"

9.      The Facebook Developer Platform (also called "Facebook Platform") enables third-party developers ("Developers") to make their applications and other services available to Facebook users.

10.      Facebook announced the opening of Facebook Platform to Developers on or about June 1, 2007.

11.      At the opening of Facebook Platform, Facebook stated· "With·this evolution of Facebook Platform, we've made it so that any developer can build the same applications that we can. And by that, we mean that they can integrate their application into Facebook — into the social graph — the same way that our applications like Photos and Notes are integrated."

12.      Facebook thereby permitted Developers to have open, equal access to integrate applications into Facebook.

13.      Facebook did not state or imply that access to Facebook Platform might later be rescinded or provided on an unequal basis.

14      As recently as March 16, 2015, this representation remained available on Facebook's web page.

15.      On or about April 21, 2010, Facebook announced the launch of Graph Application Programming Interface ("Graph API") at its developer conference.

16.      Graph API allows Developers, with the consent of a Facebook user, to read data from and write data to Facebook.

17.      Developers can only access Facebook content (referred to as "endpoints") with explicit permission from the user.

18.      Examples of endpoints include a user's birthdate, favorite athletes, or photos

19      Graph API also permits access to endpoints regarding a user's friends. One such endpoint is the set of photos that a user's friends had chosen to share with that user (the "Friends' Photos Endpoint") A user's friends can control access to their photos and other endpoints by Developers even if they are not users of the Developer application.

3

FINAL

20. By granting Developers access to the Friends' Photos Endpoint, Facebook allowed Developers to build applications that enabled a Facebook user to search the user's friends' photos via a Facebook platform application, assuming the user's friend provided such permission to Developers.

21 During the announcement of Graph API, Facebook touted several features of Graph API in order to increase its appeal to Developers such as 643.

22. Facebook emphasized how Graph API would become more and more open to developers: "As we open the graph, developers can use these connections to create a smarter, more personalized Web that gets better with every action taken."

23. Facebook also emphasized the business potential of Graph API: "Through Facebook's new tools and technologies, every developer — new and existing, big and small, novice and advanced — can engage users, build businesses and revolutionize industries."

24 As recently as March 16, 2015, these representations remained available on Facebook's web page.

25. 643 relied upon these representations, and others, as to the open nature of Graph API, and invested considerable time, energy, and money developing an application to make use of Graph API on Facebook.

26. In December 2012, 643 entered into the Facebook Developer Platform, which permitted 643 to develop applications using the Graph API.

27. 643 has developed a unique automated image classification capability, which it used to develop an application called Pikinis ("the App").

28. The App is available for download on any iOS-compatible device, including the iPhone and iPad. The App enables Facebook users to reduce time spent searching by automatically classifying photos that their friends have shared with them through Facebook's network, assuming their friends have provided such permission to Developers.

29 The App requires use of Facebook's Graph API, and specifically the Friends' Photos Endpoint.

1    30.    The App uses 643's pattern-recognition technology to search through shared
2    photos and identify those of their friends at the beach or in the summer.

3    31.    643 conducted initial user research that indicated considerable consumer demand
4    for the App.

5    32.    Facebook has never expressed any disapproval of the App.

6    33    643 made plans to market and promote the App to attract users.

7    34    643 sells the App for $1 99 in Apple's App store.

8    35    The basic version of the App allows a user to run a certain number of searches per
9    month.

10    36.    In addition, users can choose to pay for premium access, which allows unlimited
11    searching. 643 offers different pricing tiers for premium access, ranging from $1.99 for a monthly
12    subscription, to $6 99 for 6 months, to $9.99 for 12 months.

13    37.    Facebook benefits from the work of Developers such as 643 who create
14    applications for use with Facebook. These applications can enhance user experience and drive
15    traffic to Facebook's website and mobile app, which in turn generates revenue for Facebook
16    through advertising sales, its primary revenue stream.

17    38    On January 20, 2015, Facebook sent an email to 643 stating that 643 must
18    "upgrade" the App to Graph API v. 2.0 by April 30, 2015.

19    39.    The email stated that Facebook would end third-party access to the Friends'
20    Photos Endpoint on April 30, 2015

21    40    The App will not function at all without access to the Friends' Photos Endpoint, so
22    Facebook's suggestion that 643 "upgrade" the App to Graph API v. 2.0 was not possible.

23    41.    By deciding to end access to the Friends' Photos Endpoint, Facebook has made it
24    impossible for 643 to continue to operate the App, to abide by the license agreements and
25    purchase terms entered into by 643 with its users, and for 643 to recoup any of its investment of
26    capital, human labor, time, effort, and energy

27    42.    643 has sold approximately 5,000 copies of the App since launch.

28    43.    A substantial portion of App users have paid for premium access

FINAL

5

Case No. _____                    Plaintiff's Complaint for Injunction and Damages

1  44. Each one of the App users entered into a license agreement with 643

2  45. Facebook requires Developers to enter into license agreements with users of

3 applications for Facebook  These license agreements must, among other things, require that the

4 users of these applications adhere to Facebook's terms of service

5  46 Accordingly, Facebook knew, or had reason to know, about the existence of 643's

6 license agreements with its users.

7  47 Had Facebook refrained from ending access to Friends' Photos Endpoint, 643

8 could have quickly begun to generate hundreds of thousands of dollars of revenue on a monthly

9 basis

10  48. In total, 643 expended approximately \$1.15 million in capital and uncompensated

11 labor by its executives in developing and marketing the App

12  49. 643 attended Facebook events for Developers and made known the harm caused

13 verbally and via email to the appropriate Facebook employees

14  50 Faced with the imminent loss of its investment, 643 wrote to Facebook on March

15 16, 2015, and informed Facebook that its decision to discontinue access to the Friends' Photos

16 Endpoint would harm 643 in several ways  643 informed Facebook that it had reasonably relied

17 on Facebook's representations that the endpoints would remain open, and that Developers would

18 have an equal opportunity to integrate applications into the social graph.

19  51. 643 requested that Facebook continue to permit Developers to have access to the

20 Friends' Photos Endpoint.

21  52. 643 alerted Facebook to the considerable harm it would suffer should access be cut

22 off.

23  53 643 also noted that some of its users had entered into subscriptions that extend

24 beyond the April 30, 2015, cut-off date, and that these users could be entitled to refunds of their

25 purchases.

26  54 As of the date of this complaint, 643 has received no response to its letter

27  55. Facebook has not announced that it would change its policy.

28

FINAL

6

Case No _____    Plaintiff's Complaint for Injunction and Damages

1    56    In doing the things herein alleged, Facebook acted with fraud, malice and

2  oppression, and in reckless disregard of the rights of 643

### COUNT I: PROMISSORY ESTOPPEL
### [Against all Defendants]

5    57    643 re-alleges and repleads paragraphs 1 through 56 as though set forth fully

6  herein

7    58    Facebook clearly and unambiguously promised to keep open the Friends' Photos

8  Endpoint.

9    59.    643 invested considerable capital, labor, time, and effort into developing the App

10  in reliance on this promise.

11    60    643's reliance was reasonable.

12    61    643's reliance was foreseeable by Facebook.

13    62    643 was injured as a result of its reliance on Facebook's promise, which Facebook

14  did not keep, in an unascertained amount in excess of $25,000 00, to be established according to

15  proof at trial

16    63    Accordingly, Facebook is liable to 643 for damages.

### COUNT II: INTENTIONAL INTERFERENCE WITH CONTRACT
### [Against all Defendants]

19    64.    643 re-alleges and repleads paragraphs 1 through 63 as though set forth fully

20  herein

21    65.    643 had entered into license agreements and subscriptions for premium access

22  with its users

23    66    Facebook knew of these license agreements and subscriptions.

24    67    Facebook intentionally interfered with and disrupted these contracts when it stated

25  that it would end 643's access to the Friends' Photos Endpoint on April 30, 2015, despite

26  knowing that disruption of these contracts would be the natural result of ending 643's access.

27    68    As of April 30, 2015, if Facebook ends 643's access to the Friends' Photos

28  Endpoint as it has announced, then Facebook will further intentionally interfere with and disrupt

FINAL

7

1   643's contracts with its users, despite knowing that disruption of these contracts would be the

2   natural result of ending 643's access

3       69.     643's contract with its users was thereby disrupted, and as of April 30, 2015, 643's

4   contract with its users will be further disrupted.

5       70.     As a result, 643 has suffered and will suffer damage in an unascertained amount in

6   excess of $25,000.00 to be established according to proof at trial.

7       71.     Accordingly, Facebook is liable to 643 for damages.

8                       **COUNT III: INTENTIONAL INTERFERENCE WITH**
                        **PROSPECTIVE BUSINESS RELATIONS**
9                              **[Against all Defendants]**

10      72      643 re-alleges and repleads paragraphs 1 through 71 as though set forth fully

11  herein.

12      73.     643 had an expectation of economic benefit from third parties, including its users

13  who downloaded the App and other Facebook users who may have downloaded the App if 643

14  had marketed the App as it planned.

15      74.     Facebook knew of 643's relationship with the users of the App, and knew of 643's

16  plans to market the App widely.

17      75.     Facebook intentionally disrupted these relationships when it announced that it

18  would end 643's access to the Friends' Photos Endpoint on April 30, 2015, despite knowing that

19  disruption of these relationships would be the natural result of ending 643's access.

20      76.     As of April 30, 2015, if Facebook ends 643's access to the Friends' Photos

21  Endpoint as it has announced, then Facebook will further intentionally interfere with and disrupt

22  643's relationships with its users, despite knowing that disruption of these relationships would be

23  the natural result of ending 643's access

24      77.     643's relationship with its users was thereby disrupted, and will be further

25  disrupted.

26      78.     As a result, 643 suffered damage in an unascertained amount in excess of

27  $25,000.00 to be established according to proof at trial.

28      79.     Accordingly, Facebook is liable to 643 for damages

FINAL

Case No. _____                    Plaintiff's Complaint for Injunction and Damages

## COUNT IV: VIOLATION OF BUSINESS AND PROFESSIONS CODE §§ 17200 *et seq.*
### [Against all Defendants]

80      643 re-alleges and repleads paragraphs 1 through 79 as though set forth fully herein

81.     Facebook's decision to end access to the Friends' Photos Endpoint was unlawful

82.     643 suffered substantial injury as a result of Facebook's actions, including the loss of its investment in developing the App and lost revenue.

83.     No countervailing benefits of Facebook's decision to consumers or competitors exist.

84.     643 could not have reasonably avoided its injury because Facebook only announced its decision after 643 had made considerable investment and Facebook had approved the App.

85.     643 also requested that Facebook not end access to Friends' Photos Endpoint, but Facebook did not change its decision.

86.     Accordingly, Facebook is liable to 643 for violation of California's Unfair Business Practices Act.

87      As a proximate result of the acts and conduct of Facebook herein alleged, 643 has found it necessary to engage attorneys, and incur attorney's fees, and will continue to incur attorney's fees, in an unascertained amount to be established according to proof following the conclusion of trial

### JURY TRIAL DEMAND

88.     643 demands a trial by jury on all claims so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff 643 asks this Court to enter judgment against Defendant Facebook, Inc., as follows·

A.      A judgment or order declaring Facebook's conduct, as alleged, unlawful under California's Unfair Business Practices Act,

B.      A judgment, order, or award of damages adequate to compensate 643;

9

FINAL

1    C    A permanent injunction prohibiting Facebook from removing access to the

2  Friends' User Photos Endpoint,

3    D.    A permanent injunction prohibiting Facebook from interfering with 643's

4  contracts or prospective business relations;

5    E.    An award of its reasonable attorneys' fees and costs;

6    F.    Punitive damages and/or treble damages as provided by California's Unfair

7  Business Practices Act; and

8    G.    Such other further relief as this Court or a jury may deem proper and just.

9

10  Dated: _April 19, 2016_                    CRITERION LAW

11

12                                    By: _____

13                                        Basil P. Fthenakis, Esq.
                                         Attorney for Plaintiff
14                                        Six4Three, LLC

15                                        Of counsel:
                                         David S. Godkin
16                                        Andrew A. Caffrey, III

17

18

19

20

21

22

23

24

25

26

27

28

Case No. _____        Plaintiff's Complaint for Injunction and Damages

EXHIBIT B

Basil P. Fthenakis, Esq. (88399)
CRITERION LAW
2225 E. Bayshore Road, Suite 200
Palo Alto, California 94303
Tel. (650) 352-8400
Fax. (650) 352-8408

Of counsel:

David S. Godkin (admitted *pro hac vice*)
Andrew A. Caffrey, III (admitted *pro hac vice*)
BIRNBAUM & GODKIN, LLP
280 Summer Street
Boston, MA 02210
(617) 307-6100
godkin@birnbaumgodkin.com
caffrey@birnbaumgodkin.com

Attorneys for Plaintiff,
SIX4THREE, LLC, a Delaware
limited liability company

**FILED**
SAN MATEO COUNTY

FEB 2 6 2016

Clerk of the Superior Court
By _____
            DEPUTY CLERK

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| SIX4THREE, LLC, a Delaware limited liability company, <br><br> Plaintiff, <br><br> v. <br><br> FACEBOOK, INC., a Delaware corporation and DOES 1 through 50, inclusive <br><br> Defendants. | Case No. CIV 533328 <br><br> SECOND AMENDED COMPLAINT OF PLAINTIFF, SIX4THREE, LLC, FOR INJUNCTION AND DAMAGES FOR: <br> 1. VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200 ET SEQ.; <br> 2. PROMISSORY ESTOPPEL; <br> 3. NEGLIGENT MISREPRESENTATION; <br> 4. INTENTIONAL INTERFERENCE WITH CONTRACT; AND <br> 5. INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS. |

BY FAX

Plaintiff, Six4Three, LLC, alleges as follows:

1.     This matter concerns Defendant Facebook, Inc.'s campaign of promises, enticements, and representations to third-party software developers ("Developers") such as

1  Plaintiff Six4Three, LLC ("643"), to develop applications for Facebook, based on Facebook's

2  representations that Developers would have a level playing field, fair competition, and an

3  opportunity to grow their business. Facebook's campaign was part of a calculated strategy to

4  drive Facebook's own growth by leveraging the hard work of Developers. But once Facebook

5  decided it would prefer to no longer compete with Developers, it abruptly reversed course, and

6  broke its promise of fair competition in Facebook's platform. Facebook's conduct here is a classic

7  "bait and switch" tactic that is barred by California law, as detailed below.

8  **PARTIES**

9  2.  Plaintiff 643 is a Delaware Limited Liability Corporation with a principal place of

10  business at 535 Mission Street, 14th Floor, San Francisco, California.

11  3.  On information and belief, Defendant Facebook, Inc., is a Delaware Corporation

12  with a principal place of business of One Hacker Way, Menlo Park, California.

13  4.  Plaintiff is ignorant of the true names and capacities of the Defendants sued herein

14  as Does 1 through 50, inclusive, and each of them, and therefore sues said Defendants by such

15  fictitious names. Plaintiff will amend this complaint when the true names and capacities of said

16  Defendants have been ascertained. Plaintiff is informed and believes and thereon alleges, that

17  Defendants Does 1 through 50, inclusive, and each of them, are legally responsible in some

18  manner for the events and happenings referred to herein and proximately caused or contributed to

19  the injuries to Plaintiff as hereinafter alleged. Wherever in this complaint any Defendant is the

20  subject of any charging allegation by Plaintiff, it shall be deemed that said Defendants Does 1

21  through 50, inclusive, and each of them, are likewise the subjects of said charging allegation.

22  5.  Plaintiff is informed and believes, and thereon alleges, that at all times herein

23  mentioned, each of the Defendants was the agent and employee of each of the remaining

24  Defendants and, in doing the things herein alleged, was acting within the course and scope of said

25  agency and employment.

26  **FACTS**

27  6.  643 is an image pattern recognition startup company.

28

2

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

7.      Facebook operates a social networking service that enables users to connect and share information with their friends and family.

8.      Facebook refers to the network of relationships between its users as the "Graph" or the "Social Graph."

9.      The Facebook Developer Platform (also called "Facebook Platform") enables Developers to make their applications and other services available to Facebook users.

**I.   LAUNCH OF FACEBOOK PLATFORM IN 2007**

10.      At 3PM PDT on May 24, 2007, Mark Zuckerberg, Facebook Founder and CEO, made a self-described revolutionary announcement to a crowded room of software developers in San Francisco. Zuckerberg announced the launch of Facebook Platform, which he had described weeks earlier in an interview with Fortune magazine as "the most powerful distribution mechanism that's been created in a generation."[1] He went on in the Fortune interview to describe the motivation for creating Facebook Platform in this way: "We want to make Facebook into something of an operating system so you can run full applications," specifying that this development was the internet-equivalent to what Microsoft did with Windows, which allowed other developers to build applications for PCs. (See http://archive.fortune.com/2007/05/24/technology/facebook.fortune/index.htm.)

11.      In fact, Zuckerberg's first demonstration of Facebook Platform was purportedly to Bill Gates in early May 2007. Microsoft and Facebook had reached an agreement for Microsoft to purchase banner ads on Facebook in which Microsoft had guaranteed Facebook a minimum of $100 million per year through 2011. Facebook Platform was positioned by Facebook to Microsoft as the driving force behind meeting Facebook's ambitious growth metrics. At the time of this announcement, Facebook had just exceeded 20 million active users and had raised only $37.7 million in venture capital investment. Even at this modest point in Facebook's growth, its photo sharing application was the largest photo application on the Internet, and according to Facebook's

---

[1] In the quoted text here and elsewhere in the Second Amended Complaint, representations by Facebook or its employees have been underlined for emphasis.

1  own internal statistics, drew more than twice the traffic of the next three photo sites combined at

2  the time of the May 24, 2007 announcement of Facebook Platform.

3      12.   Zuckerberg announced that the three key elements of Facebook Platform were

4  "deep integration, mass distribution, and new opportunity." These were three key themes he

5  would repeat throughout the day and for years to come in numerous public conversations and

6  presentations. (See https://gigaom.com/2007/05/24/live-at-the-facebook-launch/.)

7      13.   Thus, Zuckerberg made three distinct promises: (1) promise of deep integration

8  with Facebook's social graph; (2) promise of Facebook's support in achieving mass distribution

9  of developer applications; and (3) promise of an opportunity to build a business on Facebook.

10     14.   By 8PM that evening, these key elements were memorialized on Facebook's

11  website with the official announcement "Facebook Platform Launches", stating "You can now

12  build applications that have the same access to integration into the social graph as Facebook

13  applications, such as photos, notes, and events…. The power of mass distribution is now in your

14  hands. You can gain distribution for your applications through the social graph like never before.

15  Applications can be virally engineered to reach millions of Facebook users quickly and efficiently

16  through the profile, news feed, and mini-feed…. With access to deep integration into the site, and

17  mass distribution through the social graph comes a new opportunity for you to build a business

18  with your application. You are free to monetize your canvas pages through advertising or other

19  transactions that you control." (See Facebook Platform Launches,

20  http://web.archive.org/web/20070706002021/http://developers.facebook.com/news.php?blog=1&

21  story=21).

22     15.   Facebook's announcement thus promised that (1) developers have "same access to

23  integration" for applications such as photos and notes as Facebook employees; (2) developers are

24  able to distribute applications through Facebook Platform; and (3) developers are able to

25  monetize applications through Facebook Platform.

26     16.   Zuckerberg went on to say: "The social graph is our base, and we've built a

27  framework that is completely optimized for developing social applications within our

28  environment…. We believe that there is more value for everyone in letting other people develop

4

1  applications on top of the base we've built than we could ever possibly provide on our own....

2  This is good for us because if developers build great applications then they're providing a service

3  to our users and strengthening the social graph.... This is a big opportunity. We provide the

4  integration and distribution and developers provide the applications. We help users share more

5  information and together we benefit."

6          17.    Zuckerberg thus promised that Facebook is committed long term to serving as a

7  platform that lets developers build applications on a level playing field because it is a big

8  opportunity for everyone.

9          18.    Zuckerberg then announced that Facebook had been working with over 70

10  developers in anticipation of the launch of Facebook Platform, including Amazon, Forbes, iLike,

11  Lending Club, Microsoft, Obama for America, Photobucket, Red Bull, Twitter, Uber, Virgin

12  Mobile USA, Warner Bros, Washington Post, and many others. (See live blog of F8 event from

13  leading Internet blogger, Mashable, at http://mashable.com/2007/05/24/facebook-f8-

14  live/#CIfbgFfPV5q0.)

15          19.    Around 4PM during Zuckerberg's presentation, he announced 5 case studies from

16  these early developer partners aimed at showing how easy it was for all developers to integrate

17  with Facebook Platform. Zuckerberg distributed case studies from Red Bull, Box.net, Lending

18  Club, Microsoft and Slide.com. Zuckerberg continued to emphasize during this public, annual

19  keynote to Developers that Facebook Platform is the single biggest and most revolutionary

20  change to Facebook since its inception, stating: "Every once in a while a platform comes along

21  that allows people to build a completely new application—sometimes even starts new industries."

22  (See https://gigaom.com/2007/05/24/live-at-the-facebook-launch/.)

23          20.    GigaOm, a leading Internet blogger, live blogged the event and further quoted

24  Zuckerberg as saying: "With photo-sharing, he explained, 'it's not just the photos that spread, it's

25  the whole photos application'. Third-party applications won't be treated like second-class citizens

26  on Facebook, he says; users can add them to their profiles and drag them and drop them to their

27  content. Applications can use Flash, JavaScript, and Silverlight if a user approves them. Outside

28  applications can issue unlimited notifications to users, and fit into the Facebook environment by

Case No. CIV 533328        Plaintiff's Second Amended Complaint for Injunction and Damages

1   accessing a 'friend selector' that spits out each users' connections. Now Zuckerberg says you can

2   serve ads on your app pages and keep all the revenue, sell them yourselves or use a network, and

3   process transactions within the site, keeping all the revenue without diverting users off

4   Facebook." (See https://gigaom.com/2007/05/24/live-at-the-facebook-launch/.)

5        21.   Zuckerberg thus promised that (1) developer applications won't be "second class

6   citizens"; (2) developer applications can access a user's connections and related user data made

7   available in the social graph; and (3) developer applications can sell ads through the Facebook

8   Platform.

9        22.   This grandiose language from Zuckerberg obviously sparked substantial questions

10   from the developer community so by 4:20PM pacific (1 hour and 20 minutes after the keynote

11   had started), Facebook had released the official "Facebook Platform FAQ", which was being

12   circulated among bloggers to educate developers further on this announcement. (See Exhibit 1,

13   Facebook F8 and Platform FAQ.) The Facebook Platform FAQ states, among other things:

14      **What is Facebook Platform?** Facebook Platform is a development system that enables

15      companies and developers to build applications for the Facebook website, where all of

16      Facebook's 24 million active users can interact with them. Facebook Platform offers deep

17      integration in the Facebook website, distribution through the social graph and an

18      opportunity to build a business.

19      * * *

20      **What's new in Facebook Platform?** We've been adding functionality since Facebook

21      Platform first shipped in beta in August 2006. With the latest evolution of Facebook

22      Platform however, third-party developers can now create applications on the Facebook

23      site with the same level of integration as applications built by internal Facebook

24      developers. Now developers everywhere have the ability to create Facebook applications

25      that deeply integrate into the Facebook site, as well as the potential for mass distribution

26      through the social graph and new business opportunities.

27      **Why did Facebook launch Facebook Platform?** Our engineers have created great

28      applications for Facebook, but we recognized that third-party developers can help us make

Case No. CIV 533328     Plaintiff's Second Amended Complaint for Injunction and Damages

Facebook an even more powerful social utility. Facebook Platform gives developers everywhere the tools to create applications that we just wouldn't have the resources to build in-house, and those applications make Facebook an even better way for our users to exchange information. Developers also benefit from the Facebook Platform as it gives them the potential to broadly distribute their applications and even build new business opportunities.

**What kinds of applications can be built on Facebook Platform?** The kinds of applications developers can build on Facebook Platform are limited only by their imaginations. Because applications are based on the Facebook social graph they can be more relevant to users, keeping people in touch with what and whom they care about. We've already seen a variety of applications built by our developer partners, including those for sharing media files, book reviews, slideshows and more. Some of the possibilities of Facebook applications are illustrated in the Facebook Platform Application Directory, available at http://facebook.com/apps.

**Are there any restrictions on what developers can build?** Developers are encouraged to exercise their creativity when building applications. Of course, all applications are subject to the Terms of Service that every developer agrees to, which include basic requirements such as not storing any sensitive user information, not creating any offensive or illegal applications, and not building anything that phishes or spams users. And users will always have the power to report any applications that compromise Facebook's trusted environment, keeping our users' information safe.

\* \* \*

**How will Facebook deal with applications that compete with one another or even compete with Facebook-built applications?** We welcome developers with competing applications, including developers whose applications might compete with Facebook-built applications. Many applications are likely to offer similar features. We've designed Facebook Platform so that applications from third-party developers are on a level playing field with applications built by Facebook. Ultimately, our users will decide which

7

1    applications they find most useful, and it is these applications that will become the most

2    popular.

3    * * *

4    **Can Facebook applications include ads?** We want to enable developers to build a

5    business on their Facebook applications, so we're giving developers the freedom to

6    monetize their applications as they like. Developers can include advertising on their

7    applications' canvas pages , though no advertising will be allowed within the application

8    boxes that appear within user profiles.

9    **Are you going to share revenue with developers?** While revenue sharing is not

10   available at launch, we are looking into ways to share advertising revenue with

11   developers. The version of Facebook Platform already lets developers monetize their

12   applications as they like, whether they choose to offer it for free or to build a business on

13   their application.

14   23.    In sum, these representations by Facebook reflected the following promises to

15   Developers:

16       a.   Developers would have "deep integration";

17       b.   Developers would have access to the "social graph";

18       c.   Developers would have "an opportunity to build a business."

19       d.   Developers would have the same level of integration and ability to develop apps in

20          the same manner as internal Facebook employees;

21       e.   Facebook will provide adequate tools necessary for Developers to build their

22          applications;

23       f.   Facebook will help Developers achieve broad distribution of their applications;

24       g.   so long as applications abide by Terms of Service (e.g. are not offensive or

25          unlawful), Facebook will be neutral as to the applications built on its operating

26          system;

27

28

Case No. CIV 533328        Plaintiff's Second Amended Complaint for Injunction and Damages

1       h.  any application that does not violate Terms of Service, phish or spam users,

2            contain offensive material, or break the law shall be accepted in Facebook

3            Platform;

4       i.  competing applications are welcome on Facebook's operating system;

5       j.  Facebook will remain neutral among competing applications;

6       k.  Facebook will remain neutral among its own applications and those of developers

7            regardless of whether they compete or not;

8       l.  applications similar in purpose and content will be allowed to compete on a "level

9            playing field"

10      m.  "level playing field" constitutes a definition of fairness in market competition, and

11          that definition of fairness means that ultimately users will decide which

12          applications win the market, not Facebook or other third parties;

13      n.  implicit in this definition of fairness based on user decision is the necessary

14          consequence that Facebook shall take no actions to promote its own applications

15          or preferred applications from companies that have a special relationship with

16          Facebook in order to slant this playing field in a manner that makes it less likely

17          for users ultimately to decide the winner;

18      o.  Facebook will enable Developers to build businesses on their operating system by

19          directly monetizing their applications on Facebook;

20      p.  Developers will be able to sell ads on their application pages; and

21      q.  Developers will have a choice as to whether they monetize their application on

22          Facebook's operating system.

## II. DEVELOPERS RESPONDED ENTHUSIASTICALLY TO THE LAUNCH OF FACEBOOK PLATFORM, JUST AS FACEBOOK INTENDED

24.    The blogging community went into an immediate and prolonged frenzy over this announcement. Paul B. Allen, founder of Ancestry.com and well known Internet blogger, summed up the general sentiment expressed by countless bloggers when he wrote that same day, "I saw history in the making today...I was lucky enough to be in San Francisco for the Facebook

9

1  f8 Platform launch event. This announcement was at least an 8.0 on the Richter scale. It was a

2  whopper.... A huge new opportunity was presented to the few hundred people in the room,

3  including 65 companies that have spent the last few weeks developing applications for the launch

4  of Facebook Platform. Facebook is inviting anyone to develop applications for their users on top

5  of what Mark calls their "social graph" – the core of their service which basically keeps track of

6  real people and their real connections to each other....[Facebook's] growth will be dramatically

7  accelerated by the Platform announcement. If Facebook is adding 100,000 new users per day with

8  its own few simple applications (like its photo sharing, a very simple service that has given

9  Facebook twice as many photos as all other photo sharing sites combined), what will happen

10  when thousands or tens of thousands of developers start building apps in Facebook and marketing

11  them to more users? Facebook will reach 50 million, then 100 million, then 200 million users, and

12  beyond. Rather than continue to try to develop features within its own proprietary, closed

13  network, basically keeping all of its users to itself...Facebook intuitively gets the concepts that

14  are so brilliantly discussed in Wikinomics (which are so non-intuitive to old schools business

15  types), and has chosen to open up its network for all to participate in...Application developers

16  can now have access to core Facebook features, such as user profiles and user connections, and

17  even publishing to the News Feed, all with the control and permission of Facebook users...When

18  Facebook has 100 million users, in the not too distant future, having the ability to develop an App

19  in their system will almost be like being able to get a link on Google's own home page." (See

20  http://www.paulallen.net/prediction-facebook-will-be-the-largest-social-network-in-the-world/.)

21       25.     To Developers, Facebook Platform represented not just an entire new operating

22  system, but an ecosystem that could potentially reorganize the entire Internet (potentially

23  replacing Google). The sentiment amongst Developers, as widely held throughout the industry

24  and reported by popular sites like TechCrunch (http://techcrunch.com/2007/05/24/facebook-

25  launches-facebook-platform-they-are-the-anti-myspace/) and the Wall Street Journal

26  (http://www.wsj.com/public/article/SB117971397890009177-

27  wjdKPmjAqS_9ZZbwiRp_CoSqvwQ_20070620.html), was that if you aren't building for

28  Facebook, you will be left behind.

10

26.      Facebook and the Developers who were selected to participate in the private beta of Facebook Platform quickly set out to make Developers comfortable with this grandiose vision and create a level of comfort to induce them to participate in this entirely new industry. For instance, on May 29, 2007, just five days after Zuckerberg's announcement of Facebook Platform, Venture Beat, the popular tech blog, did a Q&A with iLike founder, Ali Partovi, who was also an early advisor and shareholder of Facebook. iLike was the first successful application on Facebook Platform and for quite some time was the largest music application on the Facebook Platform. iLike was purchased by MySpace in 2009.

> Tell me about your experiences with Platform so far. You've been working on putting iLike on Facebook for several months now. Yet on the integration since Friday morning, there have been bugs and other issues on iLike's end. What's the status?
>
> Partovi: So, first to give you the back-story on how we got involved. Over the past several months, we've pushed and pushed with Facebook asking for some sort of exclusive relationship. They repeatedly said they won't do an exclusive relationship but would rather create a level playing field where we could compete with other third parties. We then gave up a bit, and we were actually a bit late to the game learning about the platform in detail. But when we finally did get access, our President, Hadi Partovi (my twin brother) took very little time to decide this was a huge strategic priority. That was a month ago. We re-prioritized everything else, and started moving our people off other projects onto this. First two or three people, then a few more, and by the end it was a huge group of engineers pulling back-to-back all-nighters for a week-long sprint to the launch.
>
> What made iLike think that Facebook Platform would be a big deal? What stood out about it?
>
> Hadi has a strong background in the concept of platforms...at 24 he became the head of product management in the IE group at Microsoft, and was a key player in the browser wars. A month ago, even though the Facebook Platform wasn't fully fleshed out, he saw just from the early beginnings of it that this could redefine web development. What he said was, 'in the history of computing, there was the personal computer, there was

11

1    Windows, there was the web, and now the Facebook Platform'. You can imagine that I

2    and most our company was pretty skeptical. But he makes these calls so we followed him.

3    As to what stood out, it's a combination of three things: (1) the technology itself –

4    Facebook Platform, like any platform, offers the developer building blocks to build apps

5    faster than they could if they were starting from scratch, and to tap into a rich source of

6    data & capabilities that would never otherwise be available; (2) the potential for viral

7    spread – due to the way the Facebook news feed works, an app can spread across the

8    community entirely by viral spread, as friends get notified when one person adopts

9    it…this essentially bypasses the idea of trying to make your app 'viral' as a standalone,

10   because Facebook is itself naturally viral; (3) the rhetoric from the Facebook management

11   team, starting from the CEO himself, made it clear that they have a long-term

12   commitment to a level playing field. For example, they absolutely refused to give us any

13   special advantage, insisting that the market needs to see a level playing field…we offered

14   them ownership in our company, money, etc – but they had no interest. Furthermore, they

15   built and launched their own 'video' app, but left it to 'compete' on its own merits

16   alongside other third-party apps rather than making it 'pre-installed' for all Facebook

17   users. So #1 and #2 made this something we had to jump on, and #3 made us comfortable

18   with the long-term strategic implications . (See http://venturebeat.com/2007/05/29/qa-

19   with-ilikes-ali-partovi-on-facebook/.)

20        27.    Partovi's comments immediately following Zuckerberg's announcement serve

21   both to reflect the general sentiment held by Developers – that Facebook had made clear its long

22   term commitment to a level playing field for Developers – and to show how Facebook's allies

23   (Partovi was an early advisor and shareholder after all), were committed to helping Facebook

24   grow its new operating system quickly and induce developers to participate with large

25   investments of capital. After all, iLike saw massive growth in the two years following its decision

26   to build on the Facebook Platform and was ultimately acquired by MySpace in 2009 in large part

27   due to that growth.

28

### III. FACEBOOK CONTINUED TO ACTIVELY PROMOTE FACEBOOK PLATFORM TO DEVELOPERS

28.     Three days after Partovi's Q&A with Venture Beat, on June 1, 2007 Facebook released its own statement further clarifying its intentions with Facebook Platform, entitled "Platform is Here".

"Last Friday, we promised more information, so here it is…. With this evolution of Facebook Platform, we've made it so that any developer can build the same applications that we can. And by that, we mean that they can integrate their application into Facebook—into the social graph—the same way that our applications like Photos and Notes are integrated. " (See https://www.facebook.com/notes/facebook/platform-is-here/2437282130/)

29.     Thus Facebook promised that developers will be able to build applications in the same way that Facebook can by accessing the social graph.

30.     As recently as February 23, 2016, this representation remained available on Facebook's web page.

31.     Throughout the summer of 2007 Facebook remained on the offensive about its long-term commitment to developers on Facebook Platform. Facebook held numerous Hackathons and Developer Meetups in various cities to introduce new developers to Facebook Platform, it launched a Developer Feed and Wiki on its website to educate the Developer community on the benefits of Facebook Platform and help them more seamlessly invest their capital and resources towards building applications on the Facebook Platform. Facebook also held contests with prizes for developers. Zuckerberg continued to emphasize the revolutionary impact Facebook Platform would have on the Internet as a whole during this time. For instance, on July 17, 2007, Zuckerberg was interviewed by Time Magazine:

**Time:** the frenzy surrounding Facebook seems to have intensified quite dramatically over the past several months. What do you think is behind the company's newfound cachet?

**Zuckerberg:** I think the most recent surge, at least in the press, is around the launch of Facebook Platform. For the first time we're allowing developers who don't work at

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

1  Facebook to develop applications just as if they were. That's a big deal because it means

2  that all developers have a new way of doing business if they choose to take advantage of

3  it. There are whole companies that are forming whose only product is a Facebook

4  Platform application. That provides an opportunity for them, it provides an opportunity for

5  people who want to make money by investing in those companies, and I think that's

6  something that's pretty exciting to the business community. " (See

7  http://content.time.com/time/business/article/0,8599,1644040,00.html)

8       32.     In these public statements to Time Magazine, Zuckerberg made at least four

9  distinct promises: (1) Facebook would allow developers to build applications as if they were

10  developers employed by Facebook; (2) Facebook would offer developers on Facebook Platform a

11  new way of doing business; (3) Facebook would support an ecosystem where entire companies

12  could be formed whose sole business activity was within the Facebook Platform ecosystem; (4)

13  Facebook would support an ecosystem where investors could reasonably rely on Facebook to

14  make money by investing in companies solely devoted to the Facebook Platform ecosystem.

15       33.     Then on September 17, 2007, Facebook went even further by setting up a $10

16  million fund exclusively devoted to providing grants to developers to build on Facebook

17  Platform. Facebook and its partners in the fund would not even take equity in the developer; they

18  were offering free money to build applications on Facebook Platform with the only commitments

19  being that the grantee use the money to build on Facebook Platform and that Facebook's partners

20  would have the opportunity to invest first if they were interested in doing so. When asked why

21  Facebook was forming this fund, it replied: "We are forming this fund to help grow the Facebook

22  application ecosystem. By decreasing the barrier to start a company, we hope to entice an even

23  larger group of people to become entrepreneurs and build a compelling business on Facebook

24  Platform. We hope this is also a funding model that other venture capitalists will follow. " (See

25  http://500hats.typepad.com/500blogs/2007/09/facebook-announ.html.)

26       34.     Facebook's conduct in providing free money to developers to build applications on

27  Facebook Platform implies a specific promise that it will support developers' opportunity to

28  "build a compelling business on Facebook Platform" and that it is committed long term to the

14

Case No. CIV 533328     Plaintiff's Second Amended Complaint for Injunction and Damages

1  stability of Facebook platform as an ecosystem that can support substantial investment and where

2  investors who participate in that ecosystem can expect a level playing field upon which to

3  generate a return on that investment.

4        35.      Indeed, others were quick to follow Facebook's lead in making investors

5  comfortable with supporting this new industry with large sums of capital. Numerous venture

6  capital firms or funds were soon after established that invested solely in Facebook applications. In

7  September 2007, Wired Magazine reported the following: "And by turning itself into a platform

8  for new applications, Facebook has launched a whole new branch of the software development

9  industry, just like Bill Gates did with MS-DOS in the 1980s. By allowing developers to charge

10 for their wares or collect the advertising revenue they generate, Zuckerberg set up a system for

11 every programmer to get paid for their efforts. Now venture capitalists like Bay Partners are

12 scrambling to fund almost anyone who has an idea for a Facebook application." (See

13 https://archive.wired.com/techbiz/startups/news/2007/09/ff_facebook?currentPage=all.)

14       36.      As a result of Facebook and its partners tremendous efforts in inducing Developers

15 to build applications on Facebook Platform and promising them the opportunity to build entire

16 industries, new sectors of investment and new types of applications, Facebook Platform quickly

17 became, in the words of AdWeek, "the most viral software distribution system ever". The overall

18 traffic to Facebook increased by one third within a mere three weeks of the announcement. By

19 December, the Facebook user base had gone from 24 million at the time of the announcement to

20 58 million, a 141% increase. Where Facebook had been adding about 100,000 new users per day

21 prior to Facebook Platform, it was now adding more than 250,000 users per day. (See

22 http://www.adweek.com/socialtimes/top-10-facebook-stories-of-2007/211540.)

23       37.      While it touted Facebook Platform to Developers around the world, Facebook did

24 not state or imply that access to Facebook Platform might later be rescinded or provided on an

25 unequal basis.

26       38.      By the end of 2009, in large part due to the Facebook Platform's success in

27 inducing developers to make investments in this new ecosystem, Facebook's user growth had

28

15

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

1  skyrocketed from 24 million active users at the time of the announcement of Facebook Platform

2  in May 2007 to over 350 million users in December 2009.

3        39.    In late 2009, Facebook released a document "A Look Back on the App Economy

4  of Facebook in 2009," in which it cited numerous success stories. For instance, Facebook app

5  Playfish was acquired by Electronic Arts that year for no less than $275 million. Watercooler, a

6  leading fantasy sports application on the Facebook Platform, successfully raised $5.5 million to

7  fuel its growth. Weardrobe was acquired by Like.com for an undisclosed sum. The document,

8  published by the Director of the Facebook Developer Network, ended: "We'd like to say thank

9  you to the developers and entrepreneurs who make up the Facebook Platform ecosystem and

10  congratulations on your accomplishments in 2009." (See

11  http://web.archive.org/web/20091223055629/http://developers.facebook.com/news.php?blog=1&

12  story=351.)

13  **IV. FACEBOOK LAUNCHED GRAPH API IN 2010**

14        40.    On or about April 21, 2010, Facebook announced the launch of Graph Application

15  Programming Interface ("Graph API") as a key new component of Facebook Platform at its

16  developer conference. Graph API allows Developers, with the consent of a Facebook user, to read

17  data from and write data to Facebook.

18        41.    Developers can only access Facebook content (referred to as "endpoints") with

19  explicit permission from the user. Examples of endpoints include a user's birthdate, favorite

20  athletes, or photos.

21        42.    Graph API also permits access to endpoints regarding a user's friends. One such

22  endpoint is the set of photos that a user's friends had chosen to share with that user (the "Friends'

23  Photos Endpoint"). A user's friends can control access to their photos and other endpoints by

24  Developers even if they are not users of the Developer's application.

25        43.    By granting Developers access to the Friends' Photos Endpoint, Facebook allowed

26  Developers to build applications that enabled a Facebook user to search the user's friends' photos

27  via a Facebook Platform application, assuming the user's friend explicitly provided such

28  permission. A user's friend had complete control over the permission settings. For instance, the

16

1   user's friend could provide access to all or no developers or to specific developers but not others,

2   as the user's friend saw fit.

3        44.      During the announcement of Graph API, Facebook touted several features of

4   Graph API in order to increase its appeal to Developers such as 643.

5        45.      Specifically, at the F8 Conference 2010, Zuckerberg announced: "The open graph

6   puts people at the center of the web – it means that the web can become a set of personally and

7   meaningfully semantic connections between people…Three years ago at our first F8 we launched

8   Facebook Platform, and together we all started an industry…We think what we have to show you

9   today will be the most transformative thing we've ever done for the web…Use the open graph to

10  make it so that people can have instantly social and personalized experiences everywhere they go.

11  We're gonna be announcing a few pieces of new technology that make this possible – the first is

12  the Graph API – makes it completely simple to read connections to Facebook's map of the

13  graph…implemented on top of an open standard." (See

14  https://www.youtube.com/watch?v=4SOcRKINiSM.)

15       46.      After Zuckerberg completed his keynote at F8 2010, Bret Taylor, a Facebook

16  employee, further explained what Graph API meant for developers: "With Graph API every

17  object in Facebook has a unique ID, whether that object is a user profile, event, etc…you just

18  need to download an object with a new ID or download a connection with a new name. So to

19  download my friends you just need to download /btaylor /friends… And this applies for every

20  single object in Facebook. So let's say Facebook launches a new feature next year. We're not

21  gonna make you download a new SDK. You just need to download an object with a new ID or

22  download a connection with a new name. All of the code you already wrote will continue to work

23  perfectly. This is a really significant change for our new platform that I'm sure you can

24  appreciate. For the first time via the search capability of the Graph API, we're giving developers

25  the capability to search over all the public updates on Facebook. I think this is gonna lead to a

26  bunch of cool new applications and I'm really excited to see where people go with this…. We've

27  built our core of the Facebook Platform from the ground up with simplicity, stability, and the

28

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

1    graph in mind. This graph that for the first time we're building together." (See

2    https://www.youtube.com/watch?v=4SOcRKINiSM.)

3        47.    Facebook's employee Bret Taylor thus promised that: (1) developers can access

4    Graph API objects in a simple manner ("you just need to download an object with a new ID"); (2)

5    the accessible objects are ubiquitous ("this applies for every single object in Facebook"); (3) this

6    access will be sustained and can be relied upon by developers ("All of the code you already wrote

7    will continue to work perfectly…We're not gonna make you download a new SDK") (a Software

8    Development Kit (or "SDK") is a set of software development tools that allows for the creation of

9    applications for a particular development platform); (4) developers can search over all objects for

10   all public updates on Facebook; and (5) Facebook Platform guarantees simplicity, stability and

11   your ability to access and help build the graph with us.

12       48.    The software industry uses a common and well-known convention of referring to

13   software by version number (e.g., version 1.0, 2.0, etc.) to signify the existence of separate

14   versions of software and to identify a particular version of the software. When Facebook

15   announced the launch of Graph API, it did not refer to Graph API as having different versions.

16   Facebook thereby signified that Graph API's open, equal, and neutral nature would not change.

17   This representation was of course a deliberate decision on Facebook's part to continue to entice

18   developers by conveying a sense of security around investing time, money and effort building

19   applications on its revolutionary platform.

20       49.    Facebook did not represent that it had reserved the right to terminate any endpoint

21   of Graph API. To the contrary, Facebook repeatedly expressed its long-term commitment to this

22   API.

23       50.    This extension of the Facebook Platform ecosystem to further expand its

24   reorganization potential for the entire Internet contributed even further to Facebook's meteoric

25   rise and induced even more investors and developers to expand the industry Facebook had

26   created. By way of example, on October 21, 2010, Facebook partnered with Kleiner Perkins

27   Caufield & Byers, Zynga and Amazon to launch a $250 million fund to invest in new apps on the

28   Facebook Platform. By September 19, 2011, Facebook Platform had created over 182,000 jobs

18

1   and $12.19 billion in value to the U.S. economy. Facebook now boasted over 850 million users as

2   of late 2011.

3       51.    On September 24, 2011, Facebook further extended its long-term commitment to

4   Facebook Platform by expanding Open Graph to accelerate its reorganization of the disparate

5   content on the Internet. (See http://mashable.com/2012/05/24/facebook-developer-platform-

6   infographic/#fDCxuACag5qr.) In his keynote address at F8 2011 on September 24, 2011,

7   Zuckerberg stated to a packed auditorium of developers: "The next era is defined by the apps and

8   depth of engagement that is now possible now that this whole network has been established… In

9   2007 in our very first F8 I introduced the concept of the social graph, all of the relationships

10  between people in the world. Last year we introduced the concept of the open graph as not only

11  the map of all the relationships but all of the connections in the world…. This year, we're taking

12  the next step: we're going to make it so that you can connect to anything you want in any way

13  you want…. Sometimes I think about what we're doing with the open graph is helping to define a

14  brand new language for how people connect…every year we take the next step and make some

15  new social apps possible. Open graph enables apps that focus primarily on two types of things:

16  the first is filling out your timeline, and the second is helping you discover new things through

17  your friends."

18      52.    Facebook thus made at least four distinct promises in this September 24, 2011

19  announcement: (1) Facebook has a long-term commitment to the Facebook Platform and ensuring

20  a fair playing field for developers and has had such a commitment for over four years now; (2)

21  Facebook is committed to extending the Facebook Platform to provide developers with more

22  ways to innovate and build businesses; (3) in keeping with this long term commitment, Facebook

23  will continue to help make new kinds of social apps possible; and (4) Facebook is in particular

24  focused on helping you discover new things through your friends and Facebook Platform will

25  enable developers seeking to do so.

26      53.    643 relied upon these representations, and others, as to the fair, level playing field

27  and the open, equal, and neutral nature of Facebook's Platform and Graph API, and invested

28

1  considerable time, energy, and money developing an application to make use of Graph API on

2  Facebook's Platform.

3  **V. THE FTC ORDERED FACEBOOK NOT TO MISREPRESENT THE MANNER**

4  **IN WHICH FACEBOOK PROVIDES ACCESS TO USER DATA**

5  54.     On or about July 27, 2012, the United States Federal Trade Commission ("FTC")

6  entered a Decision and Order (the "FTC Order") against Facebook.

7  55.     The FTC Order entered following a consent agreement between FTC and

8  Facebook.

9  56.     The FTC noted in the FTC Order that the FTC had reason to believe Facebook has

10  violated the Federal Trade Commission Act.

11  57.     The FTC Order provided, among other things, that Facebook and its

12  representatives "shall not misrepresent in any manner, expressly or by implication, the extent to

13  which it maintains the privacy or security of covered information . . . ."

14  58.     The FTC Order defined "covered information" to include an individual

15  consumer's photos, among other things.

16  59.     The FTC Order also provided that Facebook and its representatives "shall not

17  misrepresent in any manner, expressly or by implication . . . the extent to which [Facebook]

18  makes or has made covered information accessible to third parties."

19  **VI. IN DECEMBER 2012, PLAINTIFF 643 BECAME A FACEBOOK DEVELOPER**

20  **AND BEGAN DEVELOPING AN APPLICATION**

21  60.     In December 2012, 643 entered into the Facebook Developer Platform, which

22  permitted 643 to develop applications using the Graph API.

23  61.     643 has developed a unique automated image classification capability, which it

24  used to develop an application called Pikinis ("the App"). The App was available for download

25  on any iOS-compatible device, including the iPhone and iPad. The App enabled Facebook users

26  to reduce time spent searching by automatically classifying photos that their friends have shared

27  with them through Facebook's network, assuming their friends have provided such permission to

28  Developers.

20

62. The App required use of Facebook's Graph API, and specifically the Friends' Photos Endpoint. The App used 643's pattern-recognition technology to search through shared photos and identify those of their friends at the beach or in the summer.

63. The App could only be used to sort through photos that a user's friend had chosen to share with that user based on the friend's Facebook privacy settings. 643 conducted initial user research that indicated considerable consumer demand for the App, among both men and women. Facebook has never expressed any disapproval of the App as the only content it accesses is content already available on Facebook.

64. 643 made plans to market and promote the App to attract users.

65. 643 sold the App for $1.99 in Apple's App store. The basic version of the App allowed a user to run a certain number of searches per month. In addition, users could choose to pay for premium access, which allowed unlimited searching. 643 offered different pricing tiers for premium access, ranging from $1.99 for a monthly subscription, to $6.99 for 6 months, to $9.99 for 12 months.

66. Facebook benefits from the work of Developers such as 643 who create applications for use with Facebook. These applications can enhance user experience and drive traffic to Facebook's website and mobile app, which in turn generates revenue for Facebook through advertising sales, its primary revenue stream. It is no secret that Facebook's meteoric rise from 24 million users in 2007 to almost 1.6 billion users in 2016 rested in significant part on the release and growth of Facebook Platform.

**VII.   FACEBOOK RE-ITERATED ITS PROMISES RELATED TO GRAPH API AND FACEBOOK PLATFORM AT ITS 2014 F8 CONFERENCE**

67. The extension of the Graph API at F8 2011 was simply the next step in Facebook's long term commitment to serve as a platform for other developers, a commitment that every statement and action it took since May 2007 (a period of well over 4 years) reaffirmed without a shadow of a doubt. The extension of the Facebook Platform continued to accelerate the massive economy Facebook had built. By January 2012, Facebook Platform had created 232,000 jobs in the EU alone, amounting to $15.3 billion of value to the European economy. By February 2012,

21

1   250 million people were playing games on Facebook Platform each day (that is 12 times more

2   people than the average viewership of American Idol, the highest-rated TV show in the history of

3   television). By April 2012, 7 of the 10 highest grossing apps in the Apple App Store were built on

4   Facebook Platform. (See http://mashable.com/2012/05/24/facebook-developer-platform-

5   infographic/#fDCxuACag5qr.) It should be noted, in large part due to its long-term commitment

6   to the Facebook Platform, Facebook exceeded 1 billion users in 2012.

7          68.     By April 30, 2014, at the 2014 F8, having accumulated over 1.3 billion users,

8   Facebook decided that certain parts of this massive application ecosystem it had built (along with

9   hundreds of thousands of developers and billions of dollars of outside investment capital) were

10  better kept to itself. Despite having made this decision, Facebook made numerous promises that it

11  explicitly never intended to keep. Zuckerberg announced during his keynote: "This is gonna be a

12  different kind of F8. In the past we've had F8 when we've had a big product announcement or

13  new direction we were going in. This always meant a lot of different changes for your apps. Now

14  we're focused on building a stable mobile platform. You're trying to build great mobile apps and

15  businesses. And we want to bring this community together once per year to talk about all the

16  different things were doing to support you. We've heard from you that you want to use Facebook

17  Platform to do 3 things. Help you build, grow and monetize your apps."

18         69.     Thus, Zuckerberg reiterated the promise that Facebook had expressed to

19  developers unequivocally for over seven years now: that Facebook is committed in the long term

20  to helping them build, grow and monetize their apps.

21         70.     Zuckerberg continued: "As I said we're really focused on building a stable mobile

22  platform. And one thing you may not know, is that all of our mobile apps are built on top of the

23  very same platform and APIs that you guys use when you're writing Facebook and all our

24  engineers use the same tools and read all the same documentation that you do…. It's really

25  important for you and for all of our teams internally that we build stable and efficient

26  infrastructure that you can rely on for the long term. So this has been a really big focus for us…. I

27  want to start today by going through a few things we're doing to make our platform even more

28  stable and reliable for you to build, grow and monetize your apps. You want to be able to build

Case No. CIV 533328        Plaintiff's Second Amended Complaint for Injunction and Damages

1   something and know that it's gonna be able to work for a while. So today for the first time we're

2   introducing a 2-year stability guarantee for all of our core API platforms…so even if we change

3   these core APIs in the future, we're guaranteeing that we're going to keep supporting them as is

4   for at least two years and maybe longer from the time we make that change. We're still gonna

5   experiment with new features and different things but we're gonna mark them as beta so you

6   know what's gonna be part of this core stable platform. We're also introducing API versioning.

7   This is something we want to make sure that all the apps we wrote two years ago keep working.

8   This is something we wanted internally as we build on this platform, so now everything is gonna

9   be versioned so you get to decide which version of the API you get to build against."

10      71.     Accordingly, Zuckerberg made at least four promises that: (1) Facebook continues

11   to provide a level playing field to developers where developers use the same tools as Facebook

12   employees to develop apps; (2) Facebook continues to be committed in providing developer

13   access "that you can rely on for the long term"; (3) Facebook promises that for all of its core API

14   endpoints it will guarantee their stability for no less than two years going forward; (4) Facebook

15   promises that it will let developers choose which version of the API they would like to access as

16   it introduces API versioning ("This is something we want to make sure that all the apps we wrote

17   two years ago keep working. This is something we wanted internally as we build on this platform,

18   so now everything is gonna be versioned *so you get to decide* which version of the API you get to

19   build against.").

20      72.     Many developers initially applauded Zuckerberg's 2-year stability guarantee and

21   the ability to let developers choose which version of the API to build against. One blogger

22   applauded Facebook's commitment to developers in noting: "Facebook co-founder and CEO

23   Mark Zuckerberg announced a two-year stability guarantee for all of the company's core APIs

24   and platforms. In fact every API launched by Facebook will now be versioned, and developers

25   will be able to choose which version to build on." (See

26   http://thenextweb.com/facebook/2014/04/30/facebook-announces-two-year-stability-guarantee-

27   core-apis-sla-fix-major-bugs-within-48-hours/#gref.) TechCrunch and many other bloggers also

28   reported on the API Guarantee, stating that developers "will be able to build with confidence

Case No. CIV 533328          Plaintiff's Second Amended Complaint for Injunction and Damages

1  knowing that a core API will be available for at least two years". (See

2  http://techcrunch.com/2014/04/30/facebook-api-guarantee/.)

3  **VIII.   FACEBOOK THEN IMPLEMENTED POLICIES THAT DEPARTED RADICALLY FROM ZUCKERBERG'S ANNOUNCEMENT AT F8 2014**

4

5        73.      Unfortunately for the Developer community, Zuckerberg's announcement directly

6  contradicted the policy that Facebook immediately began implementing that very day.

7  Zuckerberg's statement that Developers, like Facebook employees, would be able to choose

8  which API to use was simply false, and he must have known this statement to be false at the time

9  he made it as only hours later Facebook sent Developers a notice that the Graph API they had

10  come to rely on and upon which Facebook had enticed them to invest billions of dollars around

11  was to be permanently retired in one year. Zuckerberg explicitly omitted and contradicted the

12  one-year lifespan of Graph API during his keynote address. But given that Zuckerberg's

13  announcement and the notice to developers occurred on the very same day, Zuckerberg must have

14  known of this change while making his statements and approved of such changes in advance.

15        74.      Moreover, the 2-year stability guarantee turned out not to apply to the original

16  Graph API and only to future APIs. Thus Facebook pulled the rug out from under the Developer

17  community and took full economic advantage of the ecosystem Developers had built, but

18  Zuckerberg's keynote address still generated sound bites consistent with his previous

19  representations that Facebook was maintaining a fair and level playing field for Developers.

20  Zuckerberg was forced to make statements he knew at the time to be false precisely because it

21  was obvious to everyone in the developer community, especially Zuckerberg, that Facebook had

22  for seven years been making clear and unambiguous promises to developers that they could rely

23  on Facebook Platform over the long term to provide a fair playing field and to enable developers

24  to build businesses.

25        75.      Finally, Graph API explicitly removed endpoints that were of high value to

26  Developers, like the ability to access Photos, which for years Facebook had touted as one of its

27  most valuable and highly trafficked features in order to entice developers to build applications.

28  Facebook's only justification for removing access to photos was that this endpoint was "rarely

1   used", which contravenes every public statement Facebook had previously stated for over seven

2   years in which Photos were consistently touted as its #1 application and driver of user

3   engagement, an application that captured more photos and traffic than the next three photo sites

4   on the Internet combined.

5         76.     Facebook's behavior of intentionally inducing Developers to build Facebook's

6   business and then pulling the rug out from under them is a repeated pattern in Facebook's growth

7   story. It is not an isolated incident simply related to Graph API versioning and the thousands of

8   developers, like 643, whose businesses were destroyed by this bait and switch tactic.

9         77.     As an example, Facebook recently executed another bait and switch tactic that

10  caused thousands of Developers to go out of business and lose countless millions of dollars of

11  enterprise value and capital investment. At the same time that Zuckerberg pulled the rug out from

12  Developers using photos and other endpoints in the Graph API at F8 2014, he also announced

13  Facebook's acquisition and reliance on Parse as its new preferred tool for developers to build on

14  Facebook Platform. Parse was a popular development platform for creating applications for

15  Facebook, which handled much of the back-end functionality of such applications, allowing

16  Developers to focus on features that matter to users. Zuckerberg stated in the same keynote where

17  he announced the Graph API 2.0: "One of the things we're really excited about offering is

18  Parse...We make it easy to focus on your app, the thing that will get you users and make you

19  money...and Parse takes care of all the rest." A Facebook employee who followed Zuckerberg on

20  stage went on to note that they had expanded the free tier to make it easier to grow on Parse,

21  giving developers "unlimited requests, unlimited recipients, free analytics". Zuckerberg then

22  finished his thoughts on Parse by saying "We're excited, we're aligned with your app, and we

23  hope that it does get huge."

24        78.     As a result of this and many other similar statements and actions by Facebook,

25  hundreds of thousands of Developers began using Parse to build applications on Facebook

26  Platform. Parse's platform on Facebook states: "From startups to the Fortune 500, hundreds of

27  thousands of developers trust us."

28

Case No. CIV 533328      Plaintiff's Second Amended Complaint for Injunction and Damages

79.     Then, abruptly, on January 28, 2016, Facebook announced that Parse would be shutting down: "We have a difficult announcement to make. Beginning today we're winding down the Parse service, and Parse will be fully retired after a year-long period ending on January 28, 2017. We're proud that we've been able to help so many of you build great mobile apps, but we need to focus our resources elsewhere." The statement continues: "We understand that this won't be an easy transition...We know that many of you have come to rely on Parse, and we are striving to make this transition as straightforward as possible."

80.     Many developers immediately commented on the devastating effect this would have on their app, business and investment in the Facebook Platform. One developer wrote: "@ParseIt Wow... Have spent months optimizing my app with your service to launch soon, and now this... Seems sudden... #utterlydisappointed." Another: "@ParseIt it would be nice to hear a little bit more about the need to focus your resources elsewhere." "@ParseIt my app had 2.5M users on your platform...this is sickening."

81.     The incident with Parse demonstrates a continued clear pattern on the part of Facebook to make clear and unambiguous promises to developers, to engage in conduct that induces developers to make substantial investments of time and money (all of which helped make Facebook one of the most valuable companies in the world today), and then Facebook seems to think that it can violate these promises with impunity the moment it becomes convenient for them to do so.

## IX. PLAINTIFF 643 RECEIVED NOTICE FROM FACEBOOK THAT ITS APP WOULD NO LONGER FUNCTION

82.     On January 20, 2015, Facebook sent an email to 643 stating that 643 must "upgrade" the App to Graph API v. 2.0 by April 30, 2015. The email stated that Facebook would end third-party access to the Friends' Photos Endpoint on April 30, 2015. The App will not function at all without access to the Friends' Photos Endpoint, so Facebook's suggestion that 643 "upgrade" the App to Graph API v. 2.0 was not possible.

83.     By deciding to end access to the Friends' Photos Endpoint, Facebook has made it impossible for 643 to continue to operate the App, to abide by the license agreements and

26

1  purchase terms entered into by 643 with its users, and for 643 to recoup any of its investment of

2  capital, human labor, time, effort, and energy.

3      84.   643 has sold approximately 5,000 copies of the App since its beta launch. A

4  substantial portion of App users have paid for premium access. 643 was not able to execute its

5  full public launch as a result of Facebook's decision.

6      85.   Each one of the App users entered into a license agreement with 643.

7      86.   Facebook requires Developers to enter into license agreements with users of

8  applications for Facebook. These license agreements must, among other things, require that the

9  users of these applications adhere to Facebook's terms of service.

10     87.   Accordingly, Facebook knew, or had reason to know, about the existence of 643's

11  license agreements with its users.

12     88.   Had Facebook refrained from ending access to Friends' Photos Endpoint, 643

13  could have quickly begun to generate hundreds of thousands of dollars of revenue on a monthly

14  basis.

15     89.   In total, 643 expended approximately $1.15 million in capital and uncompensated

16  labor by its team members in developing and marketing the App.

17     90.   643 attended Facebook events for Developers and made known the harm caused

18  verbally and via email to the appropriate Facebook employees.

19     91.   Faced with the imminent loss of its investment, 643 wrote to Facebook on March

20  16, 2015, and informed Facebook that its decision to discontinue access to the Friends' Photos

21  Endpoint would harm 643 in several ways. 643 informed Facebook that it had reasonably relied

22  on Facebook's representations that the endpoints would remain open, and that Developers would

23  have an equal opportunity to integrate applications into the social graph.

24     92.   643 requested that Facebook continue to permit Developers to have access to the

25  Friends' Photos Endpoint.

26     93.   643 alerted Facebook to the considerable harm it would suffer should access be cut

27  off. 643 also noted that some of its users had entered into subscriptions that extend beyond the

28  April 30, 2015, cut-off date, and that these users could be entitled to refunds of their purchases.

27

94.     Thus Facebook had actual knowledge of the contracts 643 had entered into with its users. In addition, Facebook had actual knowledge of the prospective economic relationships 643 expected with its users, as well as Facebook users generally.

95.     On or about April 30, 2015, Facebook did end access to the Friends' Photos Endpoint.

96.     As a result of Facebook ending access to the Friends' Photos Endpoint, the App no longer functions.

97.     On information and belief, Facebook has been working on its own applications using image recognition.

98.     On June 15, 2015, less than two months after closing access to the Friends' Photos Endpoint for Developers, Facebook announced the launch of "Moments," which allows users to "sync" photos they have taken with their friends and, using Facebook's facial recognition software, allows users to search photos that their friends have shared with them. *See* http://newsroom.fb.com/news/2015/06/introducing-moments/ (last accessed October 27, 2015).

99.     Instagram is an on-line photo sharing service that Facebook acquired in 2012.

100.    In June 2015, just two months after Facebook closed access to the Friends' Photos Endpoint, Instagram announced enhancements to its Search and Explore features, which allow users to search through photos that have been shared with that user on Instagram.

101.    On information and belief, in addition to 643, other Developers have been adversely impacted by Facebook closing access to certain endpoints of Graph API, including Friends' Photos.

102.    On September 21, 2015, the Wall Street Journal reported that Facebook's decision to restrict access to Graph API has caused a drug addiction researcher to halt his research efforts, shut down a voter-registration tool used by the 2012 Obama campaign, and decommissioned an app designed to help first generation college students connect with one another. Deepa Seetharaman & Elizabeth Dwoskin, "Facebook's Restrictions on User Data Cast a Long Shadow; Curbs disrupt startups, academic research and even political strategy"," THE WALL STREET J.,

Case No. CIV 533328        Plaintiff's Second Amended Complaint for Injunction and Damages

Sept. 22, 2015, at B1 (available at

http://www.wsj.com/articles/facebooksrestrictionsonuserdatacastalongshadow1442881332).

103.    The Wall Street Journal also reported in the same article that Facebook reached an unspecified compromise with dating app Tinder that permitted some form of access to photos of mutual friends.

104.    Facebook has not offered 643 a compromise that would permit the App to function and even if Facebook were to make such an offer, the harm to 643 is irreparable as its team members have moved on to new employment and its code has been fully retired.

105.    Instead, the only proposed technical "fix" by Facebook was to create an offline, searchable cache of Facebook's users' photos. But this solution (1) on its face violates Facebook's own terms, (2) would not permit the App to function as originally intended and in the same manner it had been, and (3) could result in a grave and substantial abuse of user trust, violate user privacy, and gut the core principle of an individual's ownership and control of their own data.

106.    Facebook did not terminate access to the Friends' Photos Endpoint for the purpose of enhancing user privacy, as users already possessed complete control over such data. Instead, it took these actions for the purpose of improperly monopolizing for itself the ability to access the data previously accessible through the Friends' Photos Endpoint and other terminated endpoints, and to create applications based on those data. As a result of these actions, users now have less control over this data. They are not permitted to share it with other applications they trust but only with Facebook.

107.    In sum, Facebook acts as a platform when it wants to exploit Developer creativity and resources, and a monopolist when it wants to secure areas of the ecosystem for itself once developer creativity and resources have been invested.

108.    As set forth above, Facebook made repeated, clear, and unambiguous promises upon which many developers, including 643, relied, over a period of more than seven years, and which were broken by Facebook. These broken promises directly and substantially harmed 643,

1   nullifying its investment of time and money and making it impossible to generate revenues and

2   profits.

3         109.   Facebook deliberately baited, induced, and enticed (through countless promises in

4   both words and conduct) developers to help turn Facebook from a website that had raised $37

5   million and secured 24 million users to a company that is now one of the most valuable

6   enterprises in the world.

7   **COUNT I: VIOLATION OF BUSINESS AND PROFESSIONS CODE §§ 17200 *et seq.***
**[Against all Defendants]**

8
9         110.   643 re-alleges and repleads paragraphs 1 through 109 as though set forth fully

    herein.

10
11        111.   Facebook's representations and conduct were designed to, and did, entice 643 and

12  other Developers to create applications for Facebook with promises of, among other things, a

13  level playing field, fair competition, and a chance to build a business. Facebook decided to open

    certain endpoints, and not others, precisely to induce developers to build certain types of

14  applications, including advanced photo-searching applications. Facebook promised Developers

15  that their own advanced photo-searching applications would be treated on a level playing field

16  with any photo-searching applications Facebook decided to launch in the future. Facebook also

17  promised developers it was committed over the long term to enable Developers to build

18  businesses using advanced photo-searching applications.

19
20        112.   Facebook caused substantial harm to 643 and other Developers when it then

21  decided to terminate Developers' ability to build advanced photo-searching applications, while

22  retaining its own ability to create these kinds of applications, because 643, like other Developers,

    had invested considerable time and resources in developing this kind of application for Facebook.

23
24        113.   The efforts by 643 and other Developers helped to drive user adoption of

25  Facebook by enhancing user experience, thus creating substantial additional revenue and user

    base for Facebook's benefit.

26
27        114.   In addition, Facebook took advantage of the market research and development

28  efforts by 643 and other Developers, which proved that advanced photo-searching applications

1  represented a massive market, perhaps one of the most attractive markets to help Facebook grow

2  its revenues going forward, as evinced by Facebook's recent announcement of "Moments", its

3  own photo searching application (see "Facebook Moments is a Smarter Photo App – Much

4  Smarter, in *Wired Magazine*, June 15, 2015, http://www.wired.com/2015/06/faccbook-

5  moments/).

6       115.   Facebook's decision to end access to the Friends' Photos Endpoint does not

7  enhance user privacy because the App could only sort through photos that had already been

8  shared with the App user and the App user and the user's friends had full control over which, if

9  any, developers were permitted to access their photos.

10       116.   Instead, by ending Developer access to the Friends' Photos Endpoint, Facebook

11  has monopolized for itself the ability to create applications capable of searching or sorting photos,

12  which harms consumers, Developers, and competitors.

13       117.   No countervailing benefits to competition or consumers stemming from

14  Facebook's representations and conduct exist.

15       118.   The harm to 643 and other Developers by Facebook's representations and conduct

16  outweighs the reasons, justifications, or motives for the representations and conduct by Facebook.

17       119.   643 could not have reasonably avoided its injury because Facebook only

18  announced its decision to terminate access to the Friends' Photos Endpoint after 643 had made

19  considerable investment and Facebook had approved the App.

20       120.   643 also requested that Facebook not end access to Friends' Photos Endpoint, but

21  Facebook did not change its decision.

22       121.   Facebook's actions thus constituted an unfair business practice under California's

23  Unfair Business Practices Act.

24       122.   Facebook's decision to end access to the Friends' Photos Endpoint was also

25  unlawful.

26       123.   In taking the actions alleged herein, Facebook acted with fraud, malice and

27  oppression, and in reckless disregard of the rights of 643.

28

Case No. CIV 533328    Plaintiff's Second Amended Complaint for Injunction and Damages

124.   643 suffered substantial injury as a result of Facebook's actions, including the loss of its investment in developing the App and lost revenue.

125.   Accordingly, Facebook is liable to 643 for violation of California's Unfair Business Practices Act.

126.   As a proximate result of the acts and conduct of Facebook herein alleged, 643 has found it necessary to engage attorneys, and incur attorney's fees, and will continue to incur attorney's fees, in an unascertained amount to be established according to proof following the conclusion of trial.

## COUNT II: PROMISSORY ESTOPPEL
### [Against all Defendants]

127.   643 re-alleges and repleads paragraphs 1 through 126 as though set forth fully herein.

128.   Facebook clearly and unambiguously promised that:

   a.   Developers would be able to integrate their applications into Facebook's social graph;

   b.   Developers would have the same access to integration of their applications as Facebook;

   c.   Developers could easily access Graph API objects;

   d.   Facebook would support Developers in achieving mass distribution of Developer applications;

   e.   Facebook would provide adequate tools for developers to build their applications;

   f.   Developers would be able to build a business on Facebook Platform;

   g.   Developers would be able to monetize their applications on Facebook by selling ads on their application pages;

   h.   Developers would be able to build applications on a fair, level playing field;

   i.   Developer applications would not be "second class citizens" compared to Facebook's own applications;

j.  Developer applications that compete with Facebook applications would be welcome; and

k.  As long as Developer applications abided by Facebook Terms of Service, Facebook will be neutral as to these applications.

129.  643 invested considerable capital, labor, time, and effort into developing the App in reliance on these promises.

130.  643's reliance was reasonable because Facebook had consistently made these representations for seven years without ever stating that it could prevent Developers from building the specific kinds of applications Facebook was enticing them to build all along.

131.  643's reliance was foreseeable by Facebook.

132.  643 was injured as a result of its reliance on Facebook's promises, which Facebook did not keep, in an unascertained amount in excess of $25,000.00, to be established according to proof at trial.

133.  Accordingly, Facebook is liable to 643 for damages.

### COUNT III: NEGLIGENT MISREPRESENTATION
**[Against all Defendants]**

134.  643 re-alleges and repleads paragraphs 1 through 133 as though set forth fully herein.

135.  Facebook represented that

a.  Developers would be able to integrate their applications into Facebook's social graph;

b.  Developers would have the same access to integration of their applications as Facebook;

c.  Developers could easily access Graph API objects;

d.  Facebook would support Developers in achieving mass distribution of Developer applications;

e.  Facebook would provide adequate tools for developers to build their applications;

f.  Developers would be able to build a business on Facebook Platform;

33

g.   Developers would be able to monetize their applications on Facebook by selling ads on their application pages;

h.   Developers would be able to build applications on a fair, level playing field;

i.   Developer applications would not be "second class citizens" compared to Facebook's own applications;

j.   Developer applications that compete with Facebook applications would be welcome; and

k.   As long as Developer applications abided by Facebook Terms of Service, Facebook will be neutral as to these applications.

136.   Such representations were untrue, because Facebook later claimed that it had retained for itself the right to terminate the Friends' Photos Endpoint, and did close the Friends' Photos Endpoint to Developers, while Facebook kept for itself the ability to develop applications that access photos.

137.   Regardless of its actual belief, Facebook must have made those representations without any reasonable ground for believing the representations to be true.

138.   Facebook conveyed the representations in a commercial setting for a business purpose, namely inducing Developers to develop applications for Facebook.

139.   Facebook made those representations with the intent to induce Developers, including 643, to develop applications, including the App, that used the Friends' Photos endpoint, thereby adding features to Facebook, enhancing Facebook's functionality and user experience, and generating more revenue for Facebook.

140.   643 was not aware that Facebook's representations were false, and 643 developed the App in reliance on the truth of Facebook's representations.

141.   643's reliance on the truth of Facebook's representations was justified because Facebook had consistently made these representations for seven years without ever stating that it could prevent Developers from building the specific kinds of applications Facebook was enticing them to build all along.

34

142.   643 was injured as a result of its reliance on Facebook's representations, in an unascertained amount in excess of $25,000.00, to be established according to proof at trial.

143.   In taking the actions alleged herein, Facebook acted with fraud, malice and oppression, and in reckless disregard of the rights of 643.

144.   Accordingly, Facebook is liable to 643 for damages.

## COUNT IV: INTENTIONAL INTERFERENCE WITH CONTRACT
### [Against all Defendants]

145.   643 re-alleges and repleads paragraphs 1 through 144 as though set forth fully herein.

146.   643 had entered into license agreements and subscriptions for premium access with its users.

147.   Facebook knew of these license agreements and subscriptions.

148.   Facebook intentionally interfered with and disrupted these contracts when it stated that it would end 643's access to the Friends' Photos Endpoint on April 30, 2015, despite knowing that interference with these contracts would be certain or substantially certain to occur as a result of Facebook's act in ending 643's access.

149.   Facebook further intentionally interfered with and disrupted 643's contracts with its users when it did terminate 643's access to the Friends' Photos Endpoint on April 30, 2015, despite knowing that interference with these contracts would be certain or substantially certain to occur as a result of Facebook's act in ending 643's access.

150.   643's contract with its users was thereby disrupted by Facebook.

151.   As a result, 643 has suffered and will suffer damage in an unascertained amount in excess of $25,000.00 to be established according to proof at trial.

152.   In taking the actions alleged herein, Facebook acted with fraud, malice and oppression, and in reckless disregard of the rights of 643.

153.   Accordingly, Facebook is liable to 643 for damages.

Case No. CIV 533328         Plaintiff's Second Amended Complaint for Injunction and Damages

## COUNT V: INTENTIONAL INTERFERENCE WITH
## PROSPECTIVE BUSINESS RELATIONS
### [Against all Defendants]

154.    643 re-alleges and repleads paragraphs 1 through 153 as though set forth fully herein.

155.    643 had an expectation of economic benefit from third parties, including its users who downloaded the App and other Facebook users who may have downloaded the App if 643 had marketed the App as it planned.

156.    Facebook knew of 643's relationship with the users of the App, and knew of 643's plans to market the App.

157.    Facebook intentionally disrupted these relationships when it announced that it would end 643's access to the Friends' Photos Endpoint on April 30, 2015, despite knowing that interference with these relationships would be certain or substantially certain to occur as a result of Facebook's act in ending 643's access.

158.    Facebook further intentionally interfered with and disrupted 643's relationships with its users when it did terminate 643's access to the Friends' Photos Endpoint on April 30, 2015, despite knowing that interference with these relationships would be certain or substantially certain to occur as a result of Facebook's act in ending 643's access.

159.    643's relationship with its users was thereby disrupted, and will be further disrupted.

160.    As a result, 643 suffered damage in an unascertained amount in excess of $25,000.00 to be established according to proof at trial.

161.    In taking the actions alleged herein, Facebook acted with fraud, malice and oppression, and in reckless disregard of the rights of 643.

162.    Accordingly, Facebook is liable to 643 for damages.

### JURY TRIAL DEMAND

163.    643 demands a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff 643 asks this Court to enter judgment against Defendant Facebook, Inc., as follows:

A.    A judgment or order declaring Facebook's conduct, as alleged, unlawful under California's Unfair Business Practices Act;

B.    A judgment, order, or award of damages adequate to compensate 643;

C.    A permanent injunction prohibiting Facebook from removing Developer access to the Friends' User Photos Endpoint;

D.    A permanent injunction prohibiting Facebook from interfering with 643's contracts or prospective business relations;

E.    An award of its reasonable attorneys' fees and costs;

F.    Punitive damages and/or treble damages as provided by California's Unfair Business Practices Act; and

G.    Such other further relief as this Court or a jury may deem proper and just.


Dated: February 26, 2016                    CRITERION LAW

                                            BIRNBAUM & GODKIN, LLP


                                            By: _____
                                               Basil P. Fthenakis, Esq.
                                               David S. Godkin (admitted *pro hac vice*)
                                               Andrew A. Caffrey, III (admitted *pro hac vice*)
                                               Attorneys for Plaintiff
                                               Six4Three, LLC

Case No. CIV 533328        Plaintiff's Second Amended Complaint for Injunction and Damages

# EXHIBIT 1



**f8 Event and Facebook Platform FAQ**

**What is f8?**
f8 was an event held at the San Francisco Design Center on May 24, 2007, during which Mark Zuckerberg unveiled the next evolution of Facebook Platform. The event included an eight-hour "hackathon," where both Facebook engineers and outside developers collaborated on building new applications on the new Facebook Platform.

**What is a "hackathon"?**
A hackathon is an all-night coding event during which Facebook engineers work on any project that interests them. Facebook uses the word "hackathon" to refer to a gathering of engineers, who possess technical expertise and collaborate on innovative projects. Facebook has a tradition of holding frequent developer hackathons, which have spawned some of the most popular features and applications on the site.

**What is Facebook Platform?**
Facebook Platform is a development system that enables companies and developers to build applications for the Facebook website, where all of Facebook's 24 million active users can interact with them. Facebook Platform offers deep integration into the Facebook website, distribution through the social graph and an opportunity to build a business.

**What is the social graph?**
The social graph is at the core of Facebook. It is the network of connections and relationships between people on Facebook and enables the efficient spreading and filtering of information. Just as people share information with their friends and the people around them in the real world, these connections are reflected online in the Facebook social graph.

**What is a Facebook application?**
A Facebook application uses Facebook Platform to access information from the social graph, offering users an experience that's relevant to them. Facebook applications can plug into the Facebook website in a number of ways: applications can be embedded on users' profile pages, reside on their own separate pages (called "canvas" pages), or live through desktop applications using data from the Facebook social graph.

**What's new in Facebook Platform?**
We've been adding functionality since Facebook Platform first shipped in beta in August 2006. With the latest evolution of Facebook Platform however, third-party developers can now create applications on the Facebook site with the same level of integration as applications built by internal Facebook developers. Now developers everywhere have the ability to create Facebook applications that deeply integrate into the Facebook site, as well as the potential for mass distribution through the social graph and new business opportunities.

**Why did Facebook launch Facebook Platform?**
Our engineers have created great applications for Facebook, but we recognized that third-party developers can help us make Facebook an even more powerful social utility. Facebook Platform gives developers everywhere the tools to create applications that we just wouldn't have the resources to build in-house, and those applications make Facebook an even better way for our users to exchange information. Developers also benefit from Facebook Platform as it gives them the potential to broadly distribute their applications and even build new business opportunities.

**What kinds of applications can be built on Facebook Platform?**
The kinds of applications developers can build on Facebook Platform are limited only by their imaginations. Because applications are based on the Facebook social graph they can be more relevant to users, keeping people in touch with what and whom they care about. We've already seen a variety of applications built by our developer partners, including those for sharing media files, book reviews, slideshows and more. Some of the

**facebook**

possibilities of Facebook applications are illustrated in the Facebook Platform Application Directory, available at http://www.facebook.com/apps.

**Are there any restrictions on what developers can build?**
Developers are encouraged to exercise their creativity when building applications. Of course, all applications are subject to the Terms of Service that every developer agrees to, which include basic requirements such as not storing any sensitive user information, not creating any offensive or illegal applications, and not building anything that phishes or spams users. And users will always have the power to report any applications that compromise Facebook's trusted environment, keeping our users' information safe.

**What are the benefits of Facebook Platform for users?**
With Facebook Platform, users gain the ability to define their experience on Facebook by choosing applications that are useful and relevant to them. Now that they have access to a virtually limitless set of applications from outside developers, users have an unprecedented amount of choice. They can share information and communicate with their trusted connections in ways that would never have been possible before Facebook opened its platform.

**How do users add applications to and remove applications from their account?**
If a user sees an application she likes on a friend's profile, she can add it to her account by clicking the "Add" link on the application's profile box. She can also add new applications by navigating to the application's specific page in the Facebook Platform Application Directory and clicking "Add Application" in the top-right corner. To remove an application, she first clicks "Applications" on the left navigation bar. From there, she can "Remove" any of the applications in her account, whether they are built by a developer partner or by Facebook.

**What are the privacy controls for Facebook Platform, and what kind of user information can be shared?**
On Facebook, users are always in control of their information and can choose how much of their information is made available to specific applications. With Facebook Platform, we're offering additional privacy controls and requiring that third parties treat user information with the same respect we do—and our users have come to expect. Users can also choose to completely opt out of making their data available through Facebook Platform. Applications can never violate users' basic privacy settings and are meant to provide users with a better opportunity to share their information with their friends and networks.

**What do third-party applications do with user information?**
Applications built by third parties are required to respect Facebook users' privacy preferences. Third-party applications allow users and their friends to share information in new ways, without affecting the security and privacy that they've always enjoyed on Facebook.

**How many applications are there for Facebook Platform?**
At f8, we are launching with over 85 applications from more than 65 developer partners, and that's only the beginning. We're encouraging interested developers everywhere to create Facebook applications. We have no limits on the number of applications that can be created.

**What differentiates Facebook applications from widgets on other sites?**
Facebook applications are deeply integrated into the site and take advantage of the network of real connections through which users share information and communicate—what we call the "social graph." Widgets are typically single-purpose Flash add-ons to-a web page (i.e, displaying a single video) that are not fully integrated into a site nor are aware of the social context among users.

**How will Facebook maintain its minimalist style if users can add and move applications around on their profile?**
We're giving our users the choice to add applications and control their placement in their profiles, but we're not changing the essential layout and familiar style of the Facebook site. Facebook applications are focused on providing new ways to spread information on Facebook, not about redesigning the way a profile looks. For example, users will not be able to change the site background, add music that plays when their profiles load, or



insert animation into their profiles. Individual applications may play media, music or animations but only when a visitor to that profile interacts with them.

**How will Facebook deal with applications that compete with one another or even compete with Facebook-built applications?**
We welcome developers with competing applications, including developers whose applications might compete with Facebook-built applications. Many applications are likely to offer similar features. We've designed Facebook Platform so that applications from third-party developers are on a level playing field with applications built by Facebook. Ultimately, our users will decide which applications they find most useful, and it is these applications that will become the most popular.

**How will Facebook monetize Facebook Platform?**
All the great applications built by our developer partners provide a service to our users and strengthen the social graph. The result is even more engaged Facebook users creating more advertising opportunities.

**Can Facebook applications include ads?**
We want to enable developers to build a business on their Facebook applications, so we're giving developers the freedom to monetize their applications as they like. Developers can include advertising on their applications' canvas pages, though no advertising will be allowed within the application boxes that appear within user profiles.

**Are you going to share revenue with developers?**
While revenue sharing is not available at launch, we are looking into ways to share advertising revenue with developers. This version of Facebook Platform already lets developers monetize their applications as they like, whether they choose to offer it for free or build a business on their application.

**What are the key technical elements of Facebook Platform?**
Facebook Platform offers several technologies that help developers use data from the social graph. In addition to the Facebook API, this recently launched version of Facebook Platform introduces Facebook Markup Language (FBML), which enables developers to build applications that deeply integrate into the Facebook site.  Facebook Platform also includes Facebook Query Language (FQL), which lets developers use a SQL-style interface to query the data they can access through the API.

For more details on the technology behind Facebook Platform, check out the Facebook Developer site at http://developers.facebook.com.

###

| Attorney or Party without Attorney:<br>ALAN H. PACKER, SBN 124724<br>NEWMEYER & DILLION LLP<br>1333 N. CALIFORNIA BLVD.<br>SUITE 600<br>WALNUT CREEK, CA 94596<br>*Telephone No:* 925-988-3200    *FAX No:* 925-988-3290 | *For Court Use Only*<br><br>**FILED**<br>SAN MATEO COUNTY<br><br>FEB 2 6 2016<br><br>Clerk of the Superior Court<br>By_____<br>DEPUTY CLERK |
|---|---|

*Attorney for:* Plaintiff    *Ref. No. or File No.:*

*Insert name of Court, and Judicial District and Branch Court:*
 Superior Court Of The State Of California - County Of San Mateo

*Plaintiff:* BUTLER REALTY, LLC
*Defendant:* CALIFORNIA CAPITAL INSURANCE COMPANY

| **PROOF OF SERVICE**<br>**SUMMONS** | *Hearing Date:* | *Time:* | *Dept/Div:* | *Case Number:*<br>CIV536982 |
|---|---|---|---|---|

*1. At the time of service I was at least 18 years of age and not a party to this action.*

2. I served copies of the SUMMONS; CIVIL CASE COVER SHEET; COMPLAINT; ADR INFORMATION PACKET; NOTICE OF CASE MANAGEMENT CONFERENCE

*3. a. Party served:*        CALIFORNIA CAPITAL INSURANCE COMPANY -
                DAVIS TINDALL, AGENT FOR SERVICE OF PROCESS
 *b. Person served:*       MICHAEL JOHNSON, CONTROLLER. AUTHORIZED TO ACCEPT SERVICE
                OF PROCESS.

*4. Address where the party was served:*  2300 GARDEN ROAD
                MONTEREY, CA 93940

*5. I served the party:*
 a. **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive
 process for the party (1) on: Thu., Jan. 21, 2016 (2) at: 9:22AM

*6. The "Notice to the Person Served" (on the Summons) was completed as follows:*
 *on behalf of:* CALIFORNIA CAPITAL INSURANCE COMPANY
 Under CCP 416.10 (corporation)

*7. Person Who Served Papers:*      Recoverable Cost Per CCP 1033.5(a)(4)(B)
 a. HECTOR GARCIA

              d. *The Fee for Service was:*

              e. I am: (3) registered California process server
  **First Legal** 1511 West Beverly Blvd.    (i) Independent Contractor
     Los Angeles, CA 90026    (ii) *Registration No.:* 100
     Telephone (213) 250-9111  (iii) *County:*   Monterey
     Fax    (213) 250-1197
     www.firstlegalnetwork.com

*8. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.*

 Date: Fri, Jan. 22, 2016

Judicial Council Form POS-010     PROOF OF SERVICE    HECTOR GARCIA
Rule 2.150.(a)&(b) Rev January 1, 2007   SUMMONS      *7240671  .newdi-sf.769089*

AMENDED
# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
ELIZABETH M.B. KARNAZES, EDWARD L. NOVAK, LAURA J.
WONS, and DOES 2 to 20, inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JOHN E. FERRY and KIRSTEN FERRY



FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

FILED
SAN MATEO COUNTY
FEB 2 6 2016
Clerk of the Superior Court
by
DEPUTY CLERK

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* San Mateo Superior Court<br>400 County Center<br>Redwood City, CA 94063 | CASE NUMBER:<br>*(Número del Caso):*<br>CIV535965 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
John E. Ferry and Kirsten Ferry / P.O. Box 55621, Hayward CA 94545 / (650) 421-8095

| DATE: FEB 2 6 2016<br>*(Fecha)* | , by RODINA M. CATALAN<br>*(Secretario)* | , Deputy<br>*(Adjunto)* |
|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)      ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)

          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

AMENDED   SUMMONS

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*



# EXHIBIT C

1   Basil P. Fthenakis, Esq. (88399)
    CRITERION LAW
2   2225 E. Bayshore Road, Suite 200
    Palo Alto, California  94303
3   Tel. (650) 352-8400
    Fax. (650) 352-8408
4   bpf@criterionlaw.com

5   Of counsel:

6   David S. Godkin (admitted *pro hac vice*)
    BIRNBAUM & GODKIN, LLP
7   280 Summer Street
    Boston, MA 02210
8   (617) 307-6100
    godkin@birnbaumgodkin.com
9
    James Kruzer (admitted *pro hac vice*)
10  BIRNBAUM & GODKIN, LLP
    280 Summer Street
11  Boston, MA 02210
    (617) 307-6100
12  kruzer@birnbaumgodkin.com

13

14  Attorneys for Plaintiff,
    SIX4THREE, LLC, a Delaware
15  limited liability company

16              SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                         COUNTY OF SAN MATEO

18

19  SIX4THREE, LLC, a Delaware limited          Case No. CIV533328
    liability company,
20                                              **PLAINTIFF SIX4THREE LLC'S**
                        Plaintiff,              **RESPONSE TO DEFENDANT**
21                                              **FACEBOOK, INC.'S SPECIALLY**
          v.                                    **PREPARED INTERROGATORIES (SET**
22                                              **TWO)**
    FACEBOOK, INC., a Delaware
23  corporation and DOES 1-50, inclusive,

24                      Defendant.

25

26

27

28

1 | **PROPOUNDING PARTY:**      **DEFENDANT FACEBOOK, INC.**

2 | **RESPONDING PARTY:**       **PLAINTIFF SIX4THREE LLC**

3 | **SET:**                    **ONE**

4 |     Plaintiff Six4Three, LLC ("643") hereby objects and responds as follows to the Specially

5 | Prepared Interrogatories (Set One) ("Special Interrogatories") propounded by Defendant

6 | Facebook, Inc. ("Defendant").

7 | **PLAINTIFF'S GENERAL OBJECTIONS**

8 |     Each and every Special Interrogatory is subject to the General Objections and limitations

9 | set forth herein ("General Objections"), in addition to the specific objections and limitations set

10 | forth in the respective responses. The General Objections and limitations form part of the

11 | Response to each Special Interrogatory and are set forth to avoid duplication for each response.

12 | 643 makes the following General Objections to each Special Interrogatory:

13 |     1.    Responding Party objects to the Special Interrogatories to the extent they are

14 | unduly burdensome and oppressive in the context of this action.

15 |     2.    Responding Party objects to these Special Interrogatories insofar as they seek

16 | communications protected by the Stored Communications Act, 18 U.S.C. §§ 2701, *et seq.*,

17 | ("SCA"), which prohibits service providers from disclosing electronic communication content

18 | stored on a remote computing service.

19 |     3.    Responding Party objects to these Special Interrogatories to the extent they seek

20 | information subject to the SCA pertaining to Users.

21 |     4.    Responding Party objects to these Special Interrogatories to the extent they seek

22 | information 643 is legally or contractually prohibited from disclosing, including information that

23 | would require Responding Party to breach a confidentiality contract, protective order, settlement,

24 | or other duty to a third party to maintain confidentiality.

25 |     5.    Responding Party objects to these Special Interrogatories to the extent they are

26 | unduly burdensome and oppressive in the context of this action.

27 |     6.    Responding Party objects to these Special Interrogatories to the extent they are

28 | covered by the attorney-client privilege, settlement privilege, work-product doctrine, or other

-1-

1   applicable privilege. Any such documents will not be provided in response to these requests for

2   production and any inadvertent production shall not be deemed a waiver of any privilege with

3   respect to such documents or of any work-product protections attaching to such documents.

4           7.      Responding Party objects to these Special Interrogatories to the extent they require

5   disclosure of documents containing proprietary or confidential information, trade secrets, or

6   information that may implicate third-party privacy rights.

7           8.      Responding Party objects to these Special Interrogatories to the extent they are

8   vague, ambiguous, unintelligible, overly broad, or harassing.

9           9.      Responding Party objects to these Special Interrogatories to the extent they seek

10  documents not relevant to the subject matter of this action or reasonably calculated to lead to the

11  discovery of admissible evidence.

12          10.     Responding Party objects to these Special Interrogatories to the extent they seek

13  information not within the possession, custody or control of Responding Party. An objection on

14  this ground does not constitute a representation or admission that such documents exist.

15          11.     Responding Party objects to these Special Interrogatories insofar as they seek

16  information already in Propounding Party's possession, custody or control, or that can be

17  obtained by Propounding Party with equal burden or directly from Users.

18          12.     Responding Party objects to these Special Interrogatories to the extent they attempt

19  to impose obligations beyond those required or allowed by the California Code of Civil

20  Procedure.

21          13.     Responding Party objects to the definitions of "Documents" and

22  "Communications" to the extent they impose any obligations with respect to the production of

23  electronically stored information that are different from or in addition to those imposed by the

24  California Code of Civil Procedure. Responding Party further objects to these definitions to the

25  extent they include electronically stored information that is not reasonably accessible due to

26  undue burden or expense, obtainable from another source that is less burdensome, and/or

27  unreasonably cumulative or duplicative, or where the likely burden or expense outweighs the

28  likely benefit.

-2-

1      14.     Responding Party objects to the definitions of "643," "Plaintiff," "You," and

2  "Your" on the grounds that they are overbroad and call for information covered by the attorney-

3  client and work product privileges.

4      15.     Responding Party's responses are based solely upon information presently

5  available and specifically known to Responding Party. As such, Responding Party's responses are

6  made without prejudice to its right subsequently to add, modify or otherwise change or amend

7  these responses. Responding Party reserves the right to change any of its objections or responses

8  as new information is discovered. Specifically, Responding Party reserves the right to introduce

9  other information or documents, use information that it may later determine to have been

10  responsive to these requests, and revise, correct, supplement or clarify any of its written responses

11  at any time.

12      These General Objections are incorporated into each and every objection to Propounding

13  Party's specific requests for production. All responses are subject to, preserve and do not

14  constitute a waiver of these General Objections.

15  ## OBJECTIONS AND RESPONSES TO SPECIAL INTERROGATORIES

16  **SPECIAL INTERROGATORY NO. 33:**

17      State ALL antitrust laws that YOU contend Facebook's conduct threatens an incipient

18  violation of, or violates the policy or spirit of.

19  **RESPONSE TO SPECIAL INTERROGATORY NO. 33:**

20      Responding Party incorporates each of the General Objections and further objects to this

21  demand to the extent that it: (1) is vague and ambiguous; (2) is overly broad and unduly

22  burdensome in seeking "ALL laws"; (3) calls for information covered by the attorney-client

23  privilege and work product privileges; (4) seeks information not relevant to the subject matter of

24  this litigation and not reasonably calculated to lead to the discovery of admissible evidence; and

25  (5) seeks information equally available to Defendant.

26      Subject to and without waiving the foregoing objections, Responding Party responds that

27  its analysis, investigation and discovery are ongoing and it does not intend to limit evidence at

28

1   trial to matters stated herein. Facebook's conduct repeatedly violates Business and Professions

2   Code § 17200 et seq. by engaging in: (1) unlawful business acts or practices; (2) unfair business

3   acts or practices; (3) fraudulent business acts or practices; (4) unfair, deceptive, untrue or

4   misleading advertising; and (5) business acts or practices prohibited by §§ 17500-17577.5.

5   Further, Facebook's conduct repeatedly violates Business and Professions Code §§ 17500 et seq.,

6   which prohibits advertising goods or services that Facebook knew or should have known were

7   likely to deceive. Facebook's conduct also repeatedly violates California's Consumer Legal

8   Remedies Act (Cal. Civ. Code §§ 1750 et seq.) protecting consumers against unfair and deceptive

9   business practices (Cal. Civ. Code § 1760) and various violations of Cal. Civ. Code § 1770.

10  Finally, Facebook's conduct repeatedly violates Business and Professions Code §§ 16600 et seq.

11  prohibiting contracts that restrain engagement in a lawful profession, trade or business of any

12  kind.

13          Facebook's conduct also violates Section 5 of the Federal Trade Commission Act (15

14  U.S.C. § 45) prohibiting unfair methods of competition in or affecting commerce and unfair or

15  deceptive practices in or affecting commerce. Facebook's conduct further violates Section 1 of

16  the Sherman Act prohibiting contracts in restraint of trade or commerce. Facebook's conduct

17  further repeatedly violates Section 2 of the Sherman Act prohibiting the monopolization or

18  attempt to monopolize any part of the trade or commerce among states. Facebook's conduct

19  further repeatedly violates Section 2 of the Clayton Act, the Robinson-Patman Price

20  Discrimination Act, prohibiting discrimination of price between different purchasers where the

21  effect is to lessen competition or tend to create a monopoly. Facebook's conduct further

22  repeatedly violates Section 3 of the Clayton Act prohibiting agreements that require avoidance of

23  services or goods from competitors that tend to create a monopoly or lessen competition.

24  Facebook's conduct further repeatedly violates the Cartwright Act, Business and Professions

25  Code §§ 16720 et seq., prohibiting trusts or actions in concert in restraint of trade or commerce.

26  Facebook's violations further include numerous per se violations resulting from tying agreements

27  with a host of third parties.

28

1    Finally, Facebook's conduct violates numerous other state laws that are accessible via

2 Business and Professions Code §§ 17200 et seq., including but not limited to New York General

3 Business Law §§ 349 et seq. prohibiting deceptive acts or practices in conduct of any business,

4 trade or commerce or in the furnishing of any service. Facebook's conduct further violates

5 Business and Professions Code § 17200 et seq. by reason of its tortious conduct, including but not

6 limited to constructive fraud, negligent misrepresentation of material fact, intentional interference

7 with contract and intentional interference with prospective business relations.

8 **SPECIAL INTERROGATORY NO. 34:**

9    State ALL laws that YOU contend Facebook's conduct violates RELATED TO YOUR

10 claim for violation of Business and Professions Code § 17200 et seq.

11 **RESPONSE TO SPECIAL INTERROGATORY NO. 34:**

12    Responding Party incorporates each of the General Objections and further objects to this

13 demand to the extent that it: (1) is vague and ambiguous; (2) is overly broad and unduly

14 burdensome in seeking "ALL laws"; (3) calls for information covered by the attorney-client

15 privilege and work product privileges; (4) seeks information not relevant to the subject matter of

16 this litigation and not reasonably calculated to lead to the discovery of admissible evidence; and

17 (5) seeks information equally available to Defendant.

18    Subject to and without waiving the foregoing objections, Responding Party responds that

19 its analysis, investigation and discovery are ongoing and it does not intend to limit evidence at

20 trial to matters stated herein. Facebook's conduct repeatedly violates Business and Professions

21 Code § 17200 et seq. by engaging in: (1) unlawful business acts or practices; (2) unfair business

22 acts or practices; (3) fraudulent business acts or practices; (4) unfair, deceptive, untrue or

23 misleading advertising; and (5) business acts or practices prohibited by §§ 17500-17577.5.

24 Further, Facebook's conduct repeatedly violates Business and Professions Code §§ 17500 et seq.,

25 which prohibits advertising goods or services that Facebook knew or should have known were

26 likely to deceive. Facebook's conduct also repeatedly violates California's Consumer Legal

27 Remedies Act (Cal. Civ. Code §§ 1750 et seq.) protecting consumers against unfair and deceptive

28 business practices (Cal. Civ. Code § 1760) and various violations of Cal. Civ. Code § 1770.

-5-

1    Finally, Facebook's conduct repeatedly violates Business and Professions Code §§ 16600 et seq.

2    prohibiting contracts that restrain engagement in a lawful profession, trade or business of any

3    kind.

4          Facebook's conduct also violates Section 5 of the Federal Trade Commission Act (15

5    U.S.C. § 45) prohibiting unfair methods of competition in or affecting commerce and unfair or

6    deceptive practices in or affecting commerce. Facebook's conduct further violates Section 1 of

7    the Sherman Act prohibiting contracts in restraint of trade or commerce. Facebook's conduct

8    further repeatedly violates Section 2 of the Sherman Act prohibiting the monopolization or

9    attempt to monopolize any part of the trade or commerce among states. Facebook's conduct

10   further repeatedly violates Section 2 of the Clayton Act, the Robinson-Patman Price

11   Discrimination Act, prohibiting discrimination of price between different purchasers where the

12   effect is to lessen competition or tend to create a monopoly. Facebook's conduct further

13   repeatedly violates Section 3 of the Clayton Act prohibiting agreements that require avoidance of

14   services or goods from competitors that tend to create a monopoly or lessen competition.

15   Facebook's conduct further repeatedly violates the Cartwright Act, Business and Professions

16   Code §§ 16720 et seq., prohibiting trusts or actions in concert in restraint of trade or commerce.

17   Facebook's violations further include numerous per se violations resulting from tying agreements

18   with a host of third parties.

19          Finally, Facebook's conduct violates numerous other state laws that are accessible via

20   Business and Professions Code §§ 17200 et seq., including but not limited to New York General

21   Business Law §§ 349 et seq. prohibiting deceptive acts or practices in conduct of any business,

22   trade or commerce or in the furnishing of any service. Facebook's conduct further violates

23   Business and Professions Code § 17200 et seq. by reason of its tortious conduct, including but not

24   limited to constructive fraud, negligent misrepresentation of material fact, intentional interference

25   with contract and intentional interference with prospective business relations.

26

27

28

1

2   DATED:  January 11, 2017                    CRITERION LAW

3                                               BIRNBAUM & GODKIN

4                                               By:

5                                                  Basil P. Fthenakis
                                                   David S. Godkin (admitted *pro hac vice*)
6                                                  James E. Kruzer (admitted *pro hac vice*)
                                                   Attorneys for Plaintiff
7                                                  Six4Three, LLC

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-7-

**PROOF OF SERVICE**

I, James E. Kruzer, declare:

I am a citizen of the United States and employed in Suffolk County, Massachusetts. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 280 Summer Street, Boston, MA 02210. On January 12, 2017, I served a copy of the within document(s):

PLAINTIFF SIX4THREE LLC'S RESPONSE TO DEFENDANT FACEBOOK, INC.'S SPECIALLY PREPARED INTERROGATORIES (SET TWO)

☒      By electronically mailing a true and correct copy through Birnbaum & Godkin, LLP's electronic mail system to the email addresses set forth below.

SONAL N. MEHTA (SBN 222086)
LAURA E. MILLER (SBN 271713)
CATHERINE Y. KIM (SBN 308442)
Durie Tangri LLP
217 Leidesdorff Street
San Francisco, CA  94111
Telephone: 415-362-6666
Facsimile: 415-236-6300
smehta@durietangri.com
lmiller@durietangri.com
ckim@durietangri.com

Attorney for Defendant
FACEBOOK, INC.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed January 12, 2017, at Boston, Massachusetts.

_____
James E. Kruzer

Case No. 533328      643 RESPONSE TO FACEBOOK'S SPECIAL INTERROGATORIES (SET TWO)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, Ted Kramer, as a certified representative of Plaintiff Six4Three LLC ("643"), certify and declare under penalty of perjury under the laws of the state of California that I have read and reviewed 643's Answers to Facebook's Second Set of Specially Prepared Interrogatories; and believe them to be true and accurate based on the information available to 643 at the present time.

Executed January 11, 2017, at San Francisco, California.

_____

By: Ted Kramer

-1-

# EXHIBIT D

## Case Information

CIV533328 | SIX4THREE, LLC VS FACEBOOK, INC, ET AL

| Case Number | Court | File Date |
|---|---|---|
| CIV533328 | Civil Unlimited | 04/10/2015 |
| Case Type | Case Status | |
| (07) Unlimited Business Tort/Unfair Business Practice | Active | |

## Party

**Plaintiff**
SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT COMPANY

Active Attorneys ▾
Lead Attorney
FTHENAKIS, BASIL P
Retained

**Defendant**
FACEBOOK, INC, A DELAWARE CORPORATION

Active Attorneys ▾
Attorney
MILLER, LAURA E.
Retained

Attorney
KIM, CATHERINE Y.
Retained

Lead Attorney
MEHTA, SONAL N
Retained

Inactive Attorneys ▾
Attorney
SCHWARTZ, JULIE E
Retained

## Cause of Action

| File Date | Cause of Action | Type | Filed By | Filed Against |
|---|---|---|---|---|
| 04/10/2015 | Complaint | Action | SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT COMPANY | FACEBOOK, INC, A DELAWARE CORPORATION |

## Events and Hearings

04/10/2015 Complaint ▾

(S) COMPLAINT FILED

Comment
COM: (S) COMPLAINT FILED

04/10/2015 Conversion Minute ▾

Comment
*FEE: 150410-0768-CK 194/ 435.00 PAYMT

04/10/2015 Conversion Minute ▾

Comment
*REFNM: 150410-0768-CK REFERENCE NUMBER D3395386

04/10/2015 Civil Case Cover Sheet ▾

CIVIL CASE COVERSHEET RECEIVED

Comment
CCS: CIVIL CASE COVERSHEET RECEIVED

04/10/2015 Summons Issued / Filed ▾

30 DAY SUMMONS, ISSUED AND FILED.

Comment
S30IF: 30 DAY SUMMONS, ISSUED AND FILED.

04/10/2015 New Filed Case

04/10/2015 Cause Of Action ▾

| Action | File Date |
| --- | --- |
| Complaint | 04/10/2015 |

06/09/2015 Conversion Action ▾

Comment
EXFEE: EX-PARTE FEE PAID BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

06/09/2015 Conversion Minute ▾

Comment
*FEE: 150609-0544-CK 036/ 60.00 PAYMT

06/09/2015 Conversion Minute ▾

Comment
*REFNM: 150609-0544-CK REFERENCE NUMBER 123

06/09/2015 Ex Parte Application ▾

EX PARTE APPLICATION ORDER EXTENDING TIME FOR SERVICE OF PROCESS FILED.

Comment
EXV: EX PARTE APPLICATION ORDER EXTENDING TIME FOR SERVICE OF PROCESS FILED.

06/09/2015 Declaration ▾

DECLARATION OF BASIL P. FTHENAKIS REGARDING NOTICE OF PLAINTIFF'S APPLICATION FOR EX PARTE ORDER FI

Comment
DECL: DECLARATION OF BASIL P. FTHENAKIS REGARDING NOTICE OF PLAINTIFF'S APPLICATION FOR EX PARTE ORDER FILED BY SIX4THREE, LLC, A DELAWARE
LIMITED LIABILIT

06/09/2015 Declaration ▾

DECLARATION OF BASIL P. FTHENAKIS IN SUPPORT OF APPLICATION FOR EX PARTE ORDER EXTENDING FILED BY S

Comment
DECL: DECLARATION OF BASIL P. FTHENAKIS IN SUPPORT OF APPLICATION FOR EX PARTE ORDER EXTENDING FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

06/09/2015 Memorandum of Points & Authorities Filed ▾

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN SUPPOR

Comment
MPA: MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN SUPPORT OF APPLICATION FOR EX PARTE ORDER EXTENDING TIME FOR SERVICE OF PROCESS

06/09/2015 Order ▾

ORDER EXTENDING TIME FOR SERVICE OF PROCESS, SIGNED BY JUDGE SCOTT ON 06/09/15 FILED.

Comment
O2: ORDER EXTENDING TIME FOR SERVICE OF PROCESS, SIGNED BY JUDGE SCOTT ON 06/09/15 FILED.

06/16/2015 Conversion Action ▾

Comment
*620*: HCMC1I CALENDARED ON 08/21/15 IN DEPT. 7. HAS BEEN UPDATED TO 08/21/15 IN DEPT. 21.

07/10/2015 Conversion Action ▾

PROOF OF SERVICE (QUESTIONABLE SERVICE) OF SUMMONS AND COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMI

Comment
PSQS: PROOF OF SERVICE (QUESTIONABLE SERVICE) OF SUMMONS AND COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT AS TO FACEBOOK, INC, A DELAWARE CORPORATION FILED. SERVICE QUESTIONABLE BECAUSE NAMED DEFENDANT MUST MATCH COMPLAINT EXACTLY.

08/03/2015 Proof of Service by PERSONAL SERVICE of ▾

PROOF OF SERVICE (PERSONAL) OF PLAINTIFF'S FIRST SET OF DEMANDS FOR INSPECTION DOCS TO DEFT FACEBOO

Comment
PSN2: PROOF OF SERVICE (PERSONAL) OF PLAINTIFF'S FIRST SET OF DEMANDS FOR INSPECTION DOCS TO DEFT FACEBOOK, INC SERVED ON FACEBOOK, INC, A DELAWARE CORPORATION WITH SERVICE DATE OF 07/31/15 FILED.

08/06/2015 Case Management Statement ▾

CASE MANAGEMENT STATEMENT FILED BY FACEBOOK, INC, A DELAWARE CORPORATION.

Comment
CMS: CASE MANAGEMENT STATEMENT FILED BY FACEBOOK, INC, A DELAWARE CORPORATION.

08/06/2015 Proof of Service by MAIL of ▾

PROOF OF SERVICE (BY MAIL) OF CASE MANAGEMENT STATEMENT SERVED ON SEE SERVICE LIST WITH A SERVICE D

Comment
PSN3: PROOF OF SERVICE (BY MAIL) OF CASE MANAGEMENT STATEMENT SERVED ON SEE SERVICE LIST WITH A SERVICE DATE OF 08/06/15 FILED.

08/06/2015 Case Management Statement ▾

CASE MANAGEMENT STATEMENT FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

Comment
CMS: CASE MANAGEMENT STATEMENT FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

08/13/2015 First Paper Fee Paid ▾

Comment
FFP4: MOTION FEE PAID BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

08/13/2015 Conversion Minute ▾

Comment
*FEE: 150813-0215-CK 037/ 20.00 PAYMT

08/13/2015 Conversion Minute ▾

Comment
*REFNM: 150813-0215-CK REFERENCE NUMBER 007780

08/13/2015 Conversion Action ▾

Comment
*620*: HCMC1I CALENDARED ON 08/21/15 IN DEPT. 21. HAS BEEN UPDATED TO 08/21/15 IN DEPT. 7.

08/17/2015 Conversion Action ▾

Comment
COMM1: DPET 7 STIP TO EXTEND TIME TO RESPOND TO COMPLT

08/20/2015 Stipulation & Order ▾

STIPULATION AND ORDER TO EXTEND TIME TO RESPOND TO COMPLAINT FILED BY SIX4THREE, LLC, A DELAWARE LI

Comment
SO: STIPULATION AND ORDER TO EXTEND TIME TO RESPOND TO COMPLAINT FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT, FACEBOOK, INC, A DELAWARE CORPORATION.

08/20/2015 Notice ▾

NOTICE OF JURY FEE DEPOSIT BY PLAINTIFF FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

Comment
N: NOTICE OF JURY FEE DEPOSIT BY PLAINTIFF FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

08/21/2015 Conversion Hearing ▾

CASE MANAGEMENT CONFERENCE

| Judicial Officer | Comment |
| --- | --- |
| Dylina, Steven L | CASE MANAGEMENT CONFERENCE |

08/21/2015 Conversion Minute ▾

| Judicial Officer | Comment |
| --- | --- |
| Dylina, Steven L | JCR1: HONORABLE STEVEN L. DYLINA, JUDGE PRESIDING. CLERK: CHERYL LYSSAND. COURT REPORTER: NONE. |

08/21/2015 Conversion Minute ▾

Comment
FFT: ATTORNEY(S): ANDREW CAFFREY AND BASIL P. FTHENAKIS APPEARED BY COURTCALL ON BEHALF OF THE

08/21/2015 Conversion Minute ▾

Comment
FFT: PLAINTIFF.

08/21/2015 Conversion Minute ▾

Comment
AT: ATTORNEY(S): JULIE E. SCHWARTZ APPEARED BY COURTCALL ON BEHALF OF THE DEFENDANT.

08/21/2015 Conversion Minute ▾

Comment
COM: THE COURT IS INFORMED THE RESPONSIVE PLEADING IS DUE SEPTEMBER 8, 2015.

08/21/2015 Conversion Minute ▾

Comment
HC: HEARING CONTINUED TO 11/13/15 AT 09:00 IN DEPARTMENT 21.

08/21/2015 Conversion Minute ▾

Comment
PDUCMS: PLAINTIFF AND DEFENDANT SHALL SUBMIT AN UPDATED CASE MANAGEMENT STATEMENT.

08/21/2015 Conversion Minute ▾

Comment
MICMS: ENTERED BY C LYSSAND ON 08/21/15.

08/21/2015 Conversion Minute ▾

Comment
COM1: - 5 -

**08/21/2015 Conversion Minute ▾**

Comment

PMO: MINUTE ORDER PRINTED.

**08/21/2015 Advance jury fee (Nonrefundable) ▾**

Comment

AJFEE: ADVANCE JURY FEE POSTED BY PLAINTIFF ON BEHALF OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

**08/21/2015 Conversion Minute ▾**

Comment

*FEE: 150821-0186-CK 209/ 150.00 PAYMT

**08/21/2015 Conversion Minute ▾**

Comment

*REFNM: 150821-0186-CK REFERENCE NUMBER D3429513

**08/21/2015 Case Management Conference ▾**

Original Type

Case Management Conference

Judicial Officer

Dylina, Steven L

Hearing Time

9:00 AM

Result

Conversion Continuance

Comment

Dept: 7 CASE MANAGEMENT CONFERENCE

**09/08/2015 First Paper Fee Paid ▾**

Comment

FFP: FIRST PAPER FEE PAID BY FACEBOOK, INC, A DELAWARE CORPORATION.

**09/08/2015 Conversion Minute ▾**

Comment

*FEE: 150908-0735-CK 195/ 435.00 210/ 30.00 PAYMT

**09/08/2015 Conversion Minute ▾**

Comment

*REFNM: 150908-0735-CK REFERENCE NUMBER 008687

**09/08/2015 Conversion Action ▾**

(S) DEMURRER TO COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED BY FACEBOOK, INC, A

Comment

DEM: (S) DEMURRER TO COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED BY FACEBOOK, INC, A DELAWARE CORPORATION REPRESENTED BY JULIE E SCHWARTZ

**09/08/2015 Request for Judicial Notice ▾**

REQUEST FOR JUDICIAL NOTICE OF IN SUPPORT OF DEMURRER TO PLTF'S COMPLAINT FILED BY FACEBOOK, INC, A

Comment

RJN: REQUEST FOR JUDICIAL NOTICE OF IN SUPPORT OF DEMURRER TO PLTF'S COMPLAINT FILED BY FACEBOOK, INC, A DELAWARE CORPORATION.

**09/08/2015 Declaration ▾**

DECLARATION OF JEREMY E. JORDAN IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE FILED BY FACEBOOK, INC, A

Comment

DECL: DECLARATION OF JEREMY E. JORDAN IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE FILED BY FACEBOOK, INC, A DELAWARE CORPORATION

**09/08/2015 Declaration ▾**

DECLARATION OF JULIE E. SCHWARTZ IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE FILED BY FACEBOOK, INC,

Comment

DECL: DECLARATION OF JULIE E. SCHWARTZ IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE FILED BY FACEBOOK, INC, A DELAWARE CORPORATION

09/08/2015 Proof of Service ▾

PROOF OF SERVICE OF NOTICE OF HEARING ON DEMURRER, ETC SERVED ON SEE SERVICE LIST BY OVERNIGHT DELI

Comment
POSI: PROOF OF SERVICE OF NOTICE OF HEARING ON DEMURRER, ETC SERVED ON SEE SERVICE LIST BY OVERNIGHT DELIVERY - FEDERAL EXPRESS WITH A SERVICE DATE OF 09/08/15.

09/10/2015 Memorandum of Points & Authorities Filed ▾

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN SUPPOR

Comment
MPA: MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN SUPPORT OF APPLICATION OF ANDREW A CAFFREY FOR ADMISSION PRO HAC VICE

09/10/2015 Declaration ▾

DECLARATION OF BASIL P. FTHENAKIS RE: SERVICE ON THE STATE BAR OF CALIFORNIA AND PAYMENT OF REQ FEE

Comment
DECL: DECLARATION OF BASIL P. FTHENAKIS RE: SERVICE ON THE STATE BAR OF CALIFORNIA AND PAYMENT OF REQ FEE FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

09/10/2015 Order received ▾

PROPOSED ORDER RECEIVED.

Comment
POR: PROPOSED ORDER RECEIVED.

09/10/2015 Notice ▾

NOTICE OF HEARINF RE: APPLICATION OF ANDREW A. CAFFREY, I II, ESQ. FOR ADMISSION PRO HAC VICE FILED

Comment
N2: NOTICE OF HEARINF RE: APPLICATION OF ANDREW A. CAFFREY, I II, ESQ. FOR ADMISSION PRO HAC VICE FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

09/10/2015 Conversion Action ▾

APPLICATION BY ANDREW A. CAFFREY, III, ESQ. TO APPEAR AS COUNSEL PRO HAC VICE FOR SIX4THREE, LLC, A

Comment
APHV: APPLICATION BY ANDREW A. CAFFREY, III, ESQ. TO APPEAR AS COUNSEL PRO HAC VICE FOR SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

09/10/2015 Conversion Minute ▾

Comment
*FEE: 150911-0035-CK 164/ 500.00 210/ 30.00 PAYMT

09/10/2015 Conversion Minute ▾

Comment
*REFNM: 150911-0035-CK REFERENCE NUMBER D 3435234

09/10/2015 Conversion Action ▾

APPLICATION BY DAVID S. GODKIN, ESQ. TO APPEAR AS COUNSEL PRO HAC VICE FOR SIX4THREE, LLC, A DELAWA

Comment
APHV: APPLICATION BY DAVID S. GODKIN, ESQ. TO APPEAR AS COUNSEL PRO HAC VICE FOR SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

09/10/2015 Conversion Minute ▾

Comment
*FEE: 150911-0043-CK 164/ 500.00 210/ 30.00 PAYMT

09/10/2015 Conversion Minute ▾

Comment
*REFNM: 150911-0043-CK REFERENCE NUMBER D 3435233

09/10/2015 Notice ▾

NOTICE OF HEARING RE: APPLICATION OF DAVID S. GODKIN, ESQ. FOR ADMISSION PRO HAC VICE FILED BY SIX4

Comment
N2: NOTICE OF HEARING RE: APPLICATION OF DAVID S. GODKIN, ESQ. FOR ADMISSION PRO HAC VICE FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

09/10/2015 Memorandum of Points & Authorities Filed ▾

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN SUPPOR

Comment
MPA: MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN SUPPORT OF APPLICATION OF DAVID S. GODKIN, ESQ. FOR ADMISSION PRO HAC VICE

09/10/2015 Declaration ▾

DECLARATION OF BASIL P. FTHENAKIS RE: SERVICE ON THE STATE BAR OF CALIFORNIA AND PAYMENT OF REQ FEE

Comment
DECL: DECLARATION OF BASIL P. FTHENAKIS RE: SERVICE ON THE STATE BAR OF CALIFORNIA AND PAYMENT OF REQ FEE FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

09/10/2015 Order received ▾

PROPOSED ORDER RECEIVED.

Comment
POR: PROPOSED ORDER RECEIVED.

09/18/2015 Conversion Action ▾

APPLICATION BY JAMES R. MCCULLAGH TO APPEAR AS COUNSEL PRO HAC VICE FOR FACEBOOK, INC, A DELAWARE C

Comment
APHV: APPLICATION BY JAMES R. MCCULLAGH TO APPEAR AS COUNSEL PRO HAC VICE FOR FACEBOOK, INC, A DELAWARE CORPORATION

09/18/2015 Conversion Minute ▾

Comment
*FEE: 150921-0301-CK 164/ 500.00 210/ 30.00 PAYMT

09/18/2015 Conversion Minute ▾

Comment
*REFNM: 150921-0301-CK REFERENCE NUMBER 6249

09/18/2015 Notice ▾

NOTICE OF HEARING REGARDING APPLICATION OF JAMES R. MCCULLAGH TO APPEAR AS COUNSEL PRO HAC VICE FIL

Comment
N2: NOTICE OF HEARING REGARDING APPLICATION OF JAMES R. MCCULLAGH TO APPEAR AS COUNSEL PRO HAC VICE FILED BY FACEBOOK, INC, A DELAWARE CORPORATION.

09/18/2015 Memorandum of Points & Authorities Filed ▾

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY FACEBOOK, INC, A DELAWARE CORPORATION IN SUPPORT OF N

Comment
MPA: MEMORANDUM OF POINTS AND AUTHORITIES FILED BY FACEBOOK, INC, A DELAWARE CORPORATION IN SUPPORT OF NOTICE OF HEARING RE APPLICATION OF JAMES R. MCCULLAGH TO APPEAR AS COUNSEL, ETC.

09/18/2015 Order received ▾

PROPOSED ORDER RECEIVED.

Comment
POR: PROPOSED ORDER RECEIVED.

09/18/2015 Proof of Service ▾

PROOF OF SERVICE OF FACEBOOK, INC.'S NOTICE OF HEARING, ETC. SERVED ON SEE LIST BY HAND DELIVERY AN

Comment
POSI: PROOF OF SERVICE OF FACEBOOK, INC.'S NOTICE OF HEARING, ETC. SERVED ON SEE LIST BY HAND DELIVERY AND OVERNIGHT WITH A SERVICE DATE OF 09/18/15.

09/22/2015 Conversion Action ▾

SUPPLEMENTAL DECLARATION OF BASIL P. FTHENAKIS RE PAYMENT OF REQUIRED FEE TO THE STATE BAR OF CA, E

Comment
SUP: SUPPLEMENTAL DECLARATION OF BASIL P. FTHENAKIS RE PAYMENT OF REQUIRED FEE TO THE STATE BAR OF CA, ETC. FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

09/22/2015 Conversion Action ▾

SUPPLEMENTAL DECLARATION OF BASIL P. FTHENAKIS RE PAYMENT OF REQUIRED FEE TO THE STATE BAR OF CA, E

Comment
SUP: SUPPLEMENTAL DECLARATION OF BASIL P. FTHENAKIS RE PAYMENT OF REQUIRED FEE TO THE STATE BAR OF CA, ETC. FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

---

09/29/2015 Stipulation ▾

(S) STIPULATIONTO CONTINUE HEARING ON DEMURRER FILED

Comment
STIP1: (S) STIPULATIONTO CONTINUE HEARING ON DEMURRER FILED

---

10/02/2015 Conversion Action ▾

SUPPLEMENTAL DECLARATION OF JULIE E. SCHWARTZ REGARDING CALIFORNIA STATE BAR FEES FOR PRO HAC FILED

Comment
SUP: SUPPLEMENTAL DECLARATION OF JULIE E. SCHWARTZ REGARDING CALIFORNIA STATE BAR FEES FOR PRO HAC FILED BY FACEBOOK, INC, A DELAWARE CORPORATION.

---

10/05/2015 Conversion Hearing ▾

| Judicial Officer | Comment |
| --- | --- |
| Etezadi, Susan I | HEARING: APPLICATION TO APPEAR AS COUNSEL PRO HAC VICE BY ANDREW A. CAFFREY, III, ESQ. |

---

10/05/2015 Conversion Minute ▾

| Judicial Officer | Comment |
| --- | --- |
| Etezadi, Susan I | JCR: HONORABLE SUSAN I. ETEZADI, JUDGE PRESIDING. CLERK: VALERIE HRONIS. COURT REPORTER: NIKI MAKELA. |

---

10/05/2015 Conversion Minute ▾

Comment
NAP: NO APPEARANCE IS MADE BY ANY PARTIES HEREIN OR THEIR COUNSEL OF RECORD.

---

10/05/2015 Conversion Minute ▾

Comment
TRA: TENTATIVE RULING ADOPTED AND BECOMES THE ORDER:

---

10/05/2015 Conversion Minute ▾

Comment
FFT: ANDREW CAFFREY AND DAVID GODKIN'S APPLICATIONS TO APPEAR AS COUNSEL PRO HAC VICE FOR PLAINTIFF

---

10/05/2015 Conversion Minute ▾

Comment
FFT: SIX4THREE, LLC IN THIS MATTER ARE GRANTED PURSUANT TO CALIFORNIA RULES OF COURT, RULE

---

10/05/2015 Conversion Minute ▾

Comment
FFT: 9.40. COUNSEL HAVE PAID THE $50 FEE TO THE STATE BAR AS REQUIRED BY RULE 9.40(E) AND THE $500 FEE

---

10/05/2015 Conversion Minute ▾

Comment
FFT: REQUIRED BY THE SAN MATEO COUNTY SUPERIOR COURT PURSUANT TO GOVT. CODE 70617. THEY HAVE MET ALL

---

10/05/2015 Conversion Minute ▾

Comment
FFT: OF THE OTHER REQUIREMENTS OF CRC 9.40, WHICH ARE THE ONLY REQUIREMENTS TO BE ELIGIBLE FOR

---

10/05/2015 Conversion Minute ▾

Comment
FFT: ADMISSION PRO HAC VICE.

---

10/05/2015 Conversion Minute ▾

Comment
COM: * *.

---

10/05/2015 Conversion Minute ▾

Comment
FFT: IF THE TENTATIVE RULING IS UNCONTESTED, IT SHALL BECOME THE ORDER OF THE COURT. THEREAFTER,

10/05/2015 Conversion Minute ▼

Comment
FFT: MOVING PARTY IS DIRECTED TO PREPARE A WRITTEN ORDER CONSISTENT WITH THE COURT'S RULING FOR THE

10/05/2015 Conversion Minute ▼

Comment
FFT: COURT'S SIGNATURE, PURSUANT TO CALIFORNIA RULES OF COURT, RULE 3.1312, AND TO PROVIDE NOTICE

10/05/2015 Conversion Minute ▼

Comment
FFT: THEREOF TO THE OPPOSING PARTY/COUNSEL AS REQUIRED BY LAW AND THE CALIFORNIA RULES OF

10/05/2015 Conversion Minute ▼

Comment
FFT: COURT. THE ORDER IS TO BE SUBMITTED DIRECTLY TO JUDGE SUSAN IRENE ETEZADI, DEPARTMENT 18.

10/05/2015 Conversion Minute ▼

Comment
HCOM: HEARING COMPLETED.

10/05/2015 Conversion Minute ▼

Comment
MICMS: ENTERED BY VALERIE HRONIS ON 10/05/15.

10/05/2015 Conversion Minute ▼

Comment
LINE: ======================================

10/05/2015 Conversion Minute ▼

Comment
PMO: MINUTE ORDER PRINTED.

10/05/2015 Conversion Minute ▼

Comment
PMO: MINUTE ORDER PRINTED.

10/05/2015 Conversion Hearing ▼

Judicial Officer
Etezadi, Susan I

Comment
HEARING: APPLICATION TO APPEAR AS COUNSEL PRO HAC VICE BY DAVID S. GODKIN, ESQ.

10/05/2015 Conversion Minute ▼

Judicial Officer
Etezadi, Susan I

Comment
JCR: HONORABLE SUSAN I. ETEZADI, JUDGE PRESIDING. CLERK: VALERIE HRONIS. COURT REPORTER: NIKI MAKELA.

10/05/2015 Conversion Minute ▼

Comment
NAP: NO APPEARANCE IS MADE BY ANY PARTIES HEREIN OR THEIR COUNSEL OF RECORD.

10/05/2015 Conversion Minute ▼

Comment
TRA: TENTATIVE RULING ADOPTED AND BECOMES THE ORDER:

10/05/2015 Conversion Minute ▼

Comment
FFT: ANDREW CAFFREY AND DAVID GODKIN'S APPLICATIONS TO APPEAR AS COUNSEL PRO HAC VICE FOR PLAINTIFF

10/05/2015 Conversion Minute ▼

Comment
FFT: SIX4THREE, LLC IN THIS MATTER ARE GRANTED PURSUANT TO CALIFORNIA RULES OF COURT, RULE

10/05/2015 Conversion Minute ▾

Comment
FFT: 9.40. COUNSEL HAVE PAID THE $50 FEE TO THE STATE BAR AS REQUIRED BY RULE 9.40(E) AND THE $500 FEE

10/05/2015 Conversion Minute ▾

Comment
FFT: REQUIRED BY THE SAN MATEO COUNTY SUPERIOR COURT PURSUANT TO GOVT. CODE 70617. THEY HAVE MET ALL

10/05/2015 Conversion Minute ▾

Comment
FFT: OF THE OTHER REQUIREMENTS OF CRC 9.40, WHICH ARE THE ONLY REQUIREMENTS TO BE ELIGIBLE FOR

10/05/2015 Conversion Minute ▾

Comment
FFT: ADMISSION PRO HAC VICE.

10/05/2015 Conversion Minute ▾

Comment
COM: * *.

10/05/2015 Conversion Minute ▾

Comment
FFT: MOVING PARTY IS DIRECTED TO PREPARE A WRITTEN ORDER CONSISTENT WITH THE COURT'S RULING FOR THE

10/05/2015 Conversion Minute ▾

Comment
FFT: COURT'S SIGNATURE, PURSUANT TO CALIFORNIA RULES OF COURT, RULE 3.1312, AND TO PROVIDE NOTICE

10/05/2015 Conversion Minute ▾

Comment
FFT: THEREOF TO THE OPPOSING PARTY/COUNSEL AS REQUIRED BY LAW AND THE CALIFORNIA RULES OF

10/05/2015 Conversion Minute ▾

Comment
FFT: COURT. THE ORDER IS TO BE SUBMITTED DIRECTLY TO JUDGE SUSAN IRENE ETEZADI, DEPARTMENT 18.

10/05/2015 Conversion Minute ▾

Comment
HCOM: HEARING COMPLETED.

10/05/2015 Conversion Minute ▾

Comment
MICMS: ENTERED BY KDUERRE ON 10/05/15.

10/05/2015 Conversion Minute ▾

Comment
LINE: ===================================

10/05/2015 Conversion Minute ▾

Comment
PMO: MINUTE ORDER PRINTED.

10/05/2015 Application to Appear as Counsel Pro Hac Vice ▾

Original Type
Application to Appear as Counsel Pro Hac Vice

Judicial Officer
Etezadi, Susan I

Hearing Time
9:00 AM

Result
Held

Comment
Dept LM HEARING: APPLICATION TO APPEAR AS COUNSEL PRO HAC VICE BY ANDREW A. CAFFREY, III, ESQ.

10/05/2015 Application to Appear as Counsel Pro Hac Vice ▾

Original Type
Application to Appear as Counsel Pro Hac Vice

Judicial Officer
Etezadi, Susan I

Hearing Time
9:00 AM

Result
Held

Comment
Dept LM HEARING: APPLICATION TO APPEAR AS COUNSEL PRO HAC VICE BY DAVID S. GODKIN, ESQ.

10/14/2015 Conversion Hearing ▾

| Judicial Officer | Comment |
|---|---|
| Etezadi, Susan I | HEARING: APPLICATION TO APPEAR AS COUNSEL PRO HAC VICE BY JAMES R. MCCULLAGH |

10/14/2015 Conversion Minute ▾

| Judicial Officer | Comment |
|---|---|
| Etezadi, Susan I | JCR: HONORABLE SUSAN I. ETEZADI, JUDGE PRESIDING. CLERK: KEVIN DUERRE. COURT REPORTER: NIKI MAKELA. |

10/14/2015 Conversion Minute ▾

Comment
NAP: NO APPEARANCE IS MADE BY ANY PARTIES HEREIN OR THEIR COUNSEL OF RECORD.

10/14/2015 Conversion Minute ▾

Comment
TRA: TENTATIVE RULING ADOPTED AND BECOMES THE ORDER:

10/14/2015 Conversion Minute ▾

Comment
FFT: JAMES R. MCCULLAGH'S APPLICATION TO APPEAR AS COUNSEL PRO HAC VICE FOR DEFENDANT FACEBOOK,

10/14/2015 Conversion Minute ▾

Comment
FFT: INC. IN THIS MATTER IS GRANTED PURSUANT TO CALIFORNIA RULES OF COURT, RULE 9.40. COUNSEL

10/14/2015 Conversion Minute ▾

Comment
FFT: HAS PAID THE $50 FEE TO THE STATE BAR AS REQUIRED BY RULE 9.40(E) AND THE $500 FEE NOW

10/14/2015 Conversion Minute ▾

Comment
FFT: REQUIRED BY THE SAN MATEO COUNTY SUPERIOR COURT PURSUANT TO GOVT. CODE SECTION 70617. HE HAS

10/14/2015 Conversion Minute ▾

Comment
FFT: MET ALL OF THE OTHER REQUIREMENTS OF CRC 9.40, WHICH ARE THE ONLY REQUIREMENTS TO BE ELIGIBLE

10/14/2015 Conversion Minute ▾

Comment
FFT: FOR ADMISSION PRO HAC VICE.

10/14/2015 Conversion Minute ▾

Comment
COM: * *.

10/14/2015 Conversion Minute ▾

Comment
FFT: MOVING PARTY IS DIRECTED TO PREPARE A WRITTEN ORDER CONSISTENT WITH THE COURT'S RULING FOR THE

---

10/14/2015 Conversion Minute ▾

Comment
FFT: COURT'S SIGNATURE, PURSUANT TO CALIFORNIA RULES OF COURT, RULE 3.1312, AND PROVIDE NOTICE

---

10/14/2015 Conversion Minute ▾

Comment
FFT: THEREOF TO THE OPPOSING PARTY/COUNSEL AS REQUIRED BY LAW AND THE CALIFORNIA RULES OF

---

10/14/2015 Conversion Minute ▾

Comment
FFT: COURT. THE ORDER IS TO BE SUBMITTED DIRECTLY TO JUDGE SUSAN IRENE ETEZADI, DEPARTMENT 18.

---

10/14/2015 Conversion Minute ▾

Comment
HCOM: HEARING COMPLETED.

---

10/14/2015 Conversion Minute ▾

Comment
MICMS: ENTERED BY KDUERRE ON 10/14/15.

---

10/14/2015 Conversion Minute ▾

Comment
LINE: =====================================

---

10/14/2015 Conversion Minute ▾

Comment
PMO: MINUTE ORDER PRINTED.

---

10/14/2015 Conversion Minute ▾

Comment
PMO: MINUTE ORDER PRINTED.

---

10/14/2015 Application to Appear as Counsel Pro Hac Vice ▾

Original Type
Application to Appear as Counsel Pro Hac Vice

Judicial Officer
Etezadi, Susan I

Hearing Time
9:00 AM

Result
Held

Comment
Dept: LM HEARING: APPLICATION TO APPEAR AS COUNSEL PRO HAC VICE BY JAMES R. MCCULLAGH

---

10/16/2015 Conversion Hearing ▾

Comment
HEARING: DEMURRER TO COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

---

10/16/2015 Conversion Minute ▾

Comment
HC: HEARING CONTINUED TO 11/13/15 AT 09:00 IN DEPARTMENT LM.

---

10/16/2015 Conversion Minute ▾

Comment
COM: PER STIPULATION TO CONTINUE HEARING FILED ON 09/29/15.

---

10/16/2015 Hearing on Demurrer ▾

Original Type
**Hearing on Demurrer**

Hearing Time
**9:00 AM**

Result
**Conversion Continuance**

Comment
**Dept: LM HEARING: DEMURRER TO COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION**

---

10/20/2015 Order ▾

ORDER GRANTING APPLICATION FOR ADMISSION PRO HAC VICE, SIGNED BY JUDGE ETEZADI ON 10/19/15 FILED.

Comment
O2: ORDER GRANTING APPLICATION FOR ADMISSION PRO HAC VICE, SIGNED BY JUDGE ETEZADI ON 10/19/15 FILED.

---

10/30/2015 Amended Complaint ▾

(L) 1ST AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED (AMENDED COMPLAINT)

Comment
ACM: (L) 1ST AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED (AMENDED COMPLAINT)

---

10/30/2015 Order ▾

ORDER GRANTING APPLICATION OF JAMES R. MCCULLAGH TO APPEAR AS COUNSEL, SIGNED BY JUDGE ETEZADI ON 1

Comment
O2: ORDER GRANTING APPLICATION OF JAMES R. MCCULLAGH TO APPEAR AS COUNSEL, SIGNED BY JUDGE ETEZADI ON 10/28/15 FILED.

---

11/10/2015 Conversion Action ▾

Comment
COMM: LETTER REQUESTING TO VACATE 11/13/15 RECEIVED.

---

11/13/2015 Conversion Hearing ▾

Comment
CASE MANAGEMENT CONFERENCE

---

11/13/2015 Conversion Minute ▾

Comment
HC: HEARING CONTINUED TO 12/02/15 AT 09:00 IN DEPARTMENT 21.

---

11/13/2015 Conversion Hearing ▾

Judicial Officer
Lee, Elizabeth K

Comment
HEARING: DEMURRER TO COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

---

11/13/2015 Conversion Minute ▾

Judicial Officer
Lee, Elizabeth K

Comment
JCRB: HONORABLE ELIZABETH K. LEE, JUDGE PRESIDING. CLERK: SYLVIA CUELLAR, COURT REPORTER: JENELL MULLANE

---

11/13/2015 Conversion Minute ▾

Comment
NAP: NO APPEARANCE IS MADE BY ANY PARTIES HEREIN OR THEIR COUNSEL OF RECORD.

---

11/13/2015 Conversion Minute ▾

Comment
FFT: THIS MATTER IS MOOT. A FIRST AMENDED COMPLAINT WAS FILED ON OCTOBER 30, 2015.

---

11/13/2015 Conversion Minute ▾

Comment
HCOM: HEARING COMPLETED.

---

11/13/2015 Conversion Minute ▾

Comment
MICMS: ENTERED BY SC ON 11/13/15.

11/13/2015 Conversion Minute ▾

Comment
LINE: ======================================

11/13/2015 Conversion Minute ▾

Comment
PMO: MINUTE ORDER PRINTED.

11/13/2015 Case Management Conference ▾

Original Type
Case Management Conference

Hearing Time
9:00 AM

Result
Conversion Continuance

Comment
Dept: 21 CASE MANAGEMENT CONFERENCE

11/13/2015 Hearing on Demurrer ▾

Original Type
Hearing on Demurrer

Judicial Officer
Lee, Elizabeth K

Hearing Time
9:00 AM

Result
Held

Comment
Dept: LM HEARING: DEMURRER TO COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

11/24/2015 Conversion Action ▾

Comment
COMM: FAXED REQUEST TO CONTINUE THE 12/11/15 CMC RECEIVED.

12/02/2015 Conversion Hearing ▾

Comment
CASE MANAGEMENT CONFERENCE

12/02/2015 Conversion Minute ▾

Comment
PNCMC: PRINT CASE MANAGEMENT CONFERENCE NOTICE.

12/02/2015 Conversion Minute ▾

Comment
*NOT: NOTICES PRINTED FOR BASIL P FTHENAKIS ON 9/25/15

12/02/2015 Conversion Minute ▾

Comment
*NOT: NOTICES PRINTED FOR PC14 /JES ON 9/25/15

12/02/2015 Conversion Minute ▾

Comment
HC: HEARING CONTINUED TO 12/11/15 AT 09:00 IN DEPARTMENT 21.

12/02/2015 Case Management Conference ▾

Original Type
Case Management Conference

Hearing Time
9:00 AM

Result
Conversion Continuance

Comment
Dept: 21 CASE MANAGEMENT CONFERENCE

12/03/2015 Conversion Action ▾

Comment
COMM: STIP AND ORDER FWD TO JUDGE SCOTT.

12/03/2015 First Paper Fee Paid ▾

Comment
FFP4: MOTION FEE PAID BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

12/03/2015 Conversion Minute ▾

Comment
*FEE: 151203-0774-CK 037/ 20.00 PAYMT

12/03/2015 Conversion Minute ▾

Comment
*REFNM: 151203-0774-CK REFERENCE NUMBER 091088

12/08/2015 Conversion Action ▾

STIPULATION AND ORDER EXTENDING TIME TO ANSWER TO F.A.C. SIGNED BY JOSEPH C. SCOTT ON 12/08/15.

Comment
SO2: STIPULATION AND ORDER EXTENDING TIME TO ANSWER TO F.A.C. SIGNED BY JOSEPH C. SCOTT ON 12/08/15.

12/11/2015 Conversion Hearing ▾

Comment
CASE MANAGEMENT CONFERENCE

12/11/2015 Conversion Minute ▾

Comment
PNCMC: PRINT CASE MANAGEMENT CONFERENCE NOTICE.

12/11/2015 Conversion Minute ▾

Comment
*NOT: NOTICES PRINTED FOR BASIL P FTHENAKIS ON 9/28/15

12/11/2015 Conversion Minute ▾

Comment
*NOT: NOTICES PRINTED FOR PC14 /JES ON 9/28/15

12/11/2015 Conversion Minute ▾

Comment
HC: HEARING CONTINUED TO 03/16/16 AT 09:00 IN DEPARTMENT 21.

12/11/2015 Case Management Conference ▾

Original Type
Case Management Conference

Hearing Time
9:00 AM

Result
Conversion Continuance

Comment
Dept: 21 CASE MANAGEMENT CONFERENCE

12/23/2015 First Paper Fee Paid ▾

Comment
FFP4: MOTION FEE PAID BY FACEBOOK, INC, A DELAWARE CORPORATION.

12/23/2015 Conversion Minute ▾

Comment
*FEE: 151223-0474-CK 036/ 60.00 210/ 30.00 PAYMT

---

12/23/2015 Conversion Minute ▾

Comment
*REFNM: 151223-0474-CK REFERENCE NUMBER 091652

---

12/23/2015 Conversion Action ▾

(S) DEMURRER TO 1ST AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED BY FACEB

Comment
DEM: (S) DEMURRER TO 1ST AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED BY FACEBOOK, INC, A DELAWARE CORPORATION REPRESENTED BY JULIE E SCHWARTZ

---

12/23/2015 Request for Judicial Notice ▾

REQUEST FOR JUDICIAL NOTICE OF IN SUPPORT OF DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT FILED

Comment
RJN: REQUEST FOR JUDICIAL NOTICE OF IN SUPPORT OF DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT FILED BY FACEBOOK, INC, A DELAWARE CORPORATION.

---

12/23/2015 Declaration ▾

DECLARATION OF JEREMY E. JORDAN IN SUPPORT OF FACEBOOK INC'S REQUEST FOR JUDICIAL NOTICE FILED BY F

Comment
DECL: DECLARATION OF JEREMY E. JORDAN IN SUPPORT OF FACEBOOK INC'S REQUEST FOR JUDICIAL NOTICE FILED BY FACEBOOK, INC, A DELAWARE CORPORATION

---

12/23/2015 Declaration ▾

DECLARATION OF JULIE E. SCHWARTZ IN SUPPORT OF FACEBOOK INC'S REQUEST FOR JUDICIAL NOTICE FILED BY

Comment
DECL: DECLARATION OF JULIE E. SCHWARTZ IN SUPPORT OF FACEBOOK INC'S REQUEST FOR JUDICIAL NOTICE FILED BY FACEBOOK, INC, A DELAWARE CORPORATION

---

12/23/2015 Proof of Service ▾

PROOF OF SERVICE OF NOITCE OF HEARING ON DEMURRER, ETC SERVED ON SEE SERVICE LIST BY OVERNIGHT DELI

Comment
POSI: PROOF OF SERVICE OF NOITCE OF HEARING ON DEMURRER, ETC SERVED ON SEE SERVICE LIST BY OVERNIGHT DELIVERY WITH A SERVICE DATE OF 12/23/15.

---

01/13/2016 Memorandum of Points & Authorities Filed ▾

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN OPPOSI

Comment
MPA: MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN OPPOSITION TO DEMURRER

---

01/13/2016 Conversion Action ▾

OBJECTION TO REQUEST FOR JUDICIAL NOTICE FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

Comment
OBJ: OBJECTION TO REQUEST FOR JUDICIAL NOTICE FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

---

01/13/2016 Document ▾

CAFFREY DECLARATION IN SUPPORT OF PLTFF'S OBJECTION TO REQUEST FOR JUDICIAL NOTICE, FILED.

Comment
FILED: CAFFREY DECLARATION IN SUPPORT OF PLTFF'S OBJECTION TO REQUEST FOR JUDICIAL NOTICE, FILED.

---

01/20/2016 Document ▾

DEFT FACEBOOK'S REPLY IN SUPPORT OF DEMURRER TO FIRST AMENDED COMPLAINT, FILED.

Comment
FILED: DEFT FACEBOOK'S REPLY IN SUPPORT OF DEMURRER TO FIRST AMENDED COMPLAINT, FILED.

---

01/20/2016 Response ▾

FACEBOOK, INC, A DELAWARE CORPORATION`S RESPONSE TO PLTFF'S OBJECTIONS TO REQUEST FOR JUDICIAL NOTI

Comment
RESP: FACEBOOK, INC, A DELAWARE CORPORATION`S RESPONSE TO PLTFF'S OBJECTIONS TO REQUEST FOR JUDICIAL NOTICE FILED.

01/20/2016 Proof of Service ▾

PROOF OF SERVICE OF SEE DOCUMENT LIST SERVED ON SEE SERVICE LIST BY OVERNIGHT DELIVERY - FEDEX WITH

Comment
POSI: PROOF OF SERVICE OF SEE DOCUMENT LIST SERVED ON SEE SERVICE LIST BY OVERNIGHT DELIVERY - FEDEX WITH A SERVICE DATE OF 01/20/16.

01/27/2016 Conversion Hearing ▾

Judicial Officer
Ayoob, Donald J

Comment
HEARING: DEMURRER TO 1ST AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

01/27/2016 Conversion Minute ▾

Judicial Officer
Ayoob, Donald J

Comment
JCR: HONORABLE DONALD J. AYOOB, JUDGE PRESIDING. CLERK: ALMA DE LA ROSA. COURT REPORTER: ROSA DE NOLA.

01/27/2016 Conversion Minute ▾

Comment
AT: ATTORNEY(S): ANDREW CAFFREW & BASIL P. FTHENAKIS PRESENT FOR SIX4THREE,LLC

01/27/2016 Conversion Minute ▾

Comment
AT: ATTORNEY(S): JULIE SCHWARTZ & JIM MCCULLAGH PRESENT ON BEHALF OF FACEBOOK, INC.

01/27/2016 Conversion Minute ▾

Comment
MAS: MATTER ARGUED BY COUNSEL AND SUBMITTED TO THE COURT.

01/27/2016 Conversion Minute ▾

Comment
TRA: TENTATIVE RULING ADOPTED AND BECOMES THE ORDER:

01/27/2016 Conversion Minute ▾

Comment
FFT: DEFENDANT FACEBOOK, INC.'S REQUEST FOR JUDICIAL NOTICE IS GRANTED PURSUANT TO EVIDENCE CODE

01/27/2016 Conversion Minute ▾

Comment
FFT: SECTION 452(H) AND 453(A). THAT SAID, THE LEGAL EFFECT, TRUTHFULNESS AND PROPER INTERPRETATION

01/27/2016 Conversion Minute ▾

Comment
FFT: OF THE DOCUMENTS REMAINS DISPUTABLE. SEE UNRUH-HAXTON V. REGENTS OF UNIVERSITY OF

01/27/2016 Conversion Minute ▾

Comment
FFT: CALIFORNIA (2008) 162 CAL APP 4TH 343, 365. A HEARING ON A DEMURRER MAY NOT BE TURNED INTO A

01/27/2016 Conversion Minute ▾

Comment
FFT: CONTESTED EVIDENTIARY HEARING THROUGH THE GUISE OF HAVING THE COURT TAKE JUDICIAL NOTICE OF

01/27/2016 Conversion Minute ▾

Comment
FFT: DOCUMENTS WHOSE TRUTHFULNESS OR PROPER INTERPRETATION ARE DISPUTABLE. FREMONT INDEMNITY

01/27/2016 Conversion Minute ▾

Comment
FFT: CO. V. FREMONT GENERAL CORP. (2007) 148 CAL APP 4TH 97, 112-118.

01/27/2016 Conversion Minute ▾

Comment
COM: - -.

01/27/2016 Conversion Minute ▾

Comment
FFT: DEFENDANT FACEBOOK, INC.'S DEMURRER TO PLAINTIFF'S 1ST AMENDED COMPLAINT IS SUSTAINED

01/27/2016 Conversion Minute ▾

Comment
FFT: WITH LEAVE TO AMEND.

01/27/2016 Conversion Minute ▾

Comment
COM: - -.

01/27/2016 Conversion Minute ▾

Comment
FFT: THE 1ST CAUSE OF ACTION FOR PROMISSORY ESTOPPEL, THE FAC FAILS TO SUFFICIENTLY ALLEGE A CLEAR,

01/27/2016 Conversion Minute ▾

Comment
FFT: UNAMBIGUOUS PROMISE BY FACEBOOK TO KEEP ITS FRIENDS PHOTOS ENDPOINT OPEN FOREVER, OR THEIR

01/27/2016 Conversion Minute ▾

Comment
FFT: REASONABLE RELIANCE ON SUCH A PROMISE. THE FAC IS BASED ON THE CONCLUSORY ALLEGATION AT 78

01/27/2016 Conversion Minute ▾

Comment
FFT: THAT FACEBOOK CLEARLY AND UNAMBIGUOUSLY PROMISED TO KEEP OPEN THE FRIENDS' PHOTOS ENDPOINT. AS TO

01/27/2016 Conversion Minute ▾

Comment
FFT: RELIANCE, PLAINTIFF IDENTIFIES ONLY CONCLUSORY, GENERALIZED STATEMENTS AND ALLEGED OMISSIONS

01/27/2016 Conversion Minute ▾

Comment
FFT: REGARDING FACEBOOK'S PLATFORM AND API AT THE TIME THEY WERE LAUNCHED IN 2007 AND 2010. FAC

01/27/2016 Conversion Minute ▾

Comment
FFT: 11, 22, 23. NOTHING IN THE STATEMENTS REFERRED TO THE FRIENDS PHOTO ENDPOINT AND NOTHING

01/27/2016 Conversion Minute ▾

Comment
FFT: INDICATED THAT FACEBOOK WOULD MAKE AVAILABLE ALL ENDPOINTS TO DEVELOPERS FOREVER. THIS DOES NOT

01/27/2016 Conversion Minute ▾

Comment
FFT: SUFFICIENTLY ALLEGE REASONABLE RELIANCE.

01/27/2016 Conversion Minute ▾

Comment
COM: - -.

01/27/2016 Conversion Minute ▾

Comment
FFT: THE 2ND CAUSE OF ACTION FOR PROMISSORY ESTOPPEL, THE FAC FAILS TO SUFFICIENTLY ALLEGE THE

01/27/2016 Conversion Minute ▾

Comment
FFT: ELEMENTS OF A CLAIM FOR NEGLIGENT MISREPRESENTATION. THESE INCLUDE INCLUDE 1) A

01/27/2016 Conversion Minute ▾

Comment
FFT: MISREPRESENTATION OF A PAST OR EXISTING FACT, 2) WITHOUT REASONABLE GROUNDS FOR BELIEVING IT TO BE

01/27/2016 Conversion Minute ▾

Comment
FFT: TRUE, 3) WITH THE INTENT TO INDUCE ANOTHER'S RELIANCE, 4) JUSTIFIABLE RELIANCE ON THE

01/27/2016 Conversion Minute ▾

Comment
FFT: REPRESENTATION AND

01/27/2016 Conversion Minute ▾

Comment
FFT: 5) RESULTING DAMAGE. APOLLO CAPITAL FUND, LLC V. ROTH CAPITAL PARTNERS, LLC (2007) 158 CAL APP

01/27/2016 Conversion Minute ▾

Comment
FFT: 4TH 226, 243. PLAINTIFF HAS NOT SUFFICIENTLY ALLEGED A MISREPRESENTATION, INTENT, OR

01/27/2016 Conversion Minute ▾

Comment
FFT: JUSTIFIABLE RELIANCE, FOR THE SAME REASONS THAT THE PROMISSORY ESTOPPEL CAUSE OF ACTION FAILS.

01/27/2016 Conversion Minute ▾

Comment
FFT: IT IS ALL BASED ON THE ALLEGED PROMISE THAT FACEBOOK WAS GOING TO KEEP ITS FRIENDS PHOTOS

01/27/2016 Conversion Minute ▾

Comment
FFT: ENDPOINT OPEN IN PERPETUITY. PLAINTIFF HAS NOT SUFFICIENTLY ALLEGED SUCH A REPRESENTATION AND

01/27/2016 Conversion Minute ▾

Comment
FFT: PLAINTIFF'S SUPPOSED RELIANCE ON NONEXISTENT PROMISES IS UNREASONABLE.

01/27/2016 Conversion Minute ▾

Comment
COM: - -.

01/27/2016 Conversion Minute ▾

Comment
FFT: THE 3RD CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH CONTRACT

01/27/2016 Conversion Minute ▾

Comment
FFT: ESSENTIALLY RESTATES THE PLAINTIFF'S PROMISSORY ESTOPPEL CLAIM, WHICH SOUNDS IN

01/27/2016 Conversion Minute ▾

Comment
FFT: CONTRACT. JRS PRODS., INC. V. MATSUSHITA ELEC.CORP. OF AMERICA (2004) 115 CAL APP 4TH

01/27/2016 Conversion Minute ▾

Comment
FFT: 168, 183. WHERE A CONTRACT CLAIM IS ALLEGED, A PLAINTIFF MAY NOT ALSO RAISE CLAIMS FOR

01/27/2016 Conversion Minute ▾

Comment
FFT: INTENTIONAL TORT THAT ARE BASED ON THE SAME ACTIVITY REGARDLESS OF WHETHER THE ACTIVITY

01/27/2016 Conversion Minute ▾

Comment
FFT: VIOLATES A STATUE OR WAS DONE WITH MALICE. ID. AT 182-83. THE PROMISSORY ESTOPPEL CLAIM IS

01/27/2016 Conversion Minute ▾

Comment
FFT: ROOTED IN CONTRACT. IT ALLEGES THAT FACEBOOK BREACHED ITS PROMISE TO KEEP THE FRIENDS PHOTOS

01/27/2016 Conversion Minute ▾

Comment
FFT: ENDPOINT OPEN BY STATING ITS INTENTION TO END ACCESS TO THE ENDPOINT. FAC 52, 53.

01/27/2016 Conversion Minute ▾

Comment
COM: - -.

01/27/2016 Conversion Minute ▾

Comment
FFT: PLAINTIFF HAS ALSO FAILED TO SUFFICIENTLY ALLEGE TORTUOUS INTERFERENCE. PLAINTIFF HAS NOT PLED A

01/27/2016 Conversion Minute ▾

Comment
FFT: VALID CONTRACT, HAS NOT PLAUSIBLY ALLEGED ANY KNOWLEDGE OF THE AGREEMENTS ON FACEBOOK'S PART

01/27/2016 Conversion Minute ▾

Comment
FFT: AND HAS NOT ALLEGED ANY INTENTIONAL ACTS DESIGNED TO INDUCE A BREACH. QUELIMANE CO., INC.

01/27/2016 Conversion Minute ▾

Comment
FFT: V. STEWART TITLE GUARANTY COMPANY (1998) 19 CAL 4TH 26, 55. SEE FAC AT 56, 57, 97-98.

01/27/2016 Conversion Minute ▾

Comment
COM: - -.

01/27/2016 Conversion Minute ▾

Comment
FFT: THE 4TH CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH PROSPECTIVE

01/27/2016 Conversion Minute ▾

Comment
FFT: BUSINESS RELATIONS FAILS TO SUFFICIENTLY PLED THE REQUIRED ELEMENTS FOR SUCH

01/27/2016 Conversion Minute ▾

Comment
FFT: A CAUSE OF ACTION: 1) AN ECONOMIC RELATIONSHIP BETWEEN THE PLAINTIFF AND SOME THIRD-PARTY WITH

01/27/2016 Conversion Minute ▾

Comment
FFT: THE PROBABILITY OF FUTURE ECONOMIC BENEFIT; 2) THE DEFENDANT'S KNOWLEDGE OF THE RELATIONSHIP;

01/27/2016 Conversion Minute ▾

Comment
FFT: 3) INTENTIONAL ACTS BY DEFENDANT DESIGNED TO DISRUPT THE RELATIONSHIP; 4) ACTUAL DISRUPTION

01/27/2016 Conversion Minute ▾

Comment
FFT: OF THE RELATIONSHIP AND 5) ECONOMIC HARM TO THE PLAINTIFF PROXIMATELY CAUSED BY DEFENDANT. KOREA

01/27/2016 Conversion Minute ▾

Comment
FFT: SUPPLY CO. V. LOCKHEED MARTIN CORP. (2003) 29 CAL 4TH 1134, 1153. PLAINTIFF HAS FAILED TO

01/27/2016 Conversion Minute ▾

Comment
FFT: SUFFICIENTLY PLEAD ECONOMIC RELATIONSHIP, DEFENDANT'S KNOWLEDGE OF THE RELATIONSHIP,

01/27/2016 Conversion Minute ▾

Comment
FFT: DEFENDANT'S INTENTIONAL ACTS DESIGNED TO INDUCE A BREACH AND NO INDEPENDENTLY WRONGFUL ACT.

01/27/2016 Conversion Minute ▾

Comment
COM: - -.

01/27/2016 Conversion Minute ▾

Comment
FFT: THE 5TH CAUSE OF ACTION FOR VIOLATION OF B&P CODE 17200 FAILS TO SUFFICIENTLY PLEAD THE UNFAIR,

01/27/2016 Conversion Minute ▾

Comment
FFT: UNLAWFUL OR FRAUDULENT BUSINESS PRACTICE. CEL-TECH COMMUNICATIONS, INC. V. LOS ANGELES

01/27/2016 Conversion Minute ▾

Comment
FFT: CELLULAR TELEPHONE COMPANY (1999) 20 CAL 4TH 163, 180. PLAINTIFF ALLEGES IN CONCLUSORY

01/27/2016 Conversion Minute ▾

Comment
FFT: FASHION THAT IN DOING THE THINGS HERE AND ALLEGED, FACEBOOK ACTED WITH FRAUD, MALICE AND

01/27/2016 Conversion Minute ▾

Comment
FFT: OPPRESSION AND IN RECKLESS DISREGARD OF PLAINTIFF'S RIGHTS. FAC 56.

01/27/2016 Conversion Minute ▾

Comment
COM: 30 DAYS TO AMEND IS GRANTED.

01/27/2016 Conversion Minute ▾

Comment
HCOM: HEARING COMPLETED.

01/27/2016 Conversion Minute ▾

Comment
MICMS: ENTERED BY ALMA DE LA ROSA ON 01/27/16.

01/27/2016 Conversion Minute ▾

Comment
PMO: MINUTE ORDER PRINTED.

01/27/2016 Conversion Minute ▾

Comment
LINE: ===================================

01/27/2016 Conversion Minute ▾

Comment
PMO: MINUTE ORDER PRINTED.

01/27/2016 Hearing on Demurrer ▾

Original Type
Hearing on Demurrer

Judicial Officer
Ayoob, Donald J

Hearing Time
9:00 AM

Result
Held

Comment
Dept: LM HEARING: DEMURRER TO 1ST AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

02/19/2016 Order ▾

ORDER SUSTAINING DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, SIGNED BY JUDGE AYOOB ON 01/27/16

Comment
O2: ORDER SUSTAINING DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, SIGNED BY JUDGE AYOOB ON 01/27/16 FILED.

02/19/2016 Order ▾

ORDER SUSTAINING DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, SIGNED BY JUDGE AYOOB ON 01/27/16

Comment
O2: ORDER SUSTAINING DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, SIGNED BY JUDGE AYOOB ON 01/27/16 FILED.

02/19/2016 Conversion Minute ▾

Comment
LAG: LEAVE TO AMEND GRANTED. SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT GRANTED 20 DAYS LEAVE TO AMEND

02/26/2016 Conversion Action ▾

(U) 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED (AMENDED COMPLAINT)

Comment
ACS: (U) 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED (AMENDED COMPLAINT)

03/16/2016 Conversion Hearing ▾

Comment
CASE MANAGEMENT CONFERENCE

03/16/2016 Conversion Minute ▾

Comment
PNCMC: PRINT CASE MANAGEMENT CONFERENCE NOTICE.

03/16/2016 Conversion Minute ▾

Comment
*NOT: NOTICES PRINTED FOR BASIL P FTHENAKIS ON 11/24/15

03/16/2016 Conversion Minute ▾

Comment
*NOT: NOTICES PRINTED FOR PC14 /JES ON 11/24/15

03/16/2016 Conversion Minute ▾

Comment
HC: HEARING CONTINUED TO 05/06/16 AT 09:00 IN DEPARTMENT 21.

03/16/2016 Case Management Conference ▾

Original Type
Case Management Conference

Hearing Time
9:00 AM

Result
Conversion Continuance

Comment
Dept: 21 CASE MANAGEMENT CONFERENCE

03/24/2016 First Paper Fee Paid ▾

Comment
FFP4: MOTION FEE PAID BY FACEBOOK, INC, A DELAWARE CORPORATION.

03/24/2016 Conversion Minute ▾

Comment
*FEE: 160324-0263-CK 037/ 20.00 PAYMT

03/24/2016 Conversion Minute ▾

Comment
*REFNM: 160324-0263-CK REFERENCE NUMBER 22585

03/28/2016 Conversion Action ▾

STIPULATION AND ORDER TO EXTEND TIME TO RESPOND TO 2ND AMND CMPL SIGNED BY JOHN G. SCHWARTZ ON 03/2

Comment
SO2: STIPULATION AND ORDER TO EXTEND TIME TO RESPOND TO 2ND AMND CMPL SIGNED BY JOHN G. SCHWARTZ ON 03/25/16.

03/28/2016 Conversion Minute ▾

Comment
LINE: ===================================

03/28/2016 Conversion Minute ▾

Comment
COM: DEFT SHALL HAVE UP TO AND INCLUDING APRIL 8, 2016 TO FILE AND SERVE ITS RESP TO 2ND AM.

03/28/2016 Conversion Minute ▾

Comment
LINE: ===================================

04/08/2016 First Paper Fee Paid ▾

Comment
FFP4: MOTION FEE PAID BY FACEBOOK, INC, A DELAWARE CORPORATION.

04/08/2016 Conversion Minute ▾

Comment
*FEE: 160408-0810-CK 036/ 60.00 210/ 30.00 PAYMT

04/08/2016 Conversion Minute ▾

Comment
*REFNM: 160408-0810-CK REFERENCE NUMBER 23717

04/08/2016 Conversion Action ▾

(S) DEMURRER TO 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED BY FACEB

Comment
DEM: (S) DEMURRER TO 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED BY FACEBOOK, INC, A DELAWARE CORPORATION
REPRESENTED BY JULIE E SCHWARTZ

04/08/2016 Request for Judicial Notice ▾

REQUEST FOR JUDICIAL NOTICE OF IN SUPPORT OF DEMURRER TO PLTFF'S SECOND AMENDED COMPLAINT FILED BY

Comment
RJN: REQUEST FOR JUDICIAL NOTICE OF IN SUPPORT OF DEMURRER TO PLTFF'S SECOND AMENDED COMPLAINT FILED BY FACEBOOK, INC, A DELAWARE
CORPORATION.

04/08/2016 Declaration ▾

DECLARATION OF JEREMY E. JORDAN IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE FILED BY FACEBOOK, INC, A

Comment
DECL: DECLARATION OF JEREMY E. JORDAN IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE FILED BY FACEBOOK, INC, A DELAWARE CORPORATION

04/08/2016 Declaration ▾

DECLARATION OF JULIE E. SCHWARTZ IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE AND, ETC. FILED BY FACEB

Comment
DECL: DECLARATION OF JULIE E. SCHWARTZ IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE AND, ETC. FILED BY FACEBOOK, INC, A DELAWARE CORPORATION

---

04/08/2016 Proof of Service ▾

PROOF OF SERVICE OF FACEBOOK, INC.'S NOTICE OF HEARING, ETC. SERVED ON SEE LIST BY FEDERAL EXPRESS

Comment
POSI: PROOF OF SERVICE OF FACEBOOK, INC.'S NOTICE OF HEARING, ETC. SERVED ON SEE LIST BY FEDERAL EXPRESS WITH A SERVICE DATE OF 04/08/16.

---

04/19/2016 First Paper Fee Paid ▾

Comment
FFP4: MOTION FEE PAID BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

---

04/19/2016 Conversion Minute ▾

Comment
*FEE: 160419-0560-CK 037/ 20.00 PAYMT

---

04/19/2016 Conversion Minute ▾

Comment
*REFNM: 160419-0560-CK REFERENCE NUMBER 24042

---

04/19/2016 Conversion Action ▾

Comment
COMM: STIP AND PROPOSED ORDER TO RESCHEDULE HEARING ON DEMURRER - FWD TO DEPT. 27.

---

04/25/2016 Conversion Action ▾

STIPULATION AND ORDER TO RESCHEDULE HEARING ON DEMURRER TO SAC SIGNED BY DONALD J. AYOOB ON 04/21/1

Comment
SO2: STIPULATION AND ORDER TO RESCHEDULE HEARING ON DEMURRER TO SAC SIGNED BY DONALD J. AYOOB ON 04/21/16.

---

04/28/2016 Conversion Action ▾

Comment
COMM: FAXED REQUEST TO CONTINUE THE 5/6/16 CMC RECEIVED.

---

05/05/2016 Conversion Action ▾

OBJECTION TO REQUEST FOR JUDICIAL NOTICE FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

Comment
OBJ: OBJECTION TO REQUEST FOR JUDICIAL NOTICE FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

---

05/05/2016 Memorandum of Points & Authorities Filed ▾

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN OPPOSI

Comment
MPA: MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN OPPOSITION TO DEMURRER TO SECOND AMENDED COMPLAINT

---

05/06/2016 Conversion Hearing ▾

Comment
CASE MANAGEMENT CONFERENCE

---

05/06/2016 Conversion Minute ▾

Comment
PNCMC: PRINT CASE MANAGEMENT CONFERENCE NOTICE.

---

05/06/2016 Conversion Minute ▾

Comment
*NOT: NOTICES PRINTED FOR BASIL P FTHENAKIS ON 3/07/16

---

05/06/2016 Conversion Minute ▾

Comment
*NOT: NOTICES PRINTED FOR PC14 /JES ON 3/07/16

05/06/2016 Conversion Minute ▾

Comment
HC: HEARING CONTINUED TO 07/01/16 AT 09:00 IN DEPARTMENT 21.

05/06/2016 Conversion Hearing ▾

Judicial Officer
Ayoob, Donald J

Comment
HEARING: DEMURRER TO 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

05/06/2016 Conversion Minute ▾

Judicial Officer
Ayoob, Donald J

Comment
JCR: HONORABLE DONALD J. AYOOB, JUDGE PRESIDING. CLERK: ALMA DE LA ROSA. COURT REPORTER: JOCELYNE FOKHOURI.

05/06/2016 Conversion Minute ▾

Comment
NAP: NO APPEARANCE IS MADE BY ANY PARTIES HEREIN OR THEIR COUNSEL OF RECORD.

05/06/2016 Conversion Minute ▾

Comment
FFT: PURSUANT TO STIPULATION OF THE PARTIES AND PRIOR ORDER OF THE COURT, THIS MATTER IS CONTINUED TO

05/06/2016 Conversion Minute ▾

Comment
FFT: MAY 18, 2016.

05/06/2016 Conversion Minute ▾

Comment
HC: HEARING CONTINUED TO 05/18/16 AT 09:00 IN DEPARTMENT LM.

05/06/2016 Conversion Minute ▾

Comment
MICMS: ENTERED BY ALMA DE LA ROSA ON 05/06/16.

05/06/2016 Conversion Minute ▾

Comment
PMO: MINUTE ORDER PRINTED.

05/06/2016 Conversion Minute ▾

Comment
LINE: ======================================

05/06/2016 Case Management Conference ▾

Original Type
Case Management Conference

Hearing Time
9:00 AM

Result
Conversion Continuance

Comment
Dept 21 CASE MANAGEMENT CONFERENCE

05/06/2016 Hearing on Demurrer ▾

Original Type
Hearing on Demurrer

Judicial Officer
Ayoob, Donald J

Hearing Time
9:00 AM

Result
Conversion Continuance

Comment
Dept: LM HEARING: DEMURRER TO 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

05/11/2016 Response ▾

FACEBOOK, INC, A DELAWARE CORPORATION`S RESPONSE TO PLTFF'S OBJECTIONS TO REQUEST FOR JUDICIAL NOTI

Comment
RESP: FACEBOOK, INC, A DELAWARE CORPORATION`S RESPONSE TO PLTFF'S OBJECTIONS TO REQUEST FOR JUDICIAL NOTICE FILED.

05/11/2016 Document ▾

DEFT FACEBOOK'S REPLY IN SUPPORT OF DEMURRER TO SECOND AMENDED COMPLAINT, FILED.

Comment
FILED: DEFT FACEBOOK'S REPLY IN SUPPORT OF DEMURRER TO SECOND AMENDED COMPLAINT, FILED.

05/11/2016 Proof of Service ▾

PROOF OF SERVICE OF SEE DOCUMENT LIST SERVED ON SEE SERVICE LIST BY FEDERAL EXPRESS WITH A SERVICE

Comment
POSI: PROOF OF SERVICE OF SEE DOCUMENT LIST SERVED ON SEE SERVICE LIST BY FEDERAL EXPRESS WITH A SERVICE DATE OF 05/11/16.

05/18/2016 Conversion Hearing ▾

Judicial Officer
Ayoob, Donald J

Comment
HEARING: DEMURRER TO 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

05/18/2016 Conversion Minute ▾

Judicial Officer
Ayoob, Donald J

Comment
JCR: HONORABLE DONALD J. AYOOB, JUDGE PRESIDING. CLERK: ALMA DE LA ROSA. COURT REPORTER: ROSARIO AYON.

05/18/2016 Conversion Minute ▾

Comment
NAP: NO APPEARANCE IS MADE BY ANY PARTIES HEREIN OR THEIR COUNSEL OF RECORD.

05/18/2016 Conversion Minute ▾

Comment
FFT: ON THE COURT'S OWN MOTION, THE DEMURRER BY FACEBOOK, INC. TO THE PLAINTIFF'S SECOND AMENDED

05/18/2016 Conversion Minute ▾

Comment
FFT: COMPLAINT IS CONTINUED TO JUNE 15, 2016 AT 9 AM TO BE HEARD IN DEPARTMENT 27, THE HON. DONALD

05/18/2016 Conversion Minute ▾

Comment
FFT: AYOOB PRESIDING

05/18/2016 Conversion Minute ▾

Comment
HC: HEARING CONTINUED TO 06/15/16 AT 09:00 IN DEPARTMENT LM.

05/18/2016 Conversion Minute ▾

Comment
MICMS: ENTERED BY ALMA DE LA ROSA ON 05/18/16.

05/18/2016 Conversion Minute ▾

Comment
LINE: ====================================

05/18/2016 Conversion Minute ▾

Comment
PMO: MINUTE ORDER PRINTED.

05/18/2016 Conversion Hearing ▾

Comment
HEARING: DEMURRER TO 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

05/18/2016 Conversion Minute ▾

Comment
COM: SEE PREVIOUS SCREEN FOR FULL AND COMPLETE MINUTES..

05/18/2016 Conversion Minute ▾

Comment
HCOM: HEARING COMPLETED.

05/18/2016 Conversion Minute ▾

Comment
MICMS: ENTERED BY ALMA DE LA ROSA ON 05/18/16.

05/18/2016 Hearing on Demurrer ▾

Original Type
Hearing on Demurrer

Judicial Officer
Ayoob, Donald J

Hearing Time
9:00 AM

Result
Conversion Continuance

Comment
Dept: LM HEARING: DEMURRER TO 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

05/18/2016 Hearing on Demurrer ▾

Original Type
Hearing on Demurrer

Hearing Time
9:00 AM

Result
Held

Comment
Dept: LM HEARING: DEMURRER TO 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

06/14/2016 Notice ▾

NOTICE WITHDRAWL AND DISCHARGE AS ATTORNEY OF RECORD FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LI

Comment
N2: NOTICE WITHDRAWL AND DISCHARGE AS ATTORNEY OF RECORD FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

06/14/2016 Conversion Action ▾

Comment
UA: ATTORNEY RECORD UPDATED TO SHOW BASIL P FTHENAKIS ATTORNEY FOR SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT UPDATED/CORRECTED TO BASIL P FTHENAKIS.

06/15/2016 Conversion Hearing ▾

Comment
HEARING: DEMURRER TO 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

06/15/2016 Hearing on Demurrer ▾

Hearing Time
9:00 AM

Result
Held

Comment
Dept: LM HEARING: DEMURRER TO 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT BY FACEBOOK, INC, A DELAWARE CORPORATION

Parties Present ▴

Plaintiff

    Attorney: FTHENAKIS, BASIL P

Defendant

    Attorney: SCHWARTZ, JULIE E

---

06/17/2016 Case Management Statement ▾

Case Management Statement

---

06/20/2016 Case Management Statement ▾

Case Management Statement

---

06/23/2016 Order After Hearing ▾

   Comment
   FOR 06/15/16 RECEIVED VIA FAX ON 06/22/16 (NOT ORIGINAL) - FORWARDED TO DEPT. 27

---

06/30/2016 Order ▾

Order ON DEMURRER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

   Comment
   ON DEMURRER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

---

07/01/2016 Conversion Hearing ▾

   Comment
   CASE MANAGEMENT CONFERENCE

---

07/01/2016 Conversion Minute ▾

   Comment
   PNCMC: PRINT CASE MANAGEMENT CONFERENCE NOTICE.

---

07/01/2016 Conversion Minute ▾

   Comment
   *NOT: NOTICES PRINTED FOR BASIL P FTHENAKIS ON 4/28/16

---

07/01/2016 Conversion Minute ▾

   Comment
   *NOT: NOTICES PRINTED FOR PC14 /JES ON 4/28/16

---

07/01/2016 Notice of Mandatory Settlement Conference and Jury Trial

---

07/01/2016 Case Management Conference ▾

Judicial Officer
Case Management Conferences, -

Hearing Time
9:00 AM

Result
Held

Comment
Dept 21 CASE MANAGEMENT CONFERENCE

Parties Present ▴
   Plaintiff
    Attorney: FTHENAKIS, BASIL P

---

07/05/2016 Answer / Response / Denial - Unlimited ▾

Answer / Response / Denial - Unlimited

---

07/05/2016 Notice ▾

Notice OF RULING

   Comment
   OF RULING

---

07/22/2016 Notice of Mandatory Settlement Conference and Jury Trial

08/10/2016 Application to Appear as Counsel Pro Hac Vice ▾

Application to Appear as Counsel Pro Hac Vice OF JAMES E. KRUZER, ESQ.

Comment
OF JAMES E. KRUZER, ESQ.

08/10/2016 Court Reporter service less than one hour

08/10/2016 Notice of Hearing ▾

Notice of Hearing RE: APPLICATION OF JAMES E. KRUZER, ESQ. FOR ADMISSION PRO HAC VICE

Comment
RE: APPLICATION OF JAMES E. KRUZER, ESQ. FOR ADMISSION PRO HAC VICE

08/10/2016 Memorandum of Points & Authorities Filed ▾

Memorandum of Points & Authorities Filed IN SUPPORT OF APPLICATION OF JAMES E. KRUZER, ESQ. FOR ADMI

Comment
IN SUPPORT OF APPLICATION OF JAMES E. KRUZER, ESQ. FOR ADMISSION PRO HAC VICE

08/10/2016 Declaration ▾

Declaration OF BASIL P. FTHENAKIS RE; SERVICE ON THE STATE BAR OF CALIFORNIA AND PAYMENT OF REQUIRED

Comment
OF BASIL P. FTHENAKIS RE; SERVICE ON THE STATE BAR OF CALIFORNIA AND PAYMENT OF REQUIRED FEE

08/10/2016 Proposed Order Received ▾

Proposed Order Received RE: ORDER GRANTING APPLICATION OF JAMES E. KRUZER, ESQ. FOR ADMISSION PRO HA

Comment
RE: ORDER GRANTING APPLICATION OF JAMES E. KRUZER, ESQ. FOR ADMISSION PRO HAC VICE

08/11/2016 Motion ▾

Motion FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS, ETC

Comment
FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS, ETC

08/11/2016 Court Reporter service less than one hour

08/11/2016 Memorandum of Points & Authorities Filed ▾

Memorandum of Points & Authorities Filed IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES

Comment
IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES, ETC

08/11/2016 Separate Statement ▾

Separate Statement OF DEMANDS IN DISPUTE IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES

Comment
OF DEMANDS IN DISPUTE IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES, ETC

08/11/2016 Declaration ▾

Declaration OF DAVID GODKIN IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES, ETC

Comment
OF DAVID GODKIN IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES, ETC

08/12/2016 Stipulation and Order received and forwarded to Dept ▾

Comment
21, ADR

08/17/2016 Stipulation and Order to ADR ▾

Stipulation and Order to ADR

Judicial Officer
Foiles, Robert D

08/25/2016 Opposition filed ▾

Opposition filed TO PLTFF'S MOTION TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS

Comment
TO PLTFF'S MOTION TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS, COMPELLING PRODUCTION OF DOCUMENTS, AND FOR SANCTIONS

08/25/2016 Declaration ▼

Declaration OF JULIE W. SCHWARTZ ISO FACEBOOK'S OPPOSITION TO PLTFF'S MOTION TO COMPEL, ETC.

Comment
OF JULIE W. SCHWARTZ ISO FACEBOOK'S OPPOSITION TO PLTFF'S MOTION TO COMPEL, ETC.

08/25/2016 Separate Statement ▼

Separate Statement FACEBOOK'S RESPONSE SEPARATE STATEMENT ISO OPPOSITION TO PLTFF'S MOTION TO COMPEL

Comment
FACEBOOK'S RESPONSE SEPARATE STATEMENT ISO OPPOSITION TO PLTFF'S MOTION TO COMPEL, ETC.

08/25/2016 Proof of Service by ▼

Proof of Service by FEDERAL EXPRESS served on SEE SERVICE LIST with a service date of 08/25/16

Comment
FEDERAL EXPRESS served on SEE SERVICE LIST with a service date of 08/25/16

08/30/2016 Reply ▼

Reply IN SUPPORT OF NOTICE OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND FOR INSPECTION

Comment
IN SUPPORT OF NOTICE OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS, COMPELLING PRODUCTION OF DOCUMENTS, AND FOR SANCTIONS

09/02/2016 Application to Appear as Counsel Pro Hac Vice ▼

CIV Minute Order

Judicial Officer
Karesh, Jonathan E

Hearing Time
9:00 AM

Result
Held

09/08/2016 Motion hearings ▼

CIV Minute Order

Judicial Officer
Karesh, Jonathan E

Hearing Time
9:00 AM

Result
Held

Comment
FOR ORDER COMPELLING FURTHER RESPONSES, ETC

Parties Present ▲
Plaintiff
    Attorney: FTHENAKIS, BASIL P

Defendant
    Attorney: SCHWARTZ, JULIE E

09/14/2016 Order received ▼

Comment
AND FWD TO DEPT 20

09/15/2016 Motion ▼

Motion FOR PROTECTIVE ORDER

Comment
FOR PROTECTIVE ORDER

09/15/2016 Court Reporter service less than one hour

09/15/2016 Memorandum of Points & Authorities Filed ▾

Memorandum of Points & Authorities Filed IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

Comment
IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

09/15/2016 Declaration ▾

Declaration OF DAVID S. GODKIN ISO OF MOTION FOR PROTECTIVE ORDER

Comment
OF DAVID S. GODKIN ISO OF MOTION FOR PROTECTIVE ORDER

09/19/2016 Document ▾

Document LETTER TO JUDGE KARESH IN REGARDS TO PROPOSED ORDER ON MOTION FOR ORDER COMPELLING FURTHER

Comment
LETTER TO JUDGE KARESH IN REGARDS TO PROPOSED ORDER ON MOTION FOR ORDER COMPELLING FURTHER RESPONSES, ETC.

09/19/2016 Order ▾

Order ON MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS, ETC. S

Comment
ON MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS, ETC. SIGNED BY JUDGE KARESH ON 09/15/16

09/22/2016 Stipulation and Order received and forwarded to Dept ▾

Comment
20; RE CONTINUING HEARING ON MOTION FOR PROTECTIVE ORDER ON 10/06/16

09/22/2016 Motion ▾

Motion FOR PROTECTIVE ORDER

Comment
FOR PROTECTIVE ORDER

09/22/2016 Court Reporter service less than one hour

09/22/2016 Declaration ▾

Declaration OF JULIE E. SCHWARTZ ISO FACEBOOK'S MOTION FOR PROTECTIVE ORDER

Comment
OF JULIE E. SCHWARTZ ISO FACEBOOK'S MOTION FOR PROTECTIVE ORDER

09/22/2016 Proof of Service by ▾

Proof of Service by FEDERAL EXPRESS served on SEE SERVICE LIST with a service date of 09/22/16

Comment
FEDERAL EXPRESS served on SEE SERVICE LIST with a service date of 09/22/16

09/27/2016 Stipulation & Order ▾

Stipulation & Order CONTINUING HEARING ON SIX4THREE, LLC'S MOTION FOR PROTECTIVE ORDER signed by JUD

Comment
CONTINUING HEARING ON SIX4THREE, LLC'S MOTION FOR PROTECTIVE ORDER signed by JUDGE KARESH 9/23/16

09/29/2016 Opposition filed ▾

Opposition filed TO PLTFF'S MOTION FOR PROTECTIVE ORDER

Comment
TO PLTFF'S MOTION FOR PROTECTIVE ORDER

09/29/2016 Declaration ▾

Declaration OF JULIE E. SCHWARTZ IN SUPPORT OF FACEBOOK'S OPPOSITION TO PLTFF'S MOTION FOR PROTECTIV

Comment
OF JULIE E. SCHWARTZ IN SUPPORT OF FACEBOOK'S OPPOSITION TO PLTFF'S MOTION FOR PROTECTIVE ORDER

09/29/2016 Proof of Service by ▾

Proof of Service by FEDERAL EXPRESS served on SEE SERVICE LIST with a service date of 09/29/16

Comment
FEDERAL EXPRESS served on SEE SERVICE LIST with a service date of 09/29/16

10/05/2016 Reply ▾

Reply TO DEFENDANT FACEBOOK INC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

Comment
TO DEFENDANT FACEBOOK INC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

10/05/2016 Reply ▾

Reply IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

Comment
IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

10/13/2016 Motion hearings ▾

CIV Minute Order

Judicial Officer
Karesh, Jonathan E

Hearing Time
9:00 AM

Result
Held

Comment
FOR PROTECTIVE ORDER

Parties Present ▴
Plaintiff
    Attorney: FTHENAKIS, BASIL P

Defendant
    Attorney: SCHWARTZ, JULIE E

10/13/2016 Motion hearings ▾

CIV Minute Order

Judicial Officer
Karesh, Jonathan E

Hearing Time
9:00 AM

Result
Held

Comment
FOR PROTECTIVE ORDER

Parties Present ▴
Plaintiff
    Attorney: FTHENAKIS, BASIL P

Defendant
    Attorney: SCHWARTZ, JULIE E

10/24/2016 Notice ▾

Notice OF APPEARANCE ON BEHALF OF FACEBOOK

Comment
OF APPEARANCE ON BEHALF OF FACEBOOK

10/25/2016 ADR Evaluation Notice Sent

10/25/2016 Order After Hearing ▾

Order After Hearing signed by Judge Karesh 10/24/16 SIX4THREE'S MOTION FOR PROTECTIVE ORDER AND FAC

Comment
signed by Judge Karesh 10/24/16 SIX4THREE'S MOTION FOR PROTECTIVE ORDER AND FACEBOOK'S MOTION FOR PROTECTIVE ORDER

10/25/2016 Order ▾

Order STIPULATED PROTECTIVE ORDER signed by Judge Karesh 10/24/16

Comment
STIPULATED PROTECTIVE ORDER signed by Judge Karesh 10/24/16

10/28/2016 Ex Parte Fee Paid

10/28/2016 Ex Parte ▾

Ex Parte Filed APPLICATION TO CONTINUE OCTOBER 31 DOCUMENT PRODUCTION DEADLINE AND REMAINING CASE DE

Comment
APPLICATION TO CONTINUE OCTOBER 31 DOCUMENT PRODUCTION DEADLINE AND REMAINING CASE DEADLINES INCLUDING TRIAL DATE; ETC

10/28/2016 Opposition filed ▾

Opposition filed TO DEFENDANT FACEBOOK INC'S EX PARTE APPLICATION

Comment
TO DEFENDANT FACEBOOK INC'S EX PARTE APPLICATION

10/28/2016 Order ▾

Order GRANTING DEFT FACEBOOK INC'S EX PARTE APPLICATION TO CONTINUE OCTOBER 31 DOCUMENTS PRODUCTION

Comment
GRANTING DEFT FACEBOOK INC'S EX PARTE APPLICATION TO CONTINUE OCTOBER 31 DOCUMENTS PRODUCTION DEADLINE AND REMAINING CASE DEADLINES INCLUDING TRIAL DATE SIGNED BY JUDGE KARESH ON 10/28/16.

10/28/2016 Order ▾

Order GRANTING DEFT FACEBOOK INC'S EX PARTE APPLICATION TO CONTINUE TRIAL SIGNED BY JUDGE GRANDSAERT

Comment
GRANTING DEFT FACEBOOK INC'S EX PARTE APPLICATION TO CONTINUE TRIAL SIGNED BY JUDGE GRANDSAERT ON 10/28/16. (COPY OF ORDER FORWARDED TO MASTER CALENDAR)

10/31/2016 Notice of Mandatory Settlement Conference and Jury Trial ▾

Notice of Mandatory Settlement Conference and Jury Trial

10/31/2016 Motion ▾

Motion FOR A PROTECTIVE ORDER

Comment
FOR A PROTECTIVE ORDER

10/31/2016 Court Reporter service less than one hour

10/31/2016 Separate Statement ▾

Separate Statement IN SUPPORT OF DEFT FACEBOOK, INC'S MOTION FOR PROTECTIVE ORDER

Comment
IN SUPPORT OF DEFT FACEBOOK, INC'S MOTION FOR PROTECTIVE ORDER

11/01/2016 Notice ▾

Notice OF APPEARANCE OF CATHERINE KIM ON BEHLAF OF FACEBOOK

Comment
OF APPEARANCE OF CATHERINE KIM ON BEHLAF OF FACEBOOK

11/03/2016 Motion ▾

Motion FOR ORDER TO COMPEL FURTHER RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES

Comment
FOR ORDER TO COMPEL FURTHER RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES

11/03/2016 Court Reporter service less than one hour

11/03/2016 Memorandum of Points & Authorities Filed ▾

Memorandum of Points & Authorities Filed IN SUPPORT OF MOTION TO COMPEL FURTHER RESPONSES TO PLAINTI

Comment
IN SUPPORT OF MOTION TO COMPEL FURTHER RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES

11/03/2016 Separate Statement ▾

Separate Statement OF ANSWERS TO PLAINTIFF'S SPECIALLY PREPARED INTERROGATORIES IN DISPUTE

Comment
OF ANSWERS TO PLAINTIFF'S SPECIALLY PREPARED INTERROGATORIES IN DISPUTE

11/03/2016 Declaration ▾

Declaration OF DAVID S. GODKIN IN SUPPORT OF MOTION TO COMPEL FURTHER RESPONSES TO PLAINTIFF'S SPECI

Comment
OF DAVID S. GODKIN IN SUPPORT OF MOTION TO COMPEL FURTHER RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES

11/03/2016 Motion ▾

Motion FOR ORDER TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS (SET TWO)

Comment
FOR ORDER TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS (SET TWO)

11/03/2016 Court Reporter service less than one hour

11/03/2016 Memorandom of Points & Authorities Filed ▾

Memorandum of Points & Authorities Filed IN SUPPORT OF MOTION FOR ORDER TO COMPEL FURTHER RESPONSES

Comment
IN SUPPORT OF MOTION FOR ORDER TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS (SET TWO)

11/03/2016 Separate Statement ▾

Separate Statement OF DEMANDS IN DISPUTE (SET TWO)

Comment
OF DEMANDS IN DISPUTE (SET TWO)

11/03/2016 Declaration ▾

Declaration OF DAVID S. GODKIN IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND

Comment
OF DAVID S. GODKIN IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS, ETC

11/08/2016 ADR Mediation Scheduled

11/17/2016 Motion ▾

Motion TO COMPEL

Comment
TO COMPEL

11/17/2016 Court Reporter service less than one hour

11/17/2016 Notice ▾

Notice of LODGING OF DOCUMENTS WITH THE COURT CONDITIONALLY UNDER SEAL

Comment
of LODGING OF DOCUMENTS WITH THE COURT CONDITIONALLY UNDER SEAL

11/17/2016 Separate Statement ▾

Separate Statement of Facts in SUPPORT OF ITS MOTION TO COMPEL

Comment
of Facts in SUPPORT OF ITS MOTION TO COMPEL

11/17/2016 Declaration ▾

Declaration OF LAURA E MILLER IN SUPPORT OF DEFT FACEBOOK INC'S MOTION TO COMPEL

Comment
OF LAURA E MILLER IN SUPPORT OF DEFT FACEBOOK INC'S MOTION TO COMPEL

11/17/2016 Memorandum of Points & Authorities Filed ▾

Memorandum of Points & Authorities Filed IN SUPPORT OF ITS MOTION TO COMPEL

Comment
IN SUPPORT OF ITS MOTION TO COMPEL

11/18/2016 Proof of Service by MESSENGER SERVICE of ▾

Proof of Service by MESSENGER SERVICE OF DEFT FACEBOOK, INC'S NOTICE OF MOT/MOT TO COMPEL; MEMO P&A;

Comment
DEFT FACEBOOK, INC'S NOTICE OF MOT/MOT TO COMPEL; MEMO P&A; ETC

11/21/2016 Opposition filed ▾

Opposition filed TO DEFT FACEBOOK INC MOTION FOR A PROTECTIVE ORDER; ETC

Comment
TO DEFT FACEBOOK INC MOTION FOR A PROTECTIVE ORDER; ETC

11/22/2016 Opposition filed ▾

Opposition filed TO PLAINTIFF'S MOTION TO COMPEL FURTHER RESPONSES TO SPECIALLY PREPARED INTERROGATO

Comment
TO PLAINTIFF'S MOTION TO COMPEL FURTHER RESPONSES TO SPECIALLY PREPARED INTERROGATORIES SET ONE

11/22/2016 Response ▾

Response SEPARATE STATEMENT IN SUPPORT OF OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES TO

Comment
SEPARATE STATEMENT IN SUPPORT OF OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES TO SPECIALLY PREPARED INTERROGATORIES SET ONE

11/22/2016 Declaration ▾

Declaration OF CATHERINE Y KIM IN SUPPORT OF FACEBOOK, INC'S OPPOSITION TO PLTF'S MOTION TO COMPEL F

Comment
OF CATHERINE Y KIM IN SUPPORT OF FACEBOOK, INC'S OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES TO SPECIALLY PREPARED INTERROGATORIES SET ONE

11/22/2016 Proof of Service by MAIL of ▾

Proof of Service by MAIL of FACEBOOK, INC.'S OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES

Comment
FACEBOOK, INC.'S OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES TO SPECIALLY PREPARED INTERROGATORIES (SET ONE); RESPONSE; ETC

11/22/2016 Opposition filed ▾

Opposition filed TO DEFT FACEBOOK INC'S MOTION FOR A PROTECTIVE ORDER LIMITING PRODUCTION RESPONSIVE

Comment
TO DEFT FACEBOOK INC'S MOTION FOR A PROTECTIVE ORDER LIMITING PRODUCTION RESPONSIVE TO DOCUMENT REQUEST NOS. 5,25, AND 26

11/23/2016 Opposition filed ▾

Opposition filed FACEBOOK, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL FURTHER RESPONSES TO DE

Comment
FACEBOOK, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION O OF DOCUMENTS (SET TWO)

11/23/2016 Response ▾

Response FACEBOOK, INC.'S RESPONSE SEPARATE STATEMENT IN SUPPORT OF OPPOSITION TO PLTF'S MOTION TO C

Comment
FACEBOOK, INC.'S RESPONSE SEPARATE STATEMENT IN SUPPORT OF OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS (SET TWO)

11/23/2016 Declaration ▾

Declaration of CATHERINE Y KIM IN SUPPORT OF FACEBOOK, INC.'S OPPOSITION TO PLTF'S MOTION TO COMPEL

Comment
of CATHERINE Y KIM IN SUPPORT OF FACEBOOK, INC.'S OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS (SET TWO)

11/23/2016 Proof of Service by MAIL of ▾

Proof of Service by MAIL of FACEBOOK, INC.'S OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES

Comment
FACEBOOK, INC.'S OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS (SET TWO); ETC

11/28/2016 Reply ▾

Reply DEFENDANT FACEBOOK, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PROTECTIVE ORDER LI

Comment
DEFENDANT FACEBOOK, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PROTECTIVE ORDER LIMITING PRODUCTION RESPONSIVE TO DOCUMENT REQUEST

---

11/28/2016 Declaration ▾

Declaration of LAURA E MILLER IN SUPPORT OF FACEBOOK, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTI

Comment
of LAURA E MILLER IN SUPPORT OF FACEBOOK, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PROTECTIVE ORDER LIMITING PRODUCTION RESPONSIVE TO DOCUMENT REQUEST

---

11/30/2016 Reply ▾

Reply IN SUPPORT OF NOTICE OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO SPECIALLY PREPARED IN

Comment
IN SUPPORT OF NOTICE OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO SPECIALLY PREPARED INTERROGATORIES (SET ONE)

---

12/01/2016 Reply ▾

Reply BY PLAINTIFF IN SUPPORT OF NOTICE OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND F

Comment
BY PLAINTIFF IN SUPPORT OF NOTICE OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS (SET TWO);ETC

---

12/02/2016 Ex Parte Fee Paid

---

12/02/2016 Ex Parte ▾

Ex Parte Filed PLTF SEX4THREE'S EX PARTE APPLICATION

Comment
PLTF SEX4THREE'S EX PARTE APPLICATION

---

12/02/2016 Memorandum of Points & Authorities Filed ▾

Memorandum of Points & Authorities Filed IN SUPPORT OF PLTF'S EX PARTE APPLICATION

Comment
IN SUPPORT OF PLTF'S EX PARTE APPLICATION

---

12/02/2016 Declaration ▾

Declaration OF JAMES E KRUZER IN SUPPORT OF PLTF'S EX PARTE APPLICATION

Comment
OF JAMES E KRUZER IN SUPPORT OF PLTF'S EX PARTE APPLICATION

---

12/02/2016 Order ▾

Order Signed by Judge Karesh DENYING PLAINTIFF'S EX PARTE APPLICATION TO CONTINUE DEFT FACEBOOK, INC

Comment
Signed by Judge Karesh DENYING PLAINTIFF'S EX PARTE APPLICATION TO CONTINUE DEFT FACEBOOK, INC'S MOTION TO COMPEL

---

12/02/2016 Opposition filed ▾

Opposition filed DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX PARTE MOTION

Comment
DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX PARTE MOTION

---

12/05/2016 Substitution of Attorney as to ▾

Substitution of Attorney as to Former Attorney: JULIE SCHWARTZ New Attorney: SONAL MEHTA

Comment
Former Attorney: JULIE SCHWARTZ New Attorney: SONAL MEHTA

---

12/05/2016 Minutes corrected as follows: ▾

Comment
GRAMMATICAL UPDATE OF TENTATIVE RULING PER JUDGE KARESH ON 12/12/16

---

12/05/2016 Motion hearings ▾

CIV Minute Order

Judicial Officer
Karesh, Jonathan E

Hearing Time
9:00 AM

---

Result
Held

Comment
FOR A PROTECTIVE ORDER

Parties Present ▲
   Defendant
     Attorney: MILLER, LAURA E.
     Attorney: MEHTA, SONAL N

---

12/07/2016 Opposition filed ▾

Opposition filed TO DEFT FACEBOOK INC'S NOTICE OF MOTION TO COMPEL

Comment
TO DEFT FACEBOOK INC'S NOTICE OF MOTION TO COMPEL

---

12/07/2016 Motion to Compel Further ▾

CIV Minute Order

Judicial Officer
Karesh, Jonathan E

Hearing Time
9:00 AM

Result
Held

Comment
RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES

Parties Present ▲
   Defendant
     Attorney: MILLER, LAURA E.
     Attorney: MEHTA, SONAL N

---

12/08/2016 Order sent for signature to Department ▾

Comment
20 (LM) FOR SIGNATURE ON FACEBOOK INC'S ORD GRANTING IN PART/DENYING IN PART OF MOT FOR A PROTECTIVE ORDER;ETC

---

12/08/2016 Motion hearings ▾

CIV Minute Order

Judicial Officer
Karesh, Jonathan E

Hearing Time
9:00 AM

Result
Held

Comment
FOR ORDER TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS

---

12/09/2016 Reply ▾

Reply MEMORANDUM OF POINTS AND AUTHORITIES OF DEFT FACEBOOK, INC'S IN SUPPORT OF ITS MOTION TO COMPE

Comment
MEMORANDUM OF POINTS AND AUTHORITIES OF DEFT FACEBOOK, INC'S IN SUPPORT OF ITS MOTION TO COMPEL

---

12/09/2016 Reply ▾

Reply DECLARATION OF LAURA E MILLER IN SUPPORT OF DEFT FACEBOOK, INC'S MOTION TO COMPEL

Comment
DECLARATION OF LAURA E MILLER IN SUPPORT OF DEFT FACEBOOK, INC'S MOTION TO COMPEL

---

12/09/2016 Notice ▾

Notice of LODGING OF DOCUMENTS WITH THE COURT CONDITIONALLY UNDER SEAL

Comment
of LODGING OF DOCUMENTS WITH THE COURT CONDITIONALLY UNDER SEAL

---

12/09/2016 Reply ▾

Reply UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE LODGED UNDER SEALED

Comment
UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE LODGED UNDER SEALED

12/09/2016 Reply ▾

Reply UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE LODGED UNDER SEALED

Comment
UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE LODGED UNDER SEALED

12/13/2016 Order After Hearing ▾

Order After Hearing Signed by Judge Karesh 12/12/16 GRANTING IN PART AND DENYING IN PART DEFT FACEBO

Comment
Signed by Judge Karesh 12/12/16 GRANTING IN PART AND DENYING IN PART DEFT FACEBOOK, INC'S MOTION FOR A PROTECTIVE ORDER LIMITING PRODUCTION RESPONSIVE TO DOCUMENT REQUEST

12/15/2016 Motion to Compel ▾

CIV Minute Order

Judicial Officer
Karesh, Jonathan E

Hearing Time
9:00 AM

Result
Held

01/04/2017 Stipulation and Order received and forwarded to Dept ▾

Comment
20 (TO EXTEND TIME TO RESPOND)

01/10/2017 Stipulation & Order ▾

Stipulation & Order Signed by: Judge DuBois on: 01/09/17 to ENTEND TIME TO RESPOND

Comment
Signed by: Judge DuBois on: 01/09/17 to ENTEND TIME TO RESPOND

01/12/2017 Stipulation ▾

Stipulation FOR ELECTRONIC SERVICE OF DOCUMENTS AND NOTICE

Comment
FOR ELECTRONIC SERVICE OF DOCUMENTS AND NOTICE

01/18/2017 Order sent for signature to Department ▾

Comment
16 (LM) RE STIP TO EXTEND TIME TO RESPOND

01/19/2017 Stipulation & Order ▾

Stipulation & Order Signed by: JUDGE DUBOIS on: 01/18/17 TO EXTEND TIME TO RESPOND

Comment
Signed by: JUDGE DUBOIS on: 01/18/17 TO EXTEND TIME TO RESPOND

01/20/2017 Document ▾

Document DEFENDANT FACEBOOK, INC.'S DISCOVERY SUBMISSION

Comment
DEFENDANT FACEBOOK, INC.'S DISCOVERY SUBMISSION

01/20/2017 Declaration in Support ▾

Declaration in Support OF DEFENDANT FACEBOOK,INC.'S DISCOVERY SUBMISSION

Comment
OF DEFENDANT FACEBOOK,INC.'S DISCOVERY SUBMISSION

01/20/2017 Document ▾

Document DISCOVERY PROPOSAL PURSUANT TO COURT'S DECEMBER 13, 2016 ORDER (REDACTED PUBLIC VERSION)

Comment
DISCOVERY PROPOSAL PURSUANT TO COURT'S DECEMBER 13, 2016 ORDER (REDACTED PUBLIC VERSION)

01/20/2017 Declaration in Support ▾

Declaration in Support OF 643'S DISCOVERY PROPOSAL PURSUANT TO COURT'S ORDER, AND FOR SANCTIONS

Comment
OF 643'S DISCOVERY PROPOSAL PURSUANT TO COURT'S ORDER, AND FOR SANCTIONS

01/20/2017 Notice ▾

Notice OF LODGING DOCUMENTS WITH THE COURT CONDITIONALLY UNDER SEAL PURSUANT TO C.R.C. 2.551(B)(3)

Comment
OF LODGING DOCUMENTS WITH THE COURT CONDITIONALLY UNDER SEAL PURSUANT TO C.R.C. 2.551(B)(3)

01/20/2017 Documents Lodged Conditionally Under Seal ▾

Comment
Document(s): 643'S DISCOVERY PROPOSAL PURSUANT TO COURT'S DECEMBER 13, 2016 ORDER

01/20/2017 Documents Lodged Conditionally Under Seal ▾

Comment
DECLARATION OF JAMES E. KRUZER IN SUPPORT OF 643'S DISCOVERY PROPOSAL PURSUANT TO COURT'S ORDER, AND FOR SANCTIONS

04/28/2017 Mandatory Settlement Conference ▾

Judicial Officer
Mandatory Settlement Conferences, -

Hearing Time
9:30 AM

05/15/2017 Jury Trial ▾

Judicial Officer
Master Calendar, -

Hearing Time
9:00 AM

Comment
JURY TRIAL 5 DAYS

## Financial

SIX4THREE, LLC, A DELAWARE LIABILIT COMPANY

| | | | | |
|---|---|---|---|---|
| Total Financial Assessment | | | | $2,735.00 |
| Total Payments and Credits | | | | $2,735.00 |

| | | | | |
|---|---|---|---|---|
| 4/10/2015 | Transaction Assessment | | | $435.00 |
| 4/10/2015 | Case Payment | Receipt # 201504100768 | SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT COMPANY | ($435.00) |
| 6/9/2015 | Transaction Assessment | | | $60.00 |
| 6/9/2015 | Case Payment | Receipt # 201506090544 | SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT COMPANY | ($60.00) |
| 8/13/2015 | Transaction Assessment | | | $20.00 |
| 8/13/2015 | Case Payment | Receipt # 201508130215 | SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT COMPANY | ($20.00) |
| 8/21/2015 | Transaction Assessment | | | $150.00 |
| 8/21/2015 | Case Payment | Receipt # 201508210186 | SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT COMPANY | ($150.00) |
| 9/11/2015 | Transaction Assessment | | | $530.00 |
| 9/11/2015 | Case Payment | Receipt # 201509110035 | SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT COMPANY | ($530.00) |

| Date | Type | Receipt | Party | Amount |
|---|---|---|---|---|
| 9/11/2015 | Case Payment | Receipt # 201509110043 | SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT COMPANY | ($530.00) |
| 12/3/2015 | Case Payment | Receipt # 201512030774 | SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT COMPANY | ($20.00) |
| 4/19/2016 | Case Payment | Receipt # 201604190560 | SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT COMPANY | ($20.00) |
| 8/10/2016 | Transaction Assessment | | | $500.00 |
| 8/10/2016 | Transaction Assessment | | | $30.00 |
| 8/10/2016 | Case Payment | Receipt # 2016-034962-HOJ | ONE LEGAL LLC | ($530.00) |
| 8/11/2016 | Transaction Assessment | | | $60.00 |
| 8/11/2016 | Transaction Assessment | | | $30.00 |
| 8/11/2016 | Case Payment | Receipt # 2016-035308-HOJ | ONE LEGAL LLC | ($90.00) |
| 9/15/2016 | Transaction Assessment | | | $60.00 |
| 9/15/2016 | Transaction Assessment | | | $30.00 |
| 9/15/2016 | Case Payment | Receipt # 2016-044182-HOJ | ONE LEGAL LLC | ($90.00) |
| 9/23/2016 | Transaction Assessment | | | $20.00 |
| 9/23/2016 | Case Payment | Receipt # 2016-045934-HOJ | OAKLAND SERVICE OF PROCESS, INC. | ($20.00) |
| 11/4/2016 | Transaction Assessment | | | $60.00 |
| 11/4/2016 | Transaction Assessment | | | $30.00 |
| 11/4/2016 | Case Payment | Receipt # 2016-056407-HOJ | ONE LEGAL LLC | ($90.00) |
| 11/4/2016 | Transaction Assessment | | | $60.00 |
| 11/4/2016 | Transaction Assessment | | | $30.00 |
| 11/4/2016 | Case Payment | Receipt # 2016-056466-HOJ | ONE LEGAL LLC | ($90.00) |
| 12/2/2016 | Transaction Assessment | | | $60.00 |
| 12/2/2016 | Case Payment | Receipt # 2016-063657-HOJ | FTHENAKIS, BASIL P | ($60.00) |

FACEBOOK, INC, A DELAWARE CORPORATION

| | | | |
|---|---|---|---|
| Total Financial Assessment | | | $2,020.00 |
| Total Payments and Credits | | | $2,020.00 |

| Date | Type | Receipt | Party | Amount |
|---|---|---|---|---|
| 9/8/2015 | Transaction Assessment | | | $465.00 |
| 9/8/2015 | Case Payment | Receipt # 201509080735 | FACEBOOK, INC, A DELAWARE CORPORATION | ($465.00) |
| 9/21/2015 | Transaction Assessment | | | $500.00 |
| 9/21/2015 | Case Payment | Receipt # 201509210301 | FACEBOOK, INC, A DELAWARE CORPORATION | ($530.00) |
| 12/23/2015 | Transaction Assessment | | | $60.00 |
| 12/23/2015 | Case Payment | Receipt # 201512230474 | FACEBOOK, INC, A DELAWARE CORPORATION | ($90.00) |
| 3/24/2016 | Transaction Assessment | | | $20.00 |
| 3/24/2016 | Case Payment | Receipt # 201603240263 | FACEBOOK, INC, A DELAWARE CORPORATION | ($20.00) |
| 4/8/2016 | Case Payment | Receipt # 201604080810 | FACEBOOK, INC, A DELAWARE CORPORATION | ($90.00) |
| 7/5/2016 | Transaction Assessment | | | $435.00 |
| 7/5/2016 | First paper fee paid | | | ($435.00) |
| 9/23/2016 | Transaction Assessment | | | $60.00 |
| 9/23/2016 | Transaction Assessment | | | $30.00 |
| 9/23/2016 | Case Payment | Receipt # 2016-046300-HOJ | OAKLAND SERVICE OF PROCESS, INC. | ($90.00) |
| 10/28/2016 | Transaction Assessment | | | $60.00 |
| 10/28/2016 | Case Payment | Receipt # 2016-055086-HOJ | MEHTA, SONAL N | ($60.00) |
| 11/1/2016 | Transaction Assessment | | | $60.00 |
| 11/1/2016 | Transaction Assessment | | | $30.00 |
| 11/1/2016 | Case Payment | Receipt # 2016-055635-HOJ | NATIONWIDE LEGAL, LLC | ($90.00) |
| 11/17/2016 | Transaction Assessment | | | $20.00 |
| 11/17/2016 | Case Payment | Receipt # 2016-059892-HOJ | NATIONWIDE LEGAL, LLC | ($20.00) |

| 11/17/2016 | Transaction Assessment | | | $60.00 |
| 11/17/2016 | Transaction Assessment | | | $30.00 |
| 11/17/2016 | Case Payment | Receipt # 2016-059902-HOJ | NATIONWIDE LEGAL, LLC | ($90.00) |
| 1/4/2017 | Transaction Assessment | | | $20.00 |
| 1/4/2017 | Case Payment | Receipt # 2017-000232-HOJ | NATIONWIDE LEGAL LLC | ($20.00) |
| 1/18/2017 | Transaction Assessment | | | $20.00 |
| 1/18/2017 | Case Payment | Receipt # 2017-003495-HOJ | NATIONWIDE LEGAL LLC | ($20.00) |

## Documents

(S) COMPLAINT FILED

PROOF OF SERVICE OF NOTICE OF HEARING ON DEMURRER, ETC SERVED ON SEE SERVICE LIST BY OVERNIGHT DELI

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN SUPPOR

APPLICATION BY ANDREW A. CAFFREY, III, ESQ. TO APPEAR AS COUNSEL PRO HAC VICE FOR SIX4THREE, LLC, A

PROPOSED ORDER RECEIVED.

SUPPLEMENTAL DECLARATION OF BASIL P. FTHENAKIS RE PAYMENT OF REQUIRED FEE TO THE STATE BAR OF CA, E

SUPPLEMENTAL DECLARATION OF JULIE E. SCHWARTZ REGARDING CALIFORNIA STATE BAR FEES FOR PRO HAC FILED

STIPULATION AND ORDER EXTENDING TIME TO ANSWER TO F.A.C. SIGNED BY JOSEPH C. SCOTT ON 12/08/15.

(S) DEMURRER TO 1ST AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED BY FACEB

REQUEST FOR JUDICIAL NOTICE OF IN SUPPORT OF DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT FILED

ORDER SUSTAINING DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, SIGNED BY JUDGE AYOOB ON 01/27/16

(U) 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED (AMENDED COMPLAINT)

STIPULATION AND ORDER TO RESCHEDULE HEARING ON DEMURRER TO SAC SIGNED BY DONALD J. AYOOB ON 04/21/1

OBJECTION TO REQUEST FOR JUDICIAL NOTICE FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN OPPOSI

CIVIL CASE COVERSHEET RECEIVED

30 DAY SUMMONS, ISSUED AND FILED.

PROOF OF SERVICE (PERSONAL) OF PLAINTIFF'S FIRST SET OF DEMANDS FOR INSPECTION DOCS TO DEFT FACEBOO

CASE MANAGEMENT STATEMENT FILED BY FACEBOOK, INC, A DELAWARE CORPORATION.

PROOF OF SERVICE (BY MAIL) OF CASE MANAGEMENT STATEMENT SERVED ON SEE SERVICE LIST WITH A SERVICE D

CASE MANAGEMENT STATEMENT FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

DECLARATION OF BASIL P. FTHENAKIS RE: SERVICE ON THE STATE BAR OF CALIFORNIA AND PAYMENT OF REQ FEE

PROPOSED ORDER RECEIVED.

NOTICE OF HEARINF RE: APPLICATION OF ANDREW A. CAFFREY, I II, ESQ. FOR ADMISSION PRO HAC VICE FILED

PROOF OF SERVICE OF FACEBOOK, INC.'S NOTICE OF HEARING, ETC. SERVED ON SEE LIST BY HAND DELIVERY AN

SUPPLEMENTAL DECLARATION OF BASIL P. FTHENAKIS RE PAYMENT OF REQUIRED FEE TO THE STATE BAR OF CA, E

(S) STIPULATIONTO CONTINUE HEARING ON DEMURRER FILED

PROOF OF SERVICE OF SEE DOCUMENT LIST SERVED ON SEE SERVICE LIST BY OVERNIGHT DELIVERY - FEDEX WITH

ORDER SUSTAINING DEMURRER TO PLAINTIFF'S FIRST AMENDED COMPLAINT, SIGNED BY JUDGE AYOOB ON 01/27/16

FACEBOOK, INC, A DELAWARE CORPORATION'S RESPONSE TO PLTTF'S OBJECTIONS TO REQUEST FOR JUDICIAL NOTI

ORDER GRANTING APPLICATION FOR ADMISSION PRO HAC VICE, SIGNED BY JUDGE ETEZADI ON 10/19/15 FILED.

(L) 1ST AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED (AMENDED COMPLAINT)

ORDER GRANTING APPLICATION OF JAMES R. MCCULLAGH TO APPEAR AS COUNSEL, SIGNED BY JUDGE ETEZADI ON 1

DECLARATION OF BASIL P. FTHENAKIS IN SUPPORT OF APPLICATION FOR EX PARTE ORDER EXTENDING FILED BY S

STIPULATION AND ORDER TO EXTEND TIME TO RESPOND TO COMPLAINT FILED BY SIX4THREE, LLC, A DELAWARE LI

NOTICE OF JURY FEE DEPOSIT BY PLAINTIFF FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT.

(S) DEMURRER TO COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED BY FACEBOOK, INC, A

REQUEST FOR JUDICIAL NOTICE RE: IN SUPPORT OF DEMURRER TO PLTF'S COMPLAINT FILED BY FACEBOOK, INC, A

NOTICE OF HEARING RE: APPLICATION OF DAVID S. GODKIN, ESQ. FOR ADMISSION PRO HAC VICE FILED BY SIX4

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN SUPPOR

DECLARATION OF BASIL P. FTHENAKIS RE: SERVICE ON THE STATE BAR OF CALIFORNIA AND PAYMENT OF REQ FEE

APPLICATION BY JAMES R. MCCULLAGH TO APPEAR AS COUNSEL PRO HAC VICE FOR FACEBOOK, INC, A DELAWARE C

DECLARATION OF JULIE E. SCHWARTZ IN SUPPORT OF FACEBOOK INC'S REQUEST FOR JUDICIAL NOTICE FILED BY

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN OPPOSI

OBJECTION TO REQUEST FOR JUDICIAL NOTICE FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT

STIPULATION AND ORDER TO EXTEND TIME TO RESPOND TO 2ND AMND CMPL SIGNED BY JOHN G. SCHWARTZ ON 03/2

(S) DEMURRER TO 2ND AMENDED COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT FILED BY FACEB

REQUEST FOR JUDICIAL NOTICE OF IN SUPPORT OF DEMURRER TO PLTFF'S SECOND AMENDED COMPLAINT FILED BY

DECLARATION OF JULIE E. SCHWARTZ IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE AND, ETC. FILED BY FACEB

EX PARTE APPLICATION ORDER EXTENDING TIME FOR SERVICE OF PROCESS FILED.

DECLARATION OF BASIL P. FTHENAKIS REGARDING NOTICE OF PLAINTIFF'S APPLICATION FOR EX PARTE ORDER FI

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LIABILIT IN SUPPOR

ORDER EXTENDING TIME FOR SERVICE OF PROCESS, SIGNED BY JUDGE SCOTT ON 06/09/15 FILED.

PROOF OF SERVICE (QUESTIONABLE SERVICE) OF SUMMONS AND COMPLAINT OF SIX4THREE, LLC, A DELAWARE LIMI

CASE MANAGEMENT CONFERENCE

DECLARATION OF JEREMY E. JORDAN IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE FILED BY FACEBOOK, INC, A

DECLARATION OF JULIE E. SCHWARTZ IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE FILED BY FACEBOOK, INC,

APPLICATION BY DAVID S. GODKIN, ESQ. TO APPEAR AS COUNSEL PRO HAC VICE FOR SIX4THREE, LLC, A DELAWA

PROPOSED ORDER RECEIVED.

NOTICE OF HEARING REGARDING APPLICATION OF JAMES R. MCCULLAGH TO APPEAR AS COUNSEL PRO HAC VICE FIL

MEMORANDUM OF POINTS AND AUTHORITIES FILED BY FACEBOOK, INC, A DELAWARE CORPORATION IN SUPPORT OF N

DECLARATION OF JEREMY E. JORDAN IN SUPPORT OF FACEBOOK INC'S REQUEST FOR JUDICIAL NOTICE FILED BY F

PROOF OF SERVICE OF NOITCE OF HEARING ON DEMURRER, ETC SERVED ON SEE SERVICE LIST BY OVERNIGHT DELI

CAFFREY DECLARATION IN SUPPORT OF PLTFF'S OBJECTION TO REQUEST FOR JUDICIAL NOTICE, FILED.

DEFT FACEBOOK'S REPLY IN SUPPORT OF DEMURRER TO FIRST AMENDED COMPLAINT, FILED.

FACEBOOK, INC, A DELAWARE CORPORATION`S RESPONSE TO PLTFF'S OBJECTIONS TO REQUEST FOR JUDICIAL NOTI

DECLARATION OF JEREMY E. JORDAN IN SUPPORT OF REQUEST FOR JUDICIAL NOTICE FILED BY FACEBOOK, INC, A

PROOF OF SERVICE OF FACEBOOK, INC.'S NOTICE OF HEARING, ETC. SERVED ON SEE LIST BY FEDERAL EXPRESS

DEFT FACEBOOK'S REPLY IN SUPPORT OF DEMURRER TO SECOND AMENDED COMPLAINT, FILED.

PROOF OF SERVICE OF SEE DOCUMENT LIST SERVED ON SEE SERVICE LIST BY FEDERAL EXPRESS WITH A SERVICE

NOTICE WITHDRAWL AND DISCHARGE AS ATTORNEY OF RECORD FILED BY SIX4THREE, LLC, A DELAWARE LIMITED LI

Case Management Statement

CIV Minutes Order

Case Management Statement

CIV Minutes Order

Order ON DEMURRER TO PLAINTIFF'S SECOND AMENDED COMPLAINT

CIV Minutes Order

Answer / Response / Denial - Unlimited

Notice OF RULING

Application to Appear as Counsel Pro Hac Vice OF JAMES E. KRUZER, ESQ.

Notice of Hearing RE: APPLICATION OF JAMES E. KRUZER, ESQ. FOR ADMISSION PRO HAC VICE

Memorandum of Points & Authorities Filed IN SUPPORT OF APPLICATION OF JAMES E. KRUZER, ESQ. FOR ADMI

Declaration OF BASIL P. FTHENAKIS RE; SERVICE ON THE STATE BAR OF CALIFORNIA AND PAYMENT OF REQUIRED

Proposed Order Received RE: ORDER GRANTING APPLICATION OF JAMES E. KRUZER, ESQ. FOR ADMISSION PRO HA

Motion FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS, ETC

Memorandum of Points & Authorities Filed IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES

Separate Statement OF DEMANDS IN DISPUTE IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES

Declaration OF DAVID GODKIN IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES, ETC

Stipulation and Order to ADR

Proof of Service by FEDERAL EXPRESS served on SEE SERVICE LIST with a service date of 08/25/16

Opposition filed to PLTFF'S MOTION TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS

Declaration OF JULIE W. SCHWARTZ ISO FACEBOOK'S OPPOSITION TO PLTFF'S MOTION TO COMPEL, ETC.

Separate Statement FACEBOOK'S RESPONSE SEPARATE STATEMENT ISO OPPOSITION TO PLTFF'S MOTION TO COMPEL

Reply IN SUPPORT OF NOTICE OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND FOR INSPECTION

CIV Minute Order

CIV Minute Order

Motion FOR PROTECTIVE ORDER

Memorandum of Points & Authorities Filed IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

Declaration OF DAVID S. GODKIN ISO OF MOTION FOR PROTECTIVE ORDER

Document LETTER TO JUDGE KARESH IN REGARDS TO PROPOSED ORDER ON MOTION FOR ORDER COMPELLING FURTHER

Order ON MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS, ETC. S

Motion FOR PROTECTIVE ORDER

Declaration OF JULIE E. SCHWARTZ ISO FACEBOOK'S MOTION FOR PROTECTIVE ORDER

Proof of Service by FEDERAL EXPRESS served on SEE SERVICE LIST with a service date of 09/22/16

Stipulation & Order CONTINUING HEARING ON SIX4THREE, LLC'S MOTION FOR PROTECTIVE ORDER signed by JUD

Opposition filed TO PLTFF'S MOTION FOR PROTECTIVE ORDER

Declaration OF JULIE E. SCHWARTZ IN SUPPORT OF FACEBOOK'S OPPOSITION TO PLTFF'S MOTION FOR PROTECTIV

Proof of Service by FEDERAL EXPRESS served on SEE SERVICE LIST with a service date of 09/29/16

Reply TO DEFENDANT FACEBOOK INC'S OPPOSITION TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

Reply IN SUPPORT OF MOTION FOR PROTECTIVE ORDER

CIV Minute Order

CIV Minute Order

Notice OF APPEARANCE ON BEHALF OF FACEBOOK

Order STIPULATED PROTECTIVE ORDER signed by Judge Karesh 10/24/16

Order After Hearing signed by Judge Karesh 10/24/16 SIX4THREE'S MOTION FOR PROTECTIVE ORDER AND FAC

Opposition filed TO DEFENDANT FACEBOOK INC'S EX PARTE APPLICATION

Order GRANTING DEFT FACEBOOK INC'S EX PARTE APPLICATION TO CONTINUE OCTOBER 31 DOCUMENTS PRODUCTION

Order GRANTING DEFT FACEBOOK INC'S EX PARTE APPLICATION TO CONTINUE TRIAL SIGNED BY JUDGE GRANDSAERT

Ex Parte Filed APPLICATION TO CONTINUE OCTOBER 31 DOCUMENT PRODUCTION DEADLINE AND REMAINING CASE DE

Notice of Mandatory Settlement Conference and Jury Trial

Motion FOR A PROTECTIVE ORDER

Separate Statement IN SUPPORT OF DEFT FACEBOOK, INC'S MOTION FOR PROTECTIVE ORDER

Notice OF APPEARANCE OF CATHERINE KIM ON BEHLAF OF FACEBOOK

Motion FOR ORDER TO COMPEL FURTHER RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES

Memorandum of Points & Authorities Filed IN SUPPORT OF MOTION TO COMPEL FURTHER RESPONSES TO PLAINTI

Separate Statement OF ANSWERS TO PLAINTIFF'S SPECIALLY PREPARED INTERROGATORIES IN DISPUTE

Declaration OF DAVID S. GODKIN IN SUPPORT OF MOTION TO COMPEL FURTHER RESPONSES TO PLAINTIFF'S SPECI

Motion FOR ORDER TO COMPEL FURTHER RESPONSES TO DEMAND FOR INSPECTION OF DOCUMENTS (SET TWO)

Memorandum of Points & Authorities Filed IN SUPPORT OF MOTION FOR ORDER TO COMPEL FURTHER RESPONSES

Separate Statement OF DEMANDS IN DISPUTE (SET TWO)

Declaration OF DAVID S. GODKIN IN SUPPORT OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND

Motion TO COMPEL

Notice of LODGING OF DOCUMENTS WITH THE COURT CONDITIONALLY UNDER SEAL

Separate Statement of Facts in SUPPORT OF ITS MOTION TO COMPEL

Declaration OF LAURA E MILLER IN SUPPORT OF DEFT FACEBOOK INC'S MOTION TO COMPEL

Memorandum of Points & Authorities Filed IN SUPPORT OF ITS MOTION TO COMPEL

Proof of Service by MESSENGER SERVICE OF DEFT FACEBOOK, INC'S NOTICE OF MOT/MOT TO COMPEL; MEMO P&A;

Opposition filed TO DEFT FACEBOOK INC MOTION FOR A PROTECTIVE ORDER; ETC

Opposition filed TO PLAINTIFF'S MOTION TO COMPEL FURTHER RESPONSES TO SPECIALLY PREPARED INTERROGATO

Response SEPARATE STATEMENT IN SUPPORT OF OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES TO

Declaration OF CATHERINE Y KIM IN SUPPORT OF FACEBOOK, INC'S OPPOSITION TO PLTF'S MOTION TO COMPEL F

Proof of Service by MAIL of FACEBOOK, INC.'S OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES

Opposition filed TO DEFT FACEBOOK INC'S MOTION FOR A PROTECTIVE ORDER LIMITING PRODUCTION RESPONSIVE

Opposition filed FACEBOOK, INC.'S OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL FURTHER RESPONSES TO DE

Response FACEBOOK, INC.'S RESPONSE SEPARATE STATEMENT IN SUPPORT OF OPPOSITION TO PLTF'S MOTION TO C

Proof of Service by MAIL of FACEBOOK, INC.'S OPPOSITION TO PLTF'S MOTION TO COMPEL FURTHER RESPONSES

Declaration of CATHERINE Y KIM IN SUPPORT OF FACEBOOK, INC.'S OPPOSITION TO PLTF'S MOTION TO COMPEL

Reply DEFENDANT FACEBOOK, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PROTECTIVE ORDER LI

Declaration of LAURA E MILLER IN SUPPORT OF FACEBOOK, INC.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTI

Reply IN SUPPORT OF NOTICE OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO SPECIALLY PREPARED IN

Reply BY PLAINTIFF IN SUPPORT OF NOTICE OF MOTION FOR ORDER COMPELLING FURTHER RESPONSES TO DEMAND F

CIV Minute Order

CIV Minute Order

Ex Parte Filed PLTF SEX4THREE'S EX PARTE APPLICATION

Memorandum of Points & Authorities Filed IN SUPPORT OF PLTF'S EX PARTE APPLICATION

Declaration OF JAMES E KRUZER IN SUPPORT OF PLTF'S EX PARTE APPLICATION

Order Signed by Judge Karesh DENYING PLAINTIFF'S EX PARTE APPLICATION TO CONTINUE DEFT FACEBOOK, INC

Opposition filed DEFENDANT'S OPPOSITION TO PLAINTIFF'S EX PARTE MOTION

Substitution of Attorney as to Former Attorney: JULIE SCHWARTZ New Attorney: SONAL MEHTA

CIV Minute Order

Opposition filed TO DEFT FACEBOOK INC'S NOTICE OF MOTION TO COMPEL

CIV Minute Order

Notice of LODGING OF DOCUMENTS WITH THE COURT CONDITIONALLY UNDER SEAL

Reply DECLARATION OF LAURA E MILLER IN SUPPORT OF DEFT FACEBOOK, INC'S MOTION TO COMPEL

Reply MEMORANDUM OF POINTS AND AUTHORITIES OF DEFT FACEBOOK, INC'S IN SUPPORT OF ITS MOTION TO COMPE

Reply UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE LODGED UNDER SEALED

Reply UNREDACTED VERSION OF DOCUMENT SOUGHT TO BE LODGED UNDER SEALED

CIV Minute Order

Order After Hearing Signed by Judge Karesh 12/12/16 GRANTING IN PART AND DENYING IN PART DEFT FACEBO

CIV Minute Order

Stipulation & Order Signed by: Judge DuBois on: 01/09/17 to ENTEND TIME TO RESPOND

Stipulation FOR ELECTRONIC SERVICE OF DOCUMENTS AND NOTICE

Stipulation & Order Signed by: JUDGE DUBOIS on: 01/18/17 TO EXTEND TIME TO RESPOND

Document DEFENDANT FACEBOOK, INC.'S DISCOVERY SUBMISSION

Declaration in Support OF DEFENDANT FACEBOOK,INC.'S DISCOVERY SUBMISSION

Document DISCOVERY PROPOSAL PURSUANT TO COURT'S DECEMBER 13, 2016 ORDER (REDACTED PUBLIC VERSION)

Declaration in Support OF 643'S DISCOVERY PROPOSAL PURSUANT TO COURT'S ORDER, AND FOR SANCTIONS

Notice OF LODGING DOCUMENTS WITH THE COURT CONDITIONALLY UNDER SEAL PURSUANT TO C.R.C. 2.551(B)(3)

EXHIBIT E

| | |
|---|---|
| **From:** | Sonal Mehta |
| **Sent:** | Friday, January 20, 2017 5:15 PM |
| **To:** | David Godkin; James Kruzer; bpf@criterionlaw.com |
| **Cc:** | SERVICE-SIX4THREE |
| **Subject:** | Six4Three, LLC v. Facebook, Inc., Case No. CIV533328 |

Counsel,

We have reviewed Plaintiff Six4Three LLC's January 12, 2017 Response To Defendant Facebook Inc.'s Specially Prepared Interrogatories (Set Two) seeking the basis for Six4Three's contentions with respect to the predicates for Section 17200.  In its responses, Six4Three identifies a variety of state and federal laws that it contends that Facebook has violated, a number of which are facially inapplicable and for which we do not believe Six4Three could even assert a claim in good faith.  Before we take action with the court, we ask that Six4Three review its contentions with respect to the underlying state and federal laws referenced in these interrogatory responses and let us know by 5 pm ET on Monday which of the predicate laws listed in the interrogatory responses Six4Three intends to pursue as a basis for its unlawfulness claim. If we do not hear from you by then, we will understand that Six4Three maintains its contentions that Facebook has violated the all of the laws identified therein and plans to assert those laws as a basis for its unlawfulness claim in the case going forward, including to oppose summary judgment and thereafter, and we will proceed accordingly.

Best,

**Sonal N. Mehta** | Durie Tangri LLP | smehta@durietangri.com | (415) 376-6427

1   DURIE TANGRI LLP
    SONAL N. MEHTA (SBN 222086)
2   smehta@durietangri.com
    LAURA E. MILLER (SBN 271713)
3   lmiller@durietangri.com
    CATHERINE Y. KIM (SBN 308442)
4   ckim@durietangri.com
    217 Leidesdorff Street
5   San Francisco, CA  94111
    Telephone:    415-362-6666
6   Facsimile:    415-236-6300

7   Attorneys for Defendant
    Facebook, Inc.

8

9                   IN THE UNITED STATES DISTRICT COURT

10             FOR THE NORTHERN DISTRICT OF CALIFORNIA

11   SIX4THREE, LLC,                          Case No. 3:17-cv-00359

12                        Plaintiff,          **PROOF OF SERVICE**

13          v.

14   FACEBOOK, INC.,

15                        Defendant.

16

17

18

19

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

I am a citizen of the United States and resident of the State of California.  I am employed in San Francisco County, State of California, in the office of a member of the bar of this Court, at whose direction the service was made.  I am over the age of eighteen years, and not a party to the within action. My business address is 217 Leidesdorff Street, San Francisco, CA  94111.

On January 24, 2017, I served the following documents in the manner described below:

- **CIVIL COVER SHEET;**

- **NOTICE OF REMOVAL OF ACTION: UNDER 28 U.S.C. § 1441(A) (FEDERAL QUESTION);**

- **PROOF OF SERVICE**

[X]   BY ELECTRONIC SERVICE:  By electronically mailing a true and correct copy through Durie Tangri's electronic mail system from msotto@durietangri.com to the email addresses set forth below.

On the following part(ies) in this action:

> Basil P. Fthenakis
> CRITERION LAW
> 2225 E. Bayshore Road, Suite 200
> Palo Alto, CA 94303
> Telephone: 650-352-8400
> Facsimile: 650-352-8408
> bpf@criterionlaw.com

> David S. Godkin
> James Kruzer
> BIRNBAUM & GODKIN, LLP
> 280 Summer Street
> Boston, MA 02210
> Telephone: 617-307-6100
> godkin@birnbaumgodkin.com
> kruzer@birnbaumgodkin.com

> *Attorneys for Plaintiff*
> *Six4Three, LLC*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on January 24, 2017, at San Francisco, California.

*/s/ Melissa Sotto*
Melissa Sotto

1

## **PROOF OF SERVICE**

2

     I am a citizen of the United States and resident of the State of California.  I am employed in San

3

Francisco County, State of California, in the office of a member of the bar of this Court, at whose

4

direction the service was made.  I am over the age of eighteen years, and not a party to the within action.

5

My business address is 217 Leidesdorff Street, San Francisco, CA  94111.

6

     On January 24, 2017, I served the following documents in the manner described below:

7

    **NOTICE TO ADVERSE PARTY OF REMOVAL TO FEDERAL COURT**

8

[X]     BY ELECTRONIC SERVICE:  By electronically mailing a true and correct copy through

9

Durie Tangri's electronic mail system from msotto@durietangri.com to the email addresses set forth below.

10

    On the following part(ies) in this action:

11

       Basil P. Fthenakis

12

       CRITERION LAW
       2225 E. Bayshore Road, Suite 200

13

       Palo Alto, CA 94303
       Telephone: 650-352-8400

14

       Facsimile: 650-352-8408
       bpf@criterionlaw.com

15

       David S. Godkin

16

       James Kruzer
       BIRNBAUM & GODKIN, LLP

17

       280 Summer Street
       Boston, MA 02210

18

       Telephone: 617-307-6100
       godkin@birnbaumgodkin.com

19

       kruzer@birnbaumgodkin.com

20

       *Attorneys for Plaintiff*
       *Six4Three, LLC*

21

    I declare under penalty of perjury under the laws of the United States of America that the

22

foregoing is true and correct.  Executed on January 24, 2017, at San Francisco, California.

23

24

25

                                     Melissa Sotto

26

27

28

Exhibit 5

**From:** David Godkin
**Sent:** Wednesday, January 25, 2017 3:38 PM
**To:** Laura Miller <LMiller@durietangri.com>; Sonal Mehta <SMehta@durietangri.com>; Catherine Kim <CKim@durietangri.com>
**Cc:** 'bpf@criterionlaw.com' <bpf@criterionlaw.com>; James Kruzer <kruzer@birnbaumgodkin.com>
**Subject:** RE: Six4Three LLC v. Facebook, Inc., San Mateo County Case No.: CIV

Counsel,

Facebook's removal of this case is nothing more than a transparent attempt to avoid complying with the summary judgment deadline. Notwithstanding Facebook's purported reasons, removal of the state-court case is inappropriate. 643's causes of action in the state-court case are based on common law and California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §17200 et. seq. The fact that 643 answered a special interrogatory seeking identification of laws it believes Facebook conduct violated by identifying state law, federal law, and common law violations does not confer federal jurisdiction. The case law is crystal clear on this point. *See, e.g., Kvam v. Chase Home Fin. LLC*, 2012 U.S. Dist. LEXIS 77218 (N.D. Cal. June 4, 2012)*; Pope v. Wells Fargo Bank*, 2010 U.S. Dist. LEXIS 125341, 2010 WL 8388301 (E.D. Cal. Nov. 29, 2010); *and Carbonel v. ARA Loans and Realty, Inc.,* 2010 U.S. Dist. LEXIS 81991 (N.D. Cal. Aug. 12, 2010).

Please advise by the end of today whether Facebook will stipulate to remanding this case. If Facebook does not agree to remand the case, 643 intends to seek immediate relief from the court and reserves its right to recover its costs and attorneys' fees in doing so, as Facebook's removal is contrary to unambiguous legal authority.

If Facebook does not agree to remand this case, please advise by the end of the day today whether Facebook will stipulate to shorten the time for a hearing on 643's forthcoming motion to remand (which will be filed tomorrow) to Thursday, February 2, 2017 at 8 AM, with Facebook's responsive papers to be filed by Monday, January 30, 2017. If Facebook does not agree, we will also file a motion to shorten time seeking that relief.

Regards,

David

Exhibit 6

| | |
|---|---|
| **From:** | Sonal Mehta |
| **Sent:** | Friday, January 20, 2017 5:15 PM |
| **To:** | David Godkin; James Kruzer; bpf@criterionlaw.com |
| **Cc:** | SERVICE-SIX4THREE |
| **Subject:** | Six4Three, LLC v. Facebook, Inc., Case No. CIV533328 |

Counsel,

We have reviewed Plaintiff Six4Three LLC's January 12, 2017 Response To Defendant Facebook Inc.'s Specially Prepared Interrogatories (Set Two) seeking the basis for Six4Three's contentions with respect to the predicates for Section 17200.  In its responses, Six4Three identifies a variety of state and federal laws that it contends that Facebook has violated, a number of which are facially inapplicable and for which we do not believe Six4Three could even assert a claim in good faith.  Before we take action with the court, we ask that Six4Three review its contentions with respect to the underlying state and federal laws referenced in these interrogatory responses and let us know by 5 pm ET on Monday which of the predicate laws listed in the interrogatory responses Six4Three intends to pursue as a basis for its unlawfulness claim. If we do not hear from you by then, we will understand that Six4Three maintains its contentions that Facebook has violated the all of the laws identified therein and plans to assert those laws as a basis for its unlawfulness claim in the case going forward, including to oppose summary judgment and thereafter, and we will proceed accordingly.

Best,

Sonal N. Mehta | Durie Tangri LLP | smehta@durietangri.com | (415) 376-6427