EXHIBIT 1

1   Basil P. Fthenakis, Esq. (88399)
    CRITERION LAW
2   2225 E. Bayshore Road, Suite 200
    Palo Alto, California  94303
3   Tel. (650) 352-8400
    Fax. (650) 352-8408
4   bpf@criterionlaw.com

5   Of counsel:

6   David S. Godkin (admitted *pro hac vice*)
    BIRNBAUM & GODKIN, LLP
7   280 Summer Street
    Boston, MA 02210
8   (617) 307-6100
    godkin@birnbaumgodkin.com
9
    James E. Kruzer (admitted *pro hac vice*)
10  BIRNBAUM & GODKIN, LLP
    280 Summer Street
11  Boston, MA 02210
    (617) 307-6100
12  kruzer@birnbaumgodkin.com

13

14  Attorneys for Plaintiff,
    SIX4THREE, LLC, a Delaware
15  limited liability company

16              SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                        COUNTY OF SAN MATEO

18

19  SIX4THREE, LLC, a Delaware limited        Case No. CIV533328
    liability company,
20                                            **PLAINTIFF SIX4THREE LLC'S THIRD**
                    Plaintiff,                **SUPPLEMENTAL RESPONSE TO**
21                                            **DEFENDANT FACEBOOK, INC.'S**
            v.                                **SPECIALLY PREPARED**
22                                            **INTERROGATORIES**
    FACEBOOK, INC., a Delaware
23  corporation and DOES 1-50, inclusive,

24                  Defendant.

25

26

27

28

1    Developers. On January 5, 2014, Facebook sent yet another "Platform Status" update regarding a

2    change to the Insights feature of Facebook Platform. See Exhibit E.

3            In sum, Facebook sent dozens and dozens of emails to 643 from April 30, 2014 through

4    January 20, 2015. *Not one of these emails ever provided notice to 643 of the changes to Graph*

5    *API that would shut down 643's App. In fact, these emails provided notices of many other*

6    *changes and also encouraged 643 to find more users for its App and to make money on engaging*

7    *those users after the point in time Facebook claims it provided notice to 643 that the App would*

8    *no longer function.* This is particularly curious given that many of the emails describe many other

9    changes to Graph API and Facebook Platform but never describe the massive change of closing

10   completely all the content Facebook had promised for many years. Facebook had multiple

11   avenues to communicate this major change, including its Weekly Developer Blog and its regular

12   Platform Status updates. Facebook provided 643 with notice of many different changes through

13   these avenues and yet not until January 20, 2015 did Facebook send notice to 643 of the major

14   change that would cause 643's App to shut down. Finally, during this period between which

15   Facebook told a small group of Developers at a conference about this change and notified 643 of

16   the change (April 30, 2014 to January 20, 2015), Facebook sent numerous emails to 643 helping

17   643 gain more users for its App, engage those users better in the App, and monetize the

18   engagement of those users for 643 to make money with the App.

19   **SPECIAL INTERROGATORY NO. 9:**

20           STATE THE COMPLETE FACTUAL BASIS that you contend supports YOUR claim

21   for violation of Business and Professions Code § 17200 et seq.

22   **RESPONSE TO SPECIAL INTERROGATORY NO. 9:**

23           Responding Party incorporates each of the General Objections and further objects to this

24   demand to the extent that it: (1) is vague and ambiguous; (2) is overly broad and unduly

25   burdensome in seeking "THE COMPLETE FACTUAL BASIS"; (3) calls for information

26   covered by the attorney-client privilege and work product privileges; (4) calls for confidential

27   information in the absence of the entry of a suitable protective order; (5) seeks documents that are

28   not relevant to the subject matter of this litigation and not reasonably calculated to lead to the

discovery of admissible evidence; (6) seeks information equally available to Defendant; (7) seeks the content of electronic communications that 643 is prohibited from producing under the SCA. 643 will supplement its response to this interrogatory upon the entry of a protective order.

**SUPPLEMENTAL RESPONSE TO SPECIAL INTERROGATORY NO. 9:**

Responding Party incorporates each of the General Objections and further objects to this demand to the extent that it: (1) is vague and ambiguous; (2) is overly broad and unduly burdensome; (3) calls for information covered by the attorney-client privilege and work product privileges; (4) seeks documents that are not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence; (5) seeks information equally available to Defendant; (6) seeks the content of electronic communications that 643 is prohibited from producing under the SCA.

Subject to and without waiving the foregoing objections, 643 responds that Facebook's representations and conduct were designed to, and did, entice 643 and other Developers to create applications for Facebook with promises of, among other things, a level playing field, fair competition, and a chance to build a business. Facebook decided to open certain endpoints, and not others, precisely to induce Developers to build certain types of applications, including advanced photo-searching applications. Facebook promised Developers that their own advanced photo-searching applications would be treated on a level playing field with any photo-searching applications Facebook decided to launch in the future. Facebook also promised Developers it was committed over the long term to enable Developers to build businesses using advanced photo-searching applications.

Facebook caused substantial harm to 643 and other Developers when it then decided to terminate Developers' ability to build advanced photo-searching applications, while retaining its own ability to create these kinds of applications, because 643, like other Developers, had invested considerable time and resources in developing this kind of application for Facebook.

This type of conduct and the harm it caused 643 is by no means isolated. It is reflective of a pattern of behavior on Facebook's part over many years in which it induces investment around certain applications with promises of serving as a neutral platform provider, and then once certain

-19-

1   applications become big enough markets, it shuts off that platform and monopolizes the market

2   for itself. Indeed, the inherent conflict of interest and anti-competitive behavior associated with

3   multi-billion dollar app economies like Facebook Platform has become the locus of increasing

4   antitrust scrutiny.

5           Just as recently as October 19, 2016, U.S. Representative Henry Johnson, the Ranking

6   Member of the Antitrust Subcommittee of the House Judiciary Committee, called on the Federal

7   Trade Commission (FTC) to investigate concerns around anti-competitive activity in app

8   marketplaces. Representative Johnson's letter to the FTC reads in part:

9

10          It is our understanding that some independent and small technology
            developers have raised concerns with the Federal Trade Commission that
11          the increasing difficulty that app developers have in reaching and
            communicating with customers in some app ecosystems may undermine
12          competition in digital services and products distribution. We are concerned
            that these practices will stifle innovation and decrease channels for
13          distributing the products of application and service developers, resulting in
            fewer and less cost-effective choices for consumers. As Members of the
14          United States House of Representatives serving on the Committee on the
            Judiciary, we are committed to ensuring a competitive marketplace for all
15          companies online, including new entrants and small competitors.
            Accordingly, we ask that the Commission carefully consider these
16          concerns. (See Exhibit D.)

17   643 contends that the type of repeated "bait and switch" behavior Facebook has engaged in over

18   many years and in many contexts is precisely the type of activity that California's Unfair

19   Competition Act is intended to regulate. To accept that Facebook can make repeated promises of

20   neutrality and then decide to violate those promises when they run counter to Facebook's

21   business interests is to permit anti-competitive activity that places smaller companies at a

22   dramatic disadvantage in the app economy.  643 reserves the right to supplement its response to

23   this Special Interrogatory as new information is discovered.

24   **SECOND SUPPLEMENTAL RESPONSE TO SPECIAL INTERROGATORY NO. 9:**

25           Responding Party incorporates each of the General Objections and further objects to this

26   demand to the extent that it: (1) is vague and ambiguous; (2) is overly broad and unduly

27   burdensome; (3) calls for information covered by the attorney-client privilege and work product

28

-20-

1   privileges; (4) seeks documents that are not relevant to the subject matter of this litigation and not

2   reasonably calculated to lead to the discovery of admissible evidence; (5) seeks information

3   equally available to Defendant; (6) seeks the content of electronic communications that 643 is

4   prohibited from producing under the SCA.

5           Subject to and without waiving the foregoing objections, 643 responds that Facebook

6   claims it provided one year notice to 643 of the closing of Graph API that shut down 643's App.

7   However, Facebook did not in fact provide such notice to 643 until January 20, 2015. Facebook

8   claims that because it told select Developers that attended a conference on April 30, 2014 and

9   wrote a blog post on its website that included one line buried at the bottom of the blog post

10  mentioning that Facebook was removing some "rarely used" endpoints, and which never

11  specified the content actually being removed, that this somehow constitutes notice to 643 that the

12  App would no longer function on April 30, 2015. However, Representatives of 643 did not attend

13  the F8 Annual Conference in which this was announced, did not watch the conference online, and

14  did not proactively search the Facebook blog on a daily basis to uncover this announcement on

15  that date.

16          Facebook did not notify 643 of the shutting down of Graph API and the deprecating of the

17  FRIENDS' PHOTOS ENDPOINT until January 20, 2015 (FB_0000005). Between April 30,

18  2014 and January 20, 2015, 643 received numerous emails from Facebook, none of which ever

19  mentioned that 643's App would be shut down on April 30, 2015. In fact, many of the emails sent

20  by Facebook provided updates on Facebook Platform to ensure that 643 could continue to use

21  Facebook Platform for its App. Many other emails provided assistance to 643 on how to increase

22  the users in its App. See Exhibit E.

23          For instance, on April 30, 2014, the date Facebook announced that it was shutting down

24  Graph API to a select group of Developers at a conference, Facebook sent 643 an email entitled

25  "Insights on Pikinis," showing analytics on the likes, reach and user engagement of Pikinis on

26  Facebook, with the goal of helping Pikinis increase its adoption on Facebook Platform. On June

27  16, 2014, Facebook sent an email to 643 with an update on Facebook Platform around

28  "Upcoming Changes to App Ads," showing how Pikinis could use advertisements to monetize the

-21-

App on Facebook Platform. On July 15, 2014, Facebook sent 643 an email "Build an Audience," providing suggestions on how to increase the App's users by leveraging Facebook Platform. On August 26, 2014, Facebook sent 643 an email "Measure App Events," providing suggestions on how to measure engagement in the App to gain greater insight into user behavior. On September 1, 2014, Facebook sent 643 an email "Mobile App Custom Audiences," providing suggestions on how to segment App users to target those segments more effectively. On September 7, 2014, Facebook sent 643 an email "Reach Your High Value Users," providing suggestions on how to get more App users for Facebook Platform. On October 28, 2014, Facebook sent three different "Platform Status" updates providing information to Developers around some bugs that Facebook was working on that temporarily affected Developers' ability to use Facebook Platform. On November 4, 2014, Facebook sent another "Platform Status" update to 643 describing a change to Platform related to Messaging APIs. On December 8, 2014, Facebook sent an email to 643, "Developer Blog Weekly Digest," which is one of many weekly emails Facebook sent to 643 describing updates to Facebook Platform and Graph API. On December 14, 2014, Facebook sent another "Platform Status" update to 643 describing a change to Graph API that affected Developers. On January 5, 2014, Facebook sent yet another "Platform Status" update regarding a change to the Insights feature of Facebook Platform. See Exhibit E.

In sum, Facebook sent dozens and dozens of emails to 643 from April 30, 2014 through January 20, 2015. *Not one of these emails ever provided notice to 643 of the changes to Graph API that would shut down 643's App. In fact, these emails provided notices of many other changes and also encouraged 643 to find more users for its App and to make money on engaging those users after the point in time Facebook claims it provided notice to 643 that the App would no longer function.* This is particularly curious given that many of the emails describe many other changes to Graph API and Facebook Platform but never describe the massive change of closing completely all the content Facebook had promised for many years. Facebook had multiple avenues to communicate this major change, including its Weekly Developer Blog and its regular Platform Status updates. Facebook provided 643 with notice of many different changes through these avenues and yet not until January 20, 2015 did Facebook send notice to 643 of the major

change that would cause 643's App to shut down. Finally, during this period between which Facebook told a small group of Developers at a conference about this change and notified 643 of the change (April 30, 2014 to January 20, 2015), Facebook sent numerous emails to 643 helping 643 gain more users for its App, engage those users better in the App, and monetize the engagement of those users for 643 to make money with the App.

That Facebook continued to entice 643 to invest in Facebook Platform while deliberately withholding any updates to 643 of perhaps the most significant change to Facebook Platform since it was launched in 2007, is direct evidence in support of 643's claim that Facebook violated Business and Professions Code § 17200 et seq.

Facebook made a promise to certain Developers that attended a conference on April 30, 2014 that the Open Graph content would be available for 2 years to all Developers. Facebook then gave Developers only one year, contrary to its 2 year promise. And, what is more, Facebook then deliberately avoided notifying 643 until nine months later so 643 would continue its investment of time, capital and resources in Facebook Platform, including any contracts 643 entered into with App users during this time. To summarize: Facebook promised certain Developers that all Developers would have two years to access the Open Graph content, then produced a blog post that, hidden under various links, gave Developers one year, and then only provided notice to 643 a few months in advance of shutting down the App. This course of conduct is itself strong evidence that Facebook intended to interfere with 643's contracts. Otherwise, why would Facebook not have sent an email on April 30, 2014 to 643 at the time it made the announcement to a select group of Developers at a conference? The lack of a plausible explanation for this behavior provides strong evidence in support of deceptive and anti-competitive conduct designed to disrupt the existing and prospective contractual relations of Developers, including 643, in violation of Business and Professions Code § 17200 et seq.

**SPECIAL INTERROGATORY NO. 10:**

STATE THE COMPLETE FACTUAL BASIS that you contend supports YOUR claim for negligent misrepresentation.

1    In addition to its actual damages, 643 seeks an award of its costs and attorneys' fees, pre-

2  judgment interest, and punitive/multiple damages in amounts to be determined at trial. 643

3  reserves the right to supplement its response to this Special Interrogatory as new information is

4  discovered.

5  **SPECIAL INTERROGATORY NO. 20:**

6    For each date on which YOU sold the 643 APP in Apple's App store, separately

7  IDENTIFY the total number of customers who purchased the 643 APP on that date for $1.99, as

8  referenced in paragraph 65 of the SAC.

9  **RESPONSE TO SPECIAL INTERROGATORY NO. 20:**

10    Responding Party incorporates each of the General Objections and further objects to this

11  demand to the extent that it: (1) is vague and ambiguous; (2) is overly broad and unduly

12  burdensome in seeking "each date" and "IDENTIFY the total number of customers"; (3) calls for

13  information covered by the attorney-client privilege and work product privileges; (4) calls for

14  confidential information in the absence of the entry of a suitable protective order; (5) seeks

15  documents that are not relevant to the subject matter of this litigation and not reasonably

16  calculated to lead to the discovery of admissible evidence; (6) seeks information equally available

17  to Defendant; (7) seeks the content of electronic communications that 643 is prohibited from

18  producing under the SCA. 643 will supplement its response to this interrogatory upon the entry of

19  a protective order.

20  **SUPPLEMENTAL RESPONSE TO SPECIAL INTERROGATORY NO. 20:**

21    Responding Party incorporates each of the General Objections and further objects to this

22  demand to the extent that it: (1) is vague and ambiguous; (2) is overly broad and unduly

23  burdensome; (3) calls for information covered by the attorney-client privilege and work product

24  privileges; (4) seeks documents that are not relevant to the subject matter of this litigation and not

25  reasonably calculated to lead to the discovery of admissible evidence; (5) seeks information

26  equally available to Defendant; (6) seeks the content of electronic communications that 643 is

27  prohibited from producing under the SCA.

28

-53-

1    Subject to and without waiving the foregoing objections, 643 responds that its financial

2    model includes this information, and additionally that 4,481 users had downloaded the App, of

3    whom 3,963 had subscriptions to premium content (See Exhibit C). 643 reserves the right to

4    supplement its response to this Special Interrogatory as new information is discovered.

5    **SECOND SUPPLEMENTAL RESPONSE TO SPECIAL INTERROGATORY NO. 20:**

6    Responding Party incorporates each of the General Objections and further objects to this

7    demand to the extent that it: (1) is vague and ambiguous; (2) is overly broad and unduly

8    burdensome; (3) calls for information covered by the attorney-client privilege and work product

9    privileges; (4) seeks documents that are not relevant to the subject matter of this litigation and not

10   reasonably calculated to lead to the discovery of admissible evidence; (5) seeks information

11   equally available to Defendant; (6) seeks the content of electronic communications that 643 is

12   prohibited from producing under the SCA.

13   Subject to and without waiving the foregoing objections, 643 responds that it provided the

14   requested information in its production of 5 December (Six4Three 000014761-Six4Three

15   000015136). This document shows the specific Facebook User ID, exact timestamp of the user

16   signing up for the App, the access token that was used to authorize the user connecting to

17   Facebook Platform via the App, whether a premium subscription was authorized, and when that

18   subscription was last updated. With this information, Facebook can identify the specific

19   individual who signed up, the exact time they signed up, whether the user had a premium

20   subscription, when that subscription was last updated, and how the user was authorized to access

21   the Facebook Platform.  Each row of the document includes, for a given user, their Facebook ID

22   (_id), whether they have admin privileges (admin), when the user signed up (created_at), the

23   access token that was used to authorize the Facebook Platform connection

24   (facebook_access_token), the settings the user signed up with for the App, including the user's

25   App preferences, the last time the user's subscription was updated and when that subscription was

26   created, (settings), the existence of a premium account (premium_account), and when it was last

27   updated (updated_at). 643 has agreed to provide the information Facebook requested; 643 has, in

28

fact, produced such information; and 643 is willing to work with Facebook to clarify any further issues.

643 held in its possession a file that it has previously provided to Facebook indicating a total of 4,481 App users. Facebook stated that this file was not sufficient and that Facebook required the specific date of each user signup and the period of the subscription. 643 reconstructed from a database file a CSV file (Six4Three 000014761-Six4Three 000015136) showing 3,944 App users. 643 provides these files *as they are* and only with the modifications necessary to enable Facebook to access the information. 643 is under no obligation to correct these files as it has provided the information Facebook requested after a reasonable, good faith search of its records.

In an abundance of caution, 643 corrects its prior statement of 4,481 App users with the updated information of 3,944 App users. The information provided in Six4Three 000014761-Six4Three 000015136 is sufficient to meet Facebook's request as to the specific date of each download, the presence of premium subscription and term of such subscription. 643 is not under any obligation to undertake the cost of preparing the information in a particular manner that best meets Facebook's preferences. Notwithstanding the foregoing, 643 continues to seek to identify additional material and will work with Facebook to provide additional information as part of its ongoing production.

**THIRD SUPPLEMENTAL RESPONSE TO SPECIAL INTERROGATORY NO. 20:**

Responding Party incorporates each of the General Objections and further objects to this demand to the extent that it: (1) is vague and ambiguous; (2) is overly broad and unduly burdensome; (3) calls for information covered by the attorney-client privilege and work product privileges; (4) seeks documents that are not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence; (5) seeks information equally available to Defendant; (6) seeks the content of electronic communications that 643 is prohibited from producing under the SCA.

Subject to and without waiving the foregoing objections, Responding Party has produced the date and terms of each user's download of the App that it could locate after a reasonable

search and using the search terms agreed upon by the Parties in its production of 5 December. As 643 has told Facebook, the data around sales is maintained by another entity, Apple Inc. ("Apple"). 643's membership to Apple's Developer website in which the sales data is maintained has expired. See Exhibit F. Further, 643 has learned that the data to which 643 has access on Apple's Developer website does not go back further than April 2015. It appears Apple periodically removes older data in order to maintain its platform. Exhibit G, Exhibit H, Exhibit I, and Exhibit J all demonstrate that when 643 attempts to access data prior to April 2015 on Apple's Developer website, the App Purchase Date field to determine the date range for the data Apple displays does not go back prior to April 2015. 643 can neither type in a date range earlier than April 2015 or use the back arrow in the calendar view to access date ranges earlier than April 2015. Exhibit G, Exhibit H, Exhibit I and Exhibit J span all five interfaces Apple makes available on its Developer website to view this data. 643 is not aware of another way reasonably to obtain this data from Apple.

However, 643 was able to identify a screenshot in its files, though it cannot accurately identify the specific date of the screenshot, from its prior access of Apple's Developer website. See Exhibit K. Exhibit K shows 4,320 basic App downloads, 140 1-month App subscriptions, 14 6-month App subscriptions and 7 1-year App subscriptions. This data in Exhibit K served as the basis of 643's original claim of 4,481 downloads. This data demonstrates that 643 had sales of its App prior to the notice Facebook provided 643 that it was shutting down Graph API on January 20, 2015. Further, Exhibit L shows that even in a very short period of time prior to the App shutting down, the App was able to generate meaningful sales, user sessions, in-app purchases and page views immediately prior to the shutting down of the App. Finally, Exhibit M demonstrates that even after the App was completely broken and no longer functioned at all, after April 30, 2015 customers tried to access the App 785 times even though the App just displayed a blank page. It is this strong data in support of user desire for the App and user engagement in the App that serves as the basis for 643's damages calculations.

**SPECIAL INTERROGATORY NO. 21:**

-56-

privileges; (4) seeks documents that are not relevant to the subject matter of this litigation and not reasonably calculated to lead to the discovery of admissible evidence; (5) seeks information equally available to Defendant; (6) seeks the content of electronic communications that 643 is prohibited from producing under the SCA.

Subject to and without waiving the foregoing objections, 643 responds that Ted Kramer received and responded to user feedback. 643 reserves the right to supplement its response to this Special Interrogatory as new information is discovered.

DATED:  December 27, 2016

CRITERION LAW

BIRNBAUM & GODKIN

By: _____

Basil P. Fthenakis
David S. Godkin (admitted *pro hac vice*)
James E. Kruzer (admitted *pro hac vice*)
Attorneys for Plaintiff
Six4Three, LLC

**VERIFICATION**

I, Ted Kramer, as a certified representative of Plaintiff Six4Three LLC ("643"), certify and declare under penalty of perjury under the laws of the state of California that I have read and reviewed 643's (1) Third Supplemental Answers to Facebook's First Set of Specially Prepared Interrogatories; and (2) Third Supplemental Answers to Facebook's First Set of Requests for Production of Documents and believe them to be true and accurate based on the information available to 643 at the present time.

Executed December 27, 2016, at San Francisco, California.

_____

By: Ted Kramer

Case No. 533328        643 SUPPLEMENTAL VERIFICATION