1  Basil P. Fthenakis, Esq. (88399)
   CRITERION LAW
2  2225 E. Bayshore Road, Suite 200
   Palo Alto, California 94303
3  Tel. (650) 352-8400
   Fax. (650) 352-8408
4
5  Of counsel:

6  David S. Godkin (Admitted *pro hac vice*)
   James E. Kruzer (Admitted *pro hac vice*)
7  BIRNBAUM & GODKIN, LLP
   280 Summer Street
8  Boston, MA 02210
   (617) 307-6100
9  godkin@birnbaumgodkin.com
   kruzer@birnbaumgodkin.com
10
11 Attorneys for Plaintiff,
   SIX4THREE, LLC, a Delaware
12 limited liability company

13

14                UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16
   SIX4THREE, LLC, a Delaware limited      )   Case No. 3:17-cv-00359-WHA
17 liability company,                      )
                                           )   REPLY TO DEFENDANT'S OPPOSITION
18          Plaintiff,                     )   TO PLAINTIFF'S NOTICE OF MOTION
                                           )   TO REMAND FOR LACK OF FEDERAL
19 v.                                      )   JURISDICTION AND AWARD OF FEES
                                           )   AND COSTS
20 FACEBOOK, INC., a Delaware corporation  )   _____
   and DOES 1 through 50, inclusive        )
21                                         )   Date: February 16, 2017
          Defendants.                      )   Time: 8:00AM
22 _____        )   Ctrm: 8
                                               Judge: Honorable William H. Alsup
23

24

25

26

27

28

                                    i

**TABLE OF CONTENTS**

**Page**

I. ARGUMENT.................................................................................................................. 1

    A. Plaintiff's Claim Under the "Unlawful" Prong of Cal. Bus & Prof. Code § 17200
    and Its Discovery Responses Have Not Focused on Sherman Act Conduct .................... 1

    B. To the Extent Monopolistic Conduct is Implicated by Plaintiff's Second Amended
    Complaint, Facebook's Removal Petition Was Filed Too Late........................................ 8

    C. There is No Exclusive Federal Jurisdiction Because Numerous State and Common Law
    Claims are Asserted ......................................................................................................... 9

    D. It Remains Premature to Determine the Full Nature of Potential Antitrust Claims as
    Discovery in Superior Court is Ongoing, but Ample Evidence of Cartwright Act
    Violations Has Been Found in Facebook's Files. ............................................................ 10

II. CONCLUSION ......................................................................................................... 15

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1 (2012) ...................... 15

*California v. Pinnacle Sec. CA LP*, 746 F. Supp. 2d 1129 (N.D. Cal. 2010) ................. 6,8

*Corwin v. Los Angeles Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842 (1971). ................ 15

*Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986) ......................................... 14

*Hendricks v. Dynegy Power Marketing*, 160 F. Supp. 2d 1155 (S.D. Cal. 2001) ...... 6, 7, 8

*In re Nat'l Football Leagues Sunday Ticket Antitrust Litig.*, 2016 U.S. Dist. LEXIS 41639 (C.D. Cal. Mar. 28, 2016) .............................................................. 3, 4, 9

*In re Sony Grand WEGA KDF-E A10/A20 Series Rear Projection HDTV Litig.*, 758 F. Supp. 2d 1077 (S.D.Cal. 2010) ........................................................................... 9

*Kasky v. Nike, Inc.*, 27 Cal. 4th 939 (2002) ..................................................................... 10

*Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612 (1993) ................................... 9

*Lippitt v. Raymond James Fin. Servs.*, 340 F.3d 1033 (9th Cir. 2003) ...................... 6, 7, 8

*Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709 (1982). ............................................ 15

*Moss v. Infinity Ins. Co.*, 2015 U.S. Dist. LEXIS 158059 (N.D. Cal. Nov. 20, 2015) ..... 10

*National Credit Reporting Ass'n v. Experian Info. Solutions, Inc.*, 2004 U.S. Dist. LEXIS 17303 (N.D. Cal. July 21, 2004) ....................................................... 3, 4, 8, 9

*Nevada v. Bank of Am. Corp.*, 672 F.3d 661 (9th Cir. Nev. 2012) ..................................... 1

*People v. Dollar Rent-A-Car Systems, Inc.,* 211 Cal. App. 3d 119 (1989) ..................... 10

*Spanos v. Bancorp*, 2015 U.S. Dist. LEXIS 14785 (C.D. Cal. Feb. 6, 2015) .................... 2

## <u>Other Authorities</u>

28 U.S.C. § 1446 ................................................................................................................. 8

28 U.S.C. § 1447 ............................................................................................................... 15

Cal. Bus. & Prof. Code § 17200 ................................................................................. 1-9, 15

Cal. Bus. & Prof. Code § 17500 ................................................................................... 9, 10

Cal. Bus. & Prof. Code § 16720 ............................................................................... 4, 14, 15

## I. **ARGUMENT**

### a. Plaintiff's Claim Under the "Unlawful" Prong of Cal. Bus & Prof. Code § 17200 and its Discovery Responses Have Not Focused on Sherman Act Conduct.

Facebook's Opposition rests on a plainly false assertion: "The bottom line is that unilateral monopoly is the focus of the operative complaint." *See* Defendant's Opposition to Motion to Remand ("Opposition"), at 1-2. The gravamen of Plaintiff's Second Amended Complaint ("SAC") is not grounded in antitrust at all. Rather than focusing on monopoly position, market power and other federal antitrust questions, the SAC alleges common law and state law claims related to deceptive, unfair, fraudulent, tortious and collusive conduct surrounding Facebook's decision to deliberately misrepresent its intentions with its operating system. The SAC focuses almost entirely on the pattern of clear and unambiguous promises by Facebook over many years to demonstrate the reasonability of Plaintiff's reliance in investing time and capital in building an application on Facebook's operating system. Indeed, over half of the paragraphs in the SAC focus on these repeated, clear and unambiguous promises made by Facebook and its partners to establish the reasonableness of Plaintiff's reliance. *See* ECF No. 1-2, ¶¶ 1-53, ¶¶ 67-72. The SAC focuses on this to ground the elements of its alleged causes of action, including intentional interference with contract, intentional interference with prospective business relations, negligent misrepresentation, and Section 17200 violations of unfair, deceptive or unlawful conduct.

In addition, Plaintiff never characterizes Facebook's anti-competitive conduct as unilateral and makes clear that the conduct in question is not unilateral. The SAC specifically references a *Wall Street Journal* investigative report that demonstrates that Facebook and Tinder reached an "unspecified compromise" to give Tinder an unfair competitive advantage that Facebook refused to offer to Plaintiff, violating promises that Facebook would maintain a fair operating system. *See* ECF No. 1-2, ¶¶ 103-104.

Notably, the SAC does *not* invoke the concepts of federal antitrust law described by terms like "monopoly power," "market power" or "unilateral". The SAC refers to Facebook as a "monopolist" only once and further notes that Facebook "monopolized for itself" the image search market: "In sum, Facebook acts as a platform when it wants to exploit Developer creativity and resources, and a monopolist when it wants to secure areas of the ecosystem for itself once developer creativity and resources have been invested." *See* ECF No. 1-2, ¶¶ 107,

116. This reference to Facebook as a "monopolist" and as "monopolizing for itself" is not sufficient to make any reasonable determination as to whether Facebook's conduct was unilateral or in concert with other partners with which it executed binding agreements to extract large advertising payments in exchange for their continued access to data that had been shut off to all other companies, thereby giving these partners an insurmountable competitive advantage in various software markets.

Instead, Facebook quotes the Superior Court's June 28, 2016 Ruling on Demurrer permitting Plaintiff to proceed under its Section 17200 claim: "Plaintiff has specifically alleged that it was a victim to a Facebook practice/scheme to lure in developers, generate additional advertising revenue by enhancing the user's experience, and then ***monopolize for itself*** the market for image search capabilities." *See* Opposition, at 9. Remarkably, Facebook contends that this phrase used by the Superior Court – "monopolize for itself" – is somehow dispositive that Plaintiff is unequivocally alleging unilateral monopoly conduct when the gravamen of the SAC and its discovery responses contradict this baseless conclusion. The phrase "monopolize for itself" is not remotely sufficient to determine whether Facebook's conduct created a monopoly or an oligopoly in any specific market for software applications (e.g. photo sharing applications) or whether Facebook acted on its own or in concert with others to create a monopoly or oligopoly.[1]

As such, Facebook's reliance on *National Credit Reporting Ass'n v. Experian Info Sols. Inc.*, No. C04-01661 WHA, 2004 WL 1888769 (N.D. Cal. July 21, 2004) and *In re Nat'l Football Leagues Sunday Ticket Antitrust Litig.*, 2016 U.S. Dist. LEXIS 41639 (C.D. Cal. Mar. 28, 2016) is entirely misplaced. *National Credit* and *National Football Leagues* apply only if the SAC in fact "alleges unilateral monopolistic conduct by Facebook" and "the only law identified by [Plaintiff] that prohibits the alleged conduct is Section 2 of the Sherman Act". *See* Opposition, at 11. In *National Credit* and *National Football Leagues*, the plaintiffs repeatedly alleged federal antitrust violations in their complaints, acknowledged that these violations were the sole basis for their "unlawful" claims under Section 17200, and did not rely upon any other actionable state or common law claims that did not require resolution of the Sherman Act

---

[1] To be clear, the following four scenarios are possible for each software market affected by Facebook's anti-competitive conduct: (1) Facebook acted unilaterally to monopolize the market; (2) Facebook acted unilaterally to oligopolize the market; (3) Facebook acted in concert with other large companies to monopolize the market; or (4) Facebook acted in concert with other large companies to oligopolize the market. Facebook's interpretation of "monopolize for itself" somehow concludes that *only* scenario (1) is a possibility here, notwithstanding that

violation. In *National Credit,* the plaintiff alleged a single cause of action that was hollow in the absence of a determination of unilateral abuse of market power as virtually every paragraph of its complaint borrowed the language of federal antitrust law.[2]

The *National Football Leagues* complaint is replete with allegations that DirecTV is a monopoly that uses its market power to impose supra-competitive prices on consumers. *See* Godkin Reply Decl., Exhibit 2, ¶¶ 7-9, 27-28, 35-42, 57-60, 72, 77. The language used to describe the allegations is borrowed heavily from federal antitrust law and the allegations could not have been made without reference to federal antitrust law.[3] Moreover, the conduct at issue centered on unilateral price fixing, for which there is no actionable basis in California antitrust law. The *National Football Leagues* court denied remand because the plaintiffs did not have an adequate state law basis for their allegations, since price fixing is not prohibited by state law, and necessarily had to reach a federal question to prevail on the merits of any of their claims: "If the Court were to disregard the allegations regarding Defendants' alleged 'monopoly position' and 'supra-competitive prices', no alternative and independent unconscionability theory would remain." *See National Football Leagues*, 2016 U.S. Dist. LEXIS 41639, at 11. Here, the Superior Court could entirely disregard considerations of Facebook's market power, which is not even mentioned in the SAC, and Plaintiff's one reference to Facebook being a "monopolist," and still find numerous violations of state and common law related to Facebook's campaign of promising from 2007 to 2014 that it would maintain a fair operating system in order to induce investment by startups and then engaging in schemes with large companies beginning at least by 2012 to reap the benefits of the startups' investments upon shutting off their access to the operating system in 2015. In sharp contrast to *National Credit* and *National Football Leagues*, a big leap is required to conclude that the Sherman Act is the exclusive means through which Facebook's alleged conduct can be regulated, particularly when discovery is ongoing regarding the nature of that conduct and has already provided clear evidence of entirely independent state and common law violations.

---

Plaintiff's discovery to date has uncovered specific evidence that scenario (4) occurred in a number of software markets affected by Facebook's anti-competitive behavior.

[2] The *National Credit* complaint asserts, among other things, that "defendants possess virtually 100% of the market for the provision of consumer credit reports," "each of the defendants has and exercises monopolistic market power over buyers of consumer credit reports," and defendants' conduct increases "above competitive levels, the prices of credit reports," thereby violating "state and federal antitrust laws" *See* Declaration of David S. Godkin In Support of Plaintiff's Reply to Opposition ("Godkin Reply Decl."), Exhibit 1, ¶¶ 15, 56.

[3] Terms like "monopoly power," "monopoly position," and "market power" blanket the *National Football Leagues* complaint. *See* Godkin Reply Decl., Exhibit 2, ¶¶ 7, 9, 11, 27, 28, 35, 36, 38, 39, 41, 58, 59, 60, 67,78.

Further, at no time since filing the SAC has Plaintiff affirmatively stated that it seeks to pursue federal antitrust claims as predicate violations of Section 17200. Plaintiff answered Facebook's interrogatory by first stating that its "analysis, investigation and discovery are ongoing and it does not intend to limit evidence at trial to matters stated herein." *See* ECF No. 1-3 at 3, 5. Plaintiff then provided a comprehensive list of all potential laws Facebook's conduct may have violated in order to ensure it would not be precluded from alleging any of the listed violations upon completing discovery. Plaintiff is entirely within its rights to preserve its ability to allege any of the listed violations in its interrogatory response after reviewing relevant documents of key Facebook executives it has moved to compel in Superior Court. That Plaintiff *might* allege a federal antitrust violation under the "unlawful" prong of Section 17200 is not sufficient to provide exclusive federal jurisdiction, particularly when Plaintiff has also asserted that it might allege entirely independent state and common law violations, particularly violations of the Cartwright Act.[4] Plaintiff has consistently stated that it reserves its rights regarding the predicate violations it will rely upon until it reviews the discovery that is central to the conduct at issue.

Because it would not be prudent to determine the predicate violations before completing discovery, Facebook is left putting words in Plaintiff's mouth. Facebook repeatedly attempts to recharacterize Plaintiff's silence or inaction as affirmative intent. For instance, Facebook states that Plaintiff "***made clear*** that it was sticking with that approach and would not be withdrawing its federal claims". *See* Opposition, at 2. The act to which Facebook refers in which Plaintiff "***made clear***" its intent was Plaintiff's decision not to respond to an email from Facebook requiring that Plaintiff confirm or disavow any federal causes of action. Importantly, Plaintiff has no obligation to confirm or disavow any causes of action and its silence in response to an email from Facebook attempting to bait Plaintiff further cannot be construed as an affirmative intent to pursue any specific causes of action.

Facebook mischaracterizes Plaintiff's interrogatory response in other ways. It claims that Plaintiff's interrogatory response "***makes clear*** that [the Sherman Act] is not an alternative theory or among a list of predicate violations of law set forth in the disjunctive." *See* Opposition, at 1. Further, Plaintiff has "***unequivocally stated*** that its Section 17200 theory turns on allegations that Facebook violated federal antitrust law." *See* Opposition, at 1-2. Plaintiff

---

[4] Plaintiff's interrogatory response explicitly states: "Facebook's conduct further repeatedly violates the Cartwright Act" and "include numerous per se violations resulting from tying agreements with a host of third

disputes that its interrogatory response expressed specific intent regarding the use of conjunctive adjectives simply because words like "also" and "further" were used. Defendant asked for "ALL laws"; Plaintiff provided a list of "ALL laws". It would be a curious result if this case could be removed to federal court simply because Defendant is permitted to impute intent regarding the conjunctive when Plaintiff took itself to be providing a list of predicate violations in the disjunctive. Plaintiff further disputes that it has made an "unequivocal" statement that the Superior Court must decide on federal antitrust law before finding an "unlawful" violation under Section 17200. Finally, Facebook states that Plaintiff "continues to decline to disavow reliance on Section 2 of the Sherman Act," again attempting to impute affirmative intent from the decision not to respond to a baiting email. *See* Opposition, at 8. Plaintiff has no obligation to "disavow" its reliance on Section 2 of the Sherman Act. Plaintiff's position has remained consistent: Plaintiff reserves its rights to allege any number of state, common or federal causes of action and will do so after it is able to access and review the documents of key Facebook executives that it moved to compel Facebook to produce months ago.

Facebook has gone to great lengths to recast Plaintiff's silence and inaction as clear, unequivocal and affirmative intent to make a Sherman Act bed.[5] But Plaintiff's SAC and discovery responses make clear how far Facebook is stretching. For example, Plaintiff responded on December 13, 2016 to other interrogatories requesting that it state the complete factual basis for the causes of action alleged in its complaint. Interrogatory No. 9 sought the complete factual basis to support the Section 17200 claim, Interrogatory No. 10 for negligent misrepresentation, Interrogatory No. 11 for intentional interference with contract, and Interrogatory No. 12 for intentional interference with prospective business relations. Plaintiff's response to these interrogatories borrows nothing from federal antitrust law, but instead focus on Facebook's failure to provide notice to Plaintiff of its decision to close Graph API once

---

parties." *See* ECF No. 1-3 at 6.
[5] Facebook further makes much of the definition of "contention" in attempting to use Plaintiff's interrogatory response regarding "ALL laws" to recharacterize Plaintiff's causes of action as necessarily relying on federal antitrust law. *See* Opposition, at 7. Facebook conveniently ignores that Plaintiff began its response to the interrogatory by explicitly stating that its discovery was ongoing and it was not intending to limit its discussion of matters at trial to the responses therein, and that Plaintiff reserved the right to update its responses in the future. Plaintiff does not dispute the meaning of "contention". Plaintiff simply asserts that its intent in responding to the interrogatory was to contend that any one of the listed predicate violations may be asserted, not that Plaintiff intended to assert *all* of the predicate violations, particularly since Plaintiff has not obtained discovery necessary to determine if the elements of all of the predicate violations are established. Plaintiff has never affirmatively stated it intends to assert *all* of the predicate violations, though it reserves its rights to do so.

Facebook made the decision.[6] Such notice, had it been provided, would have put Plaintiff on notice to cease making further investments in building applications on Facebook's operating system. Plaintiff states as the factual basis for its Section 17200 claim the following:

> Facebook did not notify [Plaintiff] of the shutting down of Graph API…until January 20, 2015. Between April 30, 2014 and January 20, 2015, [Plaintiff] received numerous emails from Facebook, none of which ever mentioned that 643's App would be shut down on April 30, 2015. In fact, many of the emails sent by Facebook provided updates…to ensure that [Plaintiff] could continue to use Facebook Platform…. That Facebook continued to entice [Plaintiff] to invest in Facebook Platform while deliberately withholding updates to [Plaintiff] of perhaps the most significant change to Facebook Platform since it was launched in 2007, is direct evidence in support of [Plaintiff's] claim that Facebook violated Business and Professions Code 17200 et seq. *See* ECF No. 20-2 at 21-23.

It stretches the imagination to suggest, particularly prior to completing necessary discovery, that the kind of conduct described in this interrogatory response as the basis for the Section 17200 claim *necessarily* implicates Section 2 of the Sherman Act.

For this reason, Facebook's attempt to distinguish *Lippitt*, *Hendricks* and *Pinnacle* falls short.[7] Facebook argues that the dispositive question for the *Lippitt* court was the fact that the plaintiff in *Lippitt* "***disclaimed*** that his complaint sought to enforce any federal statute or regulation, and instead only relied on false advertising as the basis for his Section 17200 claim. Here, not only has [Plaintiff] not disclaimed a significant federal question, it has expressly alleged a violation of Section 2 of the Sherman Act, as well as violations of several other federal antitrust provisions." See Opposition at 11-12 (referencing *Lippitt*, 340 F.3d at 1040). The *Lippitt* court's language that Facebook references is as follows: "Lippitt contends that his complaint has been misinterpreted by Defendants and by the district court…. What the complaint seeks, according to Lippitt, is not a ban on the instrument itself, but rather a ban on false advertising…. While the complaint is the exact opposite of a model of clarity, it can be

---

[6] Facebook's Opposition references an October 31, 2016 response to Interrogatory No. 9 that borrows the language of the Superior Court Order on Demurrer in using the phrase "monopolize for itself". *See* Opposition, at 5. Facebook attempts again to rely on this phrase to argue that Plaintiff has alleged unilateral monopoly behavior under the Sherman Act all along. It should be noted that Facebook takes this quotation and Plaintiff's reference to the Antitrust Subcommittee of the U.S. House of Representatives from Plaintiff's response entirely out of context. Plaintiff states prior to the quoted section: "This type of conduct and the harm it caused 643 is by no means isolated." *See* ECF No. 20-2 at 19-20. The reference to "monopolize for itself" was not even referring to the conduct alleged in the SAC. It was referring to examples of other conduct. Surely this is not sufficient to establish Facebook's argument that Plaintiff's sole basis for the Section 17200 claim is Section 2 of the Sherman Act.

read in the way Lippitt asserts. Because Lippitt has disclaimed a broader reach, we need not consider whether a state court action that seeks to ban the sale of a given investment instrument altogether would necessarily be subject to federal jurisdiction." *Lippitt*, 340 F.3d at 1040. Here, Plaintiff certainly contends that its SAC is being misinterpreted by Facebook. Plaintiff further contends that the SAC "can be read in the way [Plaintiff] asserts". Plaintiff contends that the conduct described in the SAC entails a scheme whereby Facebook falsely advertises its "revolutionary" new operating system from 2007 to 2014. Finally, the plaintiff in *Lippitt* "disclaimed" the defendant's interpretation of his complaint in a reply brief in that matter. Plaintiff here is doing the same. And, perhaps most importantly, the *Lippitt* court's decision did not in fact turn on whether plaintiff proactively took measures to explicitly disavow specific federal causes of action and waive its right to raise them in the future. The *Lippitt* court hinged its decision entirely on the fact that the "state court need not inquire into NYSE regulations, or even refer to federal law, in the case before us." *Lippitt*, 340 F.3d at 1045. Here, the Superior Court can avoid reference to federal law and Plaintiff can prevail on each of its causes of action, including the "unlawful" claim under Section 17200.

Facebook's attempt to distinguish *Hendricks* similarly falls short. Facebook argues that Plaintiff has alleged state and federal law violations whereas the plaintiff in *Hendricks* only alleged state law violations. As Plaintiff has stated repeatedly, it disputes that it has made any affirmative statement regarding the arguments it intends to raise at trial and should be taken to have contended that it has reserved its rights to pursue any number of common, state and federal law violations. Even so, the court's decision in *Hendricks* did not turn on the mere presence of federal antitrust issues. The decision specifically turned on whether the plaintiff in *Hendricks* could establish the "unlawful" prong of Section 17200 without determining a federal question. *Hendricks*, 160 F. Supp. 2d at 1156. In this important respect, *Hendricks* is precisely on point. *Hendricks*, along with *Pinnacle*, further supports Plaintiff's position that just because Plaintiff "might" pursue violations of federal law, a conclusion Plaintiff has repeatedly stated it will not reach until it completes discovery, this fact in no way requires the Superior Court to reach a federal question. *Id.* at 1163. Facebook attempts to distinguish *Pinnacle* along the same lines by attempting to recharacterize the dispositive question on whether any state or federal law is implicated or alleged on the face of a plaintiff's complaint. However, in none of these

---

[7] *See California v. Pinnacle Sec. CA LP*, 746 F. Supp.2d 1129 (N.D. Cal. 2010); Hendricks *v. Dynegy Power Marketing*, 160 F. Supp. 2d 1155 (S.D. Cal. 2001); *Lippitt v. Raymond James Fin. Servs.*, 340 F.3d 1033 (9th Cir.

1
2
3
4

cases is that the dispositive question. The fundamental question in *Lippitt*, *Hendricks*, *Pinnacle*, *National Credit*, and *National Football League* is whether it is possible for the Superior Court to disregard federal law without hollowing out *any* of Plaintiff's causes of action. Here, it is abundantly clear that questions of federal antitrust law could be disregarded entirely without hollowing out *any* of Plaintiff's claims.

5
6

### b. To the Extent Monopolistic Conduct is Implicated by Plaintiff's Second Amended Complaint, Facebook's Removal Petition Was Filed Too Late.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Facebook's Opposition suffers from a fatal flaw in relying repeatedly on statements and actions by Plaintiff that are many months old. In relying upon these statements and actions, Facebook clearly fails to meet the deadline for removal under 28 U.S.C. § 1446(b)(3). Facebook repeatedly attempts to characterize the SAC, filed almost one year ago on February 26, 2016, as describing unilateral monopoly conduct under the exclusive jurisdiction of the Sherman Act. *See* Opposition, at 3-4. To the extent the SAC is *really* about unilateral monopolistic behavior, an assertion that Plaintiff emphatically rejects, then Plaintiff's interrogatory response provided no new information and Facebook is more than 10 months late in filing its removal petition. Further, Facebook relies on Plaintiff's interrogatory response of October 31, 2016 noting that Facebook sought to "monopolize the market for itself". *See* Opposition, at 5. Again, this quotation is taken out of context, but regardless, *if* it has the meaning Facebook purports it to have, then Plaintiff's Third Supplemental Interrogatory Response provides no new information and Facebook's removal petition is almost two months late. In order to avoid remand, Facebook must assert that the merits of Plaintiff's causes of action necessarily hinge on Section 2 of the Sherman Act and that Plaintiff is now taking "belated efforts" to recharacterize its claims under state law. *See* Opposition, at 13. However, by citing to the SAC and Plaintiff's earlier discovery responses, Facebook necessarily concedes that it had ample basis to remove this case long ago, but missed the deadline.

23
24

### c. There is No Exclusive Federal Jurisdiction Because Numerous State and Common Law Claims are Asserted.

25
26
27

Facebook's Opposition depends entirely on its argument that the only cognizable predicate for Plaintiff's "unlawful" claim under Section 17200 is Section 2 of the Sherman Act. This is not true. Facebook conveniently ignores entirely that in its interrogatory response Plaintiff reserves its right to assert that Facebook's conduct violates the "unlawful" prong of

28

2003).

Section 17200 "by reason of its tortious conduct, including but not limited to constructive fraud, negligent misrepresentation of material fact, intentional interference with contract and intentional interference with prospective business relations." *See* ECF No. 1-3 at 6. Plaintiff need not reach any federal question in order to establish the elements of such violations based on the conduct it has described – conduct that need not rely on questions under which federal law asserts exclusive jurisdiction, such as unilateral supra-competitive pricing, as in *National Credit* and *National Football Leagues*.

Further, Plaintiff may pursue the "unlawful" prong of Section 17200 via Section 17500 false advertising prohibition. Facebook's reliance on *Khoury v. Maly's of California, Inc.*, 14 Cal. App. 4th 612 (1993) is inapposite. In *Khoury*, the appellant "[failed] to describe with any reasonable particularity the facts supporting violation…nor [did] the facts explain the manner of misleading appellant's customers" *Khoury*, 14 Cal. App. 4th at 619. Here, Plaintiff devotes much of its SAC to detailing specific false representations at specific dates and times while demonstrating that it relied on those false representations and that such reliance was reasonable. *See* ECF No. 1-2, ¶¶ 1-53, ¶¶ 67-72. In its Section 17200 count, Plaintiff specifically incorporates these repeated false statements and misrepresentations. *Id.*, ¶ 110. A Section 17500 claim "need be alleged only with 'reasonable particularity'" and "must allege actual reliance". *See In re Sony Grand WEGA KDF-E A10/A20 Series Rear Projection HDTV Litig.*, 758 F.Supp.2d 1077, 1093 (S.D.Cal. 2010) (quoting *Khoury*, 14 Cal. App. 4th at 619). The SAC meets both of these requirements.

Further, Facebook's narrow construal of advertising and its limitation to the offering of selling real property is belied by the language of Section 17500 and the case law surrounding it. The Section 17500 language is explicitly not limited to "real or personal property" but applies to "services, professional or otherwise, or anything of any nature whatsoever…in any other manner or means whatever…concerning any circumstance or matter or fact connected with the proposed performance or disposition thereof, which is untrue or misleading." *See* Cal. Bus. & Prof. Code ¶ 17500 et seq. The case law strongly supports the view that when a company makes representations of fact about its own business operations for the purpose of promoting sales of its products, these messages are commercial speech for purposes of applying state laws barring false and misleading commercial messages. *See, e.g., Kasky v. Nike, Inc.*, 27 Cal. 4th 939 (2002). For seven years, Facebook made false statements with the intention of increasing adoption of its operating system to generate substantial revenues for it and its partners. Clearly

9

commercial statements intentionally designed to mislead companies and consumers to participate in Facebook's operating system and purchase advertisements in the operating system, which Plaintiff and many other businesses in fact did, fall squarely under the purview of Section 17500 as its prohibition "extends to the use of false or misleading oral statements" and to recover under Section 17500 "it is necessary to show only that members of the public are likely to be deceived." *See People v. Dollar Rent-A-Car Systems, Inc.,* 211 Cal. App. 3d 119, 129 (1989); *see also Moss v. Infinity Ins. Co.*, 2015 U.S. Dist. LEXIS 158059; *Kasky*, 27 Cal. 4th at 951 ("Thus, to state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived") (quotations omitted).

     **d.** **It is Premature to Determine the Full Nature of Potential Antitrust Claims as Discovery in Superior Court is Ongoing, but Ample Evidence of Potential Cartwright Act Violations Has Been Found in Facebook's Files.**

     Facebook filed its removal petition on the eve of its deadline to serve its motions for summary judgment and mere days before the Superior Court's ruling on Plaintiff's discovery motions to obtain information from key Facebook executives, including Chief Executive Zuckerberg, regarding the decision to close Graph API that shut down Plaintiff's business and many others. ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████ Plaintiff has yet to receive information regarding this decision that shut down its business. Rather, Facebook has produced documents only from low-level employees that Facebook unilaterally selected as custodians and who clearly had no involvement in the decision that shut down Plaintiff's business. ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

10

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:17-cv-00359-WHA        REPLY TO OPPOSITION TO MOTION TO REMAND



Case No. 3:17-cv-00359-WHA          REPLY TO OPPOSITION TO MOTION TO REMAND

Case No. 3:17-cv-00359-WHA          REPLY TO OPPOSITION TO MOTION TO REMAND

Tinder, along with a number of other companies that rely upon photo or friend information from Facebook and executed whitelist agreements under Facebook's "reciprocity principle," are competitors of Plaintiff. It is entirely plausible that Facebook and each of these entities constitute a trust under the Cartwright Act as they engaged in "a combination of capital, skill, or acts by two or more persons to achieve an anticompetitive end." The anticompetitive ends encompass restrictions in trade or commerce, the reduced production of a commodity and contracts to preclude free competition, and the combination of interests in connection with a sale of advertising. For instance, the number and kinds of software applications from which consumers could choose decreased precipitously once Facebook shut down access to its data. Consumers were forced to choose from a much smaller pool of applications – those developed exclusively by Facebook or companies from which Facebook could extract large advertising payments.

*Dimidowich v. Bell & Howell* makes abundantly clear that "a claim for conspiracy to monopolize is cognizable under the Cartwright Act because it alleges the requisite combination of actors." *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1475 (9th Cir. 1986). Further, "[s]ince it is often difficult to show direct evidence of a combination or conspiracy, concerted action may be inferred from circumstantial evidence of the antitrust defendant's conduct and course of dealings. However, to survive a motion for summary judgment, a plaintiff must present evidence that tends to exclude the possibility that the alleged conspirators acted independently." *Dimidowich*, 803 F.2d at 1475. Plaintiff's SAC and its discovery motions continually refer to concerted action and circumstantial evidence suggesting Facebook conspired with other companies. Plaintiff's review of Facebook's files confirms this suspicion and reveals abundant evidence specifically describing the negotiation of multiple, tied contracts (at least one contract

to extract advertising payments and another to provide special data access).[9] Facebook's files further confirm that significant engineering effort and capital was deployed in executing these contracts. As such, Facebook and its partners are separate entities undertaking acts in concert which caused proximate harm to Plaintiff, other companies, and the public by actually depriving the marketplace of competition. *See Asahi Kasei Pharma Corp. v. CoTherix, Inc.*, 204 Cal. App. 4th 1, 8 (2012) ("To maintain an action for a combination in restraint of trade under the Cartwright Act, 'the following elements must be established: (1) the formation and operation of the conspiracy; (2) illegal acts done pursuant thereto; and (3) damage proximately caused by such acts." (*quoting Kolling v. Dow Jones & Co.*, 137 Cal.App.3d 709, 718 (1982)). For these reasons, Facebook's argument that Plaintiff "has neither the facts nor even a plausible story to assert a Cartwright Act claim in good faith" is simply not true. *See* Opposition, at 16. Plaintiff has found ample evidence and awaits completion of discovery before deciding whether to name additional defendants and assert predicate violations of its Section 17200 claim.

## II.   **CONCLUSION**

For all of the foregoing reasons, Plaintiff respectfully requests that the Court remand this matter back to the Superior Court. Additionally, as set forth above, Facebook did not have an objectively reasonable basis for removal. Therefore, Plaintiff respectfully requests an award of its costs and fees in accordance with 28 U.S.C. § 1447(c).

Dated: February 9, 2017                    CRITERION LAW

BIRNBAUM & GODKIN, LLP

By:____/s/ David S. Godkin_____
        Basil P. Fthenakis, Esq.
        David S. Godkin (*pro hac vice*)
        James E. Kruzer (*pro hac vice*)
        Attorneys for Plaintiff Six4Three, LLC

---

[9] As Facebook notes in its Opposition, a tying agreement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier... They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products." *See Corwin v. Los Angeles Newspaper Serv. Bureau, Inc.*, 4 Cal. 3d 842, 856 (1971).