# EXHIBIT 1

1   SCHRAG & BAUM
    Thomas F. Schrag, SBN: 39377
2   James S. Baum, SBN: 52202
    280 Panoramic Way
3   Berkley, CA 94704
    Tel: (510) 849-1618
4   Fax: (510) 841-6050

5   HULETT HARPER STEWART LLP
    Dennis Stewart, SBN: 99152
6   Stephanie L. Dieringer, SBN: 221394
    550 West C Street, Suite 1600
7   San Diego, CA 92101
    Tel: (619) 338-1133
8   Fax: (619) 338-1139

9   DAVID DANIS LAW FIRM, P.C.
10  Michael J. Flannery, SBN: 196266
    8325 Forsyth, Suite 1100
11  St. Louis, MO 63105
    Tel: (314) 725-7700
12  Fax: (314) 721-0905

13  Counsel for Plaintiff

14  [Additional counsel appear on signature page]

15

16          SUPERIOR COURT OF THE STATE OF CALIFORNIA
                     COUNTY OF ALAMEDA
17

18  NATIONAL CREDIT REPORTING
    ASSOCIATION, INC.,                          Case No. _____
19
              Plaintiff,                         COMPLAINT FOR INJUNCTIVE
20  vs.                                          RELIEF AND RESTITUTION UNDER
                                                 BUS. & PROF. CODE §§ 17200,
21                                               ET SEQ.
    EXPERIAN INFORMATION SOLUTIONS,
22  INC., EQUIFAX, INC., and TRANSUNION,         DEMAND FOR JURY TRIAL
    LLC, and DOES 1 through 50, inclusive,
23
24            Defendants,
25
26
27
28

───────────────────────────────────────────────
        COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION

FILED BY FAX
ALAMEDA COUNTY

March 25, 2004

CLERK OF
THE SUPERIOR COURT
By Rosanne Case, Dep

CASE NUMBER:
RG04147772

1       Plaintiff National Credit Reporting Association, Inc. ("NCRA"), a non-profit trade

2  organization of independent consumer credit reporting agencies, commonly know as "credit

3  resellers," on behalf of the general public, by and through its undersigned attorneys, brings this

4  action based on information and belief and the investigation of counsel, except for information

5  based on personal knowledge, against Experian Information Solutions, Inc. ("Experian"),

6  Equifax, Inc. ("Equifax") and TransUnion, LLC ("TransUnion") (collectively, "Defendants"), for

7  relief under California's Unfair Business Practices Act, Business & Professions Code § 17200,

8  and alleges as follows:

9                      **NATURE OF THE ACTION**

10     1.    Plaintiff's membership is composed of independent consumer credit reporting

11 agencies, a significant number of which are California businesses that purchase for resale, credit

12 information contained in the databases maintained by the three Defendants.  This action concerns

13 and is brought to enjoin Defendants' unfair, deceptive and anticompetitive business practices in

14 the market for consumer credit reports.  These practices have had, and threaten to continue to

15 have, the effect of lessening competition and promoting the acquisition and maintenance of

16 monopoly power of the Defendants in this market.  These anticompetitive practices have had, and

17 will continue to have, an adverse effect on consumers and businesses in California and the

18 general public, in that they have the effect of increasing prices for credit reports and related

19 services, diminishing the quality and variety of credit information products, discouraging

20 innovation and choice in the market, restricting the output of credit reports and related products,

21 perpetuating errors resident in the consumer credit information databases maintained by the

22 Defendants and discouraging and eliminating the market factors and market forces which have

23 the incentives and the capabilities to promote the correction of errors in those databases on behalf

24 of California residents seeking access to credit.  The perversion of these markets by Defendants'

25 anticompetitive practices and the perpetuation of Defendants' erroneous databases has

26 widespread negative effects on Californians because of the fundamental importance credit

27 information has to the availability and price of basic consumer products and services such as

28 credit, employment, housing, insurance and utility service.

1

2.      Credit reports are fundamental elements in lending, insurance, employment, tenant, and utility service decisions. All consumers have a vital interest in the accuracy of their credit reports and the credit scores that are now routinely generated from the data in those reports. Current studies of the accuracy of credit reports and credit scores indicate that errors and inaccuracies in consumer credit information maintained by the three dominant credit bureaus, the Defendants in this case, are pervasive, wide-ranging and substantial. These credit report errors can have a devastating impact on the consumer – a denial of credit, insurance, employment, housing or utility service or, if not outright denial of credit, insurance or housing, a marked increase in the price or diminution in the quality of those products as consumers, based on erroneous credit information, are wrongly identified as higher credit risks than an accurate credit report or score would indicate.

3.      Given the harm such errors can cause consumers, it is imperative that market forces and structures which tend to promote the consumer's ability to easily and quickly obtain correction of their credit information (specifically to secure the elimination of negative erroneous information and the inclusion of positive information) not be undermined by unfair deceptive or anticompetitive business practices. Quickly correcting the frequent credit information errors in the massive databases maintained by the Defendants in mortgage credit transactions has been one of the primary products and benefits offered by the customer service oriented members of the NCRA, credit report resellers who purchase consumer credit information from the Defendants and resell it to clients (such as mortgage lenders) who deal with consumers seeking credit. Credit resellers are service-intensive businesses who can and do react quickly as intermediaries between the mortgage lender and consumer and the Defendants in taking action to correct erroneous information in consumer credit reports generated by the Defendants and facilitating rapid rescoring of consumers' credit scores within the frequently tight time periods required to obtain the credit determination sought by the consumer.

4.      Over the last several years, however, the Defendants have embarked on a course of conduct, described in this complaint, the purpose and effect of which has been to weaken and eliminate credit resellers who are also horizontal competitors of theirs in selling to buyers of

-2-

COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION

1   credit reports. Defendants, who already control the supply of the essential product, the credit

2   information resident in their databases, have embarked on a campaign to gain control over the

3   distribution of that product by weakening and eliminating their competitors, the independent

4   reseller members of the NCRA.

5       5.    Defendants' unfair and deceptive business practices and anti-competitive conduct

6   have included: 1) acquisition of firms which had previously offered access to credit information

7   at competitive prices; 2) increasing the wholesale prices charged to credit resellers for credit

8   reports and related services particularly relative to the lower prices offered by them for the same

9   products in direct transactions with the customers of those resellers; 3) price discriminating

10  against independent resellers; 4) prohibiting credit resellers from reselling reports to categories of

11  purchasers through line of business restrictions which have the effect of eliminating competition

12  in these lines of business and preserving these lines of business for themselves or other entities

13  favored by them; and 5) imposing restrictions on the products resellers may offer to their

14  customers and the charges they or their customers can charge for services, particularly rapid

15  credit rescoring one of the most important services offered consumers seeking favorable and

16  timely mortgage credit decisions and requiring the correction of erroneous credit information

17  maintained and provided by the Defendants. This latter business practice creates the utterly

18  anomalous and unfair result that the Defendants transfer the costs of correcting errors in their own

19  databases onto credit resellers who are then restrained by the Defendants from recovering their

20  costs for those services. In addition, the Defendants maintain the credit resellers under constant

21  economic threat and duress by virtue of the veto power they hold over the credit resellers' very

22  ability to do business. This coercive power results from the fact that the mortgage business

23  requires that resellers furnish credit reports from all three of the Defendants' databases. If a

24  reseller is deprived of access to any one of the Defendants' databases they are effectively out of

25  the mortgage business. And because the mortgage business is such a large part of the reseller

26  business (in part, a result of the line of business restrictions Defendants impose on the resellers),

27  being out of the mortgage business effectively means being out of business. Knowing this, the

28  Defendants impose oppressive contracts of adhesion on credit resellers with onerous terms and

-3-

COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION

1   pricing on a take-it-or-leave-it basis, reserve the right to, threaten to and in fact, conduct

2   disruptive and oppressive audits to check compliance with the multiple contractual requirements

3   which are onerous to observe but which frequently serve no or little useful purpose. The

4   Defendants threaten to terminate the reseller's access to the Defendant's database and thereby put

5   the reseller out of business for even minor non-compliance issues. Fearing such devastating

6   retaliatory responses, resellers have little choice but to accept the Defendants' oppressive business

7   practices and unfair pricing and are loath to complain about them.

8         6.     The anticompetitive, unfair and deceptive business practices described in detail in

9   this complaint, have had, and are continuing to have, their intended effects — the number of credit

10   resellers operating in the United States has plummeted in the last several years from over 1500 to

11   a fraction of that, prices have increased, Defendants' monopoly power has been consolidated and

12   their dominant position entrenched, choice and innovation of credit products and accuracy of

13   credit information have suffered, and the resellers who have been able to weather these practices

14   are cowed into acceptance of the Defendants' practices out of fear for their economic lives.

15   Unless the Defendants' course of conduct is stopped, they will succeed in monopolizing the credit

16   reporting business to the irreparable harm of the members of the Plaintiff and to California

17   consumers who will lose their best allies and their easiest and most affordable vehicle for quickly

18   resolving erroneous credit reports and credit scores in mortgage credit transactions — credit

19   resellers.

20        7.     Plaintiff brings this action for injunctive relief and restitution to remedy and

21   terminate these unfair, deceptive and anticompetitive business practices which are harming and

22   threaten to harm its members, consumers in California and businesses in California that purchase

23   credit reports and related services.

24                      **JURISDICTION AND VENUE**

25        8.     Pursuant to California Code of Civil Procedure §410.10 and Business &

26   Professions Code §§17203 & 17204, the Defendants are subject to the jurisdiction of the courts of

27   the State of California by virtue of their extensive business dealings and transactions within this

28   state. Injuries caused by Defendants, including violations of Bus. & Prof. Code §17200, occurred

-4-

COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION

1   in California. The Defendants do business in California and have sufficient minimum contacts

2   with California or otherwise avail themselves of the credit report market in California through the

3   marketing, promotion, issuance, sale and use of their credit reports so as to render the exercise of

4   jurisdiction by the courts of California permissible and appropriate.

5          9.     The California Superior Court has jurisdiction over this action pursuant to

6   Constitution Article VI, § 10 which grants the Superior Court original jurisdiction in all cases

7   except those given by statute to trial courts. The statutes under which this action is brought do

8   not grant jurisdiction to any other trial court.

9          10.    Venue is proper in this county pursuant to Cal. Civ. Proc. Code §395.5 and Bus. &

10  Prof. Code §17203 because the Defendants conduct substantial business in the county, including

11  selling reports, collecting credit information on, and issuing and selling credit reports about

12  virtually every adult resident of the county.

13                                    **PARTIES**

14         11.    Plaintiff National Credit Reporting Association, Inc. ("NCRA") is a national trade

15  organization of consumer credit reporting agencies and associated professionals (including

16  agencies and professionals located in California) that provide products and services to hundreds

17  of thousands of credit grantors, employers, landlords and all types of general businesses, many of

18  whom are located in California. Headquartered in Bloomingdale, Illinois, NCRA serves members

19  in the United States and Puerto Rico. NCRA's membership includes mortgage credit reporting

20  agencies, employment-screening services, tenant screening companies, consultants and a variety

21  of affiliate vendors. Plaintiff sues as a private attorney general pursuant to Bus. & Prof. Code

22  §17200 for injunctive relief and restitution.

23         12.    Defendant Experian Information Solutions, Inc. ("Experian") is a corporation

24  organized and existing under the laws of the State of Ohio, with its principal place of business at

25  475 Anton Boulevard, Costa Mesa, California 92626, that does business in the State of California

26  and the County of Alameda. Experian is a consumer-reporting agency that compiles and

27  maintains files on consumers on a nationwide basis as that term is defined in Section 603(p), 15

28  U.S.C. §1681a(p) of the Fair Credit and Reporting Act. Experian is one of three dominant

-5-

1   repositories of credit information in the United States.

2         13.    Defendant Equifax, Inc. ("Equifax") is a corporation organized and existing under

3   the laws of the State of Georgia, with its principal place of business at 1550 Peachtree Street,

4   N.W., Atlanta, Georgia 30309 that does business in the State of California and the County of

5   Alameda. Equifax is a consumer reporting agency that compiles and maintains files on

6   consumers on a nationwide basis as that term is defined in Section 603(p), 15 U.S.C. § 1681a(p),

7   of the Fair Credit Reporting Act. Equifax is one of three dominant repositories of credit

8   information in the United States.

9         14.    Defendant TransUnion, LLC ("TransUnion") is a limited liability company

10   organized and existing under the laws of the State of Illinois, with its principal place of business

11   at 555 West Adams Street, Chicago, Illinois 60661, that does business in the State of California

12   and the County of Alameda. TransUnion is a consumer-reporting agency that compiles and

13   maintains files on consumers on a nationwide basis as that term is defined in Section 603(p), 15

14   U.S.C. §1681a(p), of the Fair Credit Reporting Act. TransUnion is one of three dominant

15   repositories of credit information in the United States.

16         15.    Collectively, Defendants possess virtually 100% of the market for the provision of

17   consumer credit reports in California and in the United States during the relevant time period.

18   Together they possess nearly 100% of the capacity in California and the United States to provide

19   consumer credit information. Because virtually all mortgage lenders require a credit report that

20   contains information from all three of the Defendants' databases, each of the Defendants has and

21   exercises monopolistic market power over buyers of consumer credit reports.

22         16.    Defendants Does 1-50 inclusive are sued herein under fictitious names. Their true

23   names and capacities are unknown to Plaintiff. When their true names and capacities are

24   ascertained, Plaintiff will amend this complaint to name them. Plaintiff believes that each of the

25   fictitiously named Defendants is responsible for the violations alleged in this complaint.

26   **FACTUAL ALLEGATIONS AND BACKGROUND ON THE**

27   **CREDIT REPORTING INDUSTRY**

28         17.    Accurate credit information is a critical aspect of millions of consumer

-6-

COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION

1    transactions throughout California and the rest of the country every day. For example, in

2    purchasing a home, buying a car, obtaining a job or renting an apartment, consumers must

3    demonstrate that their credit history is sufficiently positive to justify the particular transaction

4    under consideration. Businesses across the country must obtain this credit information from

5    Defendants who control the essential ingredient required for a consumer credit report, *i.e.*, the

6    databases of that information. Plaintiff's members are important intermediaries between

7    Defendants (also know as "the repositories" or "bureaus") and the businesses that require

8    consumer credit information and the consumers who are seeking to consummate a transaction

9    with those businesses. Plaintiff's members purchase credit reports directly from Defendants and

10   then resell them to clients in California and across the country who utilize them in evaluating

11   consumer applications for goods and services, the availability and prices of which are dependent

12   in part on the creditworthiness of the consumer.

13       18.    Participants in the credit reporting industry can be categorized into three groups:

14   the Defendant repositories, resellers affiliated with the Defendant repositories and independent

15   resellers. End-users of credit reports (with the exception of the large numbers and categories of

16   end-users who are denied access to resellers because of the Defendants' anticompetitive line of

17   business restrictions) purchase from all three segments.

18       19.    Equifax and TransUnion each have subsidiaries that provide mortgage credit

19   reports (Equifax Mortgage Services and TU Mortgage Information Systems, respectively), while

20   Experian recently purchased a company to enter the mortgage credit reporting market. Moreover,

21   each of the repositories has "affiliates." These affiliates act both as resellers and local credit

22   bureaus that administer some local databases which complement the repositories' databases. All

23   affiliates sell mortgage credit reports. Whether directly or though affiliates, each of the

24   Defendants operate at both the wholesale (selling to Plaintiff's members) and retail (selling to

25   end-users) levels of the credit reporting industry.

26       20.    Over the past several years, as part of their ongoing effort to gain control over

27   these markets, the repositories have been aggressively acquiring their affiliates. TransUnion now

28   has a single affiliate that is a large, diversified company operating in five territories (the CBC

-7-

**COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION**

1   Companies). Equifax is affiliated with nine companies, including CSC Credit Services, which

2   operates in 52 territories. Experian, which started its affiliate acquisition program last year, has

3.  30 affiliates. Whether directly or through affiliates, each of the three dominant repositories

4   operate at two levels of the credit reporting industry, providing credit reports at "wholesale" to

5   resellers and also at "retail" to end-users.

6          21.    Many of the NCRA member independent credit resellers are smaller entities than

7   the repositories or their affiliates. As such, these smaller, local resellers provide an important

8   benefit for consumers, because they frequently provide enhanced services in the mortgage lending

9   context that quickly, in the short time periods required for credit decisions, verify, update, and

10  correct data that appears on credit reports. This process promotes the interests of its clients who,

11  with accurate credit information, may be able to extend a favorable credit decision which it could

12  not in the absence of correct information, thereby placing, for example, a loan it might otherwise

13  not have placed. This process also promotes the interests of consumers who, with accurate credit

14  information, may gain access to a mortgage loan, or obtain more favorable pricing for that loan,

15  such as where accurate information allows the consumer to qualify for a lender's lowest interest

16  rate, rather than the higher rates charged in the sub-prime segment of the market. For reasons

17  discussed more fully below, the smaller resellers are structured to be able to, and in fact do,

18  devote a much greater proportion of their resources to providing enhanced services such as rapid

19  credit report correction – which allows for correction of errors in the Defendants' databases and

20  decisions based on accurate consumer credit information – than do the repositories or the larger

21  resellers.

22         22.    The current industry structure is the result of three broad trends over the past five

23  years, corresponding roughly with the introduction of automated underwriting and risk-based

24  pricing and the 1996 amendments to the Fair Credit Reporting Act. The first is the tendency of

25  credit bureaus with their own databases to be acquired by the national repository with whom they

26  are affiliated. The second broad trend is the reduction in the ranks of independent resellers.

27  Finally, there is a tendency for mortgage lenders or title companies to acquire mortgage credit

28  reporting agencies. In addition to the vertical integration of Countrywide and Landsafe, First

**COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION**

1 American Title Company owns Credco, the largest independent reseller; Fidelity National

2 Financial (acquirer of the former Chicago Title Company) owns Fidelity National Credit

3 Services, an Experian affiliate; and Land-America Financial Group, Inc. has recently acquired

4 Info 1, the fourth largest independent reseller. All three trends appear to be continuing.

## THE PERVASINESS AND ADVERSE IMPACTS OF CREDIT REPORTING AND
## CREDIT SCORING ERRORS

7    23.    Credit histories have long been an important factor in decisions to extend or deny

8 credit and in the price of credit. Historically such decisions required a human review of the

9 information in an individual's credit history and an evaluation of the likelihood the individual

10 would timely repay a loan. Now computer models that produce numerical scores are used to

11 automate the credit evaluation process and produce quick credit assessments.

12    24.    During the second half of the 1990's, mortgage underwriting increasingly

13 incorporated credit scores and other automated credit history evaluations. By 1999 the

14 underwriting of 60 to 70 percent of all mortgages employed an automated credit evaluation, a

15 trend which has continued.

16    25.    The use of automated credit scoring and credit history evaluation goes beyond

17 their application in credit decisions. In a practice commonly referred to as "risk-based pricing,"

18 credit scores are used to price mortgages and other consumer credit, as well as private mortgage

19 insurance (required on all mortgages with down payments of less than 20%). Even very small

20 differences in credit scores that can and often do result from inaccurate information or the

21 omission of information in the Defendants' databases can result in substantially higher rates, and

22 less favorable terms on new loans.

23    26.    Lenders also use credit scores and automated credit histories to evaluate existing

24 credit accounts, to decide whether to change credit limits, interest rates or other terms.

25    27.    Employers and landlords also use automated credit scores/credit histories.

26 Landlords use the information to determine if a potential tenant is likely to pay rent in a timely

27 manner. Employers will review this data during the hiring process, particularly if an applicant is

28 to be bonded. Utility, telephone and cellular companies may also request an automated credit

-9-

1    report to determine whether and on what terms to offer service.

2        28.    Insurance companies also use credit scores and insurance scores (derived from the

3    same automated credit histories) as a basis to deny coverage for new customers, refuse renewals

4    of coverage, and raise premiums.

5        29.    Thus, a consumer's credit record and corresponding credit score can determine

6    both access to, and the pricing of, the most fundamental financial and consumer services. The

7    increased use of automated credit evaluations has brought about a number of abuses that have

8    harmed California consumers in the form of denied access to credit or materially increased costs

9    of credit.

10                        **Customized or risk-based pricing**

11        30.    Automated credit scores increase the potential for customized credit pricing based

12    on the risk an individual poses (as reflected in the credit score). These scoring systems allow

13    lenders to extract greater profits from consumers who do not attain target credit scores. Risk-

14    based pricing, automated scoring and this potential for increased profits create disincentives for

15    maintaining accurate credit data, insuring that a consumer's credit report contains accurate credit

16    information, and helping consumers correct errors in their credit records.

17        31.    As a result, consumers with inaccuracies in their credit reports (and corresponding

18    credit scores) may unnecessarily be charged higher rates for credit.

19                             **Statistical Validity**

20        32.    While automated credit scoring may have statistical validity, and may be

21    predictive of repayment behavior for large populations, credit-scoring models are not perfect

22    predictors of individual credit-worthiness. Businesses who manage large numbers of accounts

23    priced by credit risk have a greater tolerance for errors in credit scoring than consumers. These

24    businesses can balance credit report errors in their favor against errors in favor of consumers; so

25    long as enough consumers are charged higher rates based on inflated risk assessments to cover

26    losses from those incorrectly assessed low risk and charged lower rates, these businesses will

27    suffer no material harm. A consumer however, will have no tolerance for errors in transactions

28    governed by credit scoring and credit reports – if the consumer is denied a product or service,

-10-

1   such as a loan, or is overcharged for that loan, because of a credit scoring system error, there is no

2   countervailing rebate to the consumer to even the statistical scale and no comfort in the overall

3   validity of credit scoring for the population of the lender's portfolio.

### Inaccurate Credit Reports

5       33.    The most fundamental credit scoring issue is the accuracy of the credit data upon

6   which the credit score is based. Inaccuracies in credit reports that result in a denial of credit or

7   insurance, higher credit or insurance costs, or a loss of housing or employment cause irreparable

8   harm to the consumer. A 1998 study by the Public Interest Research Group found that 29% of the

9   credit reports it reviewed contained errors that could result in the denial of credit; 70% of the

10  reports contained an error of some kind. Consumers Union asked consumers in 1991 to review

11  their credit reports for accuracy: 20% of the reports contained a major inaccuracy that could affect

12  the consumer's credit eligibility, and 48% contained inaccurate information of some kind.

13  Almost half the reports surveyed omitted some of the consumer's current accounts. A 2000

14  Consumers Union survey found that more than 50% of the credit reports reviewed contained

15  inaccuracies with the potential to result in a denial, or higher cost of credit.

16      34.    In December 2002, the Consumer Federation of America and the National Credit

17  Reporting Association published the results of a study entitled "Credit Score Accuracy and

18  Implications for Customers." The CFA/NCRA report included the following findings:

19      a.    *Omissions of all kinds of information from the credit reports was a*

20  *common occurrence.* Over 78% of the files were missing a revolving account in good standing.

21  One third of the files omitted a mortgage account that had never been paid late. 67% of the files

22  were missing another type of installment account that had never been paid late. Positive account

23  information is especially important for consumers who are beginning to establish credit, or who

24  are trying to re-establish their credit rating after bankruptcy. Omitting positive information can

25  have a dramatically negative impact on these consumers.

26      b.    *Many consumer files contained conflicting information about the*

27  *consumer's record of late payments.* In 43% of the files, reports on the same accounts conflicted

28  about how often the consumers had been late by 30 days. In almost 30% of the cases there was

-11-

1  conflicting information about how many times the consumer had been 60 days late, and in almost

2  24%, conflicting information about the number of times an account had been 90 days past due.

3  Delinquencies are a major contributing factor to a consumer's score, and a consumer can be

4  harmed by a report that indicates an account is past due when it is not.

5          c.      *Account balances and credit limits were inconsistently and incorrectly*

6  *reported.* One of the most frequently provided explanations for a consumer's credit score is that

7  the proportion of balances to credit limits on revolving accounts is too high. This was the

8  primary explanation listed on 1 in 6 reports reviewed by CFA/NCRA.

9          35.     CFA/NCRA reached the following conclusions and implications for consumers in

10  the December 2002 report:

11          a.      *Credit scores and the information in credit reports vary significantly*

12  *among repositories.* The wide range in scores reflects the broad variation in data in each

13  repository report, as well as missing, incorrect and inconsistent information in the reports.

14          b.      *Tens of millions of consumers are at risk of being penalized for incorrect*

15  *information in their credit report, in the form of increased costs or decreased access to credit*

16  *and vital services.* Errors in credit reports that produce a lower score can unfairly cost the

17  consumers higher loan pricing, or even disqualify the consumer. The CFA/NCRA study found

18  that one in five consumers – 22% or over 40 million Americans – is at risk of misclassification

19  into the sub-prime, higher priced lending market because of errors or inaccuracies in the

20  consumer's credit report. Falling below the cutoff score for a prime rate mortgage can add a

21  tremendous financial burden to the consumer, as sub-prime rates can be as much as 3.25 points

22  higher. Credit report and scoring errors can cost an individual consumer hundreds of thousands

23  of dollars in interest payments. Moreover these numbers do not quantify those who are being

24  overcharged because error pushed them into higher pricing within the prime or sub-prime

25  markets. Nor do these numbers address the consumers with errors in their credit reports or scores

26  who are penalized with higher credit card rates and insurance premiums, or who are denied

27  insurance, housing, utility service or employment.

28          c.      *Almost one in ten consumers runs the risk of being excluded from the*

COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION

*credit marketplace altogether because of incomplete records, duplicate files and mixed files.* If a consumer has little credit history or has just emerged from bankruptcy, every positive account is vital for creating a record that has enough information to be scored. Yet consumers have very little control over the inclusion in their credit record of duplicate files or mixed information not belonging to them. When a lender requests a scored report on a consumer, but a repository is unable to return a score (as was the case for one in ten files reviewed in the study), the lender may choose to set aside the application in favor of applications with enough credit to be scored, and priced with minimal work. When and if the lender returns to the un-scored file once loan processing volumes have subsided (because of seasonal home buying fluctuations or rising interest rates), the consumer will have suffered substantial harm by being excluded – even temporarily – from the marketplace.

## BACKGROUND ON THE WHOLESALE MARKET FOR CREDIT REPORTS FOR MORTGAGE LENDING

36.     Residential mortgage loans make up a large portion of Plaintiff's members' business. Residential mortgage loans are originated both by depository institutions (commercial banks and savings institutions) and non-depository institutions (mortgage bankers, mortgage brokers, and others). Some of these loans involve some form of government sponsorship. For example, the Federal Housing Administration ("FHA"), created in 1934, insures loans made by private lenders to protect the lender from default and foreclosure risk, and the Veterans' Administration ("VA") guarantees loans made by private lenders to U.S. veterans. The vast majority of mortgage loans, however, are not insured or guaranteed by the government.

37.     The value of mortgage loans outstanding in 1996 was $4.86 trillion, a figure that by 2002 had grown to over $8.48 trillion, more than 75% of which represents mortgages on single-family homes. Over 70% of all mortgage loans are sold in the secondary market rather than being held in the lenders' portfolios. The secondary market is dominated by government-sponsored entities ("GSEs"), *i.e.*, the Federal Mortgage Association ("FNMA," or "Fannie Mae"), the Federal Home Loan Mortgage Corporation ("FHLMC," or "Freddie Mac"), and the Government National Mortgage Association (*"GNMA."* or Ginnie Mae), along with the United

-13-

COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION

04/27/04  13:55 FAX 61046.         1              PACIFIC RESEARCH                                         ☑016

SENT BY: HULETT HARPER STEWART LLP;        6199381139;        MAR-25-04  3:25PM;        PAGE 18/26

1    States Department of Housing and Urban Development ("HUD"). Both FNMA and FHLMC are

2    federally chartered, private corporations whose stock trades on the NYSE. Both purchase single

3    family and multifamily FHA/VA and conventional mortgages. These mortgages are either held

4    in portfolios or sold to investors after being packaged into mortgage-backed securities ("MBSs").

5    Neither entity can originate mortgage loans. FNMA-issued MBSs and their portfolio account for

6    23% of the residential mortgage market, while FHLMC-issued MBS's and portfolio loans

7    account for about 16%.

8         38.    Importantly, Fannie Mae, Freddie Mac and Ginnie Mae require that mortgage

9    loans they purchase conform to strict underwriting standards, taking into account the borrower's

10   credit record, employment outlook, the adequacy of the secured property, and the adequacy of the

11   borrower's income. Principle, interest, taxes and insurance, for example, must satisfy certain

12   ratios to gross income for conventional loans. As a result of this requirement, banks and other

13   institutions making mortgage loans are required to obtain credit history information from all three

14   of the Defendants before consummating any single transaction. More specifically, with respect to

15   a borrower's credit history, loans purchased by Fannie Mae, Freddie Mac and Ginnie Mae must

16   be based on risk scores calculated from data from all three Defendants, each of whom has a

17   national credit information database.

18        39.    The principle concern here is the credit history, which for GSE-conforming loans

19   must be based on risk scores calculated from data from all three of the dominant credit reporting

20   agencies Equifax, TransUnion and Experian, the Defendants in this case. Before the advent of

21   automated underwriting, some mortgage lenders discovered that additional credit information was

22   often uncovered when credit reports from all three repositories were analyzed.

23        40.    Credit reports incorporating data from all three repositories are sometimes called

24   "tri-merged" reports, or 3-bureau reports. This so-called "tri-merge" requirement means that the

25   data from each of the Defendants is necessary for any residential mortgage loan transaction. In

26   1996, when FNMA and FHLMC updated their underwriting guidelines to accommodate

27   automated underwriting, the requirement for tri-merged reports was adopted.

28        41.    Each GSE has established a proprietary automated underwriting system. FNMA's

-14-

COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION

1   system is know as the MORNETPlus® Network, and includes components know as the Desktop

2   Originator® and Desktop Underwriter® ("DO/DU"). FHLMC's automated systems are known

3   as Gold Works® and Loan Prospector® ("LP"). While both GSEs require tri-merged reports,

4   their procedures for obtaining them differ. FNMA has established a network of 13 "sponsors," 12

5   credit reporting agencies and one trade association (the National Credit Reporting Association,

6   the Plaintiff herein) which provide access and interface to the DO/DU system. The lender-

7   customers of these agencies obtain loan approvals through their automated system in part based

8   on the tri-merged credit reports. By contrast, the FHLMC obtains credit reports from each of the

9   three repositories directly, and involves resellers only when correction, updating, or re-scoring is

10  required. Access to LP is provided through one of five FHLMC credit-reporting sponsors that

11  service 100 resellers. HUD employs a "private label" version of DO/DU that is more flexible,

12  and although they also require tri-merged reports they also continue to accept a 3-bureau version

13  of the pre-automation format known as the Residential Mortgage Credit Report.

14       42.    Due to the tri-merged report requirements and their sole possession and control of

15  access to their respective credit information databases, each of the three repositories controls an

16  essential input for the preparation of credit reports for mortgage loan purposes and acts as a

17  gatekeeper to that information. Thus, each repository possesses market power.

18       43.    The requirement for tri-merged reports creates in each of the repositories a "veto-

19  monopoly" in the wholesale market for consumer credit reports for mortgage lending, *i.e.*, market

20  power based on the necessity that resellers of consumer credit reports for the underwriting of

21  conforming mortgage loans have access to data from all three repositories.

22       44.    Credit reporting agencies like Plaintiff's members are often involved in these

23  residential mortgage transactions because credit information maintained by the repositories is not

24  always accurate or complete. In particular, Plaintiff's members are often retained by businesses

25  and institutions to purchase credit reports for their transaction because they know that, frequently,

26  there will be a need for correction, updating, or re-scoring of the particular consumer's

27  information.

28       45.    Because Fannie Mae, Freddie Mac and Ginnie Mae control such a large proportion

-15-

**COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION**

1 of the secondary market for residential mortgage loans, credit report resellers like Plaintiff's

2 members that cannot provide tri-merged reports cannot operate a viable mortgage credit reporting

3 business.

4      46.    Plaintiff's members have no alternative but to continue to purchase credit reports

5 from all three repositories regardless of cost. Thus, each of the Defendants controls the essential

6 input in the market for mortgage credit reports created by the tri-merge requirements in the

7 Fannie Mae/Freddie Mac/Ginnie Mae underwriting guidelines, the credit information itself.

## DEFENDANTS' ANTICOMPETITIVE ACTIVITIES IN THE CREDIT REPORTING MARKET

10      47.    Smaller resellers face substantial difficulties and are being driven out of business

11 because of the Defendants unfair, deceptive and anti-competitive business practices. Operating at

12 two levels of distribution means that the Defendants and their affiliates are both suppliers to and

13 competitors of the independent resellers. Where, as here, the supplier possesses market power, it

14 may raise its wholesale price to the distributor while lowering its retail price to the distributor's

15 customers. Without competing suppliers to turn to, the distributor is squeezed from the relevant

16 markets. That conduct has occurred in this market. The wholesale costs to resellers for credit

17 reports and risk scores and ancillary products (such as the fraud checks required by the GSEs) and

18 re-scoring have increased, while prices and terms of access to their affiliates and retail prices for

19 the same products offered directly to end-users by the repositories have declined. Similarly,

20 repositories use these advantages to unfairly compete for the reseller's clients (whom resellers are

21 required to disclose to them) and client prospects by offering prices that are at or below wholesale

22 and, thus, impossible for the resellers to match.

23      48.    In addition, two of the three repositories prohibit their affiliates from competing

24 outside their assigned territories precluding direct access by resellers to these potential alternative

25 sources of credit information.

26      49.    Defendants price discriminate in favor of larger, affiliated or favored resellers.

27 While they sometimes justify the disparate treatment of the larger resellers on the basis of volume

28 discounts, that justification does not withstand scrutiny. In such a highly automated industry

-16-

1   where the marginal cost of transmitting a credit report is virtually, if not actually nil, such

2   discounts are not likely to be proportional to any volume-related costs savings. Moreover, the

3   volume discounts, where they exist at all are much thinner to resellers than they are to end-users.

4       50.     Moreover, since the passage of the 1996 amendments to the FCRA -- which

5   required sellers to identify the use for which a credit report is requested and the identity of the

6   credit report end-user -- the contract terms under which the repositories supply products to

7   resellers have become increasingly restrictive. Prior to the 1996 amendments to the FCRA,

8   resellers were not routinely prohibited from engaging in any line of legitimate business involving

9   the furnishing of credit reports, i.e., in addition to mortgage reporting and tenant and employment

10  screening, resellers could furnish reports for any permissible purpose under the FCRA. Since

11  then, however, with few exceptions, all three repositories have prohibited the smaller resellers

12  from furnishing reports to auto dealerships, credit card companies, consumer finance companies,

13  directly to consumers, or for any other permissible purpose that did not involve a real estate

14  transaction, employment, or tenant screening. In spite of the fact that such provisions foreclose a

15  substantial share of the credit report market (from which favored resellers with a larger volume of

16  transactions are not foreclosed), smaller independent resellers have had no choice but to accept

17  these restrictions to their own detriment and to the detriment of customers in these business

18  segments which are deprived of access to the enhanced services, products and competition

19  resellers offer.

20      51.     Defendants' anticompetitive practices also include placing unjustified restraints on

21  resellers pricing practices with respect to rescoring. Rescoring is a means by which consumers

22  can have erroneous or stale information in their credit file corrected in a matter of days to avoid

23  having a credit or other transaction derailed. Although the FCRA requires corrections of credit

24  file errors to be made within 30 days, the actual elapsed time between discovery of an error and

25  obtaining a new risk score may be even longer. When the origination process has already

26  commenced, a month or more may be too long of a delay to allow the borrower to close the loan

27  on the terms originally offered. Rescoring is an increasingly popular device to avoid the

28  consequences of rejection by an automated underwriting system on account of erroneous or

-17-

**COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION**

1   inaccurate information in the credit file that has lowered the borrower's risk score.

2       52.    Although rescoring services promote the making of credit decisions based on

3   accurate and up-to-date information, have proven popular with lenders and borrowers, and

4   resellers routinely offer them, all of the repositories prohibit resellers from charging the consumer

5   "directly or indirectly" for such services. The Equifax reseller agreement, for example, includes

6   an addendum dealing with their "Rapid Resolve" rescoring service. Under paragraph 4. of the

7   addendum, entitled "Responsibilities of Client and Equifax," the agreement states:

8       **Client will: * * * (vii) ASSURE THAT ANY COSTS OR FEES**

9       **EQUIFAX CHARGES CLIENT FOR THE SERVICE WILL UNDER NO CIRCUMSTANCES BE CHARGED BACK TO THE CONSUMER, EITHER DIRECTLY OR INDIRECTLY.**

10

11       53.    This remarkable provision appears to require either that the reseller absorb the cost

12   of re-scoring, or insist that its customer (*i.e.*, a lender or mortgage broker) do so, since passing on

13   such costs to the borrower clearly involves an "indirect" charge to the consumer.

14       54.    Not surprisingly, the mortgage brokers – whose customers benefit from the more

15   accurate credit file, higher risk score, and lower mortgage interest rate which often results from

16   rescoring – resent being told by their credit reporting agency that the fees charged for such

17   services may not be charged to the borrower. The following excerpt is from the March 2003

18   issue of the official publication of the National Association of Mortgage Brokers:

19       Also our NAMB representatives have traveled around the country
20   to teach mortgage brokers and lenders about credit scoring, they consistently heard this complaint: "My credit report company tells
21   me I can't change a consumer for rapid re-scoring." Our trainers have spent a great deal of time explaining that the reseller is
22   misinterpreting their contract with the repository. * * * Even though the consumer's information on file at a repository gets modified or
23   updated as a by-product of the rescoring process, this is not the same as a credit repair. It seems to me that the fastest way to spoil
24   this wonderful new service by making it look like a credit repair would be for repositories to insist that credit resellers restrict
25   mortgage brokers and lenders from charging a fee to the consumer for the upgraded credit report. NAMB's trainers are instructing
26   mortgage brokers and lenders to have the consumer write a check for the upgraded re-scored report directly to the broker's or lender's
27   company or their trust account. *We are also encouraging mortgage professionals to shop around if their current provider of credit*
28   *reports continues to hold the line on this baseless policy.*

**COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION**

1    National Mortgage Broker, vol. 19, no. 3, March 2003, p. 24 at 25 [emphasis added].

2    Resellers faced with the prospect of audits and termination by the repositories, are understandably

3    reluctant to deviate from the express terms of their contracts which are provided to them on a

4    take-it-or-leave-it basis. But at the same time, they are loath to be perceived by their customers as

5    "holding the line on a baseless policy" which costs their customers money. The repositories have

6    been asked to clarify the rules, but have so far refused to do so. Thus, while rescoring is a

7    permissible business for resellers, the repositories have made it difficult or impossible for

8    resellers to profit from it without risking the alienation of its customers.

9        55.      Defendants unfair, deceptive and anticompetitive business practices also include

10   the imposition of oppressive contracts of adhesion on resellers presented on a non-negotiated,

11   take-it-or-leave-it basis. These contracts and policies developed pursuant to such contracts

12   include the right to conduct disruptive and oppressive compliance audits with little or no notice or

13   process. These Defendants reserve the right to terminate the reseller's access to the Defendants'

14   database, the equivalent of an economic death sentence for the reseller's business and the

15   Defendants hold the threat of terminating resellers for even minor non-compliance with a wide

16   range of contractual requirements which are frequently of little if any real importance. This

17   coercive power presents a constant threat to the reseller's livelihood which the Defendants exploit

18   to their own advantage.

19       56.      Defendants' anticompetitive conduct described above has injured California

20   residents and threatens to continue to injure them, because, among other things, it has had, and

21   tends to have, the following effects: 1) increasing, above competitive levels, the prices of credit

22   reports and related services; 2) reducing the accuracy of Defendants' credit reports and

23   perpetuating errors in their databases; 3) reducing the quality, variety and output of credit

24   information products and services; and 4) restricting and eliminating competition in the provision

25   of credit reports and related services. Defendants' wrongful conduct described above (i) violates

26   state and federal antitrust laws and threatens incipient violations of those laws and violates the

27   policy and spirit of those laws because the effects of Defendants' conduct are comparable to or

28   the same as a violation of those laws, and (ii) significantly threatens to harm competition in the

-19-

**COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION**

1   credit information industry. Defendants' anticompetitive conduct will continue to threaten the

2   viability and existence of the remaining resellers, extinguishing competition and harming

3   Californians whose financial and economic livelihoods are critically dependent upon accurate and

4   competitively priced credit reports.

5        57.    Defendants' practices are deceptive because while Defendants proclaim to be in

6   the business of providing accurate, complete and reliable consumer credit information in a

7   competitive market, the errors in their consumer credit reports and consumer credit scores are

8   common, and the business practices alleged in this complaint have the effect of perpetuating and

9   concealing the errors in those databases and perpetuating the denial or erroneous pricing of

10  products because of credit reports generated from the Defendants' databases that contain

11  erroneous or incomplete credit information. Defendants' conduct is designed to restrict access to

12  and ultimately remove from the marketplace the one fair, prompt and effective means of credit

13  record correction – the credit resellers. Without the resellers available to provide fair, prompt and

14  effective credit data correction in mortgage loan transactions, California consumers and the

15  California businesses that seek accurate credit information about their customers stand exposed to

16  the adverse impacts of inaccurate credit records or scores.

17                          **FIRST CAUSE OF ACTION**

18  **(For Unfair and Deceptive, Unlawful and Fraudulent Practices in Violation of California**

19                 **Business and Professions Code §§17200, *et seq.***

20       58.    Plaintiff incorporates by reference the allegations set forth in the preceding

21  paragraphs. These claims are brought on behalf of the general public against all Defendants.

22       59.    California Business and Professions Code §§17200, *et seq.*, prohibit acts of unfair

23  competition. Section 17200 defines unfair competition to mean and include any "unlawful, unfair

24  or fraudulent business act."

25       60.    For the reasons stated in this complaint, Defendants' unfair, unlawful and

26  deceptive business acts and practices described herein present a continuing threat to all California

27  consumers, California businesses who need to access accurate credit information and the products

28  and services offered by credit resellers and members of the general public.

-20-

---

**COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION**

61.    WHEREFORE, Plaintiff prays for judgment and relief against Defendants as set forth hereafter.

## PRAYER FOR RELIEF

Plaintiff on behalf of the general public prays for judgment and relief against Defendants as follows:

a.    For an order enjoining Defendants from continuing to engage in, use or employ the anticompetitive practices described herein;

b.    For restitution in an equitable amount for the amounts paid by credit resellers in California to Defendants Equifax and TransUnion and for such restitution paid by all resellers in the United States to Defendant Experian in the four years preceding the filing of this complaint.

c.    For reasonable attorneys' fees and costs of suit;

d.    For interest as prescribed by law; and

e.    For such other and further relief as the court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury as to all issues and claims for which a jury trial is allowed, including those claims as may be added to this matter in subsequent amendments to the complaint.

Dated: March 25, 2004                    HULETT HARPER STEWART LLP

Dennis Stewart

Stephanie L. Dieringer
550 West C Street, Suite 1600
San Diego, CA 92101

SCHRAG & BAUM
Thomas F. Schrag
James S. Baum
280 Panoramic Way
Berkley, CA 94704

DAVID DANIS LAW FIRM, P.C.
Michael J. Flannery
8325 Forsyth, Suite 1100
St. Louis, MO 63105

-21-

COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION



GERGOSIAN & GRALEWSKI LLP
Edward M. Gergosian
Robert J. Gralewski, Jr.
550 West C Street, Suite 1600
San Diego, CA 92101

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-22-

COMPLAINT FOR INJUNCTIVE RELIEF AND RESTITUTION